## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER MANCHIN, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>PACS GROUP, INC., JASON MURRAY, DERICK APT, MARK HANCOCK, JACQUELINE MILLARD, TAYLOR LEAVITT, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO. LLC, STEPHENS INC., KEYBANC CAPITAL MARKETS INC., OPPENHEIMER & CO. INC., and REGIONS SECURITIES LLC,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Christopher Manchin ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by PACS Group, Inc. ("PACS Group" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by PACS Group; and (c) review of other publicly available information concerning PACS Group.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired PACS Group: (a) common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's April 11, 2024 initial public offering ("IPO" or the "Offering"); and/or (b) securities between April 11, 2024 and November 5, 2024 inclusive (the "Class Period").  Plaintiff pursues claims against under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     PACS Group, through its subsidiaries, operates senior care facilities, skilled nursing facilities, and assisted living facilities in the United States.

3.     On April 12, 2024, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 21,428,572 shares of common stock at a price of $21.00 per share. The Company received net proceeds of approximately $450 million from the Offering. The proceeds from the IPO were purportedly to be

used to repay amounts outstanding under the Company's credit facility and general corporate purposes to support the growth of the business.

4.      On November 4, 2024, at approximately 1:00 P.M. Eastern Standard Time, investment research firm Hindenburg Research published a report based on a 5-month investigation that included interviews with 18 former PACS Group employees, competitors, and an analysis of more than 900 PACS facility cost reports. The report alleged the Company had "abused a COVID-era waiver" in a "scheme" that involved ***falsely submitting false Medicare claims which "drove more than 100% of PACS' operating and net income from 2020 – 2023***, enabling PACS to IPO in early 2024 with the illusion of legitimate growth and profitability." The report further alleged the Company engaged in a scheme to maintain revenue by "***bill[ing] thousands of unnecessary respiratory and sensory integration therapies to Medicare*** Part B regardless of clinical need or outcomes." The report also alleged a widespread practice of falsifying documentation, including by engaging in a "scheme whereby PACS ***attempts to fool regulators by 'renting' licenses*** from third parties to 'hang' on buildings" and then "either ***employs unlicensed administrators*** or has administrators manage multiple buildings in excess of state mandated limits." Similarly, the report alleges the Company engaged in a scheme related to licensure and staffing of nurses, whereby "PACS ***secretly lists uncertified nurse aides (NAs) as certified*** in the system, in an apparent scheme to cheat staffing ratios" and "***retroactively add fake RN hours***" in order "to meet minimum staffing requirements, boost star ratings, and avoid costly penalties."

5.      On this news, the Company's share price fell $11.93 or 27.78%, to close at $31.01 per share on November 4, 2024, on unusually heavy trading volume.

6.      Then, on November 6, 2024, before the market opened, the Company announced that it would postpone its fiscal third quarter 2024 earnings release. The Company further disclosed

it had "***received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report***."

7.    On this news, the Company's share price fell $11.45 or 38.76%, to close at $18.09 per share on November 6, 2024, on unusually heavy trading volume.

8.    By the commencement of this action, PACS Group stock has traded as low as $18.09 per share, a more than 13.9% decline from the $21 per share IPO price.

9.    In the Registration Statement and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company engaged in a "scheme" to submit false Medicare claims which "drove more than 100% of PACS' operating and net income from 2020 – 2023"; (2) that the Company engaged in a "scheme" to "bill thousands of unnecessary respiratory and sensory integration therapies to Medicare"; (3) that the Company engaged in a scheme to falsify documentation related to licensure and staffing; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

15.     Plaintiff Christopher Manchin, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired PACS Group common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO and/or PACS Group securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant PACS Group is incorporated under the laws of Delaware with its principal executive offices located in Farmington, Utah. PACS Group's common stock trade on the New York Stock Exchange ("NYSE") under the symbol "PACS."

17.     Defendant Jason Murray ("Murray") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18.     Defendant Derick Apt ("Apt") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19.     Defendants Murray and Apt (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

20.     Defendant Mark Hancock ("Hancock") was a director, Co-Founder and Executive Vice Chairman of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Defendant Hancock was also the Company's CFO from 2013 until January 1, 2024.

21.     Defendant Jacqueline Millard ("Millard") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Taylor Leavitt ("Leavitt") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.    Defendants Hancock, Millard, and Leavitt are collectively referred to hereinafter as the "Securities Act Individual Defendants."

24.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO. In the IPO, Citigroup agreed to purchase 6,586,136 shares of the Company's common stock, exclusive of the over-allotment option.

25.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 6,586,136 shares of the Company's common stock, exclusive of the over-allotment option.

26.    Defendant Truist Securities, Inc. ("Truist") served as an underwriter for the Company's IPO. In the IPO, Truist agreed to purchase 4,390,757 shares of the Company's common stock, exclusive of the over-allotment option.

27.    Defendant RBC Capital Markets, LLC ("RBC Capital") served as an underwriter for the Company's IPO. In the IPO, RBC Capital agreed to purchase 1,352,941 shares of the Company's common stock, exclusive of the over-allotment option.

28.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Company's IPO. In the IPO, Goldman Sachs agreed to purchase 869,747 shares of the Company's common stock, exclusive of the over-allotment option.

29.    Defendant Stephens Inc. ("Stephens") served as an underwriter for the Company's IPO. In the IPO, Stephens agreed to purchase 483,193 shares of the Company's common stock, exclusive of the over-allotment option.

30.    Defendant KeyBanc Capital Markets Inc. ("KeyBanc") served as an underwriter for the Company's IPO. In the IPO, KeyBanc agreed to purchase 386,554 shares of the Company's common stock, exclusive of the over-allotment option.

31.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an underwriter for the Company's IPO. In the IPO, Oppenheimer agreed to purchase 386,554 shares of the Company's common stock, exclusive of the over-allotment option.

32.    Defendant Regions Securities LLC ("Regions") served as an underwriter for the Company's IPO. In the IPO, Regions agreed to purchase 386,554 shares of the Company's common stock, exclusive of the over-allotment option.

33.    Defendants Citigroup, J.P. Morgan, Truist, RBC Capital, Goldman Sachs, Stephens, KeyBanc, Oppenheimer, and Regions are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

34.    PACS Group, through its subsidiaries, operates senior care facilities, skilled nursing facilities, and assisted living facilities in the United States.

### The Company's False and/or Misleading
### Registration Statement and Prospectus

35.    On April 8, 2024, the Company filed its final amendment to its General Form for Registration of Securities with the SEC on Form S-1/A, which forms part of the Registration Statement.

36.    On April 10, 2024, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1MEF, which forms part of the Registration Statement, for the sole purpose of increasing the aggregate number of shares of common stock offered by PACS Group, Inc. The Registration Statement was declared effective the same day.

37.    On April 12, 2024, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 21,428,572 shares

of common stock at a price of $21.00 per share. The Company received net proceeds of approximately $450 million from the Offering. The proceeds from the IPO were purportedly to be used to repay amounts outstanding under the Company's credit facility and general corporate purposes to support the growth of the business.

38.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

39.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

40.    The Registration Statement reported, for the year ended December 31, 2023, the Company "generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million, representing a CAGR [compound annual growth rate] of 53.4%, 63.7%, and 51.1%, respectively, over the last three years." Specifically, the Registration Statement stated the following, in relevant part: [1]

> ***For the year ended December 31, 2023, we generated total revenue of $3.1 billion, representing a CAGR of 63.3% over the last three years***. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 38.6% and 37.6% of our routine revenue for the year ended December 31, 2023, respectively. ***For the year ended December 31, 2022, we generated revenue of $2.4 billion,*** and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. ***For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million, representing a CAGR of 53.4%, 63.7%, and 51.1%, respectively, over the last three years***. For the year

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

41.     The Registration Statement reported the Company's combined and consolidated financial as of the years ended December 2021, 2022, and 2023. Specifically, the Registration Statement stated the following in relevant part:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| | (in thousands, except share and per share data) | | |
| Revenue | | | |
| Patient and resident service revenue | $ 3,110,114 | $ 2,399,155 | $ 1,135,909 |
| Additional funding | $ 375 | $ 21,482 | $ 28,563 |
| Other revenues | $ 1,003 | $ 1,357 | 2,091 |
| Total Revenue | $ 3,111,492 | $ 2,421,994 | $ 1,166,563 |
| Expenses | | | |
| Cost of services | $ 2,447,713 | $ 1,861,314 | $ 901,095 |
| Rent-cost of services | $ 216,711 | $ 160,003 | 78,122 |
| General and administrative expense | $ 213,664 | $ 149,006 | 96,834 |
| Depreciation and amortization | $ 25,632 | $ 22,311 | 7,153 |
| Total Operating Expenses | $ 2,903,720 | $ 2,192,634 | $ 1,083,204 |
| Operating Income | $ 207,772 | $ 229,360 | 83,359 |
| Other (expense) income | | | |
| Interest expense | $ (49,919) | $ (25,538) | (5,278) |
| Other income, net | $ (536) | $ 3,223 | 3,345 |
| Total Other Expense, net | $ (50,455) | $ (22,315) | (1,933) |
| Income before provision for income taxes | $ 157,317 | $ 207,045 | 81,426 |
| Provision for income taxes | $ (44,435) | $ (56,549) | (33,479) |
| Net income | $ 112,882 | $ 150,496 | 47,947 |
| Less: | | | |
| Net income attributable to noncontrolling interest | $ 8 | $ — | $ — |
| Net income attributable to PACS Group, Inc. | $ 112,874 | $ 150,496 | 47,947 |
| | | | |
| Net income per share - basic and diluted | $ 0.88 | $ 1.17 | 0.37 |
| | | | |
| Shares used in computing net income per share - basic and diluted | 128,723,386 | 128,723,386 | 128,723,386 |

                    *                    *                    *

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| | (Dollars in thousands) | | |
| **Key Skilled Services Metrics** | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % |
| Occupancy for skilled nursing services: | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % |
| Number of facilities at period end | 203 | 150 | 138 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 |
| **Non-GAAP Financial Measures** | | | |
| *Performance Measures* | | | |
| EBITDA[1] | $ 232,860 | $ 254,894 | $ 93,857 |
| Adjusted EBITDA[1] | $ 237,486 | $ 255,516 | $ 104,073 |
| *Valuation Measure* | | | |
| Adjusted EBITDAR[1] | $ 454,197 | | |

42. The Registration Statement reported that, in that period, "***Medicare and Medicaid represented our largest sources of revenue***" and stated that "***[s]killed nursing services revenue reflects the portion of patient and resident service revenue generated from all patients in skilled nursing facilities***." Specifically, the Registration Statement stated the following, in relevant part:

> For the year ended December 31, 2023, ***Medicare and Medicaid represented our largest sources of revenue and accounted for 38.6% and 37.6% of our routine revenue*** for the year ended December 31, 2023, respectively.
>
> \*                    \*                    \*
>
> - Skilled nursing services revenue — ***Skilled nursing services revenue reflects the portion of patient and resident service revenue generated from all patients in skilled nursing facilities,*** excluding revenue generated from our assisted and independent living services.
>
> - Skilled mix — We measure both revenue and nursing patient days by payor. ***Medicare and managed care patients, whom we refer to as high acuity patients, typically require a higher level of skilled nursing care. As a result, Medicare and managed care reimbursement rates are typically higher than those from other payors. In most states, Medicaid reimbursement rates are generally the lowest of all payor types. Changes in the payor mix can significantly affect our revenue and profitability.*** To monitor this performance, we evaluate two different measures of skilled mix:
>
> \*                    \*                    \*

The following tables present the above key skilled services metrics by category for all facilities, Mature facilities, Ramping facilities and New facilities as of and for the years ended December 31, 2023, 2022 and 2021:

| | Year ended December 31, | | | Growth Rate for the year ended December 31, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2023 | 2022 |
| | (Dollars in thousands) | | | | |
| **Total facility results:** | | | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 | 29.3 % | 111.0 % |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % | (9.0)% | 6.3 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % | (8.3)% | 6.2 % |
| Occupancy for skilled nursing services: | | | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 | 30.4 % | 84.1 % |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 | 31.8 % | 91.6 % |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % | 1.0 % | 3.6 % |
| Number of facilities at period end | 203 | 150 | 138 | 35.3 % | 8.7 % |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 | 40.4 % | 10.1 % |

43.    The Registration Statement reported the Company's purported employee, staffing and licensure qualifications including those of Registered Nurses ("RNs"), licensed practical nurses ("LPNs"), and certified nursing assistants ("CNA"). Specifically, the Registration Statement stated the following, in relevant part:

> As of December 31, 2023, we had 32,433 employees working across 208 post-acute care facilities in 9 states and at our corporate headquarters in Farmington, Utah. Of our 32,433 employees, 19,321 are clinicians, including approximately ***2,244 RNs including DONs, approximately 5,355 LPNs, and approximately 11,722 CNAs.*** Approximately 13,112 of our employees work in non-clinical functions and administrative / support functions, including 14 RVPs, and ***150 facility administrators***, 143 clinical and compliance support, 72 information technology support, and approximately 12,733 additional administrative and support staff. We also employ a dedicated team specifically focused on ensuring smooth functioning and support for our point-of-care including the clinical and compliance support, information technology support above. Additionally, 3,478 of our employees were represented by unions under collective bargaining agreements as of December 31, 2023

44.    The Registration Statement reported that the Company's "facilities must comply with required conditions of participation in the Medicare program and state Medicaid programs and state licensure requirements" and asserted that ***"[i]f"*** the Company were to "fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State." Specifically, the Registration Statement stated the following, in relevant part:

***Licensure and Certification***

***Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our provision of healthcare services.*** Certain states in which we operate have certificate of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine.

*                *                *

***If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State***.

45.    The Registration Statement was materially false and misleading and omitted to state: (1) that the Company engaged in a "scheme" to submit false Medicare claims which "drove more than 100% of PACS' operating and net income from 2020 – 2023"; (2) that the Company engaged in a scheme to falsify documentation related to licensure and staffing; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading**

**Statements Issued During the Class Period**

46.    The Class Period begins on April 11, 2024. On that day, PACS Group's common stock began publicly trading pursuant to the Registration Statement, including the statements identified in ¶¶40-44.

47.     On May 13, 2024, the Company issued a press release announcing financial results for the first fiscal quarter 2024 and period ended March 31, 2024. The press release reported the Company's financial results as well as business outlook. Specifically, the press release stated, as follows, in relevant part:

> ***Highlights***:
> - ***GAAP earnings per share for the quarter was $0.38, an increase of 31.0% over the prior year quarter.***
> - ***GAAP net income was $49.1 million, an increase of 30.7% over the prior year quarter.***
> - ***Consolidated GAAP revenue for the quarter was $934.7 million, an increase of 31.9% over the prior year quarter.***
> - EBITDA and Adjusted EBITDA for the quarter was $96.3 million and $88.5 million, representing increases of 47.0% and 34.0%, respectively, over the prior year quarter. Adjusted EBITDAR for the quarter was $152.5 million.
>
> ***Select KPIs***:
> - Total Facilities occupancy was 91.1% during the first quarter of 2024. Ramping and Mature Facilities occupancy increased by 1.8% and 1.4%, respectively, over the prior year quarter.
> - ***Average Medicare and Medicaid daily rates increased 11.0% and 5.3%, respectively, for the three months ended March 31, 2024, as compared to the prior year quarter.***
> - ***In the three months ended March 31, 2024 we added 10 operating facilities, including 1,334 and 174 skilled nursing and assisted living beds, respectively.***
>
> ***Business Outlook***
>
> Based on information available as of May 13, 2024, PACS is providing the following guidance for full year 2024:
>
> - ***Revenue of $3.65 billion to $3.75 billion***
> - Adjusted EBITDA of $351 million to $361 million

48.     On May 13, 2024, the Company submitted its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "1Q24 10-Q"). The 1Q24 10-Q reported the Company's "patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare

services to their respective patients and residents" and such *"[r]evenue is recognized when services are provided*." The 1Q24 10-Q further asserted that for "[t]he healthcare services in *skilled patient contracts*" *"[r]evenue is recognized as the performance obligations are satisfied*."

Specifically, the 1Q24 10-Q stated the following, in relevant part:

> *Patient and resident service revenue - Patient and resident service revenue increased by $226.5 million to $934.3 million for the three months ended March 31, 2024, a 32.0% increase compared to the three months ended March 31, 2023.* For the three months ended March 31, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> *Skilled nursing services revenue increased by 31.4%, or $221.9 million, to $927.5 million for the three months ended March 31, 2024, compared to the three months ended March 31, 2023. This change was driven by an increase in operational beds of 5,194 from March 31, 2023 to March 31, 2024 leading to a 35.3% increase in patient days year-over-year.* Additionally we experienced a consistent occupancy rate across all facilities of 91.1% for the three months ended March 31, 2024, compared to 91.8% for the three months ended March 31, 2023, following continued execution on our business model.
>
> *                *                *
>
> **NOTE 3. REVENUE AND ACCOUNTS RECEIVABLE**
>
> *Patient and Resident Service Revenue*
>
> The Company's *patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents. Revenue is recognized when services are provided to the patien*ts at the amount that reflects the consideration to which the Company expects to be entitled. These amounts are due from residents, third-party payors (including health insurers and government payors), and others and includes variable consideration for retroactive revenue adjustments due to settlement of audits and other reviews by the payor. Generally, the licensed healthcare provider entity providing the applicable services bills the applicable payors monthly.
>
> *The healthcare services in skilled patient contracts include routine services in exchange for a contractual agreed-upon amount or rate. Revenue is recognized as the performance obligations are satisfied.*
>
> *Performance obligations are determined based on the nature of the services provided by the applicable licensed healthcare provider entity. Revenue for performance obligations satisfied over time is recognized based on actual charges*

*incurred in relation to total expected (or actual) charges*. The Company believes that this method provides a faithful depiction of the transfer of services over the term of the performance obligation based on the inputs needed to satisfy the obligation.

*       *       *

**Medicaid**: Payments for skilled nursing facility services rendered to Medicaid (including Medi-Cal, which is the name of the state Medicaid program in California) program beneficiaries are based on an annually established daily reimbursement rate for eligible stays. The rate is adjusted annually. The final settlement is determined after submission of an annual cost report and audits thereof by Medicaid. ***Revenue from the Medicaid program amounted to 38.8% and 30.3% of the Company's condensed combined/consolidated net patient and resident revenue*** for the three months ended March 31, 2024 and 2023, respectively.

**Medicare**: Payments for skilled nursing facility services rendered to Medicare program beneficiaries are based on prospectively determined daily rates which vary according to a patient diagnostic classification system. The applicable licensed healthcare provider entity is paid for certain reimbursable services at the approved rate with final settlement determined after submission of the annual cost report and audit thereof by the designated Medicare fiscal intermediary. ***Revenue from the Medicare program amounted to 35.7% and 48.1% of the Company's condensed combined/consolidated net patient and resident revenue*** for the three months ended March 31, 2024 and 2023, respectively.

*       *       *

The following tables present the above key skilled services metrics by category for all facilities, Mature facilities, Ramping facilities and New facilities as of and for the three months ended March 31, 2024 and 2023:

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | Change | % Change |
| | (Dollars in thousands) | | | |
| Total facility results: | | | | |
| Skilled nursing services revenue | $ 927,456 | $ 705,574 | $ 221,881 | 31.4 % |
| Skilled mix by revenue | 52.0 % | 63.7 % | | (11.7)% |
| Skilled mix by nursing patient days | 29.8 % | 40.3 % | | (10.5)% |
| Occupancy for skilled nursing services: | | | | |
| Available patient days | 2,164,061 | 1,586,384 | 577,677 | 36.4 % |
| Actual patient days | 1,970,602 | 1,456,412 | 514,190 | 35.3 % |
| Occupancy rate (operational beds) | 91.1 % | 91.8 % | | (0.7)% |
| Number of facilities at period end | 212 | 174 | 38 | 21.8 % |
| Number of operational beds at period end | 24,315 | 19,121 | 5,194 | 27.2 % |

*       *       *

The following table presents average daily rates by payor source, excluding services that are not covered by the daily rate, for the three months ended March 31, 2024 and 2023:

| | Three Months Ended March 31, | | | | | | | |
| | Mature | | Ramping | | New | | Total | |
| | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Medicare | $937.66 | $845.94 | $968.59 | $836.27 | $917.80 | $863.92 | $949.23 | $855.41 |
| Managed care | 601.48 | 569.00 | 660.85 | 587.46 | 558.19 | 604.14 | 614.99 | 589.76 |
| *Total for skilled patient payors* [1] | *794.16* | *758.81* | *843.08* | *733.66* | *721.10* | *777.52* | *800.91* | *767.90* |
| Medicaid | 295.05 | 283.07 | 308.88 | 256.67 | 308.60 | 296.15 | 304.70 | 289.23 |
| Private and other | 380.32 | 299.68 | 408.15 | 278.98 | 354.26 | 350.11 | 382.61 | 326.93 |
| *Total* [2] | *$464.08* | *$484.08* | *$500.21* | *$440.48* | *$401.37* | *$489.75* | *$459.83* | *$485.00* |

49.    The 1Q24 10-Q reported the Company's "*Licensure and Certification*" requirements and stated that *"[i]f"* the Company were to "fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State." Specifically, the 1Q24 10-Q stated the following, in relevant part:

*Licensure and Certification*

*Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our provision of healthcare services*. Certain states in which we operate have certificate of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine.

\*                    \*                    \*

*If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State.*

50.    The 1Q24 10-Q asserted the Company "***review[s] and audit[s] the care delivery, recordkeeping and billing processes of our operating subsidiaries,***" maintains "***internal compliance professionals and [] other resources to help us comply with various requirements of federal and private healthcare programs***" and has "***not experienced any material compliance issues to date.***" Specifically, the 1Q24 10-Q stated the following, in relevant part:

> ***We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

> ***We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs***. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

> While we ***have not experienced any material compliance issues to date***, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

51.    On May 21, 2024, the Company submitted an amended quarterly report for the period ended March 31, 2024 on a Form 10-Q/A filed with the SEC, to correct an administrative error in the number of shares of common stock outstanding as of May 10, 2024 shown on the cover of the 1Q24 Form 10-Q. No other changes were made to the 1Q24 Form 10-Q. The amended 10-

Q/A affirmed the previously reported financial results and restated in all material respect those statements enumerated in the 1Q24 10-Q.

52.     On August 12, 2024, the Company issued a press release announcing financial results for the second fiscal quarter and period ended June 30, 2024. The press release reported the Company's financial results as well as business outlook. Specifically, the press release stated, as follows, in relevant part:

> *Highlights*:
> - ***GAAP net income (loss) was $38.2 million for the six months ended June 30, 2024*** and $(10.9) million for the second quarter of 2024, which was driven down by an increase in stock-based compensation expense of $90.9 million associated with restricted stock units, granted at the time of the Company's April 2024 initial public offering.
> - ***Consolidated GAAP revenue for the first six months of 2024 was $1.9 billion, an increase of 31% over the first six months of the prior year, driven largely by increased facility count and reimbursement rates, and for the second quarter of 2024 was $981.8 million, an increase of 29% over the second quarter of 2023 and an increase of 5% over the first quarter of 2024.***
> - Adjusted EBITDA was $188.2 million and $99.7 million for the first six months of 2024 and the second quarter of 2024, respectively. Adjusted EBITDAR was $318.0 million and $165.6 million over the same periods, respectively.
> - Increase in guidance for full year 2024 Revenue and Adjusted EBITDA
>   - Revenue expected to be in the range of $3.85 billion to $3.95 billion
>   - Adjusted EBITDA expected to be in the range of $370 million to $380 million
>
> *Select KPIs:*
> - Total Facilities occupancy was 91.0% during the second quarter of 2024. Ramping and Mature Facilities occupancy increased by 1.4% and 1.0%, respectively, over the same quarter of the prior year.
> - ***Average Medicare and Medicaid daily rates increased 9.5% and 3.5%, respectively, for the second quarter of 2024, as compared to the same quarter of the prior year.***
> - In the second quarter of 2024 the Company added 2 operating facilities, including 167 skilled nursing beds, respectively.

*          *          *

"***Our revenue growth was also driven in significant part by our adding 3,947 operational beds to the company over the twelve months ending June 30, 2024, leading to a 24.8% increase in patient days for the second quarter of 2024 compared to the same quarter of the prior year. Additionally, our occupancy remained strong across all facilities — 91.0% in the second quarter of 2024***,*"* said Derick Apt, PACS's Chief Financial Officer.

*          *          *

**Business Outlook**
Based on information available as of today, PACS is providing the following guidance for full year 2024:

- ***Revenue expected to be in the range of $3.85 billion to $3.95 billion***
- Adjusted EBITDA expected to be in the range of $370 million to $380 million

53.    On August 12, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "2Q24 10-Q"). The 2Q24 10-Q reported the Company's "patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents" and such "[r]***evenue is recognized when services are provided***." The 2Q24 10-Q further asserted that that "[t]he healthcare services" "***[r]evenue is recognized as the performance obligations are satisfied***." Specifically, the 2Q24 10-Q stated the following, in relevant part:

> <u>**Patient and resident service revenue**</u> - ***Patient and resident service revenue increased by $221.0 million to $981.4 million for the three months ended June 30, 2024***, a 29.1% increase compared to the three months ended June 30, 2023. For the three months ended June 30, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> ***Skilled nursing services revenue increased by 28.7%, or $217.1 million, to $973.1 million for the three months ended June 30, 2024,*** compared to the three months ended June 30, 2023. This change was driven by an increase in operational beds of 3,947 from June 30, 2023 to June 30, 2024 leading to a 24.8% increase in patient days year-over-year.
>
> *          *          *
>
> **NOTE 3. REVENUE AND ACCOUNTS RECEIVABLE**

*Patient and Resident Service Revenue*

The Company's **patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents. Revenue is recognized when services are provided to the patien**ts at the amount that reflects the consideration to which the Company expects to be entitled. These amounts are due from residents, third-party payors (including health insurers and government payors), and others and includes variable consideration for retroactive revenue adjustments due to settlement of audits and other reviews by the payor. Generally, the licensed healthcare provider entity providing the applicable services bills the applicable payors monthly.

**The healthcare services in skilled patient contracts include routine services in exchange for a contractual agreed-upon amount or rate. Revenue is recognized as the performance obligations are satisfied.**

**Performance obligations are determined based on the nature of the services provided by the applicable licensed healthcare provider entity. Revenue for performance obligations satisfied over time is recognized based on actual charges incurred in relation to total expected (or actual) charges**. The Company believes that this method provides a faithful depiction of the transfer of services over the term of the performance obligation based on the inputs needed to satisfy the obligation.

\*          \*          \*

**Medicaid**: Payments for skilled nursing facility services rendered to Medicaid (including Medi-Cal, which is the name of the state Medicaid program in California) program beneficiaries are based on an annually established daily reimbursement rate for eligible stays. The rate is adjusted annually. The final settlement is determined after submission of an annual cost report and audits thereof by Medicaid. **Revenue from the Medicaid program amounted to 38.1% and 35.4% of the Company's condensed combined/consolidated net patient and resident revenue for the three months ended June 30, 2024 and 2023, respectively, and 38.4% and 32.9% of the Company's condensed combined/consolidated net patient and resident revenue for the six months ended June 30, 2024 and 2023, respectively**.

**Medicare**: Payments for skilled nursing facility services rendered to Medicare program beneficiaries are based on prospectively determined daily rates which vary according to a patient diagnostic classification system. The applicable licensed healthcare provider entity is paid for certain reimbursable services at the approved rate with final settlement determined after submission of the annual cost report and audit thereof by the designated Medicare fiscal intermediary. **Revenue from the Medicare program amounted to 37.5% and 41.7% of the Company's condensed combined/consolidated net patient and resident revenue for the three months ended June 30, 2024 and 2023, respectively, and 36.6% and 44.8% of the**

***Company's condensed combined/consolidated net patient and resident revenue for the six months ended June 30, 2024 and 2023, respectively.***

\*                    \*                    \*

The following tables present the above key skilled services metrics by category for all facilities, Mature facilities, Ramping facilities and New facilities as of and for the six months ended June 30, 2024 and 2023:

| | Six Months Ended June 30, | | | |
| | 2024 | 2023 | Change | % Change |
|---|---|---|---|---|
| | (dollars in thousands) | | | |
| Total facility results: | | | | |
| Skilled nursing services revenue | $ 1,900,538 | $ 1,461,568 | $    438,970 | 30.0 % |
| Skilled mix by revenue | 51.6 % | 60.8 % | | (9.2)% |
| Skilled mix by nursing patient days | 29.5 % | 37.3 % | | (7.8)% |
| Occupancy for skilled nursing services: | | | | |
| Available patient days | 4,389,269 | 3,359,730 | 1,029,539 | 30.6 % |
| Actual patient days | 3,994,467 | 3,078,280 | 916,187 | 29.8 % |
| Occupancy rate (operational beds) | 91.0 % | 91.6 % | | (0.6)% |
| Number of facilities at period end | 214 | 185 | 29 | 15.7 % |
| Number of operational beds at period end | 24,483 | 20,536 | 3,947 | 19.2 % |

\*                    \*                    \*

The following table presents average daily rates by payor source, excluding services that are not covered by the daily rate, for the three months ended June 30, 2024 and 2023:

| | Three Months Ended June 30, | | | | | | | |
| | Mature | | Ramping | | New | | Total | |
| Average daily rate | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Medicare | $942.19 | $860.20 | $964.00 | $874.26 | $941.43 | $877.56 | $952.39 | $870.03 |
| Managed care | 607.42 | 578.47 | 669.00 | 622.60 | 576.64 | 660.87 | 625.09 | 615.61 |
| *Total for skilled patient payors* [1] | *799.34* | *755.50* | *840.05* | *773.19* | *744.55* | *808.09* | *805.42* | *776.92* |
| Medicaid | 295.91 | 289.89 | 307.71 | 297.55 | 308.84 | 296.27 | 304.70 | 294.46 |
| Private and other | 391.41 | 320.93 | 426.07 | 336.44 | 346.27 | 341.17 | 388.39 | 332.40 |
| *Total* [2] | *$465.52* | *$464.61* | *$494.08* | *$470.60* | *$405.66* | *$460.82* | *$458.53* | *$465.23* |

54.     The 2Q24 10-Q reported the Company's "***Licensure and Certification***" requirements and stated that "***[i]f***" the Company were to "fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State." Specifically, the 2Q24 10-Q stated the following, in relevant part:

***Licensure and Certification***

***Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our provision of healthcare services***. Certain states in which we operate have certificate

of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine.

*        *        *

***If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State.***

55.    The 2Q24 10-Q asserted the Company "***review[s] and audit[s] the care delivery, recordkeeping and billing processes of our operating subsidiaries,***" maintains "***internal compliance professionals and [] other resources to help us comply with various requirements of federal and private healthcare programs***" and has "***not experienced any material compliance issues to date.***" Specifically, the 2Q24 10-Q stated the following, in relevant part:

***We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect*** instances ***of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and

treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

While ***we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise***. We similarly investigate concerns that are reported to us by employees or other persons. ***When errors or compliance failures are identified, we seek to rectify them as appropriate***.

56.    On August 19, 2024, the Company submitted a draft registration statement on a Form DRS filed with the SEC (the "August Draft Registration Statement."). The August Draft Registration Statement reported the Company's combined and consolidated financial results. Specifically, the August Draft Registration Statement stated the following in relevant part:

| | Year Ended December 31, | | | Six Months Ended June 30, | |
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | | | | (unaudited) | |
| | (in thousands, except share and per share data) | | | | |
| **Revenue** | | | | | |
| Patient and resident service revenue | $ 3,110,114 | $ 2,399,155 | $ 1,135,909 | $ 1,915,696 | $ 1,468,250 |
| Additional funding | $ 375 | $ 21,482 | $ 28,563 | $ — | $ 375 |
| Other revenues | $ 1,003 | $ 1,357 | $ 2,091 | $ 871 | $ 481 |
| Total Revenue | $ 3,111,492 | $ 2,421,994 | $ 1,166,563 | $ 1,916,567 | $ 1,469,106 |
| **Expenses** | | | | | |
| Cost of services | $ 2,447,713 | $ 1,861,314 | $ 901,095 | $ 1,498,139 | $ 1,129,587 |
| Rent-cost of services | $ 216,711 | $ 160,003 | $ 78,122 | $ 129,794 | $ 96,560 |
| General and administrative expense | $ 213,664 | $ 149,006 | $ 96,834 | $ 191,286 | $ 122,137 |
| Depreciation and amortization | $ 25,632 | $ 22,311 | $ 7,153 | $ 16,678 | $ 11,988 |
| Total Operating Expenses | $ 2,903,720 | $ 2,192,634 | $ 1,083,204 | $ 1,835,897 | $ 1,360,272 |
| Operating Income | $ 207,772 | $ 229,360 | $ 83,359 | $ 80,670 | $ 108,834 |
| **Other (expense) income** | | | | | |
| Interest expense | $ (49,919) | $ (25,538) | $ (5,278) | $ (24,578) | $ (25,942) |
| Gain on lease termination | $ — | $ — | $ — | $ 8,046 | $ — |
| Other (expense) income, net | $ (536) | $ 3,223 | $ 3,345 | $ (3,465) | $ (2,203) |
| Total Other Expense, net | $ (50,455) | $ (22,315) | $ (1,933) | $ (19,997) | $ (28,145) |
| Income before provision for income taxes | $ 157,317 | $ 207,045 | $ 81,426 | $ 60,673 | $ 80,689 |
| Provision for income taxes | $ (44,435) | $ (56,549) | $ (33,479) | $ (22,441) | $ (21,871) |
| Net income | $ 112,882 | $ 150,496 | $ 47,947 | $ 38,232 | $ 58,818 |
| Less: | | | | | |
| Net income attributable to noncontrolling interest | $ 8 | $ — | $ — | $ 4 | $ 3 |
| Net income attributable to PACS Group, Inc. | $ 112,874 | $ 150,496 | $ 47,947 | $ 38,228 | $ 58,815 |
| | | | | | |
| Net income per share attributable to PACS Group, Inc. | | | | | |
| Basic | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| Diluted | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| Weighted-average common shares outstanding | | | | | |
| Basic | 128,723,386 | 128,723,386 | 128,723,386 | 139,093,520 | 128,723,386 |
| Diluted | 128,723,386 | 128,723,386 | 128,723,386 | 139,684,618 | 128,723,386 |

\*                    \*                    \*

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | | | (Dollars in thousands) | | |
| **Key Skilled Services Metrics** | | | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 | $ 1,900,538 | $ 1,461,568 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % | 51.6 % | 60.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % | 29.5 % | 37.3 % |
| Occupancy for skilled nursing services: | | | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 | 4,389,269 | 3,359,730 |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 | 3,994,467 | 3,078,280 |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % | 91.0 % | 91.6 % |
| Number of facilities at period end | 203 | 150 | 138 | 214 | 185 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 | 24,483 | 20,536 |
| **Non-GAAP Financial Measures** | | | | | |
| *Performance Measures* | | | | | |
| EBITDA[1] | $    232,860 | $    254,894 | $      93,857 | $    101,925 | $    118,616 |
| Adjusted EBITDA[1] | $    237,486 | $    255,516 | $    104,073 | $    188,243 | $    122,433 |
| *Valuation Measure* | | | | | |
| Adjusted EBITDAR[1] | $    454,197 | | | $    318,037 | |

57.    The August Draft Registration Statement asserted the Company "*review[s] and audit[s] the care delivery, recordkeeping and billing processes of our operating subsidiaries,*" maintains "*internal compliance professionals and [] other resources to help us comply with various requirements of federal and private healthcare programs*" and has "*not experienced any material compliance issues to date.*" Specifically, the August Draft Registration Statement stated the following, in relevant part:

> *We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.*
>
> We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and

training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

***While we have not experienced any material compliance issues to date***, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. ***When errors or compliance failures are identified, we seek to rectify them as appropriate.***

58.     On September 3, 2024, the Company submitted a general form for registration of securities on a Form S-1 filed with the SEC which affirmed the previously reported financial results submitted with the August Draft Registration Statement and restated, in all material respects those statements enumerated therein.

59.     On September 6, 2024, the Company submitted its prospectus pursuant to Rule 424(b)(4) on a Form 424B4 filed with the SEC, which affirmed the previously reported financial results submitted with the August Draft Registration Statement and restated in all material respects those statements enumerated therein. The prospectus further reported the Company's significant Medicare and Medicaid revenue, stating in relevant part:

***For the six months ended June 30, 2024 and 2023, we generated total revenue of $1.9 billion and $1.5 billion,*** respectively. A ***substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid***, which represent our largest sources of revenue and accounted for 36.6% and 38.4% of our total revenue for the six months ended June 30, 2024, respectively, and 44.8% and 32.9% of our total revenue for the six months ended June 30, 2023, respectively. For the six months ended June 30, 2024, we generated total net income of ***$38.2 million, total operating expense of $1.8 billion*** and Adjusted EBITDA of $188.2 million. For the six months ended June 30, 2023, we generated total net income of $58.8 million, total operating expense of $1.4 billion and Adjusted EBITDA of $122.4 million.

***For the year ended December 31, 2023, we generated total revenue of $3.1 billion, and Medicare and Medicaid accounted for 38.6% and 37.6% of our total revenue, respectively.*** For the year ended December 31, 2022, we generated total revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million. As of June 30, 2024, we had total long-term liabilities of $2.9 billion.

60.    The above statements identified in ¶¶ 46-59 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company engaged in a "scheme" to submit false Medicare claims which "drove more than 100% of PACS' operating and net income from 2020 – 2023"; (2) that the Company engaged in a "scheme" to "bill thousands of unnecessary respiratory and sensory integration therapies to Medicare"; (3) that the Company engaged in a scheme to falsify documentation related to licensure and staffing; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

61.    On November 4, 2024, at approximately 1:00 P.M. Eastern Standard Time, investment research firm Hindenburg Research published a report based on a 5-month investigation that included interviews with 18 former PACS employees, competitors, and an analysis of more than 900 PACS facility cost reports (the "Hindenburg Report"). The Hindenburg Report alleged the Company had "abused a COVID-era waiver" in a "scheme" which involved ***falsely submitting false Medicare claims which "drove more than 100% of PACS' operating and net income from 2020 – 2023***, enabling PACS to IPO in early 2024 with the illusion of legitimate growth and profitability." The Hindenburg Report further alleged the Company engaged in a

scheme to maintain revenue by "*bill[ing] thousands of unnecessary respiratory and sensory integration therapies to Medicare* Part B regardless of clinical need or outcomes." The Hindenburg Report also alleged a widespread practice of falsifying documentation, including by engaging in a "scheme whereby PACS *attempts to fool regulators by 'renting' licenses* from third parties to 'hang' on buildings" and then "either *employs unlicensed administrators* or has administrators manage multiple buildings in excess of state mandated limits." Finally, the Hindenburg Report alleges the Company engaged in a scheme related to licensure and staffing of nurses, whereby "PACS *secretly lists uncertified nurse aides (NAs) as certified* in the system, in an apparent scheme to cheat staffing ratios" and "*retroactively add fake RN hours*" in order "to meet minimum staffing requirements, boost star ratings, and avoid costly penalties." Specifically, the Hindenburg Report alleged the following, in relevant part:

> **Part 1: PACS' Growth From 2020 To 2023 Was Driven By A COVID-Era Medicare Billing Scheme That Drove More Than 100% Of PACS' Operating And Net Income During The Period, Per Our Estimates**
>
> *                *                *
>
> Evidence shows the most aggressive of these practices was a ***management-driven, company-wide scheme to defraud Medicare through the COVID emergency, evidenced by anomalies in PACS' Medicare revenue, and corroborated by more than a dozen former PACS employees, ranging from frontline clinical staff to regional managers.***
>
> We believe this scheme ***funded PACS' aggressive acquisition strategy throughout COVID and drove substantially all of its earnings from early 2020 to the end of 2023,*** giving investors the illusion of legitimate growth and profitability leading into its IPO.
>
> *                *                *
>
> **Background: SNFs Make 3x More Revenue From Short-Term Patients That Can Access Medicare Benefits Than From Long-Term Medicaid Patients, According To A Former PACS Administrator**

27

**Historically, The More Profitable Medicare Rates Can Generally Only Be Temporarily Accessed After A Qualifying 3-Day Hospital Stay, Per Medicare Regulations**

\*            \*            \*

**From March 2020 to May 2023, CMS Provided A COVID Emergency Waiver That Allowed SNFs To Access Patients' Higher-Paying Medicare Benefits Without The 3-Day Hospital Stay, But COVID Itself Was Not A Qualifying Condition**

\*            \*            \*

During our research, we conducted in-depth interviews with 18 former PACS employees who had worked in clinical, compliance, and human resources departments. ***Former employees detailed how PACS engaged in a multi-year, nationwide scheme to use the COVID waiver to "flip" patients from Medicaid to Medicare based on COVID exposure, roughly tripling per-patient revenue, even though the great majority of these patients didn't need Medicare-covered skilled nursing care.***

\*            \*            \*

**Former PACS Employees Said The Company Would Use A Single Positive COVID Test As Justification To "Flip" Entire Patient Populations To Medicare Coverage Under The COVID Waiver**

***"…As Soon As One Person Tested [Covid-19] Positive In Our Building, Boom, Wildfire, Every Single Person Gets Flipped [To Medicare], Absolutely Inappropriately…"*** **– Former PACS Regional Manager**

\*            \*            \*

However, after the COVID waiver expired, PACS' quarterly Medicare revenue declined suddenly and without explanation from a reported peak of ~$340 million in Q1 2023 to an estimated $271 million in Q4 2023— a decline that investors would miss if they only looked at full year revenue.

***When accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimated ~$90 million per quarter, equivalent to ~$360 million in annualized revenue.***

\*            \*            \*

**Part 2: PACS' "New Trick" To Maintain Growth Post-COVID Is Abusing Yet Another Medicare Program**

With the expiration of the COVID waiver in 2023 and a sudden decline in Medicare revenue, PACS was faced with the challenge of maintaining reported growth and profitability as the company would have to contend with Wall Street's high post-IPO expectations.

PACS appears to have met this challenge, as evidenced by the sharp recovery of its Medicare revenue in early 2024, which reached an all-time high in Q2 2024, according to PACS' disclosures, public facility-level financial reports and our own calculations.

*　　　　*　　　　*

***Using costs provided by former PACS administrators, we estimate the program has 80%+ margins and contributed the substantial majority of PACS' Q2 adjusted EBITDA of $99.7 million.***

*　　　　*　　　　*

A former PACS administrator from California explained that **the scheme involves billing respiratory and sensory integration therapies to Medicare Part B, even when these therapies aren't applicable to patients.**

> *"… now there's a new trick that they're all using. It's with Part B, Medicare Part B, that they're maximizing stuff to get back to these COVID-level profitability things [and] CMS is going to get wind of that pretty soon too.*
>
> *…there's buildings that used to bill, in an average month they bill maybe $15,000 in [Medicare] Part B revenue. Now they're billing $500,000 in [Medicare] Part B revenue. And what they're doing is they're putting everyone on respiratory therapy for Part B, and they're putting everyone on sensory integration, even if it's not really that applicable. They'll come up with 'oh they coughed once last month so they must need respiratory therapy'…"*

According to the former administrator, the widespread implementation of respiratory therapy programs, among other Part B programs, was a way to "cover up" a loss of net operating income from the COVID waiver.

> *"Now they have this Part B thing to kind of limp them through another year or two before CMS catches onto this and shuts it down."*

*　　　　*　　　　*

A former administrator from Colorado said the respiratory program was pushed onto their facility by PACS management, despite the treatments being unnecessary:

> *"The respiratory therapy program, I have never heard of it or done anything like this in my work… **They brought in [the Regional VP] and that was his***

29

*immediate thing. That's all he talks about is the respiratory program and how much profit they're making...I was paying a respiratory therapist, or like I had two full time people, I was paying them about like $32 an hour to make me $100k a month or plus."*

\*          \*          \*

Another former PACS manager who had worked as a regional clinical leader explained that the respiratory program was a top-down initiative:

> *"[The Regional VP] implemented something called the respiratory program, and he mandated it for everybody... he just wanted, you know, that program equals dollars. And so it was ineffectively rolled out and mandated and it caused, I believe, patient care to suffer because they weren't allocating resources to the right areas..."*

> *"[The Regional VP] was the one who was basically saying, 'do this or don't work here'."*

\*          \*          \*

**Former PACS Employees Say The Company Allowed Unlicensed Individuals To Run Entire Facilities, While PACS "Rents" A License From Someone Else To "Hang" On The Building In An Apparent Effort To Fool Regulators**

In California, SNF administrators must be licensed and are not allowed to manage more than 200 beds, which can be spread across a maximum of 3 facilities.

*A former administrator described how PACS places unlicensed individuals in administrator positions, while paying retired administrators ~$3,000 a month to "hang" their licenses on the facilities, despite them not working at that facility, or for PACS in any capacity*:

> *"... a lot of the times they were putting guys in the buildings that weren't even licensed. So they were running buildings without being licensed, and they would just hang a license until that guy did have one... I mean, **I had a buddy that wasn't even working in the industry, and PACS paid him to hang a license on a building. I think they paid him like $3,000 a month to hang his license...** I think the Regional [Vice President] Venmo'd him."*

A second former administrator corroborated this practice, saying that PACS will simply use someone else's license for a facility, despite that person not actively working at the facility:

> *"As a matter of fact, I know a building in Long Beach right now where the guy doesn't even have a college degree. But he'll get it, and in the meantime, **they'll put someone else's license on the building...**"*

*"... what they've done, at least what I've heard, is that **they'll find people that have a license who are not actively working and they'll rent their license from people.**"*

\*                    \*                    \*

**A Former Senior Employee Told Us That PACS Secretly Employs *Uncertified* Nurse Aides ("NAs"), Which Are Listed In The "System" As Certified, In An Apparent Scheme To Cheat Staffing Ratios**

**"Maybe 1/3 Of Their Buildings, If Not More, Had These NAs Listed As CNAs" – Former PACS Employee**

\*                    \*                    \*

**As of Q2 2024, PACS claims in its SEC filings to have employed approximately 12,633 CNAs across its network of 220 facilities. But a former senior level employee told us that for over 2 years during COVID, PACS had Nurses Aids ("NAs") in its system as CNAs, in an apparent effort to circumvent minimum staffing requirements while simultaneously lowering costs and boosting bonuses**:

> *"... they would manipulate those numbers because the NAs you can pay less, so they would have more NAs on the floor than the CNAs. But they would have them in the system as a CNA, even though they didn't actually have their CNA certification. But then they could count them as a CNA... **they'd been working for 2 years under a license that wasn't there, and they were billing according to staffing which was inaccurate.**"*

> *"I would say it was probably happening at most of their original 57 buildings... I'm not sure how long it was happening, but my assumption is that they were doing it during all of COVID, because they could... I do know that probably, maybe **1/3 of their buildings, if not more, had these NAs listed as CNAs**...There's no reason to put someone into the system as having an actual license unless they have an actual license, unless you're trying to cheat your staffing ratios."*

\*                    \*                    \*

**Former Employees Claim That PACS Retroactively Adds In Fake RN Hours In Another Apparent Effort To Meet Minimum Staffing Requirements And Boost Star Ratings**

**Former Employee: "Not Only Were They Billing For Hours That Weren't Actually Worked, They Also Were Advertising That They Were A Higher Star Rated Building … When They Technically Weren't, Because They Manipulated Their Staffing To Be A Higher Star"**

*          *          *

A former PACS employee told us that PACS retroactively adds hours for RNs to give regulators the appearance of meeting these stringent staffing requirements:

> *"… you have to have a minimum of 8 RN hours worked every single day. If you drop, like if you miss one RN hours days in a 30-day period, then your 5-star rating automatically drops to 1-star for staffing…*
>
> *And so, if they missed hours, whether it was RN hours or other nursing hours or therapy hours they would go to the staffing agency name of people, whether they worked in that building on that date or not, and they would add their names in order to get their star rating high enough."*

62.     On this news, the Company's share price fell $11.93 or 27.78%, to close at $31.01 per share on November 4, 2024, on unusually heavy trading volume.

63.     Then, on November 6, 2024, before the market opened, the Company issued a press release which announced that it would postpone its third quarter 2024 earnings release. The Company further disclosed it had "***received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report***." Specifically, the press release stated, in relevant part:

> FARMINGTON, Utah, -- November 6, 2024 -- PACS Group, Inc. (NYSE: PACS) ("PACS" or the "Company"), today provided select preliminary key operating metrics for the third quarter and ***announced the postponement of the release of its third quarter 2024 financial results.*** PACS expects to release its third quarter 2024 financial results as soon as practicable.
>
> "PACS Group operates in a highly regulated industry where compliance is of the utmost importance," said Jason Murray, PACS's Chief Executive Officer. "We believe recent third-party allegations are misleading. However, in line with our commitment to holding ourselves to a high standard – in how we serve our patients, operate our business, and engage with stakeholders – the Company's Audit Committee, with assistance from external counsel, is ***conducting an investigation of the allegations.*** Given the industry we operate in, we're subject to various governmental surveys and payment audits in the ordinary course of business and are proud of our compliance track record. ***We've received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party***

32

*report*. We take these types of allegations seriously and will continue to cooperate with the government. We have confidence in our systems and controls, and we believe our strong operating metrics in the quarter and significant liquidity underscore the fundamental strength of our business and balance sheet. We remain focused on our mission to revolutionize the delivery, leadership, and quality of post-acute care."

64.     On this news, the Company's share price fell $11.45 or 38.76%, to close at $18.09 per share on November 6, 2024, on unusually heavy trading volume.

65.     By the commencement of this action, PACS Group stock has traded as low as $18.09 per share, a more than 13.9% decline from the $21 per share IPO price.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired PACS Group: (a) common stock pursuant and/or traceable to the Company's false and/or misleading Registration Statement issued in connection with the Company's IPO; and/or (b)  securities between April 11, 2024 and November 5, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  The Company sold 21,428,572 shares of common stock in the IPO. Moreover, record owners and other members of the Class may be identified from records maintained by PACS Group or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement, statements made by Defendants to the investing public in connection with the Company's IPO, and statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PACS Group; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

72.     The market for PACS Group's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, PACS Group's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired PACS Group's securities relying upon the integrity of the market price of the Company's securities and market information relating to PACS Group, and have been damaged thereby.

73.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PACS Group's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PACS Group's business, operations, and prospects as alleged herein.

74.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PACS Group's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members

of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

75.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

76.     During the Class Period, Plaintiff and the Class purchased PACS Group's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

77.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PACS Group, their control over, and/or receipt and/or modification of PACS Group's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PACS Group, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

78.     The market for PACS Group's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, PACS Group's securities traded at artificially inflated prices during the Class Period. On November 1, 2024, the Company's share price closed at a Class Period high of $42.94 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PACS Group's securities and market information relating to PACS Group, and have been damaged thereby.

79.     During the Class Period, the artificial inflation of PACS Group's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PACS Group's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of PACS Group and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

80.     At all relevant times, the market for PACS Group's securities was an efficient market for the following reasons, among others:

        (a)     PACS Group shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, PACS Group filed periodic public reports with the SEC and/or the NYSE;

(c)    PACS Group regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    PACS Group was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

81.    As a result of the foregoing, the market for PACS Group's securities promptly digested current information regarding PACS Group from all publicly available sources and reflected such information in PACS Group's share price. Under these circumstances, all purchasers of PACS Group's securities during the Class Period suffered similar injury through their purchase of PACS Group's securities at artificially inflated prices and a presumption of reliance applies.

82.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PACS Group who knew that the statement was false when made.

## FIRST CLAIM

## Violation of Section 11 of the Securities Act

## (Against All Defendants)

84.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

85.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

86.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

87.     PACS Group is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

88.     As issuer of the shares, PACS Group is strictly liable to Plaintiff and the Class for the misstatements and omissions.

89.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

90.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

91.     Plaintiff acquired PACS Group shares pursuant and/or traceable to the Registration Statement for the IPO.

92.     Plaintiff and the Class have sustained damages.  The value of PACS Group common stock has declined substantially subsequent to and due to the Defendants' violations.

## SECOND CLAIM

### Violation of Section 15 of the Securities Act

### (Against the Securities Act Individual Defendants)

93.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

95.     The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of PACS Group within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause PACS Group to engage in the acts described herein.

96.     The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

97.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

### THIRD CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against PACS Group and the Individual Defendants

98.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

99.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PACS Group's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

100.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PACS Group's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

101.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PACS Group's financial well-being and prospects, as specified herein.

102.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PACS Group's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PACS Group and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

103.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

104.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PACS Group's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

105.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PACS Group's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the

market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PACS Group's securities during the Class Period at artificially high prices and were damaged thereby.

106.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PACS Group was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PACS Group securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

107.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

109.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

110.    Individual Defendants acted as controlling persons of PACS Group within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

112.    As set forth above, PACS Group and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 13, 2024                   */s/ Rebecca Dawson*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
          rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Christopher Manchin*

**SWORN CERTIFICATION OF PLAINTIFF**
**PACS GROUP, INC. (PACS) SECURITIES LITIGATION**

I, Christopher Manchin, certify that:

1.    I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.    I did not purchase the PACS Group, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in PACS Group, Inc. securities during the period set forth in the Complaint are as follows:

    (See attached transactions)

5.    I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


11/12/2024
_____                    _____
Date                                                    Christopher Manchin

**Christopher Manchin's Transactions in PACS Group, Inc.
(PACS)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 4/11/2024 | Bought | 280 | $23.0300 |