**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER MANCHIN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil Action No. 1:24-cv-08636-LJL-SLC |
| v. | |
| PACS GROUP, INC., JASON MURRAY, DERICK APT, MARK HANCOCK, JACQUELINE MILLARD, TAYLOR LEAVITT, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO. LLC, STEPHENS INC., KEYBANC CAPITAL MARKETS INC., OPPENHEIMER & CO. INC., and REGIONS SECURITIES LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................................................... ii

I.      Preliminary Statement.................................................................................................... 1

II.     Factual History .............................................................................................................. 2

III.    Argument ....................................................................................................................... 5

        A.      Factor 1: Lead Plaintiff's choice of forum should be afforded more weight.......... 6

        B.      Defendants' arguments related to their inconvenience do not meet the clear and
                convincing standard (Factors 2-5) ............................................................. 8

                1.      Factor 2: Purported convenience of witnesses........................................... 8

                2.      Factor 4: Purported convenience of the parties......................................... 10

                3.      Factor 5: Locus of operative facts.............................................................. 13

                4.      Factor 3: Location of relevant documents and the relative ease of access
                        to sources of proof ..................................................................... 15

        C.      The three factors that Defendants allege to be neutral actually weigh in
                Plaintiff's favor ......................................................................................... 15

                1.      Factor 6: Availability of process............................................................... 15

                2.      Factor 7: Relative means of the parties...................................................... 16

                3.      Factor 8: Forum's familiarity with governing law.................................... 17

                4.      Factor 9: Trial efficiency and the interests of justice................................ 18

        D.      Defendants failed to allege that the transferee court would have personal
                jurisdiction over the Lead Plaintiff .......................................................... 19

IV.     Conclusion .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)..................................................................................................14

*Actmedia, Inc. v. Ferrante*
  623 F. Supp. 42, 44 (S.D.N.Y. 1985)....................................................................................7

*Aerotel, Ltd. v. Sprint Corp.*,
  100 F. Supp. 2d 189 (S.D.N.Y. 2000)..................................................................................19

*Albert Fadem Tr. v. Duke Energy Corp.*,
  214 F. Supp. 2d 341 (S.D.N.Y. 2002)................................................................................8, 9

*In re Anadarko Petroleum Corp.*
  2012 WL 12894796, at *1 (S.D.N.Y. Mar. 19, 2012) ............................................................7

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)..................................................................................11

*Chanel, Inc. v. Shiver & Duke LLC*,
  2022 WL 3868113 (S.D.N.Y. Aug. 30, 2022).......................................................................9

*City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*,
  2015 WL 12659925 (S.D.N.Y. Apr. 30, 2015)....................................................................16

*In re Collins & Aikman Corp. Sec. Litig.*,
  438 F. Supp. 2d 392 (S.D.N.Y. 2006)....................................................................................5

*EasyWeb Innovations, LLC v. Facebook, Inc.*,
  888 F. Supp. 2d 342 (E.D.N.Y. 2012) ............................................................................10, 11

*Encarnacion v. Goord*
  2018 WL 3491287, at *1 (W.D.N.Y. July 18, 2018)..............................................................7

*Erickson Beamon Ltd. v. CMG Worldwide, Inc.*,
  No. 12-cv-05105, 2013 WL 5355010 (S.D.N.Y. Sept. 25, 2013)
  (Buchwald, J.) .......................................................................................................................19

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
  865 F.2d 513 (2d Cir.1989).....................................................................................................8

*In re Geopharma, Inc.*,
  2005 WL 1123883 (S.D.N.Y. May 11, 2005) .................................................................6, 7, 8

ii

*In re Hanger Orthopedic Grp., Inc. Sec. Litig.*,
    418 F. Supp. 2d 164 (E.D.N.Y. 2006) ..................................................................................6

*Hershman v. UnumProvident Corp.*,
    658 F. Supp. 2d 598 (S.D.N.Y. 2009)..................................................................................18

*Hoffman v. Blaski*,
    363 U.S. 335 (1960)..............................................................................................................7

*Janbay v. Canadian Solar, Inc.*,
    272 F.R.D. 112 (S.D.N.Y. 2010) ........................................................................................18

*Laumann Mfg. Corp. v. Castings USA, Inc.*,
    913 F. Supp. 712 (E.D.N.Y. 1996) ......................................................................................9

*In re Lehman Bros. Holdings Inc.*,
    594 B.R. 33 (Bankr. S.D.N.Y. 2018).................................................................................10

*Mazuma Holding Corp. v. Bethke*,
    1 F. Supp. 3d 6 (E.D.N.Y. 2014) .......................................................................................17

*Menowitz v. Brown*,
    991 F.2d 36 (2d Cir. 1993)..................................................................................................17

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)..................................................................................................19

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010).............................................................................................................13

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010)..............................................................................................6, 8

*New Orleans Employees' Retirement System v. PACS Group, Inc., et al.*,
    Case No. 1:24-cv-08882 (S.D.N.Y.).....................................................................................5

*Olcott v. Delaware Flood Co.*,
    76 F.3d 1538 (10th Cir. 1996) ........................................................................................17, 18

*Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*,
    980 F.2d 110 (2d Cir. 1992)..................................................................................................5

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*,
    2 F. Supp. 2d 1345 (D. Colo. 1998) (*abrogated on other grounds by Adams v.
    Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003))....................................................12

*Rabinowitz v. Kelman,*
    730 F. Supp. 3d 56 (S.D.N.Y. 2024), *aff'd*, 2025 WL 842891 (2d Cir. Mar. 18,
    2025) ..................................................................................................................................9

*Rindfleisch v. Gentiva Health Sys.,*
    752 F. Supp. 2d 246 (E.D.N.Y. 2010) ...................................................................................15

*Sinclair Oil Corp. v. Union Oil Co. of Cal.,*
    305 F. Supp. 903 (S.D.N.Y. 1969) .......................................................................................14

*Tomita Techs. U.S.A., LLC v. Nintendo Co., Ltd.,*
    818 F. Supp. 2d 770 (S.D.N.Y. 2011)....................................................................................12

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC,*
    2022 WL 17067984 (S.D.N.Y. Nov. 17, 2022) (Liman, J.) .....................................................6

**Statutes**

15 U.S.C. § 78u–4(a)(3)(A)(ii) .....................................................................................................7

15 U.S.C. § 78u-4(a)(3)(B)(ii) ......................................................................................................7

28 U.S.C. § 1404(a) ...........................................................................................................1, 5, 7

Cal. Code Regs. Tit. 22, § 72513(a)(2)..........................................................................................3

Lead Plaintiff, 1199SEIU Health Care Employees Pension Fund ("Lead Plaintiff" or the "Pension Fund"), respectfully submits this memorandum of law in opposition to the Motion to Transfer Venue of this Action to the U.S. District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a) (ECF No. 48), filed by Defendants PACS Group, Inc. ("PACS"), Jason Murray, Derick Apt, Michelle Lewis, Mark Hancock, Jacqueline Millard, Taylor Leavitt, and Evelyn Dilsaver (the "PACS Defendants"), and joined by Defendants Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Truist Securities, Inc., RBC Capital Markets, LLC, Goldman Sachs & Co., LLC, Stephens, Inc., Keybanc Capital Markets Inc., Oppenheimer & Co., Inc., Regions Securities LLC, and UBS Securities, LLC ("Underwriter Defendants" and, together with the PACS Defendants, the "Defendants") (ECF No. 51).

## I.      PRELIMINARY STATEMENT

Defendants made their Motion to Transfer Venue to the District of Utah without proffering any meaningful evidence, and it should be denied. Defendants bear the burden of demonstrating, with specific and convincing evidence, that transfer is warranted. However, the only evidence they offer is a vague, conclusory, three-page client declaration that provides no concrete details to support their motion. The declaration is devoid of any specific facts concerning the key factors that this Court must balance to evaluate transfer, such as the location of specific witnesses, actual inconvenience to any Defendant, or the inaccessibility of particular evidence. On the actual evidence before the Court, the balance of factors including convenience, judicial efficiency, and the interest of justice weigh decisively against transfer. Defendants' failure to meet their burden renders their motion meritless. Therefore, Defendants' motion should be denied, and the case should remain in this Court.

## II.    FACTUAL HISTORY

Founded in 2013 by Defendants Murray and Hancock, PACS is a holding company with 314 post-acute nursing homes spanning seventeen states.[1] PACS's purported focus is on turning around struggling skilled nursing facilities ("SNF") that provide rehabilitation services for patients who need ongoing support but do not require the intensive care of a hospital. Declaration of Alfred L. Fatale III ("Fatale Decl."), Exhibit ("Ex.") A at 1, 7. The business claims to have discovered a winning turnaround formula for transforming these SNFs, and the company has reported extensive grown in the last decade. *Id.* at 5–7. But while on paper the turnaround rate on SNFs appeared exceptional, this claimed growth was due not to any increase in quality of business, care, or training but rather through PACS systematically scamming Medicare programs and skirting regulations for profit. *Id.* at 7.

PACS's series of fraudulent schemes began in March 2020 when the Center for Medicare Services ("CMS") announced a COVID-19 ("COVID") waiver for Medicare programs. Fatale Decl. Ex. B at 16. Skilled nursing care is typically covered by Medicare Part A, but only if the patient first spent three days in a hospital. Fatale Decl. Ex. A n. 4. However, beginning in March 2020 and continuing through May 2023, CMS issued a waiver allowing beneficiaries of Medicare Part A to receive skilled nursing care at an SNF without the three-day inpatient hospital stay. Fatale Decl. Ex. B at 16. The intention of this waiver was to keep patients out of already overwhelmed hospitals, but it was to be used only in emergency situations. *Id.* The American Health Care Association ("AHCA") made it clear that a positive COVID test was an insufficient justification for accessing skilled nursing care. Fatale Decl. Ex. C at 5. Nevertheless, various PACS facilities

---

[1] *Our Story*, PACS (last visited Apr. 17, 2025), https://pacs.com/timeline/#2023.

would regularly rely on a single positive COVID test to flip an entire facility from Medicaid to Medicare, tripling the revenue of that facility. Fatale Decl. Ex. A at 11–12.

The COVID waiver expired in May 2023, and PACS's ability to triple its revenue expired along with it. As a result, PACS's Medicare skilled care revenue declined at least $90 million in each of the two quarters after expiration of the waiver. *Id*. at 16. To maintain its ruse that PACS could turn around struggling SNF facilities, PACS needed to find a new way to increase revenue. Medicare Part B was its next trick.

Beginning in early 2024, PACS employees in California and Colorado received widespread, top-down directives from Defendants to perform unnecessary respiratory therapies on thousands of patients, regardless of clinical need or outcome. *Id*. at 17. Regional Vice Presidents were brought into various facilities to push respiratory treatments for patients. *Id*. at 18. By billing respiratory treatments to Medicare Part B, a facility could drive anywhere from $150,000 to $1 million per month in high-margin revenue per facility. *Id*. at 18. Of course, it was impossible for clinical staff to provide the volume of respiratory therapy that PACS was pushing, which meant that staff were forced to falsify documentation. *Id*. at 19. According to one former regional clinical leader, "PACS turned a blind eye and said, whatever you need to do to get these numbers and get this filled out, do it." *Id.* at 19.

In addition to the Medicare Part B fraud, PACS also allowed unlicensed individuals to run California facilities in violation of state law. All California SNFs require a licensed individual to run the facility, and those individuals are permitted to run no more than three facilities or a total of no more than 200 beds at one time. *See* Cal. Code Regs. Tit. 22, § 72513(a)(2). Despite this, numerous facilities were run by unlicensed individuals, and PACS skirted state regulation by renting licenses from retired licensed individuals. Fatale Decl. Ex. A at 23–24. Many facilities also

3

lied about the number of certified nurse aids ("CNAs") that were staffed, listing noncertified nurse aids ("NAs") as CNAs. *Id*. at 29. PACS's claimed focus on "turning around" SNFs meant instead that it was willing to understaff its facilities, and lie to regulators to cover up those practices, in the name of greater profit. *Id*. at 28.

PACS's numerous fraudulent schemes worked like a charm in terms of profits and enabled its successful IPO. On April 12, 2024, PACS filed a prospectus with the SEC, registering its initial public offering of 21,428,572 shares at $21.00 per share. ECF No. 1, Class Action Complaint for Violations of the Federal Securities Laws ("Manchin Compl.") at ¶37. The IPO closed three days later, with net proceeds of approximately $450 million. *Id*. After this closure, Defendants Murray and Hancock—who at this time already owned luxury properties in California, a suburban commercial property in Arizona, and a Gulfstream private jet—purchased a second private jet, valued between $15 and $28 million. Fatale Decl. Ex. A at 33.

On September 6, 2024, PACS filed a prospectus to register its second public offering of 16,551,724 shares, 2,777,778 shares sold by the company and the other 13,773,946 sold by Defendants Murray and Hancock. Manchin Compl. ¶59.

After years of skirting regulations and filing fraudulent Medicare claims to increase profit, PACS's actions caught up with them on November 4, 2024 with the publication of a scathingly credible report from Hindenburg Research. Fatale Decl. Ex. A. The report was based on a five-month investigation that included interviews with eighteen former PACS employees and competitors and an analysis of more than 900 PACS facility cost reports. *Id.* at 1. In its forty pages, the report revealed PACS's COVID waiver scheme, the Medicare Part B scheme, the licensing scheme, and the CNA scheme. *Id.* After publication, the Company's share price fell $11.93 or 27.78% to close at $31.01 per share on November 4, 2024. Manchin Compl. ¶63. Shortly

thereafter, two PACS shareholders filed putative class actions on November 13 and November 21, 2024 in the Southern District of New York ("SDNY"). Manchin Compl.; *New Orleans Employees' Retirement System v. PACS Group, Inc., et al.*, Case No. 1:24-cv-08882 (S.D.N.Y.). The cases were consolidated on January 7, 2025 (ECF No. 16) and the Pension Fund was appointed Lead Plaintiff (ECF No. 39). Defendants now move to have the consolidated action transferred from the SDNY, where they admit venue is proper, to the District of Utah. For the reasons set forth below, that motion should be denied.

## III.   ARGUMENT

Motions for transfer pursuant to 28 U.S.C. § 1404(a) "lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 117 (2d Cir. 1992). Here, Defendants have requested such discretionary transfer pursuant to § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *Id*. at 116. Courts perform a two-part inquiry to determine whether transfer is appropriate. First, the Court must determine whether the action "'might have been brought' in the transferee court." *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392, 394 (S.D.N.Y. 2006) (quoting 28 U.S.C. § 1404(a)). Second, the Court must "evaluate whether transfer is warranted using several factors relating to the convenience of transfer and the interests of justice." *Id*.

Generally, the convenience factors the Court must balance include:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the

attendance of unwilling witnesses, and (7) the relative means of the parties.

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quotation marks and citation omitted). This Court also considers "(8) the forum's familiarity with the governing law and (9) trial efficiency and the interests of justice based on the totality of the circumstances." *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2022 WL 17067984, at *5 (S.D.N.Y. Nov. 17, 2022) (Liman, J.) (alterations and internal quotation marks omitted). The burden is on Defendants to make a "clear-cut showing" that transfer is warranted. *In re Hanger Orthopedic Grp., Inc. Sec. Litig.*, 418 F. Supp. 2d 164, 168 (E.D.N.Y. 2006) (quoting *O'Hopp v. ContiFinancial Corp.*, 88 F. Supp. 2d 31, 34–35 (E.D.N.Y. 2000)); *see Lafarge*, 599 F.3d at 114 ("[T]he party requesting transfer carries the 'burden of making out a strong case for transfer.'"). Here, Defendants do not carry their burden to prove that this Action could have been brought in Utah or that the balance of factors favors Utah. Thus, this matter should remain here.

**A.      Factor 1: Lead Plaintiff's choice of forum should be afforded more weight**

Defendants are too quick to write off Lead Plaintiff's choice of venue, and their bare assertions about this forum are insufficient to meet their burden. Lead Plaintiff's choice of forum should be honored unless Defendants can make a "convincing showing" that the venue should be changed. *In re Geopharma, Inc.*, 2005 WL 1123883, at *1 (S.D.N.Y. May 11, 2005) (quoting *Goggins v. Alliance Capital Mgmt., L.P.*, 279 F. Supp. 2d 228, 232 (S.D.N.Y. 2003)).

Rather than proffering convincing evidence, Defendants rely on the purported fact that Lead Plaintiff did not "choose" to bring the suit in this forum. ECF No. 48, Memorandum of Law in Support of PACS Defendants' Motion to Transfer to the District of Utah ("Opening Brief") at 14. This is the classic argument that proves too much. If they want the inquiry to focus on where else the Pension Fund could have brought suit, then in a narrow sense it is true that the Pension

6

Fund could not have brought suit anywhere else; indeed, if the Pension Fund initially tried to file elsewhere prior to its appointment as Lead Plaintiff, such suit presumably would have been transferred to this District to be consolidated with the "first filed action" here as part of the lead plaintiff process set forth in the Private Securities Litigation Reform Act's ("PSLRA"). 15 U.S.C. § 78u–4(a)(3)(A)(ii). But that perspective is fatal to Defendants' transfer motion, as it concedes that no other district really is one where this action "might have been brought." 28 U.S.C. § 1404(a). As the Supreme Court has held, the proper inquiry is "whether the transferee district was one in which the action 'might have been brought' by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960).

In any event, Lead Plaintiff chose this forum by participating in, contesting, and winning the lead plaintiff selection process, which this Court carefully undertook as the forum of the first-filed action. Further, courts place additional weight on a plaintiff's choice of venue where, as here, class counsel is also located in the SDNY. *Geopharma*, 2005 WL 1123883, at *1. Finally, Defendants' argument absurdly suggests this forum would be favored only if the Pension Fund had taken the superfluous extra step of filing yet another action in this Court to ***further*** select its choice of forum before participating in the lead plaintiff process under the PSLRA—a statute that expressly seeks to avoid multiple filings through consolidation. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii).

Moreover, Defendants' cases are inapposite. *Actmedia, Inc. v. Ferrante* relates to a plaintiff whose case was removed from their original choice of forum; here, the matter was brought in Lead Plaintiff's home district. 623 F. Supp. 42, 44 (S.D.N.Y. 1985). In *Encarnacion v. Goord*, plaintiff's action was moved *sua sponte* by the district court to plaintiff's home district, whereas here Defendants wish to transfer to a district with which Lead Plaintiff has no ties. 2018 WL 3491287, at *1 (W.D.N.Y. July 18, 2018). *In re Anadarko Petroleum Corp.* is a different fact pattern entirely,

as it was the lead plaintiff who brought the motion to transfer venue. 2012 WL 12894796, at *1 (S.D.N.Y. Mar. 19, 2012). Interestingly, the defendants in *In re Anadarko Petroleum Corp.* made arguments that support Lead Plaintiff's position; they argued that "although [lead plaintiff] never filed a complaint in this district—'they ratified the decisions of those who did by taking deliberate steps to litigate in this forum.'" *Id.* at *3.

In sum, "when relatively little is known about how the case will develop, courts have typically accorded substantial weight to . . . plaintiff's choice of forum, for that very choice reflects one side's assessment of the balance of relevant factors, and since the law permits the suit to be brought where plaintiff has chosen to bring it, that choice should not be lightly overridden." *Albert Fadem Tr. v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002). Given Lead Plaintiff's choice of this forum, its continued preference to remain, and Defendants' lack of compelling argument to the contrary, Lead Plaintiff's choice of venue should not be disturbed.

## B. Defendants' arguments related to their inconvenience do not meet the clear and convincing standard (Factors 2-5)

The party requesting transfer carries the "burden of making out a strong case for transfer." *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir.1989) (internal quotation marks omitted). Courts in the Second Circuit have "consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion." *Lafarge*, 599 F.3d at 114 (collecting cases). Defendants' motion and meager client declaration fall well far short of carrying this burden.

### 1. Factor 2: Purported convenience of witnesses

To support an argument that the current venue is inconvenient for witnesses, the moving party must submit "an affidavit containing detailed factual statements explaining why the transferee forum is more convenient, including 'the potential principal witnesses expected to be

8

called and a general statement of the substance of their testimony.'" *Laumann Mfg. Corp. v. Castings USA, Inc.*, 913 F. Supp. 712, 720–721 (E.D.N.Y. 1996) (denying transfer because the defendant failed to state the substance of the supposed key witnesses' testimony). Here, Defendants' proffered evidence is grossly insufficient to meet this standard. The Derick Apt Declaration is barely three pages long and includes no detailed facts about who the principal witnesses are, much less the substance of their testimony. *See* ECF No. 50, Declaration of Derick Apt ("Apt Decl."). Its only assertion relevant to this factor is that "[t]he PACS employees who had a role in drafting and distributing the statements in the SEC filings, press releases, and investor presentations challenged in the complaints in this matter, as well as the PACS officers who spoke on the earnings calls cited in the complaint, all resided in Utah at the time the statements were made, and all worked at PACS's corporate headquarters in Utah." Apt Decl. ¶9. Defendants have provided no explanations, much less evidence, of who these 230 potential witnesses are, what they would testify about, why testifying in New York would be inconvenient for any of them, or whether any of the 230 witnesses would refuse to testify if the action was in New York. Opening Brief at 6. The factor is not "location of potential witnesses," but "witness convenience." A court cannot decide a motion to transfer on hypothetical witnesses without further evidence. *See Albert Fadem Tr.*, 214 F. Supp. 2d at 344 (holding that the possibility of witnesses is an insufficient argument in favor of transfer).

The solitary paragraph nine of the Apt Declaration does not provide the requisite level of detail to meet the "clear and convincing" burden to prove this factor. *See Rabinowitz v. Kelman*, 730 F. Supp. 3d 56, 62 (S.D.N.Y. 2024) ("Beyond conclusory statements, [the movant] fails to show how he would be inconvenienced or prejudiced by the Court permitting this case to proceed before it."), *aff'd*, 2025 WL 842891 (2d Cir. Mar. 18, 2025); *Chanel, Inc. v. Shiver & Duke LLC*,

9

2022 WL 3868113, at *4 (S.D.N.Y. Aug. 30, 2022) (court was not convinced that convenience favored transfer where the defendants "provide[d] . . . no information about [the] potential witnesses or the importance of their testimony"). Defendants' evidence is conclusory, and the Court should not rely on such bare assertions when considering a motion to transfer.

In addition to lacking evidence on witness convenience, Defendants also fail to show that any witnesses would refuse to testify. Travel to New York may be extraordinarily convenient for certain witnesses, and "in the absence of proof that such witnesses would refuse to testify, the Court cannot determine that this consideration weighs in favor of transfer of venue." *In re Lehman Bros. Holdings Inc.*, 594 B.R. 33, 58 (Bankr. S.D.N.Y. 2018). In fact, Defendants admit that "there are no witnesses of whom the PACS Defendants are aware 'who would be unwilling to attend the trial of this action absent . . . a subpoena.'" Opening Brief at 11 (quoting *In re Nematron Corp. Sec. Litig.*, 30 F. Supp. 2d, 397, 405 (S.D.N.Y. 1998)). Nothing in Defendants' brief demonstrates by clear and convincing evidence that Utah would be more convenient for witnesses, and thus this factor weighs against transfer.

### 2.    Factor 4: Purported convenience of the parties

"In terms of the convenience of the parties, the Court recognizes that '[w]here transfer would merely shift the inconvenience from one party to the other,' the Court should leave plaintiff's choice of venue undisturbed." *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 352 (E.D.N.Y. 2012) (citation and quotation marks omitted). Defendants allege that convenience of the parties is one of the "single-most important" factors, yet they do not provide any evidence that Utah is, in fact, more convenient for anyone. Opening Brief at 10 (quoting *Doshi v. Gen. Cable Corp.*, 2014 WL 12774226, at *3 (S.D.N.Y. Feb. 5, 2014)). Beyond stating that PACS is headquartered in Utah and many of the Individual Defendants live there, they provide nothing close to clear and convincing evidence that the District Court in Utah is more convenient

10

for any particular individual. Opening Brief at 10–11. There is nothing in the Apt Declaration to add color to this claim, nor are there any relevant documents attached to Ms. Smith's Declaration. *See* ECF No. 49, Declaration of Colleen C. Smith ("Smith Decl."). Perhaps this lack of evidence is because both venues are at most equally convenient; given that Defendants Murray and Hancock own two private jets, the burden of travelling to New York is *de minimis*. Fatale Decl. Ex. A at 33.

Defendants attempt to argue that travel to New York "may disrupt [PACS's] business operations." Opening Brief at 13. This is a dubious claim, since Defendants Murray and Hancock have no trouble travelling to New York when it benefits them.[2] "Thousands of miles away" it may be, but a four-hour[3] trip on a private jet would likely have minimal impact on the business operations, particularly when it can be done outside of business hours. Moreover, Defendants have failed to present evidence demonstrating that litigating in this Court would in fact cause substantial and unavoidable disruption to its business operations. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696 (S.D.N.Y. 2009) (rejecting Defendant's argument that its operations would be "placed in serious jeopardy" if the venue was not transferred, and noting that Defendant "surely must be able to make arrangements for coverage when its key personnel must travel").

Also, the fact that this District is Lead Plaintiff's home is relevant here as well since a transfer should not be granted if it merely shifts the inconvenience from one party to another. *EasyWeb Innovations*, 888 F. Supp. 2d at 352 ("In terms of the convenience of the parties, the

---

[2] *See PACS Group, Inc. Announces Closing of Its Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares from the Selling Stockholders*, PACS ( Apr. 15, 2024) https://ir.pacs.com/news-events/press-releases/detail/99/pacs-group-inc-announces-closing-of-its-initial-public-offering-and-full-exercise-of-the-underwriters-option-to-purchase-additional-shares-from-the-selling-stockholders.

[3] The average flight from Utah to New York is four hours and twenty minutes. *See Flight Time From Utah to New York*, TRAVELMATH (last visited Apr. 17, 2025) https://www.travelmath.com/flying-time/from/Utah/to/New+York.

Court recognizes that '[w]here transfer would merely shift the inconvenience from one party to the other,' the Court should leave plaintiff's choice of venue undisturbed.") (citation and quotation marks omitted). Given the paltry evidence provided in support of this factor, it too weighs against transfer.

As to the Underwriter Defendants, Defendants urge the Court not to consider their convenience. While the Underwriter Defendants have joined the motion seeking transfer of venue, that proffers no facts concerning their conveniences. The Underwriter Defendants submitted a single paragraph noting their joinder, and nothing in that paragraph indicates that Utah is a more convenient forum for them. ECF No. 51, Joinder of Underwriter Defendants. Given that most of the Underwriter Defendants are either incorporated or headquartered in New York—and the few others are headquartered in metropolises with easy flights to New York—New York is almost certainly the more convenient venue.

Finally, given the lack of evidence actually put forward by Defendants in support of the Motion, the Court should consider their true motives. *See Tomita Techs. U.S.A., LLC v. Nintendo Co., Ltd.*, 818 F. Supp. 2d 770, 774 (S.D.N.Y. 2011) (Denying a motion to transfer venue and noting that a transfer would "inevitably delay the proceedings. Indeed, such tactical advantage is not unlikely to be a reason for a defendant's [sic] bringing such a motion"); *see generally Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Supp. 2d 1345, 1351–52 (D. Colo. 1998) (denying corporate defendant's request to transfer securities class action to its hometown where it was a major employer because that could give the company an unfair "home-field advantage" in a jury trial) (*abrogated on other grounds by Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003)).

### 3.    Factor 5: Locus of operative facts

Defendants argue that the locus of operative facts behind as-yet unpled claims for "misrepresentations and omissions" under the Securities Act of 1933 ("Securities Act") Securities and Exchange Act of 1934 ("Exchange Act") is in Utah, where some statements were issued. Opening Brief at 12. Their supposition is contrary to law, incorrect, and inadequate.

First, it is black letter law that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) (holding the Exchange Act did not apply to deceptive conduct in Florida where the security in question traded on foreign exchanges); *id.* at 268 ("The same focus on domestic transactions is evident in the Securities Act of 1933."). Second, it is incorrect for Defendants to claim that all asserted misrepresentations and omissions originated in Utah; the Underwriter Defendants had a hand in both the IPO and SPO at issue, and that work occurred in New York for most of the Underwriter Defendants. Fatale Decl. Exs. E and F. Indeed, the Underwriting Agreements make clear the centrality of New York to work conducted on both offerings. *Id.* For example, critical documents such as opinion letters, representations and warranties, and certification of financial information were delivered to the "office of Goodwin Proctor LLP, counsel for the Underwriters, at 620 Eighth Avenue, New York, New York" (*Id.* at Ex. E at 26–29, Ex. F at 26–29), "[a]ll communications" in connection with the underwriting were "effective only on receipt, and, if sent to the Representatives, will be mailed, delivered or telefaxed to Citigroup Global Markets Inc. at 388 Greenwich Street, New York, New York" and "J.P. Morgan Securities LLC at 383 Madison Avenue, New York, New York" (*Id.* at Ex. E at 34, Ex. F at 34), delivery of and payment for the stock at issue was made at "10:00 AM New York City Time" (Ex. E at 20, Ex. F at 20), and stock sold pursuant to the Underwriter Defendants' overallotment options were delivered to "388 Greenwich Street, New York, New York" (Ex. E at

13

20, Ex. F at 20–21). Moreover, at the time of the offerings the Company agreed that any suit in connection with the underwriting agreements would "be instituted in any State or U.S. federal court in The City of New York and County of New York." *Id.* at Ex. E at 34, Ex. F at 34. Apparently, when it suited the PACS Defendants, this District was a perfect venue for litigation arising out of the offerings now at issue in this Action.

Finally, the Apt Declaration provides no detail whatsoever to support the claim that any specific operative fact occurred in Utah. Mr. Apt declares that "[a]ll of the statements challenged in the complaints were prepared, drafted, and/or issued from our Utah headquarters," but provides no factual detail to support that claim, much less what the difference is between "preparing" and "drafting" a statement. Apt. Decl. ¶8. Without factual descriptions of what acts he is talking about, it is impossible to know where (for example) the statements were researched, revised, debated, due diligenced, quality-controlled, and finalized; his description of activities in Utah could constitute no more than opening the initial template and pressing the final "submit" button. Without adequate information to show that any operative fact occurred in Utah, the Court's ability to consider this factor "would be a product more of speculation than of knowledgeable evaluation." *Sinclair Oil Corp. v. Union Oil Co. of Cal.*, 305 F. Supp. 903, 904 (S.D.N.Y. 1969).

Defendants' zeal for filing this motion early has undermined their argument, because they do not yet know what Lead Plaintiff's consolidated complaint will allege. At present, Lead Plaintiff intends to add causes of action under Section 20A of the Exchange Act—the private right of action to recover against insider traders—for the tainted trades of their own securities Defendants Murray and Hancock made during the SPO. These trades unquestionably occurred on the New York Stock Exchange, placing the full locus of operative facts in this District for this important claim. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) ("[T]he point

14

of irrevocable liability can be used to determine the locus of a securities purchase or sale," which for a "seller" is where they "deliver a security"). Thus, this factor weighs decidedly against transfer.

### 4. Factor 3: Location of relevant documents and the relative ease of access to sources of proof

While PACS and the Individual Defendants have documents in Utah, Defendants provide no evidence whatsoever to show that all relevant documents are there. The two sentences in their brief, and nothing further in either of the declarations, are a far cry from clear and convincing evidence. Contradicting Defendants' claim, many of the Underwriter Defendants are in New York and likely possess documentation regarding proposals as to the IPO valuation, due diligence documentation, road shows from the Underwriters, and the pricing of the IPO. Lead Plaintiff is headquartered in New York, and any documents Defendants might request from it would also be here; Lead Plaintiff's relevant investment manager is also in New York. Fatale Decl. Ex. D ¶¶3, 7.

At minimum, given the fact that the overwhelming majority of documents will be available for production in electronic format, the location of physical evidence is insignificant, and the factor can be considered neutral. *Rindfleisch v. Gentiva Health Sys.,* 752 F. Supp. 2d 246, 258 (E.D.N.Y. 2010) (citing *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.,* 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents.").

### C. The three factors that Defendants allege to be neutral actually weigh in Plaintiff's favor

#### 1. Factor 6: Availability of process

Defendants attempt to argue that this factor is neutral, yet they cite to the very proposition that weighs against them. The availability of process "factor does not weigh in favor of transfer in

15

the absence of any indication that nonparty witnesses will be called to testify but will be unwilling to do so." *City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*, 2015 WL 12659925, *6 (S.D.N.Y. Apr. 30, 2015). Defendants go so far as to admit that there are no witnesses that would be unwilling to attend trial in this Court and acknowledge that "any ancillary 'witness unwilling to appear can be adequately represented through deposition testimony.'" Opening Brief at 11 (quoting *Nematron*, 30 F. Supp. 2d at 405).

Once again, Defendants have spoken too soon. In securities class actions, defendants typically seek discovery from a lead plaintiff's third-party investment manager. And while Lead Plaintiff here does not understand Defendants' analysis of Factor 6 to be waiving any right to conduct such discovery, it impairs their motion to have so plainly forgotten about this usually important third-party witness. Here, at least one of Lead Plaintiff's relevant investment managers, Cohen & Steers, Inc., is located at 1166 Avenue of the Americas, 30th Floor New York, New York 10036. Fatale Decl. Ex. D ¶8. As such, only this District has the power to compel their testimony.

Because Defendants proffer no evidence that nonparty witnesses will be unwilling to testify in this Court, and indeed the opposite appears to be true, factor 6 weighs firmly against transfer.

### 2. Factor 7: Relative means of the parties

Defendant's motion has the temerity to point to Lead Plaintiff's "more than $16.8 billion in assets" to demonstrate that the Pension Fund is similarly situated as PACS. Defendants evidently do not understand how Taft-Hartley pension funds work, though soon enough, they will learn all too well how seriously pension funds must take their fiduciary duties once discovery is underway. For now, it is enough to point out how the very source Defendants cite makes clear what that $16.8 billion in assets is for, which Defendants omitted: it supports "three 1199SEIU Pension Funds,

which pay defined monthly benefits to more than 133,000 retirees and their beneficiaries."[4] Those assets are of course dedicated to supporting causes other than the convenience of parties to this litigation. On the other hand, Defendants Murray and Hancock paid themselves $194.5 million in dividends prior to the April 2024 IPO, and have since sold $656.5 million in stock to the unsuspecting public—to say nothing of their two private jets. Fatale Decl. Ex. A at 3. This evidences not only how selfishly Defendants apparently view co-owned assets, but also constitutes evidence that Defendants are in a far better position to cover legal and travel costs. Thus, this factor weighs slightly in Lead Plaintiff's favor.

### 3.    Factor 8: Forum's familiarity with governing law

Generally, courts consider a forum's familiarity with governing law to be neutral in securities class actions, since all federal judges are presumed to be equally competent in applying federal law. *See Mazuma Holding Corp. v. Bethke*, 1 F. Supp. 3d 6, 32 (E.D.N.Y. 2014) (holding two district courts "equally capable of applying federal securities law to this action"). In this case, however, transfer to Utah would lead to an unusual conflict in choice of law rules, based on a quirk of Tenth Circuit law, making this Court more familiar than the District of Utah with applicable law. In the Second Circuit, like most circuits, courts presume that if a case arising out of federal-question jurisdiction is transferred, the law of the transferee court would apply. *See Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993) (holding that the transferee court should apply the understanding of the circuit in which it sits). In the Tenth Circuit and District of Utah, contrastingly, the law of the transferee court applies *only if* the law is the same in both transferor/transferee districts, and if they differ, the transferee court must apply the law of the transferor court. *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1546–47 (10th Cir. 1996) (applying,

---

[4] *Who We Are*, 1199SEIU FAMILY OF FUNDS (last visited Apr. 17, 2025) https://www.1199seiubenefits.org/about-1199seiu-funds/who-we-are/.

in a Rule 10b-5 action, a statute of limitations period from the transferor court where the two districts had different limitations analyses). Accordingly, if this case is transferred, the parties will have to constantly consult Second Circuit law to discover any disuniformity with the Tenth Circuit, and if any come up, *Olcott* requires the Utah District Court to apply the Second Circuit's interpretations.[5] Given this District's relative expertise in Second Circuit law, and *Olcott*, this factor weighs against transfer.

### 4.    Factor 9: Trial efficiency and the interests of justice

Defendants use data on docket congestion as proof that the District Utah would be a more efficient venue. Opening Brief at 12. "While the relative levels of docket congestion in the transferor and transferee district may be considered, they are 'insufficient on [their] own to support a transfer motion.'" *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 123–24 (S.D.N.Y. 2010) (quoting *In re Connetics*, 2007 WL 1522614, at *9 (S.D.N.Y. May 23, 2007)). Further, "even if courts in this district have heavier caseloads than those in the [District of Utah], there is no evidence that retaining jurisdiction in this district, which is experienced and accustomed to dealing with securities class actions, would result in any inefficiency." *Id*. Defendants' reliance on docket congestion is insufficient proof that the District of Utah would be a more efficient venue.

Furthermore, any slight favor towards Utah due to its marginally lower median time to trial is negated by the time it would take for a new judge to get up to speed on this matter. "[A]lthough th[is] case is still in its early stages, a transfer would if anything delay resolution of this dispute as a new court familiarized itself with the facts of the case." *Hershman v. UnumProvident Corp.*, 658 F. Supp. 2d 598, 603 (S.D.N.Y. 2009).

---

[5] This quirk becomes even more onerous if any party here ever appeals such issues to the Tenth Circuit, who will then, under *Olcott*, have to apply Second Circuit law on review.

### D.    Defendants failed to allege that the transferee court would have personal jurisdiction over the Lead Plaintiff

Alongside Defendants' insufficient claims related to transfer, they also fail to address whether the District of Utah has personal jurisdiction over the Plaintiff. To establish personal jurisdiction, Defendants need to demonstrate that Lead Plaintiff has sufficient contacts with the forum state. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citing *International Shoe Co. v. State of Wash., Off. of Unemployment Comp. and Placement*, 326 U.S. 310, 316 (1945)).

Defendants have not made, and cannot make, such a showing. Lead Plaintiff is a New York organization, has no offices in Utah, and does no meaningful business there. Fatale Decl. Ex. D ¶¶3–4, 6–7. If the Court were to transfer the case to Utah, only for that Court to find that it lacked personal jurisdiction over Plaintiff, the Pension Fund "would, in effect, have no remedy other than bringing another action in this or some other forum. Surely such a result is not in the interests of justice." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 198 (S.D.N.Y. 2000).

Indeed, one court in this district has refused transfer under 1404(a) for this reason alone. *See Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12-cv-05105, 2013 WL 5355010, at *8 (S.D.N.Y. Sept. 25, 2013) (Buchwald, J.) ("Thus, because plaintiff lacks sufficient contacts with the [transferee District], we find that transfer to that forum would not be proper.").

## IV.    CONCLUSION

In sum, eight factors weigh against transfer, and one (the location of documents) is neutral. Defendants have not met their burden of providing clear and convincing evidence that transfer of venue would be in the interests of convenience or justice, nor have they established that Utah would have personal jurisdiction over Lead Plaintiff. The balance of public and private interests

19

weighs against transfer. Accordingly, Lead Plaintiff's choice of venue should be respected, and this Court should deny Defendants' motion to transfer.

Dated: April 18, 2025

Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Jeffrey A. Dubbin
Jessica N. Goudreault
Wesley A. Mann
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
jdubbin@labaton.com
jgoudreault@labaton.com
wmann@labaton.com

*Lead Counsel for Lead Plaintiff and
the Class*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Alfred L. Fatale III, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 2(G) of the Honorable Lewis J. Liman's Individual Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 6,304 words, and does not exceed 25 pages. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:  April 18, 2025
        New York, New York

/s/ *Alfred L. Fatale III*
Alfred L. Fatale III