**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER MANCHIN, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>PACS GROUP, INC., JASON MURRAY, DERICK APT, MARK HANCOCK, MICHELLE LEWIS, JAQUELINE MILLARD, TAYLOR LEAVITT, EVELYN DILSAVER, P.J. SANFORD, JOSHUA JERGENSEN, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO. LLC, STEPHENS INC., KEYBANC CAPITAL MARKETS INC., OPPENHEIMER & CO. INC., UBS SECURITIES, LLC, and REGIONS SECURITIES, LLC,<br><br>Defendants. | No. 1:24-cv-8636-LJL<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


| | | | | Page |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| II. | NATURE OF THE ACTION | | | 2 |
| | A. | Overview | | 2 |
| | B. | Summary of the Securities Act Claims | | 5 |
| | C. | Summary of the Exchange Act Claims | | 6 |
| III. | JURISDICTION AND VENUE | | | 12 |
| IV. | PARTIES | | | 13 |
| | A. | Plaintiffs | | 13 |
| | B. | Defendants | | 14 |
| | | 1. | The Corporate Defendant | 14 |
| | | 2. | Individual Defendants | 16 |
| | | 3. | Underwriter Defendants | 20 |
| V. | BACKGROUND ON RELEVANT MEDICARE AND MEDICAID HEALTH PROGRAMS AND SKILLED NURSING FACILITIES | | | 27 |
| | A. | Medicaid and Medicare | | 27 |
| | B. | Skilled Nursing Facilities | | 29 |
| | C. | Licensed SNF Administrators | | 29 |
| VI. | BACKGROUND FACTS FOR ALL CLAIMS ASSERTED | | | 30 |
| | A. | Overview of PACS's Business | | 30 |
| | B. | PACS Services | | 30 |
| | C. | PACS's Revenue and Costs | | 31 |
| | D. | Former PACS Employees | | 32 |
| VII. | SUBSTANTIVE FACTUAL ALLEGATIONS | | | 34 |
| | A. | General Overview | | 34 |
| | B. | COVID-19 Waiver Scheme | | 36 |
| | C. | Respiratory Billing Scheme | | 41 |
| | D. | Sensory Therapy Scheme | | 48 |
| | E. | Regeneration and Census-Maximizing Scheme | | 49 |
| | F. | PACS's Other Deceptive Billing Practices | | 51 |
| | G. | Patient Neglect | | 53 |
| | H. | PACS Skirted Licensing Requirements to Allow Less Scrupulous Individuals to Implement its Various Schemes | | 53 |

I. PACS Violated Numerous Medical Record Requirements 58
J. PACS Hired Uncertified Nurses Aids and Listed Them as Certified to Cheat Staffing Ratios 59
K. PACS Used Insider Knowledge to Get Advance Notice of, and Frustrate, State Audits 60
L. PACS's "Decentralized" Operating Model was Orchestrated from the Top 60

1. Control From the Top 60
2. Leadership Controlled All Facilities Through Their Administrators 62
3. PACS Rewarded Wrongdoing 64
4. Those Who Did Not Comply With PACS's Improper Directives Were Fired 66

M. PACS's Wrongdoing Causes Investor Losses and Subsequent Developments 69

1. The Hindenburg Report 69
2. Fallout From the Hindenburg Report and its Revelations 72
3. The Company Issues its Restatement 75

a. Material Weakness in Compliance 77
b. Material Weakness in Revenue Recognition 77
c. The Restatement Conceded that Material Weaknesses Necessarily Existed by March 31, 2024 79
d. Other Concessions in the 2024 Annual Report 81

N. Control Person Allegations 83

VIII. SECURITIES ACT ALLEGATIONS 85

A. Background to Securities Act Claims 85
B. Additional Substantive Allegations of Fact Supporting the Securities Act Claims 87
C. The IPO Offering Documents and SPO Offering Documents Materially Omitted Known Trends and Uncertainties in Violation of Item 303 88
D. The IPO and SPO Offering Documents Falsely Describes Certain Risks as Potential When Such Risks Had Already Manifested 91
E. The IPO Offering Documents Also Contained Other Material Omissions 97
F. The SPO Offering Documents Also Contained Other Materially False and Misleading Statements and Omissions 100
G. Additional Allegations of Materiality Under the Securities Act 107

IX. SECURITIES ACT CLAIMS 113

COUNT I For Violation of Section 11 of the Securities Act Against the Securities Act Defendants 113

COUNT II For Violation of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants 116

COUNT III For Violation of Section 15 of the Securities Act against The IPO Individual Defendants and SPO Individual Defendants 120

X. EXCHANGE ACT ALLEGATIONS 122

A. Defendants' Materially False and Misleading Statements and Omissions 122

1. The IPO Offering Documents 123

a. Misstatement No. 1—The IPO (April 11, 2024) 123
b. Misstatement No. 2—The IPO (April 11, 2024) 126
c. Misstatement No. 3—The IPO (April 11, 2024) 129
d. Misstatement No. 4—The IPO (April 11, 2024) 131
e. Misstatement No. 5—The IPO (April 11, 2024) 132
f. Misstatement No. 6—The IPO (April 11, 2024) 134

2. PACS's First Quarter Report on Form 10-Q 135

a. Misstatement No. 7—May 13, 2024 135
b. Misstatement No. 8—May 13, 2024 139
c. Misstatement No. 9—May 13, 2024 143
d. Misstatement No. 10—May 13, 2024 146
e. Misstatement No. 11—May 13, 2024 148

3. May 13, 2024 PACS Press Release 150

a. Misstatement No. 12—May 13, 2024 151

4. May 14, 2024 PACS Earnings Call 153

a. Misstatement No. 13—May 14, 2024 153
b. Misstatement No. 14—May 14, 2024 155

5. PACS Q1 2024 Earnings Presentation 156

a. Misstatement No. 15—May 14, 2024 156
b. Misstatement No. 16—May 14, 2024 157

6. PACS's Second Quarter Report on Form 10-Q 159

a. Misstatement 17—August 12, 2024 159
b. Misstatement 18—August 12, 2024 163
c. Misstatement 19—August 12, 2024 168
d. Misstatement 20—August 12, 2024 171
e. Misstatement 21—August 12, 2024 173

| | | | |
|---|---|---|---|
| 7. | PACS's August 12, 2024 Press Release | | 176 |
| | a. | Misstatement No. 22—August 12, 2024 | 176 |
| 8. | PACS's August 12, 2024 Earnings Call | | 178 |
| | a. | Misstatement No. 23—August 12, 2024 | 178 |
| 9. | PACS's Q2 2024 Earnings Presentation | | 180 |
| | a. | Misstatement No. 24—August 12, 2024 | 180 |
| | b. | Misstatement No. 25—August 12, 2024 | 181 |
| 10. | The SPO Offering Documents | | 183 |
| | a. | Misstatement No. 26—The SPO (September 3-6, 2024) | 183 |
| | b. | Misstatement No. 27—The SPO (September 3-6, 2024) | 186 |
| | c. | Misstatement No. 28—The SPO (September 3-6, 2024) | 188 |
| | d. | Misstatement No. 29—The SPO (September 3-6, 2024) | 191 |
| | e. | Misstatement No. 30—The SPO (September 3-6, 2024) | 192 |
| | f. | Misstatement No. 31—The SPO (September 3-6, 2024) | 193 |
| 11. | The PACS Defendants Acted With Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder | | 195 |
| | a. | The PACS Defendants Knew, or Were Reckless in Not Knowing, the Extent of PACS's Underlying Wrongdoing | 196 |
| | b. | Motive and Opportunity—Highly Unusual Stock Sales Create a Strong Inference of Scienter | 197 |
| | c. | Executive Departures Strengthen the Inference of Scienter | 202 |
| | d. | Decisions to Delay Releasing 3Q 2024 Financial Results Two Days after the Hindenburg Report, Followed by Delay of All Financial Results for More Than a Year, Strengthens the Inference of Scienter | 204 |
| | e. | Defendant Murray's and Defendant Apt's Sarbanes-Oxley Certifications Further Support Scienter | 204 |
| 12. | Connection to a Purchase/Sale of Securities and Presumption of Reliance | | 207 |
| 13. | Loss Causation | | 208 |
| | a. | Loss Causation Is Shown Through a Series of Partial Corrective Disclosures | 208 |
| | b. | In the Alternative, Loss Causation Is Demonstrated Because the Undisclosed Risks Materialized | 212 |

c. In the Alternative, Loss Causation Is Demonstrated By a Mix of Corrective Disclosures and Undisclosed Risks Materializing 214

B. The PACS Defendants Perpetuated a Stock Scheme in Violation of SEC Rule 10b-5 (a) and (c) 214

1. The PACS Defendants Committed Wrongful Acts and Courses of Business During the Class Period 215

a. Deceptive And Manipulative Act/Practice No. 1: Dissemination and Maintenance of False Information 216
b. Deceptive And Manipulative Act No. 2: Creating the False Appearance of Profitability Through Improper Medicare Billing and Falsified Documentation 216
c. Deceptive And Manipulative Course of Business No. 3: Implementing a Fraudulent Business Model Dependent on Improper Medicare Revenue 218

2. The Scheme Was Designed To and Did Artificially Inflate PACS's Stock Price 219
3. The PACS Defendants Acted With Scienter When They Controlled, Orchestrated, Committed, or Otherwise Caused these Wrongful Acts 220

a. The PACS Defendants Undertook Those Deceptive and Manipulative Acts and Practices with Scienter 220
b. Motive and Opportunity—Highly Unusual Stock Sales Create a Strong Inference of Scienter 222
c. Executive Departures Strengthen the Inference of Scheme Scienter 224
d. Decisions to Delay Releasing 3Q 2024 Financial Results Two Days after the Hindenburg Report, Followed by Delay of All Financial Results for More Than a Year, Strengthens the Inference of Scienter 224

4. Connection with the Purchase or Sale of Securities 224
5. Reliance 227

a. Presumption of Reliance 227
b. Direct Reliance 229

6. Defendants' Deceptive and Manipulative Acts Caused Investor Losses 230

a. The PACS Defendants' Scheme Proximately Caused Investor Losses on November 4–6 and December 17, 2024 231

b. Defendants' Scheme Proximately Caused Additional Investor Losses on November 14, 2024 and Other Dates 231

C. The Insider Selling/Controlling Stockholder Defendants' and PACS's Insider Sales Violated Section 10 and SEC Rule 10b-5(a) and (c) 233

1. Insider Selling 233
2. Contemporaneous Trading 236
3. The Insider Selling/Controlling Stockholder Defendants and PACS Possessed Material, Nonpublic Information When They Traded 237

D. Additional Allegations of Materiality Under the Exchange Act 239

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUSTION DOCTRINE 244

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT 245

COUNT IV Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (False and Misleading Statements) Against the PACS Defendants (Except Defendant Sanford) 245

COUNT V Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Scheme Liability) Against the PACS Defendants 246

COUNT VI Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Inside Selling) Against the Insider Selling/Controlling Stockholder Defendants and PACS 248

COUNT VII Violation of Section 20A of the Exchange Act Against the Insider Selling/Controlling Stockholder Defendants and PACS 249

COUNT VIII Violation of Section 20(a) of the Exchange Act Against the Insider Selling/Controlling Stockholder Defendants 250

XIII. CLASS ACTION ALLEGATIONS 252

## TABLE OF SELECT DEFINED TERMS AND ABBREVIATIONS

| | |
|---|---|
| 199SEIU Pension Fund | 1199SEIU Health Care Employees Pension Fund |
| 2024 Annual Report | PACS Group, Inc., Annual Report (Form 10-K) (Nov. 19, 2025) |
| 2024 Form 10-K | PACS Group, Inc., Annual Report (Form 10-K) (Nov. 19, 2025) |
| AHCA | American Health Care Association |
| ASC | Accounting Standards Codification |
| Board | PACS's Board of Directors |
| CID | Civil Investigative Demand |
| Class Period | April 11, 2024 through December 16, 2024, inclusive. |
| CMS | Centers for Medicare and Medicaid Services |
| Company | PACS Group, Inc. |
| Complaint | Consolidated Class Action Complaint for Violations of the Federal Securities Laws |
| COVID | Coronavirus disease 2019 (COVID-19) caused by the coronavirus SARS-CoV-2. |
| COVID-19 Waiver | Temporary suspension of the three-day hospital stay required for Part A SNF coverage under Section 1812(f) of the Social Security Act |
| CPT | Current Procedural Terminology |
| Defendants | PACS, Murray, Hancock, Apt, Lewis, Millar, Leavitt, Dilsaver, Jergensen, Sanford, Citigroup, J.P. Morgan, Truist, RBC, Goldman, Stephens, KeyBanc, Oppenheimer, Regions, and UBS |
| Detroit P&F | Police and Fire Retirement System of the City of Detroit |
| DOJ | United States Department of Justice |
| DON | Director of Nursing |
| Exchange Act | Securities Exchange Act of 1934 |
| Executive Defendants | Murray, Hancock, Apt, Jergensen, and Sanford |
| FASB | Financial Accounting Standards Board |
| FE | Former employee |
| GAAP | Generally Accepted Accounting Principles |
| H1 2024 | The year ending December 31, 2024 |
| HCPCS | Healthcare Common Procedure Coding System |
| Hindenburg Report | Hindenburg Research's "PACS Group: How to Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" |
| IPO | PACS's April 11, 2024 initial public offering |
| IPO Individual Defendants | Murray, Hancock, Apt, Lewis, Millar, and Leavitt |
| IPO Offering Document | IPO Registration Statement and IPO Prospectus |
| IPO Prospectus | PACS' April 10, 2024 final prospectus for the IPO on Form 424(b)(4) |
| IPO Registration Statement | PACS's March 13, 2024 registration statement for the IPO on Form S-1 that, following amendments, was declared effective by the SEC on April 10, 2024. |

| | |
|---|---|
| IPO Securities Act Defendants | PACS, IPO Individual Defendants, and IPO Underwriter Defendants |
| IPO Underwriter Defendants | Citigroup, J.P. Morgan, Truist, RBC, Goldman, Stephens, KeyBanc, Oppenheimer, and Regions |
| Lead Plaintiff | 1199SEIU Health Care Employees Pension Fund |
| LDN | Licensed Dietician Nutritionist |
| LVN | Licensed Vocational Nurse |
| MDS | Minimum Data Set |
| NYSE | New York Stock Exchange |
| Offering Documents | IPO Offering Documents and the SPO Offering Documents |
| Offerings | IPO and SPO |
| PACS | PACS Group, Inc. |
| PACS Defendants | PACS and the Executive Defendants |
| PACS Services | Providence Administrative Consulting Services, Inc. |
| Paradise Valley | Paradise Valley Healthcare Center |
| PHE | Public health emergency |
| Plaintiffs | 199SEIU Pension Fund and Detroit P&F |
| Q3 2023 | The three-month period ending September 30, 2023 |
| Q4 2023 | The three-month period ending December 31, 2023 |
| Q1 2024 | The three-month period ending March 31, 2024 |
| Q2 2024 | The three-month period ending June 30, 2024 |
| Report | Hindenburg Research's "PACS Group: How to Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" |
| Restatement | PACS Group, Inc., Annual Report (Form 10-K) (Nov. 19, 2025) |
| RSUs | Restricted Stock Units |
| RVP | Regional Vice President |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933 |
| Securities Act Defendants | IPO Securities Act Defendants and SPO Securities Act Defendants |
| Selling/Controlling Stockholder Defendants | Murray and Hancock |
| SNF | Skilled Nursing Facility |
| SOX Certifications | Certification pursuant to Section 302 of the Sarbanes-Oxley Act |
| SPO | PACS's September 6, 2024 secondary public offering |
| SPO Individual Defendants | Murray, Hancock, Apt, Lewis, Millar, Leavitt, and Dilsaver |
| SPO Offering Documents | SPO Registration Statement and SPO Prospectus |
| SPO Prospectus | PACS's September 5, 2024 final prospectus for the SPO on Form 424(b)(4) |
| SPO Registration Statement | PACS's September 3, 2024 registration statement for the SPO on Form S-1 that was declared effective by the SEC on September 5, 2024 |

| | |
|---|---|
| SPO Securities Act Defendants | PACS, Individual Defendants, and SPO Underwriter Defendants |
| SPO Underwriter Defendants | Citigroup, J.P. Morgan, Truist, RBC, Goldman, UBS, Stephens, and Oppenheimer |

# I. INTRODUCTION[1]

Lead Plaintiff 1199SEIU Health Care Employees Pension Fund ("Lead Plaintiff" or the "1199SEIU Pension Fund") and additional plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F" and, together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon Plaintiffs' respective personal knowledge. Plaintiffs' information and belief is based upon the investigation undertaken by Lead Counsel, Labaton Keller Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by PACS Group, Inc. ("PACS" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"), (ii) Company press releases, transcripts of earning calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for PACS's common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former PACS employees; (viii) consultation with relevant consulting experts in the fields of damages, causation, Medicare/Medicaid, and accounting; and (ix) other publicly available materials and data. Lead Counsel's investigation into the factual matter alleged herein continues and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout, and all capitalized and defined terms used herein have the meaning ascribed in this Consolidated Class Action Complaint for Violations of the Federal Security Laws (the "Complaint").

## II. NATURE OF THE ACTION

### A. Overview

1. This federal securities class action asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"). In PACS's first five months as a public company, Defendants pulled in over $1.2 billion from the investing public by selling stock via two registered stock offerings—over half of which went to individual sellers who were insider trading. Two ***months*** later, that stock value would collapse more than 40%. All along, Defendants made materially false and misleading statements and omissions regarding PACS's revenue, profit, business model, and internal controls. Meanwhile, the PACS Defendants (as defined herein) directed a company-wide course of business to systematically overbill Medicare. Once that came out, the Company had to issue a material Restatement of its financials.[2]

2. Because those misstated financials appeared in the Offering Documents (as defined herein) used to register that stock, and because Sections 11 and 12(a)(2) of the Securities Act impose strict liability for the existence of misstatements in a company's offering documents, this is the rare case where strict liability for these violations has been admitted before litigation has begun. Indeed, these restated financials turned out to be the difference between the Company being impressively profitable or not over the relevant periods: before the Restatement and during the Offerings (as defined herein), the Company appeared quite profitable, but after restating those months including the Offerings, it was evidently not.

3. Also, because the PACS Defendants' false and misleading statements and deceptive course of business served no legitimate business purpose other than to inflate Company

---

[2] *See* PACS Group, Inc., Annual Report (Form 10-K) (Nov. 19, 2025) (the "2024 Annual Report" or the "Restatement" or the "2024 Form 10-K").

revenue, profit, and stock prices, and because the Defendants Murray and Hancock (the "Insider Selling/Controlling Stockholder Defendants") suspiciously unloaded their stock, as did PACS itself, just before the Company's misconduct began to cause investor losses, the PACS Defendants also violated Section 10(b) of the Exchange Act and PACS and the Insider Selling/Controlling Stockholder Defendants violated Section 20A of the Exchange Act.

4. Finally, PACS was a 'controlled company' at all times, so this action also asserts control person claims against PACS's Board of Directors and two controlling stockholders, *i.e.*, the IPO Individual Defendants (as defined herein) and SPO Individual Defendants (as defined herein) under Section 15 of the Securities Act and the Insider Selling/Controlling Stockholder Defendants under Section 20(a) of the Exchange Act.

5. Subject to exclusions detailed herein, this action is brought on behalf of all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock during the period from April 11, 2024 through December 16, 2024, inclusive (the "Class Period"), and were damaged thereby, including:

(a) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock pursuant and/or traceable to the IPO Offering Documents (as defined herein) issued in connection with PACS's April 11, 2024 initial public offering (the "IPO"), during the period from April 11, 2024 through September 5, 2024, inclusive, and were damaged thereby, for violations of Sections 11 and 12(a)(2) by the IPO Securities Act Defendants (as defined herein) and Section 15 of the Securities Act by the IPO Individual Defendants;

(b) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock in PACS's September 6, 2024 secondary public offering (the "SPO"), on that date, and pursuant and traceable to the SPO Offering Documents (as defined

herein) issued in connection with the SPO, and were damaged thereby, for violations of Sections 11 and 12(a)(2) of the Securities Act by the SPO Securities Act Defendants (as defined herein) and Section 15 of the Securities Act by the SPO Individual Defendants;

(c) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock during the Class Period for violations of Section 10(b) and Rule 10b-5 promulgated thereunder by the PACS Defendants and Section 20(a) of the Exchange Act by the Insider Selling/Controlling Stockholder Defendants; and

(d) all persons and entities who or which purchased or otherwise acquired PACS securities contemporaneously with PACS's and the Insider Selling/Controlling Stockholder Defendants' insider sales on April 11, 2014 and September 6, 2024, for violations of Section 20A of the Exchange Act by PACS and the Insider Selling/Controlling Stockholder Defendants.

6. PACS's main selling point to investors is its business model, where it claims to acquire "underperforming" skilled nursing facilities ("SNFs") and turn them around or "transform" them into "higher acuity high value-add" facilities. Throughout the Class Period, the PACS and other Defendants publicly attributed the Company's historical growth and profit to PACS's "disciplined and balanced acquisition strategy" wherein underperforming SNFs undergo a three-year transformation during which PACS implements its proprietary blend of "best practices designed to realize and sustain the facility's full potential." The Company summarized these best practices as "investing in clinical teams and processes and upgrading technology, equipment, training, staffing, aesthetics, and other aspects of the business." But such acts, if they even occurred, were not what truly drove PACS's claimed profitability.

7. In reality, the PACS Defendants had a different, undisclosed focus: to increase revenue and profit by using its SNFs as vehicles to inappropriately and systematically overbill

Medicare. Through a series of deceptive acts and fraudulent schemes, the PACS Defendants reconfigured the ostensibly compliant SNFs it acquired into facilities designed to exploit Medicare by violating regulations in ways that increased revenue and profit for PACS, using top-down directives like quotas and a Company-wide policy of firing anyone whose conscience, unwillingness to violate federal regulations, or preference for delivering standard care to patients led them to speak out against, or otherwise reject, PACS's improper profit-generating procedures. Indeed, PACS had to restate its Class Period financial results—specifically its revenue and profit from Medicare flowing from this conduct—and the extent of the Restatement exceeded PACS's then net income, *i.e.*, its bottom-line profit, for the first half of 2024, the exact period containing the IPO and leading up to the SPO.

**B. Summary of the Securities Act Claims**

8. Regardless of the particulars of the PACS Defendants' wrongdoing, the Restatement is sufficient to establish the Securities Act Defendants' strict liability under Sections 11 and 12(a)(2) of the Securities Act. Put simply, the Restatement was an admission that PACS's financial statements for the first two fiscal quarters of 2024 (immediately before and after it went public) were materially false. And because such materially false financial statements were included in both PACS's SPO Registration Statement (as defined herein) and SPO Prospectus (as defined herein), the Restatement amounts to an admission that the sole element of each claim is met: a materially false statement in a registration statement (violating Section 11) and a materially false statement in a prospectus (violating Section 12(a)(2)).

9. The Restatement further admitted that PACS billed Medicare despite its own internal, then-existing "billing ***uncertainties***" about how certain improper therapies "may not be eligible for reimbursement" from Medicare and therefore "may be subject to significant reversal in the future." This was tantamount to another admission that both the IPO Offering Documents

and the SPO Offering Documents violated SEC Regulation S-K, Item 303, because they failed to disclose these "known trends or ***uncertainties*** that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii) (Item 303).[3] Finally, the Restatement identified two material failures in PACS's "internal controls," rendering the purported risk factor disclosures in each of the Offering Documents materially false and misleading. These claims are pled without any reference to fraudulent conduct. As such, because these facts alone establish liability under the Securities Act, Plaintiffs expressly excludes and disclaims any allegation that could be construed as alleging fraudulent conduct as to the Securities Act claims.

10. As a result of these undisclosed adverse facts, risks, trends, and uncertainties alleged herein that existed at the time of the IPO and SPO, PACS common stock plummeted in value, falling from its IPO price of $21.00 per share to close at $20.49 per share on the day Securities Act claims were first asserted in this action with respect to the IPO (November 13, 2024) and from its SPO price of $36.25 per share to close at $16.55 per share on the day Securities Act claims were first asserted in this action with respect to the SPO (November 21, 2024).

**C. Summary of the Exchange Act Claims**

11. Independently, the PACS Defendants' fraud-related wrongdoing began in March 2020, when the Centers for Medicare & Medicaid Services ("CMS") announced a COVID-19 ("COVID") waiver for Medicare programs. PACS's SNFs provide skilled nursing care, which is typically covered by Medicare Part A insurance only if a patient first spends three days in a hospital. However, beginning in March 2020 and continuing through May 2023, CMS issued a

[3] *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("One of the potential bases for liability under §§ 11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation. *Id.* In this case, Item 303 of SEC Regulation S–K provides the basis for [defendant]'s alleged disclosure obligation.").

temporary suspension of the three-day hospital stay requirement for Part A SNF coverage under Section 1812(f) of the Social Security Act (the “COVID-19 Waiver”). The intention of this waiver was to conserve hospital beds and support continuity of care during the COVID pandemic, but it was to be used only in emergency situations. The American Health Care Association (“AHCA”) made it clear that a positive COVID test was an insufficient justification for accessing skilled nursing care coverage from Medicare Part A through the COVID-19 Waiver. Nevertheless, PACS facilities would regularly and incorrectly use a single positive COVID test—and in some cases, a mere COVID exposure—to improperly recategorize an entire facility as being Medicare-eligible, and consequently, as much as tripling the revenue of that facility.

12. The COVID-19 Waiver expired in May 2023, and the PACS Defendants’ ability to illegally boost revenue from its SNFs disappeared along with it over the next 100 days. As a result, PACS’s revenue from Medicare for skilled care declined at least $90 million in each of the two quarters after expiration of the waiver—$180 million total—an amount that exceeded PACS’s profit for each of the full years 2022 and 2023. In other words, without the PACS Defendants’ improper exploitation of the COVID-19 Waiver, PACS would not have been profitable since at least 2022. Meanwhile, to maintain the ruse that PACS could turn around underperforming SNF facilities, and to maintain an illusion of profitability for its upcoming IPO, the PACS Defendants needed to find a new way to increase revenue across the Company. Medicare Part B was its next trick.

13. Beginning before its IPO in early 2024, PACS employees in multiple states and regions received top-down directives from the PACS Defendants to perform unnecessary respiratory and sensory therapies on thousands of patients, regardless of clinical need or outcome. The PACS Defendants deployed Regional Vice Presidents into various facilities to enforce quotas

on respiratory and sensory treatments for patients and teach SNF employees how to bill Medicare in certain ways that would evade detection. By billing respiratory and sensory treatments under Medicare Part B, according to this scheme, a facility could drive anywhere from $150,000 to $1 million per month in improper, high-profit-margin revenue per facility. Of course, it was impossible for clinical staff to provide the volume of respiratory and sensory therapy that the PACS Defendants were pushing, which meant that the PACS Defendants also forced staff to falsify documentation. According to one former regional clinical leader, PACS leadership told its SNFs to do "whatever you need to do" to fill the top-down quotas for monthly respiratory therapies, as well as to do "whatever you need to do" to falsify corresponding paperwork to make it happen. The Company has now admitted that it inappropriately recorded at least $61 million of Medicare B revenue from improper respiratory and similar therapies during the first and second fiscal quarters of 2024—exceeding its claimed profits of "$38.2 million for the six months ended June 30, 2024" in some of its Offering Documents and other statements, which the Company has now needed to restate.

14. Overall, though PACS's Offering Documents and other statements falsely claimed that it was quite profitable for both its IPO and SPO, without these Medicare A and Medicare B schemes, PACS would not have been for either IPO or the SPO.

15. At the same time, the PACS Defendants implemented a top-down directive to fire any employees unwilling to violate federal and state regulations (or individual consciences) in furtherance of the scheme. SNFs operate in a highly regulated industry that must strike a delicate balance between financial necessities and patient outcomes which take years to master, yet when such knowledgeable employees protested directives to skirt such regulations, PACS leadership fired them and heavily financially incentivized their replacements to go along with the scheme.

Thus, the PACS Defendants intentionally reconstituted PACS's work force to put its Medicare B scheme into effect across the Company.

16. Having lost many of its licensed administrators in this way, the PACS Defendants also implemented a scheme to have unlicensed individuals run facilities in violation of multiple state laws yet avoid detection. For example, California (containing almost half of PACS's SNFs during the Class Period) requires all SNFs to have a licensed administrator running each facility, and those individuals are permitted to run no more than three facilities or a total of no more than 200 beds at one time. However, numerous of PACS's California facilities were run by unlicensed individuals, and PACS skirted state regulation by improperly utilizing the licenses of administrators from other facilities, often from other jurisdictions to avoid detection, an improper practice known as "hanging" the absent administrators' license on the SNF. Similar practices occurred at PACS facilities in other states with similar regulations.

17. All the while, the PACS Defendants were falsely touting PACS's internal controls, how they "transformed" the SNFs PACS acquired into better businesses, and the Company's financial results including revenue and profit. At the same time, PACS insiders were dumping more than $600 million of PACS common stock onto the unsuspecting investing public through the Offerings.

18. The PACS Defendants' numerous fraudulent schemes and false statements, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, worked like a charm and enabled its successful IPO. On April 11, 2024, while engaging in the above wrongdoing, PACS launched its IPO of 24,642,856 shares, including an overallotment of 3,214,284 insider shares, at $21.00 per share. The Company sold 21,428,572 shares in the IPO with the stated purpose of using 89% or "$371.4 million of the net proceeds...to repay amounts outstanding under our Amended

and Restated 2023 Credit Facility," the lenders on which credit facility were actually six of the IPO Underwriter Defendants[4]—effectively funneling hundreds of millions of dollars to these Defendants. Defendants Murray and Hancock, *i.e.*, the Insider Selling/Controlling Stockholder Defendants, disposed of 1,607,142 additional shares, each, in the IPO through the overallotment. The IPO yielded net proceeds of over $420 million to PACS and over $63 million to the Insider Selling/Controlling Stockholder Defendants. After the IPO, according to a later report, Defendants Murray and Hancock—who at this time already owned luxury properties in California, a suburban commercial property in Arizona, and a Gulfstream private jet—purchased a second private jet, valued between $15 and $28 million.

19. As the PACS Defendants' fraudulent schemes and statements continued, including the release of false operating results for the first two fiscal quarters of 2024 which needed to be materially restated, they enabled an even more lucrative SPO. On September 6, 2024, PACS registered 19,034,482 shares, including the overallotment option of 2,482,758. Of those shares, 2,777,778 shares sold by the Company for net proceeds of over $94 million, and the other 16,256,704 shares were sold by Insider Selling/Controlling Stockholder Defendants with net proceeds of over exceed $564 million.

20. All of these insider sales by PACS and the Insider Selling/Controlling Stockholder Defendants were made on material nonpublic information or were otherwise connected to the fraudulent conduct, unjustly enriching PACS and Defendants Murray and Hancock at the direct expense of public investors who traded contemporaneously with these sales, in violation of Section 20A of the Exchange Act.

[4] These Underwriter Defendants were Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Truist Securities, Inc., RBC Capital Markets, LLC, Regions Securities LLC and KeyBanc Capital Markets Inc.

21. After years of skirting regulations and overbilling Medicare to increase revenue and profit, the natural consequences of the PACS Defendants' actions began to catch up with them on November 4, 2024, with the publication of a scathing and credible report from Hindenburg Research titled "PACS Group: How to Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" (the "Hindenburg Report" or the "Report").

22. The Hindenburg Report was based on a five-month investigation that included interviews with eighteen former PACS employees and competitors and an analysis of more than 900 PACS facility cost reports. In its forty pages, the Report revealed PACS's COVID-19 Waiver scheme, the Medicare Part B scheme, the licensing scheme, and other misconduct. The Report also contained a disclosure that Hindenburg Research had "taken a short position in shares of PACS" and "encourage[d] every reader to do their own due diligence."

23. The Hindenburg Report denounced PACS's claims of having a winning turnaround formula for "transforming" poorly performing SNFs into profitable cash spigots. The Report revealed that, instead, the Company's strategy involved systematically scamming taxpayer-funded healthcare programs like Medicare. The report determined that more than 100% of the Company's profit since 2020 was driven by such wrongdoing. According to the Report, "if PACS is forced to curtail its many ongoing billing and staffing schemes, we believe it will be revealed for what it is: an unprofitable roll-up of distressed SNFs with no path to legitimate profitability under the current profoundly corrupt leadership."

24. After stock analysts published reports deeming the Hindenburg Report credible, and more than a day passed without a denial or even a response from PACS, on November 6, 2024, Defendant Murray issued a statement. Most importantly, he did not deny Hindenburg's findings but called them "misleading." In the same statement, Defendant Murray admitted both that PACS

was also under multiple federal investigations into its Medicare reimbursement practices and that PACS's Board of Directors (the "Board") was launching its own internal investigation through its Audit Committee, among other admissions. As a result, J.P. Morgan publicly downgraded PACS stock on December 17, 2024.

25. Between the time when PACS would announce an indefinite delay of its financial reporting obligations pending that internal investigation (on November 15, 2024) and its eventual Restatement of $61 million in improperly recognized revenue (on November 19, 2025), the Audit Committee's investigations led to the abrupt firing of two key executives connected to the wrongdoing: on August 15, 2025, the President of PACS's main operating subsidiary Defendant Sanford, and on September 8, 2025, PACS's CFO, Defendant Apt.

26. PACS's share price declined significantly in connection with many of these events, harming investors, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## III. JURISDICTION AND VENUE

27. The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29. Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). PACS stock trades on the New York Stock Exchange ("NYSE") located in

this District. Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District. Furthermore, venue is proper in this District as recognized by the District Court's Opinion and Order dated May 1, 2025, denying transfer of venue pursuant to 28 U.S.C. § 1404(a). *See* ECF No. 56.

30. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Plaintiffs

31. Court-Appointed Lead Plaintiff 1199SEIU Health Care Employees Pension Fund is a multi-employer Taft-Hartley defined benefit plan that provides retirement benefits and other specified benefits to more than 450,000 individuals, including working and retired healthcare industry workers in New York City and the surrounding areas—members of 1199SEIU United Healthcare Workers East—and their families. 1199SEIU Pension Fund is administered by a Board of Trustees with equal representation of contributing employers and the 1199SEIU United Healthcare Workers East. As set forth in the Amended Certification filed herewith as **Exhibit A**, 1199SEIU Pension Fund purchased PACS common stock during the Class Period and suffered substantial losses and damages as a result of the violations of the federal securities laws alleged in this action. 1199SEIU Pension Fund purchased PACS common stock in the SPO on September 6, 2024, pursuant to and traceable to the SPO Offering Documents. In particular, 1199SEIU Pension Fund purchased 20,326 shares of PACS common stock in the SPO directly from Defendant Citigroup Global Markets Inc. ("Citigroup") at the offering price of $36.25 and without

commission because of the underwriting discount paid to Citigroup as a selling underwriter in connection with this sale.

32. Additional plaintiff, the Police and Fire Retirement System of the City of Detroit, provides retirement, disability, and death benefits to uniformed employees of the city of Detroit, Michigan, including police officers and firefighters, through a combination of defined benefit and defined contribution plans administered by its Board of Trustees. As set forth in the Certification filed herewith as **Exhibit B**, Detroit P&F purchased PACS common stock during the Class Period and suffered substantial losses and damages as a result of the violation of federal securities laws alleged in this action. Detroit P&F purchased PACS common stock in the IPO on April 11, 2024, pursuant to and traceable to the IPO Offering Documents. In particular, Detroit P&F purchased 4,987 shares of PACS common stock in the IPO directly from Defendant Citigroup at the offering price of $21.00 and without commission because of the underwriting discount paid to Citigroup as a selling underwriter in connection with this sale. Detroit P&F purchased these shares and others at a time when only shares offered in the IPO were in the market. Detroit P&F also purchased PACS common stock in the SPO on September 6, 2024, pursuant to and traceable to the SPO Offering Documents. In particular, Detroit P&F purchased 2,060 shares of PACS common stock in the SPO directly from Defendant Citigroup at the offering price of $36.25 and without commission because of the underwriting discount paid to Citigroup as a selling underwriter in connection with this sale.

### B. Defendants

#### 1. The Corporate Defendant

33. Defendant PACS is incorporated in Delaware and headquartered in Farmington, Utah, with a network of facilities across 17 states. PACS's common stock trades on the NYSE under the ticker symbol "PACS."

34. On April 11, 2024, PACS conducted its IPO, through which 24,642,856 shares of PACS common stock, including the overallotment of 3,214,284 shares, were sold to the investing public. The IPO was priced at $21.00 per share and generated net proceeds for the Company of approximately $423 million and net proceeds of approximately $63.4 million for the Insider Selling/Controlling Stockholder Defendants. The IPO was conducted pursuant to, and the sale of PACS common stock was solicited by, several documents that were filed by PACS and the other IPO Securities Act Defendants with the SEC and disseminated to the investing public, including (i) a March 13, 2024 registration statement on Form S-1 that, following amendments, was declared effective by the SEC on April 10, 2024 (the "IPO Registration Statement"), and (ii) an April 10, 2024 final prospectus, which forms part of the IPO Registration Statement, on Form 424(b)(4) (the "IPO Prospectus" and, together with the IPO Registration Statement, the "IPO Offering Documents").

35. On September 6, 2024, PACS conducted its SPO, through which 19,034,482 shares of PACS common stock, including the overallotment of 2,482,758 shares, were sold to the investing public. The SPO was priced at $36.25 per share and generated net proceeds for the Company of approximately $96.4 million and net proceeds of approximately $564 million for the Insider Selling/Controlling Stockholder Defendants. The SPO was conducted pursuant to, and the sale of PACS common stock was solicited by, several documents that were filed by PACS and the other SPO Securities Act Defendants with the SEC and disseminated to the investing public, including (i) a September 3, 2024 registration statement on Form S-1 that was declared effective by the SEC on September 5, 2024 (the "SPO Registration Statement"), and (ii) a September 5, 2024 final prospectus, which forms part of the SPO Registration Statement, on Form 424(b)(4)

(the "SPO Prospectus" and, together with the SPO Registration Statement, the "SPO Offering Documents").

36. The IPO Offering Documents and the SPO Offering Documents are collectively referred to herein as the "Offering Documents."

37. The IPO and the SPO are collectively referred to herein as the "Offerings."

**2. Individual Defendants**

38. Defendant Jason Murray ("Murray") is a co-founder of PACS and was PACS's Chief Executive Officer and Chairman of the Board during the Class Period, including at the time of the IPO and the SPO. Defendant Murray was an insider selling stockholder in the IPO and in the SPO and a controlling stockholder of PACS at all times. Defendant Murray sold 1,607,142 shares of PACS common stock in the IPO and 8,128,352 shares of PACS common stock in the SPO.

39. Defendant Mark Hancock ("Hancock") is a co-founder of PACS and was Director and Executive Chairman of the Board during the Class Period, including at the time of the IPO and the SPO, in addition to being both its former CFO and current Interim CFO. Defendant Hancock was a member of the Board's Audit Committee at the time of the IPO. Defendant Hancock was an insider selling stockholder in the IPO and in the SPO and a controlling stockholder of PACS at all times. Defendant Hancock sold 1,607,142 shares of PACS common stock in the IPO and 8,128,352 shares of PACS common stock in the SPO.

40. Prior to July 1, 2023, Defendants Murray and Hancock were PACS's only Board members.

41. Defendants Murray and Hancock each owned 64,361,693 shares or 50% of PACS common stock prior to the IPO; as such, before the IPO, Defendants Murray and Hancock owned 128,723,386 shares combined, or 100% of all PACS common stock. Before the SPO, Defendants

Murray and Hancock owned 125,509,102 shares combined, or 82.4% of all PACS common stock. Defendants Murray and Hancock still owned 71.2% of all PACS common stock immediately following the SPO. Due to this concentration, Defendants Murray and Hancock at all relevant times have been able to determine the outcome of all corporate actions requiring shareholder approval, including the election and removal of directors and control of PACS's business direction and policies. As the Company admitted in connection with its IPO, its founders Murray and Hancock controlled the Company and "our founders will be able to control corporate matters for the foreseeable future."

42. Defendants Murray and Hancock are collectively referred to herein as the "Insider Selling/Controlling Stockholder Defendants."

43. Defendant Derrick Apt ("Apt") was PACS's Chief Financial Officer during the Class Period, including at the time of the IPO and the SPO. In connection with the IPO, Defendant Apt received an award of 1,313,830 restricted stock units ("RSUs") worth over $27.5 million at the time of the IPO. Defendants Murray and Hancock hired Defendant Apt.

44. Defendant Joshua Jergensen ("Jergensen") was the President and Chief Operating Officer at PACS during the Class Period, including at the time of the IPO and the SPO. In connection with the IPO, Defendant Jergensen received an award of 3,003,039 RSU worth over $63 million at the time of the IPO. Defendants Murray and Hancock hired Defendant Jergensen.

45. Defendant P.J. Sanford ("Sanford") was the Vice-President of Finance, and subsequently the President of PACS Services, during the Class Period, including at the time of the IPO and the SPO. In connection with the IPO, Defendant Sanford received an award of 1,501,520 RSUs worth over $31.5 million at the time of the IPO. Defendants Murray and Hancock hired Defendant Sanford.

46. Defendants Murray, Hancock, Apt, Jergensen, and Sanford are collectively referred to herein as the "Executive Defendants" and, together with PACS, the "PACS Defendants.

47. Defendant Michelle Lewis ("Lewis") was PACS's Chief Accounting Officer during the Class Period, including at the time of the IPO and the SPO. In connection with the IPO, Defendant Lewis received an award of 374,380 RSUs worth over $7.8 million at the time of the IPO. Defendants Murray and Hancock hired Defendant Lewis.

48. Defendant Jacqueline Millard ("Millard") was a director on PACS's Board during the Class Period, including at the time of the IPO and the SPO. Defendants Murray and Hancock selected Defendant Millard to be a member of the Board.

49. Defendant Taylor Leavitt ("Leavitt") was a director on PACS's Board during the Class Period, including at the time of the IPO and the SPO. Defendants Murray and Hancock selected Defendant Leavitt to be a member of the Board.

50. Defendant Evelyn Dilsaver ("Dilsaver") was a director on PACS's Board during the Class Period, including at the time of the SPO. Defendants Murray and Hancock selected Defendant Dilsaver to be a member of the Board.

51. Defendants Murray, Hancock, Apt, Lewis, Millard and Leavitt are collectively referred to herein as the "IPO Individual Defendants."

52. Defendants Murray, Hancock, Apt, Lewis, Millar, Leavitt, and Dilsaver are collectively referred to herein as the "SPO Individual Defendants.

53. The Executive Defendants, IPO Individual Defendants, and SPO Individual Defendants are collectively referred to herein as the "Individual Defendants."

54. Each of the IPO Individual Defendants participated in the preparation of and signing of the IPO Registration Statement and in the making of the IPO Offering Documents'

materially inaccurate, misleading and incomplete statements alleged herein. The IPO Individual Defendants signed the IPO Registration Statement, participated in the IPO, and solicited the purchase of PACS common stock in the IPO to serve their financial interest and those of PACS.

55. Each of the IPO Individual Defendants reviewed, edited, and approved the IPO Offering Documents. Each of the IPO Individual Defendants also reviewed, edited, and approved the IPO's roadshow presentation, talking points, and script for presentation to investors. Each of the IPO Individual Defendants conducted the roadshow along with the IPO Underwriter Defendants to solicit the purchase of PACS common stock in the IPO and to serve their financial interests and those of PACS.

56. Each of the SPO Individual Defendants participated in the preparation of and signing of the SPO Registration Statement and in the making of the SPO Offering Documents' materially inaccurate, misleading and incomplete statements alleged herein. The SPO Individual Defendants signed the SPO Registration Statement, participated in the SPO, and solicited the purchase of PACS common stock in the SPO to serve their financial interest and those of PACS.

57. Each of the SPO Individual Defendants reviewed, edited, and approved the SPO Offering Documents. Each of the IPO Individual Defendants also reviewed, edited, and approved the IPO's roadshow presentation, talking points, and script for presentation to investors. Each of the SPO Individual Defendants conducted the roadshow along with the SPO Underwriter Defendants to solicit the purchase of PACS common stock in the SPO and to serve their financial interests and those of PACS.

58. The IPO Individual Defendants and the SPO Individual Defendants were each a control person of PACS by virtue of their position as directors and/or senior officers of the Company. The IPO Individual Defendants and the SPO Individual Defendants each had a series

of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or the Insider Selling/Controlling Stockholder Defendants.

### 3. Underwriter Defendants

59. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Citigroup acted as a representative of all of the underwriters in the Offerings. Defendant Citigroup was allocated 6,586,136 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant Citigroup was allocated 5,549,696 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment. In addition, Defendant Citigroup further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended and Restated 2023 Credit Facility,[5] and Defendant Citigroup was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant Citigroup had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

60. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant J.P. Morgan acted as a representative of all of the underwriters in the Offerings. Defendant J.P. Morgan was allocated 6,586,136 shares in the IPO to sell directly to the investing public, before the exercise

---

[5] According to the IPO Offering Documents: "We intend to use approximately $371.4 million of the net proceeds from this offering, which represents approximately 89% of the estimated net proceeds from this offering, to repay amounts outstanding under our Amended and Restated 2023 Credit Facility."

of the overallotment. Defendant J.P. Morgan was allocated 4,965,518 696 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment. In addition, Defendant J.P. Morgan further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended and Restated 2023 Credit Facility, and Defendant J.P. Morgan was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant J.P. Morgan had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

61. Defendant Truist Securities, Inc. ("Truist") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Truist acted as a representative of all of the underwriters in the Offerings. Defendant Truist was allocated 4,390,757 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant Truist was allocated 3,310,345 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment. In addition, Defendant Truist further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended and Restated 2023 Credit Facility, and Defendant Truist was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant Truist had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

62. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination

of the materially inaccurate and incomplete Offering Documents. Defendant RBC was allocated 1,352,941 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant RBC was allocated 851,926 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment. In addition, Defendant RBC further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended and Restated 2023 Credit Facility, and Defendant RBC was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant RBC had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

63. Defendant Goldman Sachs & Co. LLC ("Goldman") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Goldman was allocated 869,747 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant Goldman was allocated 681,542 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment.

64. Defendant Stephens Inc. ("Stephens") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Stephens was allocated 483,193 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant Stephens was allocated 272,616 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment.

65. Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete IPO Offering Documents. Defendant KeyBanc was allocated 386,554 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. In addition, Defendant KeyBanc further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended and Restated 2023 Credit Facility, and Defendant KeyBanc was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant KeyBanc had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

66. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter for the IPO and the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Oppenheimer was allocated 386,136 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. Defendant Oppenheimer was allocated 238,539 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment.

67. Defendant Regions Securities LLC ("Regions") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete IPO Offering Documents. Defendant Regions was allocated 386,554 shares in the IPO to sell directly to the investing public, before the exercise of the overallotment. In addition, Defendant Regions further received at least 5% of the net proceeds of the IPO because some of the IPO proceeds were earmarked for paying down PACS's Amended

and Restated 2023 Credit Facility, and Defendant Regions was a lender under PACS's Amended and Restated 2023 Credit Facility. As a result, Defendant Regions had a pecuniary interest in the IPO beyond customary underwriting discounts and commissions in excess of tens of millions of dollars and had to disclose the existence of a "conflict of interest" within the meaning of FINRA Rule 5121.

68. Defendant UBS Securities LLC ("UBS") was an underwriter for the SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete SPO Offering Documents. Defendant UBS was allocated 681,542 shares in the SPO to sell directly to the investing public in the SPO, before the exercise of the overallotment.

69. Defendants Citigroup, J.P. Morgan, Truist, RBC, Goldman, Stephens, KeyBanc, Oppenheimer, and Regions are collectively referred to herein as the "IPO Underwriter Defendants."

70. Defendants Citigroup, J.P. Morgan, Truist, RBC, Goldman, UBS, Stephens, and Oppenheimer are collectively referred to herein as the "SPO Underwriter Defendants" and, together with the IPO Underwriter Defendants, the "Underwriter Defendants."

71. "Defendants" as used herein collectively refers to Defendants PACS, Murray, Hancock, Apt, Lewis, Millar, Leavitt, Dilsaver, Jergensen, Sanford, Citigroup, J.P. Morgan, Truist, RBC, Goldman, Stephens, KeyBanc, Oppenheimer, Regions, and UBS.

72. The Underwriter Defendants are investment banking houses that specialize, among other things, in underwriting public offering of securities. The IPO Underwriter Defendants and the SPO Underwriter Defendants participation in the IPO and SPO, respectively, and their

solicitation of purchases of PACS common stock in the IPO and SPO, respectively, was motived by their financial interests.

73. Collectively, the IPO Underwriter Defendants received over $31 million in fees and "underwriter discounts" in connection with their involvement in the IPO, including the sale of PACS common stock in the IPO to the investing public.

74. Collectively, the SPO Underwriter Defendants received over $29 million in fees and "underwriter discounts" in connection with their involvement in the SPO, including the sale of PACS common stock in the SPO to the investing public.

75. The IPO Underwriter Defendants and the SPO Underwriter Defendants determined that, in return for their respective shares of the IPO's proceeds and SPO's proceeds, they were willing to merchandise PACS common stock in the IPO and SPO, respectively. The IPO Underwriter Defendants arranged for a roadshow prior to the IPO during which they, and the IPO Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects. The SPO Underwriter Defendants arranged for a roadshow prior to the SPO during which they, and the SPO Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

76. The Underwriter Defendants demanded and obtained agreements from PACS that the Company would indemnify and hold the Underwriter Defendants harmless for any liability under the federal securities laws. They also made certain the PACS purchased millions of dollars of directors' and officers' liability insurance.

77. The IPO Underwriters assisted PACS and the IPO Individual Defendants in planning the IPO, and purportedly conducted a pre-IPO investigation into the business and

operations of PACS, in an undertaking known as "due diligence." The SPO Underwriters assisted by PACS and the SPO Individual Defendants in planning the SPO, and also purportedly conducted pre-SPO due diligence. During the course of their purported "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning PACS's operations and financial prospects.

78. In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, directors, and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the Offerings and ensure adequate investor demand; (ii) the terms of the Offerings, including the prices at which the Company's common stock would be sold; (iii) the language used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.

79. Prior to the IPO, the IPO Underwriter Defendants required all existing PACS stockholder, including the Company, to enter into lock-up agreements with them to prohibit the share of PACS common stock, other than those issued and sold in the IPO, from being sold in the public market for 180 days from the date of the IPO Prospectus (April 10, 2024). Indeed, the IPO Offering Documents disclosed that due to the lock-up, "only the shares of common stock sold in [the IPO] will be freely tradeable, without restriction, in the public market immediately after [the IPO]. These lock-up agreements were not waived by the IPO Underwriter Defendants prior to their expiration, except for the shares sold in the SPO on September 6, 2024. After the SPO, shares not sold in the IPO or SPO remained subject to a lock-up period of 90 days from the date of the SPO Prospectus (September 5, 2024). These lock-up agreements were not waived.

80. The IPO Underwriter Defendants caused the IPO Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the IPO Offering Documents, including to Detroit P&F and the Class.

81. The SPO Underwriter Defendants caused the SPO Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and traceable to the SPO Offering Documents, including to Plaintiffs and the Class.

## V. BACKGROUND ON RELEVANT MEDICARE AND MEDICAID HEALTH PROGRAMS AND SKILLED NURSING FACILITIES

### A. Medicaid and Medicare

82. Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid is administered by states, according to federal requirements. The program is jointly funded by states and the federal government. Eligible participants may apply for Medicaid at any time of the year. As of April 2024, approximately 74,640,222 people were enrolled in Medicaid.

83. Medicare is a health insurance program available to qualified U.S. adults age 65 or older and younger people who receive disability benefits. Medicare consists of four parts: Part A covers hospital care and related services; Part B covers doctor appointments and outpatient medical care; Part C covers the same benefits as Parts A and B but is offered by private insurers, often referred to as a Medicare Advanta plan; and Part D covers prescription drugs. This case primarily concerns Medicare Parts A and B.

84. Below is a chart comparing the relevant differences between Medicare Part A and Medicare Part B within an SNF:

| | **Part A** | **Part B** |
|---|---|---|
| **Coverage Generally** | Hospital and other inpatient services (surgeries, limited skilled nursing facility stays, hospice care, etc.). | Outpatient medical services (preventative care, doctor's appointments, therapy services (including respiratory and sensory therapies), medical equipment, etc.) |
| **Eligibility and Coverage Limits** | Part A billing requires a three-day inpatient hospital stay (excluding the discharge day), admission to an SNF within 30 days, and the need for daily skilled care. The coverage is subject to a 100-day limit per benefit period. | Does not require hospitalization and provides ongoing coverage for medically necessary outpatient services. |
| **Claim Submission** | Part A claims for SNF services are generally submitted electronically using the 837I format (the electronic equivalent of the UB-04/CMS-1450 form), though paper claims may be submitted via the UP-o4 form when permitted, for bundling payments covering inpatient skilled nursing care. It is essential to regularly track the number of benefit days and the level of care provided to the patient. | Part B claims are generally submitted using the ASI ASC X12 837I[6] format and may in certain circumstances be submitted using a CMS-1500 form by individual providers or the SNF for separate services. Every service should be medically necessary, accurately documented, and must be billed individually. Billing requires strict adherence to specific Current Procedural Terminology ("CPT") / Healthcare Common Procedure Coding System ("HCPCS") codes and documentation standards to support medical necessity. |

[6] *3-Day Stay and Benefit-Period Waivers for Medicare Part A SNF PPS*, AM. HEALTH CARE ASS'N & NAT'L CTR. FOR ASSISTED LIVING (last updated Apr. 4, 2023), https://www.ahcancal.org/Survey-Regulatory-Legal/Emergency-Preparedness/Documents/COVID19/3-Day%20Waiver%20FAQ.pdf.

**B. Skilled Nursing Facilities**

85. A skilled nursing facility ("SNF") is a healthcare facility that provides 24-hour medical care and support for individuals who are recovering from illness, surgery, or injury, as well as those with chronic health conditions.

86. SNFs provide a range of services, including medical care, rehabilitation services, and assistance with daily activities. Unlike assisted living facilities, SNFs are equipped to handle complex medical needs and rehabilitation services. SNFs are often staffed by at least one licensed administrator, a Director of Nursing, licensed nurses, and specialized therapists.

87. Health care coverage at an SNF focuses on continuing care that started in a hospital for a given health problem. For SNF care to be covered by Medicare Part A, the patient must have (a) a three-day inpatient hospital stay within the past thirty days, (b) remaining days in the 100-day Medicare benefit period that are available to be used, and (c) a medical provider that determines the patient has skilled nursing needs. However, Medicare Part A does not cover ongoing care needs, indefinite skilled nursing needs, or custodial care alone.

**C. Licensed SNF Administrators**

88. Every state has training and experience requirements for administrators to qualify for a license, and those requirements vary. Requirements could include a master's degree in healthcare administration plus six-months' experience in the field, or some combination of training, education, and work experience. Regardless of state requirements, however, all administrators must at least have the following: (1) a bachelor's degree; (2) experience working in an assisted living facility or skilled nursing facility; (3) pass a background check; (4) complete an Administrator in Training program, which typically includes 1,000 hours of experience and education; and (5) take and pass the nursing home administrator licensing examination, or its equivalent, in the state where the administrator will work.

## VI. BACKGROUND FACTS FOR ALL CLAIMS ASSERTED

### A. Overview of PACS's Business

89. Founded in 2013 by Defendants Murray and Hancock, PACS initially established itself as a provider of skilled nursing facilities to meet the growing demand for long-term care and rehabilitation services across the United States. As it expanded, PACS adopted a "turnaround" business model, claiming that the nature of its business and financial proposition to investors was that it created value by acquiring underperforming SNFs and implementing changes to genuinely enhance their financial performance. Today, PACS operates a range of healthcare services, including long-term care and short-term rehabilitation.

90. PACS operates in the highly regulated and competitive U.S. healthcare market, where it served more than 30,000 patients daily through its network of approximately 212 to 314 facilities (from the beginning to the end of the Class Period) across 17 states. The Company employed more than 40,000 staff members at its height in the Class Period, including healthcare professionals and administrative personnel.

### B. PACS Services

91. PACS's main operating subsidiary is Providence Administrative Consulting Services, Inc., also known as PACS Services. It is the only operating subsidiary specifically named in "NOTE 1. ORGANIZATION AND NATURE OF BUSINESS" within the Offering Documents. According to the Offering Documents, the Company's only facility other than its local SNFs and Assisted Living Facilities is the single "PACS Services' main office" at 262 N. University Ave, Farmington, Utah 84025 which "consists of approximately 35,000 square feet of usable office space" and houses the Company's headquarters and "principal executive offices," including each of the "named executive officers and directors."

92. According to PACS's 2024 Annual Report, PACS Services is "a comprehensive suite of offerings" created to assist local SNFs "in achieving their best clinical and operating potential." PACS Services offers "accounting, finance, human resources, payroll, accounts receivable and payable, legal, compliance, and risk management services, as well as a robust suite of technology tools." In addition, PACS Services provides "teams of regional professionals available as resources to each facility, including a regional vice president ("RVP") for each operational region, and regional clinical and non-clinical directors and consultants." PACS Services is offered to each of the Company's facilities.

**C. PACS's Revenue and Costs**

93. During the Class Period, PACS generated 97% of its total revenue from patient and resident services, which comprise skilled nursing services, senior assisted living services, and certain ancillary services provided outside of routine contractual agreements. The revenue from these services comes from governmental programs including Medicare and Medicaid, patients, and other third-party payors.

94. The business segment related to skilled nursing services is responsible for the vast majority of the Company's revenue and profit. As the Offering Documents disclosed, this part of its business contributed $3,092,577,000 in annual revenue, approximately 99.3% of the Company's 2023 revenue. In the 2024 Annual Report (including restated financials for the first and second quarters of 2024), this part of the business contributed $4,014,412,000 in revenue, approximately 98.2% of the Company's 2024 revenue.

95. Within the skilled nursing operations, revenue is generated from Medicaid, Medicare, and other payors such as commercial insurance companies, health maintenance organizations, and preferred provider organizations. Medicare is the Company's largest source of total revenue, accounting for 38.6% of total revenue for the year ended December 31, 2022, 47.6%

of total revenue for the year ended December 31, 2023, and 37.3% of total revenue for the year ended December 31, 2024.

96. Medicaid is also a significant source of funding for PACS's subsidiaries. Medicaid accounted for 29.0% of total revenue for the year ended December 31, 2022, 35.2% for the year ended December 31, 2023, and 38.1% for the year ended December 31, 2024.

97. PACS's primary costs consist of payroll and related benefits, supplies, purchased services, and ancillary expenses such as the cost of pharmacy and therapy services provided to patients. The Company incurs additional costs for general and professional liability insurance, rent expenses related to leasing its operational facilities, dietary services, contracted services, and other general costs of services.

### D. Former PACS Employees[7]

98. FE-1 was employed as a Director of Admissions at a PACS-owned SNF from November 2023 through August 2024.[8]

99. FE-2 was an Assistant Regional Director of Clinical Services at a PACS facility in California for several years during the Class Period. He oversaw approximately 15 facilities in his region over the course of his tenure at PACS. At any one time, FE-2 was supervising five facilities.

100. FE-3 was a Business Officer Manager for a California SNF from October 2023 through August 2024. In his role, FE-3 oversaw accounts receivable, insurance payments, and medical claims for his facility.

[7] Former Employees ("FEs") will be identified herein by number (FE-1, FE-2). All FEs will be described in the masculine to protect their identities.

[8] Plaintiffs believe that the details of the responsibilities of all the FEs contained herein are sufficient to satisfy the applicable pleading requirements. However, if the Court requests, Plaintiffs can provide additional identifying information to the Court through an *in camera* submission.

101. FE-4 was the Director of Medical Records for a PACS facility in Arizona from September 2024 through February 2025. FE-4 advised that he resigned from PACS because the Company routinely violated HIPAA laws, and despite his complaints, those violations were not corrected.

102. FE-5 is a Licensed Nursing Home Administrator who holds a Ph.D. in Healthcare Administration. He was an Interim Executive Director at a PACS facility in Colorado from March 2024 through October 2024. FE-5 explained that, as an Interim Administrator, he would focus on the specific issues affecting the facility where he was working; he would learn its business, its building, and any applicable issues, and then move on to another facility where an administrator was needed. He gave an example: PACS had hired an administrator to take over a facility, but that new hire was not available until July, so PACS assigned FE-5 to work at that facility as its licensed administrator until the new hire was ready to take over; at that point, FE-5 was reassigned to a new facility.

103. FE-6 was the Executive Director at a PACS facility in Arizona from April 2024 through the end of June 2024.

104. FE-7 was a PACS Regional Marketing Director in 2024. He oversaw marketing and admissions for numerous SNFs owned by PACS in the Southwest region. His duties involved helping with image, marketing, boosting revenue, and "census growth," and introducing those SNFs to his hospital contacts.

105. FE-8 was the Director of Business Development at a PACS facility in Colorado from April 2024 through April 2025. His job involved increasing streams of revenue, increasing admissions of patients, contacting health care providers for patient referrals, and communicating with families of patients when there were grievances.

106. FE-9 was an Administrator at a PACS facility in California from the second half of 2023 through 2025. FE-9's responsibilities included overseeing the facilities operations. FE-9 reported directly to Chad Nielsen, current PACS Regional Vice President of Operations.

107. FE-10 was an Administrator at a PACS facility in Arizona from September 2023 through July 2024. FE-10's responsibilities included overseeing the management and operations of the facility. When FE-10 was first employed with PACS, he reported directly to JD White, then and current PACS Regional Vice President of Operations in California, and he later reported directly to Smitty Hartley, then and current Regional Vice President of Operations in Arizona.

108. Each of the FEs herein worked during the Class Period at distinct SNFs within PACS covering 28 of PACS's 212 to 314 SNFs (totals at the start and end of the Class Period).

## VII. SUBSTANTIVE FACTUAL ALLEGATIONS

### A. General Overview

109. Skilled nursing care is typically covered by Medicare Part A, but only if the patient first spent three days in a hospital. With the onset of the COVID-19 pandemic in March 2020, and continuing through May 2023, the COVID-19 Waiver allowed beneficiaries of Medicare Part A to receive skilled nursing care at an SNF without the three-day inpatient hospital stay.

110. The COVID-19 Waiver became a significant boon for PACS, but not in the way CMS intended. The Company instead took extraordinary advantage of increased Medicare reimbursements, in situations where CMS and AHCA guidance deemed it inappropriate, to fuel its rapid growth. The IPO Offering Documents stated that the Company's net income more than doubled from 2021 through 2023 (approximately $48 million to $113 million), but did not accurately describe the role of CMS's COVID-19 Waiver in driving that increase in net income.

111. When the COVID-19 Waiver expired in May 2023, what expired with it (over the next 100 days) was PACS's ability to improperly boost its Medicare skilled care revenue at a high

profit margin. As a result, PACS's Medicare skilled care revenue declined at least $90 million in each of the two quarters after expiration of the waiver—$180 million total. For context, that amount exceeded the Company's net income for each of the full years 2022 and 2023 ($150,496,000 and $112,882,000 respectively) while PACS was abusing the waiver, and its IPO was only one quarter away. To maintain its ruse that PACS could turn around struggling SNF facilities, and that PACS was profitable with such high net income, the PACS Defendants needed to find a new way to increase revenue without increasing costs and enable a successful IPO. Medicare Part B was its **next trick**.

112. Beginning around May 2023, PACS employees company-wide began to receive top-down directives from the PACS Defendants to perform unnecessary respiratory therapies on thousands of patients, regardless of clinical need or outcome. The PACS Defendants coordinated this effort all Class Period by sending its Regional Vice Presidents—each of whom reported directly to Defendant Sanford—to various facilities to push such unnecessary respiratory treatments for patients. By billing these additional respiratory treatments to Medicare Part B, a SNF could drive anywhere from $150,000 to $1 million per month in high-profit-margin revenue per facility.

113. Of course, it was impossible for clinical staff to provide the volume of respiratory therapy that PACS was pushing, which meant that staff were forced to continually falsify documentation. According to the testimony of a former regional clinical leader cited in the Hindenburg Report, with regard to proper documentation procedures, "PACS turned a blind eye and said, whatever you need to do to get these numbers and get this filled out, do it."

114. Also throughout the Class Period, PACS orchestrated the use of "sensory rooms," devoid of any actual therapeutic tools, to derive further revenue and profit from Medicare Part B.

115. Additionally, throughout the Class Period, when a patient had exhausted eligible Medicare Part A coverage, PACS "regenerated" patients. This involved sending patients to the hospital for a few days and then re-admitting them back into the facility, even when there was no legitimate reason, to "reset" or restart their Medicare coverage.

116. These various Medicare abuses were Company-wide, had no legitimate justification, and indeed had no conceivable justification except to inflate PACS's revenue, profit, and share price—as confirmed by both Hindenburg's independent investigation and Lead Counsel's investigation which included interviewing FEs across the Company covering 28 of PACS's 212 to 314 SNFs (totals at the start and end of the Class Period).

**B. COVID-19 Waiver Scheme**

117. With the COVID Public Health Emergency ("PHE") from March 1, 2020 through May 11, 2023, CMS's COVID-19 Waiver allowed Medicare Part A beneficiaries to receive up to 100 days of skilled nursing care at an SNF without the three-day prior inpatient hospital stay, provided they required daily skilled services arising from the PHE. This included a companion waiver for one-time renewal of exhausted benefits tied to COVID disruptions. The intention was to alleviate hospital overcrowding during the emergency, but it applied only to true skilled needs—not custodial care.

118. The AHCA and CMS clarified that a positive COVID test alone was insufficient justification for Part A SNF coverage, as skilled medical necessity (e.g., beyond isolation) was required. In practice, the COVID-19 Waiver necessitated documentation of post-acute skilled needs related to the PHE, such as ventilator weaning or intensive monitoring. SNFs submitted Part A institutional claims using "Condition Code DR (Disaster Related)," while related Part B services required "Modifier CR (Catastrophe/Disaster Related)," and both were discontinued for new claims after May 11, 2023, meaning use of the COVID-19 Waiver would taper off over the ensuing

100 days. Misuse of the COVID-19 Waiver—such as billing for non-skilled or non-emergency care—exposed facilities to False Claims Act liability.

119. Nevertheless, various PACS facilities would regularly and improperly rely on insufficient justifications—often just a single positive COVID test—to flip an entire facility from Medicaid to Medicare, improperly increasing the revenue line of that facility by as much as a factor of three at an extremely high profit margin. The PACS Defendants evidently viewed the COVID-19 pandemic as an opportunity to boost revenue through fraudulent billing and abuse of the COVID-19 Waiver. Numerous FEs and the Hindenburg Report independently corroborated this Company-wide practice.

120. During COVID, employees observed these deceptive practices.

121. FE-1 advised that the goal for PACS was to "flip everyone" to Medicare because Medicare pays "much better" than private insurers.

122. FE-1 explained that "flipping" patients to Medicare referred to transferring patients from their existing insurers (such as a PPO or HMO) to Medicare coverage. According to FE-1, patients were flipped to Medicare without the patients' permission, consent, or knowledge and without the patients signing any certified letter agreeing to the flip. FE-1 noted that many clients "did not want to switch to Medicare" because those patients would be responsible for co-pays after the first 20 days of their skilled nursing stay. FE-1 indicated that PACS even flipped patients who were incapacitated, without informing those patients' family members and/or Power of Attorney holders. FE-1 advised that patients and their families often did not know that they had been flipped to Medicare until months later, typically when they received a letter in the mail from Medicare explaining their new Medicare benefits. According to FE-1, several families complained to him about this switch and were upset that it was done without their permission. Despite the complaints,

however, these flips kept happening, because FE-1 explained that if an employee did not flip patients to Medicare, "you were let go."

123. According to FE-10, Administrators were instructed to "flip" patients between payor sources to maximize billing. FE-10 explained that patients admitted under Medicare Part A would be switched to Part B when their Part A coverage expired, and then often had to apply Medicaid to cover room and board expenses while still receiving Part B services. FE-10 added that in Arizona, patients with Managed Care (Medicaid) could also be flipped between coverage types to increase reimbursement.

124. The Hindenburg Report confirmed and explained this apparent discrepancy by observing that PACS managed to keep exploiting the COVID-19 Waiver for 100 days after it expired due to the 100-day window for which Medicare A provides coverage once triggered. Per the Hindenburg Report: "The COVID waiver expired on May 11th, 2023, but any patients who had already accessed Medicare benefits under the waiver could continue doing so until their 100-day benefit period had ended, meaning SNFs could benefit financially from the waiver as late as August 2023, according to the AHCA."[9]

125. The Hindenburg Report independently corroborates the statements from FEs. After a 5-month investigation into PACS, Hindenburg reported on a "management-driven, company-wide scheme to defraud Medicare through the COVID emergency, evidenced by anomalies in PACS's Medicare revenue, and corroborated by more than a dozen former PACS employees." With the 3-day hospital stay waived, facilities were flipping entire buildings of patients from

---

[9] The Hindenburg Report, in turn, cites the AHCA by linking to *3-Day Stay and Benefit-Period Waivers for Medicare Part A SNF PPS*, AM. HEALTH CARE ASS'N & NAT'L CTR. FOR ASSISTED LIVING (last updated Apr. 4, 2023), https://www.ahcancal.org/Survey-Regulatory-Legal/Emergency-Preparedness/Documents/COVID19/3-Day%20Waiver%20FAQ.pdf.

Medicaid to Medicare based on a single person testing positive for COVID, "absolutely inappropriately." According to a regional manager interviewed by Hindenburg, the fraudulent flipping was easy "with the [COVID] waiver in place because it was just internal documentation."

126. The Hindenburg Report preemptively negated PACS's potential defense that its rise in Medicare revenue was due to its turnaround strategy by comparing Medicare revenue at facilities before COVID to the revenue generated while the COVID-19 Waiver was in effect. Hindenburg analyzed the financial performance of 26 facilities that would have been considered "mature" at the onset of the pandemic, meaning they would "be expected to already be operating at or near their 'full potential' before the COVID pandemic even started." However, despite this maturity, the 26 facilities collectively reported increasing their skilled care Medicare revenue by 190% during the pandemic, from $52.2 million in 2019 to $151.5 million in 2022. The clear implication is that this revenue increased due to PACS's exploitation of the COVID-19 Waiver and not anything to do with PACS's turnaround strategy.

127. As further proof that PACS's financial results were driven by wrongful conduct, Hindenburg identified 39 California-based SNFs operated by PACS's competitor, the Ensign Group, that also would have been considered "mature" by PACS's definition at the outset of the pandemic. Ensign's 39 SNFs increased their combined skilled care Medicare revenue from $67.2 million in 2019 to $82.8 million in 2022, or just 23% in total. PACS's mature facilities, on the other hand, reported 190% growth in the same period. This analysis indicates that PACS's triple-digit percentage growth in skilled care Medicare revenue while the COVID-19 Waiver was in place was not an industry trend.

128. According to the Hindenburg Report's credible research:

> [A]fter the COVID waiver expired, PACS' quarterly Medicare revenue declined suddenly and without explanation from a reported peak of ~$340

million in Q1 2023 to an estimated $271 million in Q4 2023.... When accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimated ~$90 million per quarter, equivalent to ~$360 million in annualized revenue.




(Source: PACS Financial Statements [Pgs. 15, 16, and F-17] and Hindenburg estimates)

We believe this decline indicates that PACS was generating hundreds of millions of dollars a year in Medicare revenue from the COVID waiver scheme, allowing it to go public with the illusion of rapid, legitimate growth and profitability....

With former employees explaining that most of the COVID waiver revenue flowed right to the bottom line, we estimate that the scheme flipped PACS' financials from negative to strongly positive, likely contributing more than 100% of PACS' 2022 and 2023 operating income of $229 million and $207 million, respectively.

(Footnotes omitted.)

129. As such, PACS would not have been profitable in 2022 or 2023 without its exploitation of the COVID-19 Waiver. Thus, when the COVID-19 Waiver ended on May 11, 2023, and its revenue-boosting effects ended within 100 days thereof, PACS would lose its appearance of profitability and growth right as it was preparing to go public in the beginning of 2024.

**C. Respiratory Billing Scheme**

130. With the end of the COVID-19 Waiver on May 11, 2023, PACS needed a new way to artificially inflate their revenue and return to the appearance of profitability in advance of the IPO, and respiratory therapy was its next scheme. Beginning in the Company's first fiscal quarter of 2024 (prior to the IPO) and continuing through its second fiscal quarter of 2024 (including and after the IPO), PACS wrongly billed Medicare B for improper revenue from unnecessary respiratory therapies. This scheme was independently confirmed by multiple former employees, the Hindenburg Report, and the Company's own Restatement of more than $61 million in "revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B should not have been recognized as revenue" in the first and second fiscal quarters of 2024. In comparison, the Company's stated GAAP net income for the same period was only "$38.2 million for the six months ended June 30, 2024." Because the Restatement attributed more than $61 million to improper recognition of revenue from Medicare B in the first half of 2024, and because PACS reported only $38.2 million in net income over the same period, the Company would not have been profitable during its IPO without this Medicare B scheme.

131. According to the Restatement, PACS recognized at least $14,885,000 in improper revenue from Medicare Part B in the first quarter of 2024 and at least $46,141,000 in improper revenue from Medicare Part B in the second quarter of 2024. PACS's Restatement reduced revenue $61 million as the result of improper recognition of revenue associated with certain Medicare Part B ancillary services, including respiratory therapy, sensory integration therapy, and ultrasound mist therapy in Q1 2024 and Q2 2024.

132. Nor would PACS have met management's previously issued guidance for the second quarter of 2024. When financial results for this quarterly period were disclosed in the Restatement, PACS beat this 2024 revenue guidance ($4.09 billion, or a 5% beat from the midpoint

of the guidance) but missed adjusted EBITDA ($279.5 million, or a 25% miss from the midpoint of the guidance).

133. FE-9 described PACS's push for respiratory therapy as one of the "fill the gap" schemes following the loss of the COVID-19 Waiver, which was previously considered PACS's main stream of revenue. FE-9 added "it was like a Ponzi scheme." According to FE-9, respiratory therapies became one of PACS's biggest revenue streams after the end of the COVID-19 Waiver. FE-9 added that respiratory therapists were given bonuses based on how much revenue they brought in through providing respiratory therapy, which, according to FE-9, was against the rules. He noted that respiratory therapists were highly incentivized to get "everyone" on respiratory therapy.

134. FE-3, who oversaw accounts receivable and medical claims, noted that he had never billed separately for respiratory therapy prior to PACS initiating its respiratory therapy services; it had always been included in skilled nursing services.

135. FE-3 recounted that there were video conferences and emails in which PACS pushed providing respiratory therapy to be billed under Medicare Part B. FE-3 indicated that the video conference meetings were led by "Corporate Level Management" of PACS. FE-3 indicated that quotas were discussed on a video call in or shortly before May 2023, during which an individual named Eric instructed the staff to perform respiratory therapy and how to bill for it.[10] According to FE-3, the May 2023 Zoom meeting was for his whole region and was attended by corporate-level clinical nurses, Administrators, business office staff, accounts receivable consultants (including those at the regional level), Directors of Nursing, and MDS Coordinators.

[10] According to Lead Counsel's investigation, the "Eric" referenced by FE-3 is Regional Vice President Eric Felton.

FE-3 explained that May 2023 was when PACS expected the facilities to start billing for respiratory therapy treatments.

136. FE-3 indicated that he was given spreadsheets about how to bill and how much to bill for various treatments. FE-3 commented that he was given very limited information as to what or how to justify the treatment in terms of which diagnoses to use.

137. FE-10 recalled that a respiratory training was held on Zoom and led by the Regional President. The training included several strategies on how to bill Medicare, such as 15 minutes of therapy that could be billed at a "set rate" to increase PACS revenue. FE-10 recalled that the training also described documenting practices for services such as "breathing treatments such as cupping," even when those treatments were not actually performed.

138. Because FE-3 and FE-10 were both located in distinct PACS regions, and reported to different RVPs, the clear implication was that the directive to over-bill Medicare B for respiratory therapies using a centrally-designed and centrally-distributed scheme came from above the Company's regional leadership and therefore came from the Company's central leadership. Because all of PACS's Regional Vice Presidents report directly to Defendant Sanford, who reported directly to Defendants Hancock and Murray, PACS's cross-regional use of the respiratory training programs in furtherance of the Medicare Part B scheme establishes that it was well-known by at least Defendant Sanford, if not also his direct supervisors Defendants Murray and Hancock.

139. FE-5 noted that at one of the monthly-in person meetings,[11] Administrator Jona Ashcroft gave a four-hour lecture on how to bill more for respiratory therapy, including how to use different billing codes for the therapy to bill for additional treatments in excess of the

[11] For context, PACS only "had 14 RVPs and regional teams" as of December 31, 2023 and at the time of its IPO, according to its IPO Prospectus.

regulatory cap on treatments per patient per day. FE-5 elaborated that Ashcroft advised attendees to make sure they billed "this way," then code "that way," to pass audits. In other words, the attendees were instructed that when they used one code too much—that is, when they maxed out the number of covered therapies—they must switch to a different code to be able to continue billing for the same respiratory therapy. FE-5 recollected that this four-hour meeting occurred in May 2024 and was attended by all Administrators and Regional VPs within Colorado. Looking back, FE-5 realized that the practices pushed in this meeting were unethical.

140. Because Ashcroft was from the California region, and FE-5 was in the Colorado region, the clear implication was that the directive to follow Ashcroft's practices over-billing Medicare B came from above the Company's regional leadership and therefore came from the Company's central leadership. Because all of PACS's Regional Vice Presidents report directly to Defendant Sanford, who reported directly to Defendants Hancock and Murray, PACS's inter-regional cooperation in pursuit of the Medicare Part B scheme establishes that it was well-known by at least Defendant Sanford, if not also his direct supervisors Defendants Murray and Hancock, by at least May 2024, if not sooner.

141. FE-9 recalled how Chad Nielsen and other Administrators encouraged facilities to enroll as many patients as possible in respiratory therapies, while Ronel Lapid, former Regional Director of MDS and Clinical Reimbursement at PACS, handled the strategy to bill the insurances. FE-9 indicated that Chad Nielsen hired respiratory therapists who were directed by him to identify eligible patients and rewarded the therapists with bonuses tied to the regional revenue from respiratory therapy.

142. FE-5 described how PACS "cheated the system" with its respiratory therapy practices. He explained that his Regional V.P. "massively" pushed Administrators to provide

respiratory therapy to their residents, just to bill for the treatment and make higher profits. FE-5 recalled that Colorado Medicaid regulations limited the number of respiratory therapy treatments it would pay for to approximately three treatments per patient per day. According to FE-5, however, PACS pushed Administrators to provide ten times the number of treatments per patient per day, solely to generate profits. He reiterated that Matthew McLane, regional V.P., engaged in "hard-core" sales pitches to Administrators to do so, beyond the number of properly covered treatments. FE-5 added that those who did not push these treatments were fired.

143. FE-1 repeatedly stated that PACS committed Medicare fraud pertaining to both Medicare Part A and Part B. FE-1 explained one example of Part B fraud that involved PACS billing Medicare for respiratory treatments that were not needed. At his facility in California, respiratory therapists were instructed to perform treatments even if the patients did not require it. One therapist was pushed to perform treatments on 12 to 15 patients a day. FE-1 recalled hearing a respiratory therapist tell the SNF Administrator that he was performing the therapy as instructed, even though he did not think certain patients needed it. The facility was also training licensed vocational nurses ("LVNs") to perform respiratory therapy on patients who did not need therapy, for the purpose of increasing PACS revenue. FE-1 emphasized that this practice of performing respiratory treatments was done just to "collect the money" from Medicare reimbursements.

144. FE-6 commented that Smitty Hartley, a regional V.P. in Arizona, constantly boasted about growing revenue, but in FE-6's view, Hartley was able to boost revenue because he was fraudulently billing Medicare. FE-6 stated that Hartley pushed respiratory therapy treatments for all patients, regardless of medical need. He elaborated that most patients did not need respiratory therapy, but PACS pushed the Administrators "hard" to provide that therapy for all patients just to make money. FE-6 advised that he resisted this pressure, telling Hartley that he

would provide therapy for the patients who needed it, but not for all patients. FE-6 noted that he was fired shortly after that.

145. FE-9 stated that the facility he managed was smaller in size and generated $70,000 to $80,000 monthly from respiratory therapy alone, a 99-bed facility would earn $100,000 from respiratory therapy and $30,000–$40,000 from sensory therapy monthly, while larger buildings earned up to $300,000, particularly those facilities with higher acute patients. FE-9 added that "test buildings" were used to pilot new therapy programs like incontinence therapy as the new revenue stream, and that Chad Nielsen tracked these numbers closely while pressuring Administrators to keep increasing respiratory therapies. He clarified that Nielsen tracked these numbers closely to see if the facilities were being reimbursed by Medicare for the therapy, because, in FE-9's words, "it was so crazy."

146. The Hindenburg Report further corroborates the testimony of these FEs. According to Hindenburg, after the COVID-19 Waiver expired, there was a "widespread, top-down directive to perform unnecessary respiratory therapies, among other therapies, on thousands of patients, regardless of clinical need or outcomes." The scheme began with California facilities and then was pushed out to facilities across the PACS network, "despite the treatments being unnecessary." A former PACS Administrator told Hindenburg that the respiratory therapy scheme was a way to "limp [PACS] through another year or two before CMS catches onto this and shuts it down."

147. As further described in the Hindenburg Report, former clinical leaders from PACS also informed Hindenburg that the clinical staff did not have time "to deliver the volume of respiratory therapy that PACS management was asking for, so they would simply document that they had," even if that was not true. As one former regional clinical leader from PACS described

it: "You know, basically, PACS turned a blind eye and said, whatever you need to do to get these numbers and get this filled out, do it."

148. Finally, PACS's Restatement of 2024 revenues confirmed that at least $61 million in revenues was improperly recognized in connection with then-known "Medicare Part B billing uncertainties." Specifically, its 2024 Annual Report stated:

> [D]ue to regulatory, compliance and Medicare Part B billing uncertainties, management determined that it is appropriate to reconsider the Company's judgmental assessments of the compliance of its respiratory and certain other therapy services. Management also determined that it is appropriate to reconsider the application of certain aspects of revenue recognition guidance under Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts With Customers ("ASC606"), including with respect to estimating variable consideration and constraining estimated variable consideration related to revenue from billings for such services. As a result, the Company determined that the revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B should not have been recognized as revenue in accordance with ASC 606 in [the first half of 2024].

149. Additionally, in the Restatement PACS disclosed two material weaknesses in internal controls over financial reporting, related to (a) lack of compliance with issues received through the whistleblower hotline and (b) revenue recognition for new services in accordance with ASC 606.

150. Thus, FE-9, FE-3, FE-5, FE-1, FE-6, the Hindenburg Report, and the Company's own Restatement independently corroborate that PACS centrally implemented a top-down effort to improperly bill Medicare B for unnecessary respiratory therapies across the Company to inflate revenue, profits, and PACS's share price throughout the Class Period.

### D. Sensory Therapy Scheme

151. In addition to PACS's abuse of respiratory therapy, the Company also pushed the use of unnecessary sensory therapy as a means of further inflating revenue from Medicare Part B. Beginning in the Company's first fiscal quarter of 2024 (prior to the IPO) and continuing through its second fiscal quarter of 2024 (including and after the IPO), PACS wrongly billed Medicare B for improper revenue from unnecessary sensory therapies. This misconduct was independently confirmed by multiple former employees, the Hindenburg Report, and the Company's own Restatement of more than $61 million in "revenue associated with the provision of respiratory services **and certain other therapy services** billed under Medicare Part B should not have been recognized as revenue" in the first and second fiscal quarters of 2024.

152. FE-10 alleged that PACS encouraged facilities to set up sensory rooms. Since his facility lacked space, they used a mobile cart instead. FE-10 explained that Regional V.P. Smitty Hartley told him that if a patient spent 15 minutes using the "sandbox or sensory wheel," it could be billed to Medicare. FE-10 indicated that he considered this unnecessary because his facility secured a dementia care unit that already covered such activities. FE-10 added that he viewed the sensory room as another example of PACS's efforts to create billing codes for services that were already part of basic care.

153. The Hindenburg Report independently confirmed PACS's improper use of sensory therapies to inflate revenue from Medicare B. According to the Report, which the market deemed credible, "Former employees described a 'new trick' to get back to 'COVID level profitability' involving billing thousands of unnecessary respiratory and sensory integration therapies to Medicare Part B regardless of clinical need or outcomes." For example, the Report quoted one former Administrator who stated PACS was "putting everyone on respiratory therapy for Part B, and they're putting everyone on sensory integration, even if it's not really that applicable."

154. Thus, FE-10, the Hindenburg Report, and the Company's own Restatement independently corroborate that PACS centrally implemented a top-down effort to improperly bill Medicare B for unnecessary sensory therapies across the Company to inflate revenue, profits, and PACS's share price throughout the Class Period.

**E. Regeneration and Census-Maximizing Scheme**

155. In addition to billing Medicare Part B for unnecessary treatments, PACS also pushed its facilities to "regenerate" patients and admit anyone that had "Medicare and a pulse."

156. FE-9 recounted yet another fraudulent Medicare billing practice that began in late 2023. He was instructed by PACS to "regenerate patients," which meant sending patients to the hospital for a few days and then re-admitting them back into the facility, even when there was no legitimate reason, to "reset" or restart their Medicare coverage. FE-9 advised that Nielsen was the person who instructed him and his staff to regenerate patients. FE-9 recounted that Nielsen called him "many times" to instruct him, "you have to regenerate." FE-9 added that Nielsen instructed him to also speak with Christina, the marketer at his facility, to figure out which patients they could send out—that is, regenerate—for a change of condition, including a changed mental state.

157. FE-9 explained that Medicare patients received 100 days of skilled therapy coverage, after which they were switched to private pay or Medi-Cal insurance—two forms of coverage that provided PACS with less revenue. According to FE-9 by re-admitting patients under questionable causes such as "a patient with a slight cough or having thoughts of suicide," Administrators would extend coverage for another 100 days, increasing revenue for the facility. FE-9 described this as a common practice at PACS to boost revenue, saying patient care was always second to financial profit.

158. To the extent patients could not be regenerated, PACS pushed its Administrators to find ways to extend a patient's stay. FE-10 recalled therapy staff being pressured to extend patient

stays, a practice referred to as "keeping heads in beds." FE-10 recalled that during morning meetings, staff were discouraged from having discussions about discharges and instead emphasized finding ways to "extend" the patients' stay.

159. FE-1 noted that methods to keep patients longer than medically necessary were discussed during the daily stand-up meetings with leadership. As an example of one method used to keep patients longer, FE-1 explained that staff would get Frappuccinos for patients, which would cause the patients' blood sugar to spike which gave the facility an excuse to keep the patient longer for monitoring. This meant more time to bill to Medicare. FE-1 recalled that his SNF would come up with any excuse possible to keep a patient longer, even when the patient had expressed that they were ready and wanted to go home.

160. FE-1 explained that the Company's expectation was to keep SNF's census numbers at 100 percent (meaning filled to capacity), and stated that he was supposed to admit "anyone" into the facility "if they had Medicare and a pulse." FE-1 stated he was "forced" to take in patients who were homeless, drug addicts, mentally ill, violent, or otherwise could not properly be treated or were dangerous to others, as long as they were covered by Medicare.

161. FE-1 confirmed that the issues he observed at his facility were happening Company-wide and definitely throughout the state of California. FE-1 explained that he left his position at PACS because PACS was "actively performing Medicare fraud," which PACS was "not stopping and not planning on stopping."

162. FE-9 indicated that he and the other Administrators were pressured to maintain census rates above 95%. FE-9 recalled when census numbers dropped, RVP Chad Nielsen called and instructed him to "regenerate" more patients or offer bonuses to marketers to increase admissions.

163. FE-10 explained that admissions were "encouraged" regardless of the patient's needs. FE-10 added that they admitted anyone, including "felon[s] or drug addict[s]" to keep census high. FE-10 said he was told by PACS "leadership" to "do whatever you can to secure the sale."

164. FE-4 stated that, in his view, the Company did not care about treating its existing residents properly, only about getting new patients into the facility.

165. FE-1 confirmed that the issues he observed at his facility were happening Company-wide and definitely throughout the state of California. FE-1 explained that he left his position at PACS because PACS was "actively performing Medicare fraud," which PACS was "not stopping and not planning on stopping."

166. Thus, FE-9, FE-1, FE-10, and FE-4 independently corroborate that PACS centrally implemented a top-down effort to increase its number of patients across the Company for non-medical reasons but rather to inflate revenue, profits, and PACS's share price throughout the Class Period.

**F. PACS's Other Deceptive Billing Practices**

167. In addition to the numerous abuses of the Medicare system, PACS also inflated its revenue through a variety of other deceptive billing practices across PACS facilities.

168. FE-2, who worked at or oversaw approximately fifteen facilities during his time at PACS, claimed that PACS misused billing coding. He alleged that the facilities would provide and bill for therapies that patients did not need or were not appropriate. As an example, FE-2 described seeing a patient on physical therapy who could move faster than the nurses and should have been discharged. FE-2 also described instances where a patient "plateaued," but PACS would continue billing for therapy.

169. FE-1 provided another example of fraudulent billing in which PACS isolated patients when it was not medically necessary to prevent contagion, because more revenue could be billed for isolated patients. According to FE-1, Medicare paid $200 to $300 more per day if that patient was isolated. FE-1 explained that the Minimum Data Set ("MDS") nurse was instructed to isolate patients and followed these orders because he was afraid of losing his job if he refused.

170. FE-10 clarified that sometimes treatments were performed but not for the actual length or frequency billed, while in other cases they were not performed at all but were still documented and billed for. According to FE-10, the Director of Nursing ("DON") Chase Prosser was responsible for instructing the floor nurses on exactly which documentation to provide for the purpose of billing Medicare. FE-10 indicated that many nurses felt "uncomfortable," because they were not trained respiratory therapists.

171. FE-9 described how Chad Nielsen and Ronel Lapid coached Administrators to bill strategically, encouraging multiple therapy sessions per day and overlapping therapy medical codes such as respiratory and sensory therapy. FE-9 specifically remembered that RVP Chad Nielsen said, "you can bill for respiratory therapy twice a day, and you can do the same with sensory therapy for the purpose of maximizing revenue." FE-9 indicated that billing records will show identical diagnoses and repeated therapy entries.

172. FE-4 recalled instances where patients or their insurers were billed for prescriptions or therapies that those patients did not receive. He recalled some instances when residents threatened to sue him for being billed for treatments or prescriptions that they did not receive. He further recalled instances when patients were given treatments or medication but there was no documentation or proof that the treatments were authorized by doctors or that the patients needed the treatments. He recalled cases where patients were billed for treatments dated after the patient

had left the facility. According to FE-4, the Medical Records office was a “mess” when he started working there.

173. Thus, FE-2, FE-1, FE-10, FE-9 independently corroborate that PACS not only tolerated, but actually demanded, that its employees falsify records and engage in other deceptive billing practices across the Company to inflate revenue, profits, and PACS’s share price throughout the Class Period.

### G. Patient Neglect

174. FE-4 described a culture of neglect at his PACS facility. He commented that PACS cared more about getting people into the facility and keeping it full than properly caring for the patients in the facility. He explained that there were many complaints from patients’ family members about patients being mistreated, including patients developing bad infections from wounds not being treated—which in at least one instance led to a patient dying from an infected wound that should have been prevented through normal care. He recalled instances when patients were left screaming for help, patients not being cleaned when they had soiled themselves, “care partners” (SNF employees who were responsible for helping patients) screaming at residents for no reason, and one instance in which a care partner smacked the hand of a resident who was asking for a television remote. FE-4 recounted how he complained about this mistreatment frequently, but nothing happened and no changes were made.

175. Given all of the above, PACS treated patients as mere tools to exploit Medicare rather than as individuals deserving care.

### H. PACS Skirted Licensing Requirements to Allow Less Scrupulous Individuals to Implement its Various Schemes

176. In addition to the numerous Medicare schemes and fraudulent billing practices, PACS also allowed unlicensed individuals to run facilities in violation of state laws. PACS would

then fool regulators, who require SNFs to be run by licensed Administrators—for good reason—by "hanging" the license of an absent Administrator from another jurisdiction on every SNF being run by unlicensed individuals. Licensed individuals would be less inclined to cheat Medicare: not only would they have a better understanding of the reasons not to engage in improper billing, but they would also be incentivized not to risk losing their licenses. Meanwhile, unlicensed individuals would overall be less knowledgeable about where regulations drew the lines between proper and improper conduct. And an unlicensed individual who knows that they only have their job because an absentee license is being "hung" on their SNF would be particularly unscrupulous to begin with. In addition, as described more fully below, PACS fired many of its licensed Administrators for protesting against PACS's improper practices, and PACS needed replacements to run its SNFs with fewer compunctions.

177. In California, all SNFs require a licensed individual to run the facility, and those individuals are permitted to run no more than three facilities or a total of no more than 200 beds at one time. *See* Cal. Code Regs. Tit. 22, § 72513(a)(2). California contains by far the most of PACS's SNFs, and the other jurisdictions in which PACS operates have similar licensing requirements for SNF Administrators. Despite this, numerous PACS facilities were run by unlicensed individuals, and PACS skirted this regulation by posting the licenses for Administrators that were never present, to enable situations across the Company where noncompliance reigned. PACS's claimed focus on "turning around" SNFs meant instead that it was willing to understaff its facilities and lie to regulators to cover up those practices in the name of greater profit.

178. According to the investigation by Hindenburg Research and the credible findings of the Hindenburg Report: "Former PACS employees say the company allowed unlicensed individuals to run entire facilities, while PACS 'rents' a license from someone else to 'hang' on

the building in an apparent effort to fool regulators" (initial capitalizations removed). The Report contained the accounts of three former administrators and a former senior-level PACS employee, each with personal experience witnessing this practice in California and Colorado. According to the Report, PACS would "simply use someone else's license for a facility, despite that person not actively working at the facility" and "would pay third parties as much as $5,000 a month to 'rent' their licenses" to cover SNFs without actual licensed Administrators.

179. FE-2 identified Chad Nielsen as an administrator whose license was improperly hanging in "multiple locations," in violation of California's requirement that all facilities under an Administrator's license must be within 100-miles or a one-hour drive. FE-2 indicated that Nielsen was not discovered because those facilities were located in different regulatory districts.

180. FE-2 also identified Natalie Dickson as an Administrator assigned to cover three California facilities: Crystal Cove, Ocean Ridge, and Artesia Palms. He noted that Artesia Palms alone is a 300-bed facility, so having Dickson on record for more than that facility was a violation.

181. FE-2 knew of at least five other Administrators that hung their licenses in California facilities where they were not present: Eduardo Aguianaga, Matt Sisco, Tei Vanderford, Andrew Hyder, and Anton Novitsky. He elaborated that each of these Administrators had hung their licenses in at least two, and sometimes three, facilities. FE-2 recalled that Eduardo Aguianaga had his license attached to PACS's West Valley and Beverly Hills facilities, and possibly one more. FE-2 further recalled that Anton Novitsky was the Administrator for two large buildings in Los Angeles, Beechwood and Beverly Hills Rehab. These two facilities were located within one hour of each other, but the two combined held more than two hundred beds, but Novitsky was the Administrator for both at the same time.

182. According to FE-2, there were several California facilities run by unlicensed AITs: Sunset, run by an AIT named Ryan; Valley View, run by an AIT named Cole; Bel Vista, run by an AIT named Dallin; Fountain Valley, run by an AIT named Darren Gallaugher; and Ocean Ridge, run by an AIT named Brady and then an AIT named Timothy Greenwood.

183. FE-2 noted that the reason PACS was able to get away with having Administrator licenses on record at numerous California facilities was because each location was in a different public health district jurisdiction, and the different districts did not cross-check with one another.

184. FE-6 echoed these sentiments, stating that PACS was "notorious for playing musical licenses," shifting Administrator licenses around to where they needed to be so that a facility could continue to operate.

185. FE-9 ran the facility for a year before he had his Nursing Home Administrator license, and that this was common practice at PACS. He described that there were a "lot of illegal" practices with Administrators having their licenses on buildings in name only, with AITs or someone in the process of obtaining their license acting as the actual Administrator under someone else's license, while still receiving Administrator bonuses. He advised that Tei Vanderford was the individual whose license was attached to his building. According to FE-9, Vanderford's license was on FE-9's building plus another building, while Vanderford was operating a third building. FE-9 described that as improper. He explained that for an Administrator to be licensed to operate two buildings, those buildings must be within a certain distance radius, but Vanderford's buildings were outside that radius.

186. FE-9 confirmed that Nielsen knew FE-9 was working without a license. He recalled that Nielsen did not push him to obtain his license until he had been working at his facility for a year. He commented that Nielsen "knew the whole time." FE-9 added that he was treated and

given bonuses the same as if he had been licensed. He indicated that "no one" at the start of their career as Administrators at PACS was working with a license.

187. FE-9 noted that Dallin Benson was another PACS employee given an Administrator role before receiving a license. FE-9 added that Benson was the Administrator for the Bel Vista Health Care center for over a year before obtaining a license, and Nielsen knew.

188. In Arizona, an Administrator cannot be appointed to more than one SNF unless the two facilities are no more than 25 miles apart and the appointment at the second SNF is for no more than 90 days. *See* Ariz. Admin. Code § R4-33-212. However, FE-10 explained that PACS used his license for another building well past the ninety-day limit. FE-10 added that he was required to oversee two facilities, Sandridge Post Acute and Apache Junction Health Center, for almost a year, which was significantly more than ninety days.

189. In Colorado, all SNFs must have a full-time Administrator who has no other conflicting employment obligations, and that Administrator must be responsible on a 24-hour-a-day basis. *See* Col. Reg. Code § 8.405.50. However, FE-5 explained that PACS would have regional-level employees obtain licenses to put on the buildings. He recalled one individual who was a regional maintenance supervisor who had obtained a license so that PACS could put his license on a building, but that individual was never actually present in that building and later left the company.

190. FE-5 also noted that his supervisor, Regional Vice President Matt McLane, put his license on approximately 15 buildings, yet McLane was never actually in those buildings or facilities. FE-5 advised that "100%" senior leadership at the Company knew McLane's license was improperly on multiple buildings, because McLane was "buddies" with senior leadership and spoke with them regularly. The Hindenburg Report independently corroborated that the same

"PACS RVP, Matt McLane," was simultaneously serving as an RVP while at the same time being "compensated $1.5 million" for supposedly working "as the administrator of record for Las Colinas Post Acute [SNF] during 2023... call[ing] into question who was actually managing the facility."

191. Thus, FE-2, FE-6, FE-10, FE-5, and the Hindenburg Report independently corroborate that PACS centrally implemented a top-down effort to allow unlicensed individuals to run SNFs across the Company and unscrupulously implement PACS's various schemes to inflate revenue, profits, and PACS's share price throughout the Class Period.

### I. PACS Violated Numerous Medical Record Requirements

192. FE-4, as a Director of Medical Records, observed that there were over 100 examples of "Consent to Treatment" forms in patients files that were not signed. FE-4 explained that the law requires that patients, or a person with power of attorney for the patient, must sign a Consent to Treatment form before any treatment can be provided, and even before a patient could be admitted to the SNF. According to FE-4, these forms were missing from both the electronic records system, called *PCC*, as well as from the patients' paper records. He informed both his Administrator and the Director of Nursing about these missing forms, but nothing was done to resolve the issue.

193. FE-4 also observed nurses, his facility's Director of Nursing, and employees in the Business Office signing forms for patients after the fact—in other words, forging the documents "just to get the papers signed." FE-4 noted that this was illegal. He noted that he reported this conduct to his Administrator, but nothing changed.

194. FE-4 noted that there were many Medicare and Medicaid reimbursement requests at his facility that were not signed by the treating doctors or nurses, which was a requirement for reimbursement. He noted that these forms are to be signed by the doctor 30, 60, or 90 days after

treatment, but there were thousands of unsigned forms. He recalled one doctor alone had approximately 15,000 forms waiting for his signature when he left PACS. FE-4 spoke to his Administrator about this issue, advising him that they must get the forms signed before they could bill to Medicare and Medicaid, but he did nothing.

195. FE-4 complained repeatedly about these violations, but nothing was done. In frustration over his Administrator's lack of action, he sent an email to PACS Corporate to complain about the violations. He sent his email to Marie May, HR Business Partner; Sally Cantwell, Senior Vice President, People and Development; and John Mitchell, Chief Legal Officer. FE-4 recalled that Corporate's response was a "slap on the wrist," but nothing changed regarding the repeated violations.

**J. PACS Hired Uncertified Nurses Aids and Listed Them as Certified to Cheat Staffing Ratios**

196. According to the Hindenburg report, "States generally have a required minimum staffing ratio." For example, in California, 2.4 of every 3.5 nursing hours per patient day need to be met by a Certified Nurse Assistant.

197. In PACS's Q2 2024 Form 10-Q, PACS reported to have employed approximately 12,633 CNAs across its network of 202 facilities. However, a former senior level employee told Hindenburg that "for over 2 years during COVID, PACS had Nurses Aids in its system as CNAs, in an apparent effort to circumvent minimum staffing requirements while simultaneously lowering costs and boosting bonuses:

> …they would manipulate those numbers because the Nas you can pay less, so they would have more NAs on the floor than the CNAs. But they would have them in the system as a CNA...they'd been working for 2 years under a license that wasn't there, and they were billing according to staffing which was inaccurate.

198. The former senior level employee went on to say,

> I would say it was probably happening at most of their original 57 buildings...I'm not sure how long it was happening, but my assumption is that they were doing it during all of COVID, because they could...I do know that probably, maybe 1/3 of their buildings, if not more, had these Nas listed as CNAs...There's no reason to put someone into the system as having an actual license unless they have an actual license, unless you're trying to cheat your staffing ratios.

## K. PACS Used Insider Knowledge to Get Advance Notice of, and Frustrate, State Audits

199. In addition to violating multiple state licensing laws and medical record requirements, PACS also skirted regulations regarding state audits in California, where nearly half of its SNFs were located. In particular, PACS used insider knowledge to get advance notice of and frustrate state audits.

200. FE-2 noted that when facilities in his California region had a complaint filed by one of its residents, the facility would receive advance notice of a state inspection or audit. According to FE-2, a Licensed Dietician Nutritionist ("LDN") named Jose Mancelia had relationships with a California surveyor who would provide Mancelia with advance notice of site visits. Mancelia would then alert the SNF being audited so it could review the records and make changes before the inspection. FE-2 commented that it was not normal for an SNF to receive advance notice of an inspection or issue unless the SNF self-reported the issue.

## L. PACS's "Decentralized" Operating Model was Orchestrated from the Top

### 1. Control From the Top

201. Contrary to PACS's claims of a "decentralized" business model, everything at PACS was controlled by the top executives, including the PACS Defendants.

202. FE-9 recalled that PACS often promoted its "five pillars" or five C words representing the Company's values, which included the word "Care." FE-9 indicated that the word

"Care" was used internally by PACS as a hidden message for profit, saying "the more care we do, the more money PACS makes." FE-9 explained that Administrators were pressured to increase therapy services, such as IVs, respiratory, and sensory therapy under the guise of improving patient care. FE-9 emphasized that "everything in PACS is hidden by using the word care," adding that this was PACS's justification for overbilling Medicare for therapy services.

203. FE-9 emphasized that every PACS meeting centered around one goal: "How can we make more money?" FE-9 described how PACS held monthly meetings for the Administrators that were "extravagant," during which they stayed at luxurious Airbnbs in Arizona and Santa Barbara, played golf on the "best golf courses in the country," gambled, and got to eat excellent food, all at Company expense. He described it as "living the life," meaning a lifestyle of luxury and making money. FE-9 called it a "Trojan horse," i.e., a way to disguise greed under the appearance of compassion for the patients.

204. FE-9 explained that PACS's entire business model was designed to maximize reimbursement, and FE-9 indicated that PACS "definitely did wrongdoing because they pushed, they encouraged, and they knew what they were doing" when they implemented respiratory and sensory therapy. FE-9 explained that, at a marketing meeting in Temecula, which occurred at or near the time PACS was in the process of going public, Nielsen told him that they had a "few good years for us, then things will change and we'll be out." According to FE-9, Nielsen stated that PACS's current owners had a plan to own the Company for three to four years, then turn over the Company to the Board of Directors; once the Board took over, "all this crazy billing stuff will be out." FE-9 noted that Nielsen repeated these comments at an Administrator meeting in Palm Springs, during which Nielsen added, "We'll keep going until the party's over."

### 2. Leadership Controlled All Facilities Through Their Administrators

205. PACS's primary operating subsidiary, PACS Services, was run by Defendant Sanford throughout the Class Period. Sanford reported directly to Defendants Murray and Hancock, and in turn had PACS's full complement of regional vice presidents reporting to him. These regional vice presidents, in turn, supervised the Administrators of each SNF in their region, who reported directly to them. According to PACS's 2024 Annual Report:

> Our PACS Services' main office is located in Farmington, Utah [headquarters]….**We provide PACS Services to each of our facilities, which includes support through a regional team of seasoned, highly qualified, cross-functional professionals, and led by an RVP**. The team also includes regional clinical support personnel (such as directors of therapy, quality assurance, medical records, and clinical services personnel) as well as non-clinical personnel such as regional directors of recruitment and accounts receivable and accounts payable, reimbursement, and risk and compliance personnel. As of December 31, 2024, we had 22 RVPs overseeing each regional teams, covering an average of 14.3 facilities within a region and have an intimate understanding of the intricacies and challenges of the post-acute industry.

206. FE-9 recalled joking with other Administrators about how Regional V.P. Smitty Hartley was previously a solar salesman with no healthcare experience before he made $1 million in his first year as an Administrator. According to FE-9, Hartley, who managed Stoney Point Acute, PACS's top-performing facility, earned bonuses of around $100,000 a month. FE-9 added that Chad Nielsen needed the bonuses to be distributed in round numbers to avoid drawing attention because odd amounts would signal the money came from respiratory revenue. He further explained that awarding bonuses in round numbers was less of a red flag for auditors because round number bonuses could be for merit or for helping out in some other fashion, and were less likely to be tied back to providing specific treatment, such as a bonus which was identifiable as a percentage of the revenue generated by respiratory therapy for the month.

207. FE-2 referred to Chad Nielsen, Regional Vice President of Operations, as the "Golden Boy" of PACS's leadership, noting that Nielsen attended PACS's IPO and related events in New York with corporate leadership. FE-2 confirmed that Nielsen attended PACS's September 2024 annual meeting in Scottsdale, Arizona. According to FE-2, information at PACS was passed down from Nielsen to the team leader of the region. FE-2 continued that team leaders echoed Nielsen's directives, relaying new metrics, rules, targets, and to-do lists. The team leader for FE-2's region, to whom Nielsen passed the information, was Mafe Wozniak.

208. According to FE-10, there was ongoing pressure from PACS "leadership" to bring in more admissions and to bill as much as possible. FE-10 explained that PACS "presidents" encouraged improper documentation to be submitted to Medicare to increase revenue, even if the service was not provided to the patient. FE-10 also noted that C-suite executives instructed Administrators to never provide auditors with more than they asked for, only summaries rather than the actual documentation.

209. FE-10 recalled attending PACS training throughout 2023 and 2024, including an annual meeting and monthly regional meetings in Arizona and California. FE-10 explained that the focus of these meetings was financial performance, how facilities were doing and how to increase revenue. FE-10 stated that PACS Regional Vice Presidents and C-suite executives, including Senior Vice President of Operations for the Western States Clark Nelson, regularly attended these meetings. FE-10 added he had direct contact with C-suite executives if his facility was not meeting its "targets."

210. FE-10 recalled from speaking to C-suite executives in person in Utah that when PACS went public, the pressure from the C suite increased. FE-10 said that PACS CFO at that time, Defendant Apt, sent emails with reminders highlighting which facilities needed to improve

their revenue. FE-10 stated that PACS executives "pushed" Administrators to focus on billing Medicare Part B to increase revenue.

211. When Regional Vice President Smitty Hartley initially took over his role in July 2024, he met with FE-7 to discuss business. FE-7 recounted how he asked him why all the SNFs were not drawing on Medicare Part B benefits and why they were not using respiratory therapy treatments to generate revenue. Once Hartley realized that FE-7 did not see respiratory therapy as a way to generate revenue across facilities without violating regulations, he stopped speaking to FE-7.

212. FE-10 recalled pushing back to Hartley about the respiratory program because he felt that what he was being instructed to do put him at risk, and he did not want to lose his Administrator's license. FE-10 added that his refusal to support the respiratory program led to PACS terminating him.

213. FE-3 explained that there was significant pressure from corporate to bill for respiratory therapy, noting he was "hounded" by the regional leadership and consultants.

214. As such, PACS's central leadership controlled all SNFs through Sanford's PACS Services, the Regional Vice Presidents in his direct reporting line, and, in turn, Administrators in the Regional Vice Presidents' reporting line.

### 3. PACS Rewarded Wrongdoing

215. FE-9 explained that PACS's culture was money driven, which was reinforced in monthly operations meetings that often-involved luxury trips to Las Vegas, St. George, and Palm Springs. FE-9 recalled these were "fun trips" where Administrators played golf and gambled for a few days, followed by a one-hour operations meeting focused on "how the company could make more money."

216. FE-9 recounted how company credit cards, such as Chad Nielsen's, were used to pay for hotels and entertainment. FE-9 noted that these trips were treated as company business expenses, mainly attended by Administrators from the South Coast region (Los Angeles County and Ventura County) under Chad Nielsen's supervision. FE-9 added that other regions followed similar practices with their regional Administrators.

217. FE-9 confirmed the misuse of company credit cards was common knowledge at PACS, particularly after the Company went public. Specifically, FE-9 recalled an incident in Victorville, California where marketers bought expensive gifts for hospitals and case managers until the threat of a lawsuit shut them down and PACS employees could no longer buy gifts for hospital employees on company credit cards. FE-9 added that this issue was a "constant battle" with hospitals and case manager, as PACS was "always" taking hospital case managers and doctors to events, such as concerts at the Staples Center in Los Angeles, where PACS had a suite. FE-9 described the practice as a "no-no."

218. FE-9 also recounted that at the monthly operations meetings, Administrators boasted about purchasing Louis Vuitton purses, event tickets, and other luxury items, using company credit cards to reward marketers for meeting monthly goals.

219. FE-9 stated that every Administrator, including Chad Nielsen and the regional Administrators, were aware of these transactions. FE-9 continued that "anything that went on within PACS, we all knew because it was a very close group," describing Chad Nielsen as "one of the bros."

220. FE-9 stated that regional managers held stock through an Evergreen fund valued at around $150 million, which would eventually be distributed amongst PACS marketers and Administrators. FE-9 explained that Administrators could choose which employees received

shares of the Company, and he recalled discussions with Chad Nielsen, after PACS went public, which revealed plans to restructure compensation after five years once "the owners were out." FE-9 had a phone call with Nielsen during which Nielsen asked him which employees in FE-9's facility should be granted stock. FE-9 added that Nielsen did not want to give stock to the marketer because she "wasn't playing the game" the way PACS wanted her to play. He clarified that the stock grants were all part of the Evergreen fund, which existed before the IPO.

221. FE-2 confirmed that for each of the approximately fifteen facilities FE-2 worked at or oversaw, the Administrator was incentivized to mandate the practice of billing for unnecessary treatments in order to generate more revenue. He elaborated that the more revenue an Administrator generated for his SNF, the higher the bonus for that Administrator.

222. These company "perks" were not restricted to Administrators. FE-1 advised that marketing employees were issued Company American Express credit cards, which were frequently used for excessive and personal purchases. FE-1 explained that PACS would let you buy "whatever you want" with the AMEX card even if it was not a business expense. FE-1 noted that there were no consequences for using the card improperly. In his view, the Company permitted this misconduct because PACS "threw money" at its marketers to ensure their loyalty.

223. As such, PACS ensured that its SNFs followed its improper directives by directly rewarding it.

#### 4. Those Who Did Not Comply With PACS's Improper Directives Were Fired

224. Numerous PACS employees were aware of the company's widespread misconduct, and PACS got rid of employees who protested it.

225. FE-1 noted that "pressure" from the top made other employees scared to refuse questionable instructions.

226. FE-8 stated that PACS employees were treated as "disposable" if they were not part of the "clique." He elaborated that the clique consisted of those employees who were close to the Administrator; everyone else was disposable. It was FE-8's understanding that he was the fifth person to hold his position as Director of Business Development since the Administrator started in his role. In his view, there had been "a lot" of terminations since this Administrator had taken over the facility, and some of those former employees had filed complaints for wrongful termination.

227. FE-6 claimed that he was fired for refusing to go along with the Company's unethical practices. FE-6 told his Regional Vice President, Smitty Hartley, that he would provide therapy for the patients who needed it, but not for all patients. FE-6 noted that he was fired shortly afterward.

228. FE-7 knew of someone who was fired for reporting the misconduct of an Administrator at a southwest facility. FE-7 understood that this person complained repeatedly to Hartley about the Administrator's business practices, raising concerns about the "lengths he was going" to get patients and generate revenue for his facility. FE-7 said that Hartley did not initially respond to those complaints, until the person sent a detailed email explaining the basis for those concerns. According to FE-7, that individual was then called into a meeting with Hartley and terminated because the Administrator that was raised as a concern was aware of her complaints and refused to pay his facility's portion of her salary. According to FE-7, Hartley told this individual that PACS could not afford to lose the Administrator because of his Administrator license, so he had to terminate this individual instead.

229. FE-7 also knew of a 2024 meeting between Hartley and an Administrator of a PACS facility in the southwest region where Hartley pressured the Administrator to fire his

respiratory director because he was not billing enough respiratory therapies. According to FE-7, Hartley told this Administrator that the respiratory director needed to use more diagnoses to generate more revenue. In other words, FE-7 confirmed, it seemed that Hartley was pressuring the Administrator and his respiratory director to provide unnecessary respiratory therapies solely to generate revenue. When the Administrator refused to terminate his respiratory director, Hartley fired that Administrator, and he was replaced with an AIT who was still in training at the time and had not yet earned his Administrator license.

230. FE-7 recalled that another Administrator was terminated by Hartley and replaced with two AITs at a PACS facility in the southwest region. FE-7 recalled that the two new AITs were personal friends of Hartley, with no experience, and who were not licensed. He noted that the license of an Administrator for another facility was hung on the wall to cover up the fact that the two AITs were not yet licensed.

231. These accounts were corroborated by Hindenburg Research and the credible findings of the Hindenburg Report. Specifically, regarding PACS's practice of allowing unlicensed Administrators to run SNFs while PACS "rents" a license from someone else to "hang" on the building in an apparent effort to fool regulators, a former "senior-level PACS employee" stated "that individuals who questioned this practice were terminated." According to the former employee:

> Pretty much anyone who spoke up ended up not having a job anymore… People would call me and say that they weren't comfortable being the actual admin because they weren't licensed… And basically, I would be told, 'oh, you don't need to worry about that'… And then I would typically get a call, maybe 30 days or less… telling me that we needed to terminate that person because their numbers were too low or whatever, and it did happen kind of often…

232. PACS's Restatement confirmed that PACS did not deal appropriately with employees who took issue with misconduct at the Company and disagreed with improper directives to overbill Medicare. The Restatement admitted that "we did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues **received through the hotline process**," i.e., by employees reporting such compliance issues up the chain. The Restatement further admitted: "These material weaknesses resulted in the restatement of our previously issued interim condensed combined/consolidated financial statements for the Impacted Periods," meaning PACS's material weakness in listening to employees was already a problem by March 30, 2024 at the latest—the end of the first Impact Period—and prior to the IPO. Instead of listening to employees who reported the misconduct detailed herein up the chain, PACS fired them.

233. As independently corroborated by FE-1, FE-8, FE-6, FE-7, the Hindenburg Report, and the Restatement, PACS ensured that its SNFs followed its improper directives by implementing a policy of firing employees who disagreed with its improper directives, which had the intent and effect of populating the Company with individuals who either did not know such directives were wrong, did not care, or both. By setting and implementing this policy, PACS leadership helped make sure that their improper directives would be implemented.

## M. PACS's Wrongdoing Causes Investor Losses and Subsequent Developments

### 1. The Hindenburg Report

234. The truth about PACS's true financial condition first began to emerge on November 4, 2024, when short-seller Hindenburg published its Report.

235. Hindenburg's investigation lasted five months, included interviews with eighteen former employees, discussions with competitors, and an analysis of over 900 detailed facility-level

cost reports, and revealed, in a detailed, forty-page long report, that PACS's business model largely relied on rampant fraud that was undisclosed in the offering documents.

236. This damning Report revealed numerous fraudulent schemes conducted by PACS, including the same practices independently corroborated by multiple FEs, all of which artificially inflated PACS's revenue, profits, and share price. The Hindenburg Report detailed PACS's abuse of the COVID-19 Waiver, its respiratory and sensory therapy billing schemes, its intentional violations of Administrator and facility licensing requirements, and its retaliation against employees who refused to participate, confirming that PACS's reported financial performance was driven by fraudulent Medicare billing and undisclosed regulatory risk.

237. As part of its findings, Hindenburg reported that PACS had previously abused the COVID-19 Waiver by improperly "flipping" entire facilities onto Medicare based on a single positive COVID test, dramatically boosting revenue with little additional cost. *See* Hindenburg Report at 9, 12–13. Once the COVID-19 Waiver expired on May 11, 2023, the Company's temporary profit windfall evaporated, prompting PACS to heavily rely on the Medicare Part B scheme subsequently exposed by the Hindenburg Report.

238. Consistent with FE accounts, Hindenburg reported that PACS replaced the lost Part A revenue by turning to another fraudulent practice: systematically inflating Medicare Part B revenue through the billing of thousands of unnecessary, unprovided, or clinically unsupported respiratory and sensory-integration therapies.

239. The Hindenburg Report corroborated the same forms of misconduct described by the FEs, including (i) pressure on facility staff to maximize billable Part B services regardless of medical need; (ii) the absence of meaningful compliance oversight surrounding new ancillary

therapy lines; and (iii) the recording of Part B revenue despite obvious eligibility and documentation deficiencies.

240. The Hindenburg Report's independent reporting together with the FE allegations show that PACS's Medicare Part B revenue, which the Company relied on to supplant its COVID-19 Waiver scheme, was artificially inflated, non-compliant, and unsustainable. The Hindenburg Report's confirmation of this widespread Medicare Part B misconduct was a key driver of the market reaction, revealing the ongoing practices that rendered PACS's statements about its financial condition, profitability, and growth trajectory materially misleading.

241. When the news of these years-long schemes broke on November 4, 2024, PACS's share price dropped 27.78% from $42.94 to $31.01, on unusually heavy trading volume. However, its stock remained inflated.

242. Analysts were shocked and disappointed by this news, with some conveying hope that PACS would answer questions and alleviate uncertainty during its third quarter 2024 earnings release ("3Q 2024 Earnings Release") slated for that week.

243. On November 4, 2024, William O'Neil & Co. ("O'Neil") announced it had withdrawn its "buy" recommendation for PACS's stock and "removed PACS from [their] U.S. Focus List after the stock was down more than 40% and broke below all its key moving averages following a Hindenburg short report on the company." *PACS Group Inc.*, WILLIAM O'NEIL + CO. (Nov. 4, 2024). O'Neil noted three key findings from the Hindenburg Report: (1) PACS "exploited a COVID waiver that allowed patients to access Medicare benefits without a hospital stay, inflating revenue by categorizing many patients as requiring 'skilled care[,]' [that] led to a dramatic increase in Medicare revenue, which drove more than 100% of PACS's operating income from 2020 to 2023, 'creating an illusion of strong profitability leading to their IPO'"; (2) PACS engaged in

"[w]idespread [f]raudulent [b]illing and [d]ocument practices[]...such as billing for unnecessary therapies (e.g., respiratory and sensory integration treatments) and falsifying documentation;" and (3) "PACS...mislead[] regulators and investors by falsely reporting high quality [facility] ratings and staffing levels."

244. RBC also noted their disappointment at the drop in stock price. *PACS Group, Inc.: Short report allegations are inconsistent with consolidated, SS stats; Sell-off overdone*, RBC CAPITAL MARKETS (Nov. 4, 2024). Some analysts, however, cautioned against panic, and awaited the company's 3Q 2024 Earnings Release. *See, e.g.*, *PACS Group: Cooler heads will prevail*, MACQUARIE (Nov. 4, 2024); *PACS Group, Inc.: Some Initial Thoughts on Today's Sell-off in PACS Shares*, UBS (Nov. 4, 2024) (noting, "We always take allegations such as those made today seriously, but we also believe that more work needs to be done and information obtained to make a complete assessment."

**2. Fallout From the Hindenburg Report and its Revelations**

245. Neither the Company nor the PACS Defendants denied the accuracy of the Hindenburg Report's findings. Typically, a company or its offers will deny the truth of a short-seller's report within a day of its publication, creating a reasonable expectation among investors of such a denial when short reports are inaccurate. The following day, however, on November 5, 2024, PACS's share price dropped another 4.74%, or $1.47, as the Company remained silent regarding Hindenburg's revelations and the market continued to evaluate the credibility of the Hindenburg Report and its contents, closing at $29.54 a share, on unusually heavy trading volume.

246. Also on November 5, 2024, Truist reported that PACS's share price was down, "with the bear thesis suggesting utilization of COVID-waivers...were used to drive higher Medicare revenue / reimbursement, unnecessary care in respiratory/sensory integration therapy

and issues around staffing." *See PACS Group, Inc.: Comments On Yesterday's Volatility/Stock Pressure*, TRUIST (Nov. 5, 2024). However, its stock remained inflated.

247. On November 6, 2024, PACS issued a press release on Form 8-K that announced certain preliminary operational metrics but otherwise stated it would postpone its 3Q 2024 Earnings Release and conference call, originally scheduled for November 7, 2024. Defendant Murray claimed, "recent third-party allegations are misleading. However, in line with our commitment to holding ourselves to a high standard...the Company's Audit Committee, with assistance from external counsel, is conducting an investigation of the allegations." PACS Group, Inc., Current Report at Ex. 99.1 (Form 8-K) (Nov. 7, 2024). The same day, the Company also disclosed that "[w]e've received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report." *Id.* These admissions increased the credibility of the Hindenburg Report and revealed new information that PACS's true financial condition was worse than investors reasonably expected.

248. PACS's announcements sent its share price into another precipitous decline, falling $11.45, or 38.76%, to close at $18.09 per share on November 6, 2024, on unusually heavy trading volume.

249. Analysts covering PACS reacted with surprise to the news of the federal government's investigative demands. Analyst Tao Qiu at Macquarie noted that "the newly disclosed Federal inquiry on referral practices took us by surprise. Since any government investigation carries a binary outcome, we caution investors that the stock will continue to be volatile until we have clarity on the regulatory actions." *PACS Group: PACS discloses gov't inquiries, delays 3Q earnings*, MACQUARIE (Nov. 6, 2024). Mr. Qiu followed up on January 2,

2025 to note that "the extended delay in PACS's quarterly filing raises uncertainties and weakens investor confidence." *PACS Group: Still awaiting update, but we think downside is priced in*, MACQUARIE (Jan. 2, 2025).

250. UBS responded similarly to the news that PACS postponed its earnings release, with a November 6, 2024 report stating "[w]e had expected the company to provide a detailed response.... The fact that the company has postponed its earnings release leads us to put our investment rating and price target Under Review until there is more clarity on this developing situation." *PACS Acknowledges Recent 3rd Party Report; Postpones 3Q Earnings Call Previously Scheduled for Nov. 7th and Discloses Federal Investigation*, UBS (Nov. 6, 2024).

251. On June 16, 2025, PACS filed a Form 8-K announcing that the Company's previously issued financial statements for the first and second quarters in 2024 could no longer be relied upon and needed to be restated. *See* PACS Group, Inc., Current Report (Form 8-K) (June 12, 2025) (the "June 8-K"). The June 8-K acknowledged the Company's ongoing investigation in response to "third-party allegations" and announced that management had determined to "reconsider the Company's...assessments of the compliance of its respiratory and certain other therapy services" because of "additional facts learned" from the Company's investigation and "regulatory, compliance and Medicare Part B billing uncertainties." The June 8-K also revealed that the Company overstated its revenue by approximately \$15–\$17 million for the three-month period ended March 31, 2024, and approximately \$46–\$48 million for the period ended June 30, 2024. These financial statements had been incorporated by reference into the IPO and/or the SPO Offering Documents.

252. On August 15, 2025, PACS abruptly announced that Defendant Sanford, President of Providence Administrative Consulting Services, Inc. ("PACS Services"), had resigned from all

positions with the Company, effective immediately.[12] PACS Services functions as PACS's centralized administrative and operational services arm, coordinating core support functions, including billing, compliance, and facility-level operational oversight, across the Company's nationwide skilled-nursing footprint. In his role as President of PACS Services, Defendant Sanford served as a key link between PACS's corporate leadership and its individual facilities, overseeing the implementation of Company-wide initiatives and operational directives at the facility level. PACS disclosed that, in connection with his resignation, Defendant Sanford entered into a separation and consulting agreement providing for a transitional consulting role.

253. On September 8, 2025, PACS abruptly announced that Defendant Apt, the Company's Chief Financial Officer, resigned at the request of the Board after an investigation by PACS's Audit Committee found that he accepted a series of high-value items from individuals associated with entities that do business with PACS, in violation of the Company's Code of Conduct.[13] The circumstances surrounding Defendant Apt's departure, coming on the heels of the Hindenburg Report and ongoing internal investigations into PACS's billing practices and financial reporting, underscore the significant compliance and internal control deficiencies at the Company that were not previously disclosed to investors.

### 3. The Company Issues its Restatement

254. On November 19, 2025, PACS issued its Restatement for the first two quarters of 2024. In its explanation for the Restatement in its 2024 Annual Report, the Company wrote, in pertinent part:

> On June 16, 2025, the Company announced that, in connection with additional facts learned, including as a result of the Audit Committee's independent investigation, and due to regulatory, compliance and Medicare Part B billing uncertainties, management determined that it is appropriate to reconsider the Company's

[12] PACS Group, Inc., Current Report (Form 8-K) (Aug. 15, 2025).
[13] PACS Group, Inc., Current Report (Form 8-K) (Sept. 8, 2025).

judgmental assessments of the compliance of its respiratory and certain other therapy services. Management also determined that it is appropriate to reconsider the application of certain aspects of revenue recognition guidance under Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts With Customers ("ASC606"), including with respect to estimating variable consideration and constraining estimated variable consideration related to revenue from billings for such services. **As a result, the Company determined that the revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B should not have been recognized as revenue in accordance with ASC 606 in the periods discussed below**.

Accordingly, the Company determined that it would restate previously issued financial statements as of March 31, 2024, and for the three months then ended, included in the Company's Quarterly Report on Form 10-Q filed with the SEC on May 13, 2024 (as amended on May 21, 2024) and as of June 30, 2024, and for the three and six months then ended, included in the Company's Quarterly Report on Form 10-Q filed with the SEC on August 12, 2024.

[. . .]

Subsequent to the issuance of the Company's Quarterly Report on Form 10-Q filed on August 12, 2024, we received information that indicated certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, may not be eligible for reimbursement under Medicare Part B. We determined that due to the underlying regulatory ambiguity those certain ancillary services revenue may be subject to significant reversal in the future. As such, we have concluded that such revenue should not be recognized until definitive conclusions regarding the eligibility of billing those certain ancillary services under Medicare Part B is permissible. **In accordance with ASC 250** - Accounting Changes and Error Corrections, SEC Staff Accounting Bulletin ("SAB") No. 99 - Materiality, and SAB No. 108 - Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, **management concluded the unaudited Condensed Combined/Consolidated financial statements for the three months ended March 31, 2024, and the three and six months ended June 30, 2024 (the "Restatement Periods") required restatement.**

[. . .]

**Material Weakness**

In connection with the preparation of our combined/consolidated financial statements for the year ended December 31, 2024, together with facts learned during the course of the Audit Committee's independent investigation, our **management identified control deficiencies that, individually or in the**

> **aggregate, constitute material weaknesses in our internal control over financial reporting**. The material weaknesses identified by management were that we did not design and maintain an effective internal control environment commensurate with the financial reporting requirements of a public company. Specifically, we did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including **potential compliance issues received through the hotline process**. In addition, **we did not design and maintain adequate controls within the revenue process to appropriately recognize revenue for new services in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 606**, Revenue from Contracts With Customers. **These material weaknesses resulted in the restatement** of our previously issued interim condensed combined/consolidated financial statements for the Impacted Periods. In addition, our Chief Executive Officer and our Interim Chief Financial Officer have concluded that, due to the material weaknesses, our disclosure controls and procedures were not effective, as such term is defined under Rules 13a-15(e) and 15(d)-15(e) under the Exchange Act, as of December 31, 2024.

255. These admissions went far beyond the mere fact that past financial statements were inaccurate and required restatement. They conceded two material weaknesses in internal controls **at the time the financial statements were prepared, dating back to March 31, 2024**, as detailed below.

### a. Material Weakness in Compliance

256. PACS admitted that "we did not design and maintain an effective internal control environment commensurate with the financial reporting requirements of a public company" and that "we did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues received through the hotline process." Because, as alleged herein, PACS fired employees who reported and protested wrongdoing rather than address compliance issues that they were reporting through the hotline process, the Restatement conceded this material weakness in internal controls.

### b. Material Weakness in Revenue Recognition

257. PACS admitted that "we did not design and maintain adequate controls within the revenue process to appropriately recognize revenue for new services in accordance with Financial

Accounting Standards Board Accounting Standards Codification Topic 606, Revenue from Contracts With Customers." Accordingly, the Company restated $61 million in revenue as improperly recognized "due to regulatory, compliance and Medicare Part B billing uncertainties" related to its billing for "respiratory therapy, sensory integration therapy, and ultrasound mist therapy" in Q1 2024 and Q2 2024.

258. To recognize revenue, PACS must first evaluate the five steps of revenue recognition under ASC 606.[14] Under those conditions, if there are "uncertainties" related to subsequent cash collection, PACS was required to adjust the transaction price to recognize only the amount of revenue where cash collection was probable and a significant reversal of revenue (*i.e.*, lack of subsequent cash receipts) would not occur. These adjustments for "uncertainties" are otherwise known as "variable consideration."[15] By the Restatement's own language, the error it corrected was PACS's failure to apply ASC 606's revenue-recognition model for transactions involving significant "uncertainties" properly.[16] Therefore, the Restatement of at least $61 million

[14] *See, e.g.*, ASC 606-10-25-1e; ASC 606-10-32-8; ASC 606-10-32-11; ASC 606-10-32-12; and ASC 606-10-32-10.

[15] ASC 606-10-32-11; ASC 606-10-32-12. PACS disclosed their methodology to comply with ASC 606 in their Registration Statement and subsequent quarterly filings as follows: "Variable consideration is estimated using the expected value method based on the Company's historical reimbursement experience. The amount of variable consideration constrains the transaction price, such that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period…. Settlements with third-party payors for retroactive adjustments due to audits or other reviews are considered variable consideration and are included in the determination of the estimated transaction price for providing resident services. These settlements are estimated based on the terms of the payment agreement with the payor, correspondence from the payor, and the Company's historical settlement activity, including an assessment to ensure that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the retroactive adjustment is subsequently resolved." *See* IPO Registration Statement, pp. F-15-16.

[16] 2024 10-K, p. 72, "We determined that due to the underlying regulatory ambiguity those certain ancillary services revenue **may be subject to significant reversal in the future.**" (emphasis added).

revenue represents an admission that PACS determined this previously recognized revenue, related to respiratory, sensory, and other services, should not have been recognized in Q1 and Q2 2024. The $61 million reversal of revenue on PACS's income statement had two cascading impacts on the balance sheet: a $30.4 million reduction to Accounts Receivable for respiratory, sensory, and other Medicare B services that had been billed but not yet collected; and a previously undisclosed $30.6 million "Refund Liability" for respiratory, sensory, and other Medicare B services for which PACS had already received cash but now expected it would have to refund to Medicare.[17]

#### c. The Restatement Conceded that Material Weaknesses Necessarily Existed by March 31, 2024

259. Finally, the Restatement conceded that "[t]hese material weaknesses resulted in the restatement of our previously issued interim condensed combined/consolidated financial statements" for the first two fiscal quarters of 2024 "[i]n accordance with ASC 250 - Accounting Changes and Error Corrections" specifically. ASC 250 defines an error in previously issued financial statements as follows:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), **or oversight or misuse of facts that existed at the time the financial statements were prepared.** A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

(emphasis added). Such a restatement is mandatory where the previously issued financial statement contains "mathematical mistakes," "mistakes... in [GAAP]," or only one other scenario, namely, "**oversight or misuse of facts that existed at the time the financial statements were prepared**." And because PACS's Restatement does not once contain the word "mistake," it falls into the last scenario. In other words, the Restatement was not the result of hindsight, new, or changed facts

[17] 2024 10-K, p. 136.

and circumstances—it was from "oversight or misuse of facts that existed at the time the financial statements were prepared." For reference, the Restatement pertained to PACS's first fiscal quarter of 2024, which ended on March 31, 2024. As such, the facts giving rise to the Restatement existed by March 31, 2024 at the latest.

260. Putting this together with the admission of "uncertainties" from Medicare B billing and two material weaknesses in internal controls—for both of PACS's first two fiscal quarters of 2024—the Restatement amounted to an admission that the uncertainties related to Medicare B billing, as well as the two distinct material weaknesses in internal controls, "**existed at the time the financial statements were prepared**" on March 31, 2024.

261. The admission of undisclosed uncertainty in their actual revenue recognition practices dating back to March 31, 2024 sets this Restatement apart from others. Specifically, the relevancy of "uncertainty" in ASC 606 is that revenue should not be recognized where "the uncertainty about the amount of consideration is not expected to be resolved for a long period of time." Therefore, PACS's Restatement is admitting that, at minimum, it was uncertain about every dollar of the $61 million being recognized. But per ASC 250, which defines the need for a restatement including PACS's here, such a restatement is only necessary here because of "oversight or misuse of facts that existed at the time the financial statements were prepared." Accordingly, PACS was uncertain about the $61 million in revenue being **recognized at the time the financial statements were prepared**, which financial statements counted such revenues, but should not have based on then-existing uncertainty. Putting it all together, **PACS had the uncertainty at the time, by March 31, 2024 at the latest, but ignored it, and concealed it**.

262. Because the financial statements were instead certified pursuant to Section 302 of the Sarbanes-Oxley Act twice—once in connection with each of the first two quarterly financial

statements—both times by Defendant Murray and Defendant Apt, the ignored uncertainty is not only PACS's, but also theirs, as the certifiers. Put simply, **the Restatement was admission that Defendants PACS, Apt, and Murray had uncertainty about PACS's revenue recognition by March 31, 2024 at the latest, but ignored it, and concealed it from the April IPO and everything thereafter**.

d. **Other Concessions in the 2024 Annual Report**

263. The 2024 Annual Report separately admitted that the Company and its Officers "received information" that "certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, may not be eligible for reimbursement under Medicare Part B," which occurred "[s]ubsequent to the issuance of the Company's Quarterly Report on Form 10-Q filed on August 12, 2024." Tellingly, this part of the Annual Report does not specify that this was the ***first*** time they received such information. Indeed, the Restatement's reference to "uncertainties" at the time the financial statements were prepared, and Defendants Murray's and Apt's certification of those same financial statements, indicates they were at least aware of a risk that these services were ineligible for reimbursement as far back as March 31, 2024—otherwise, there would have been no need to restate them under ASC 250. Nevertheless, this additional disclosure in PACS's 2024 Annual Report does constitute a further admission of the Company and the report's signatories ("We") had actually received such information right after August 12, 2024 still confirms their direct knowledge of these issues ***a month prior to the September 6, 2024 SPO***.

264. Further, the Restatement in its 2024 Annual Report acknowledged for the first time that numerous investigations were taking place into the Company's abuse of Medicare dating back all the way to ***April 8, 2024***:

(a) On April 8, 2024, PACS, PACS Services and Paradise Valley Healthcare Center ("Paradise Valley") received a Civil Investigative Demand ("CID") from the U.S.

Department of Justice ("DOJ") investigating whether they "violated the False Claims Act by submitting false claims to Medicare";

(b) On September 11, 2024, PACS received another CID from the DOJ relating to its investigation into all of PACS's California-based SNFs "to determine whether PACS violated the False Claims Act by submitting false claims to Medicare for reimbursement under the patient-driven payment model for skilled nursing and rehabilitation services";

(c) On September 30, 2024, Providence Group, Inc. received a CID from the DOJ requesting information to determine whether its SNFs "violated the False Claims Act by submitting false claims to Medicare for reimbursement under the COVID-19 related Hospital Stay Waiver"; and

(d) On February 26, 2025, PACS received a subpoena from the DOJ relating to an investigation into violations of various statutes that prohibit making fraudulent statements to any branch of the U.S. government. The subpoena included requests for information related to PACS's COVID waiver practices, billing to Medicare Part B for respiratory and sensory integration therapy services, change of insurance enrollment, cost waivers for co-pays, deductibles, and co-insurance, and claim reimbursement from Medicare for bad debt.

265. Finally, PACS's 2024 Form 10-K disclosed a new caption on the balance sheet and cash flow statement associated with an end-of-year refund liability of $145.8 million. This refund liability related to cash PACS collected yet concurrently expected to refund to payors like Medicare. By continuing to perform these services and incur the related costs, this practice has a negative impact on net income and would negatively affect EBITDA.

| *(in millions)* | **Q1 2024** | **Q2 2024** | **Q3 2024** | **Q4 2024** |
|---|---|---|---|---|
| Refund Liability | $3.9 | $30.6 | $84.0 | $145. 8 |
| QoQ Change ($) | | $26.6 | $53.4 | $61.8 |

266. The refund liability has continued to increase after December 31, 2024. As of September 30, 2025, PACS's refund liability balance is approximately $181.1 million.

**N. Control Person Allegations**

267. The Insider Selling/Controlling Stockholder Defendants Murray and Hancock at all times in the Class Period controlled PACS and all of its officers and directors due to their significant, controlling holdings of PACS stock. Before the IPO, they each owned 50% of the Company's stock, and even after the SPO, still owned 35.2% each—together, still a supermajority. All of the Offering Documents admitted that, due to Murray's and Hancock's significant stock ownership, PACS was a "controlled company" and they controlled it.

268. Indeed, according to the Company's Proxy Statement's dated November 25, 2025, PACS has not even been able to make Murray and Hancock returned the $613,510 **each** that they owe the Company in erroneous bonuses, which the Company's Clawback Policy requires that they return to the Company yet remain "outstanding and unpaid" by Defendants Murray and Hancock. They control the Company, and nobody controls them.

269. The Insider Selling/Controlling Stockholder Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Insider Selling/Controlling Stockholder Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein.

270. Defendant Murray, co-founder of PACS, served as PACS's Chief Executive Officer and Chairman of PACS's Board at all times during the Class Period. Defendant Hancock, PACS's only other co-founder, was Director and Executive Chairman of the Board during the Class Period.

271. The Insider Selling/Controlling Stockholder Defendants, as senior executive officers of the Company, were able to and did control the content of the various earnings calls and presentations pertaining to the Company during the Class Period. They were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

272. The Insider Selling/Controlling Stockholder Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about PACS; business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

273. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time period, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Insider Selling/Controlling Stockholder Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Insider Selling/Controlling

Stockholder Act Defendants controlled others' wrongdoing during the Class Period that violated these specific requirements and obligations.

## VIII. SECURITIES ACT ALLEGATIONS

### A. Background to Securities Act Claims

274. Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of complete and accurate disclosure. The Securities Act creates liability for false, misleading, and incomplete statements, as well as omissions, made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

275. The claims set forth below are strict liability claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act relating to the Offerings.

276. Sections 11 and 12(a)(2) of the Securities Act create liability against PACS, the IPO Individual Defendants and the SPO Individual Defendants, and the IPO Underwriter Defendants and SPO Underwriter Defendants for each (i) misstatement, (ii) omission in contravention of an affirmative legal disclosure obligation, and (iii) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents for the Offering in which they participated.

277. Pursuant to SEC Regulation C, the Offering Documents were also required to disclose material information necessary to ensure that representations in the Offering Documents were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

278. Separately, the Offering Documents were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information to not be indicative of future operating results.

279. Moreover, the Offering Documents were also required to comply with Item 105 (formerly Item 503) of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Document furnish, among other things, a discussion of material factors that make the Offerings speculative or risky.

280. The Securities Act claims are brought in connection with the IPO on behalf all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock pursuant and/or traceable to the IPO Offering Documents issued in connection with PACS's April 11, 2024 IPO, during the period from April 11, 2024 through September 5, 2024, inclusive, and were damaged thereby.

281. The Securities Act claims are also brought in connection with the SPO on behalf of all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock in PACS's September 6, 2024 SPO, on that date, and pursuant and traceable to the SPO Offering Documents issued in connection with the SPO, and were damaged thereby.

282. With respect to the IPO, the Securities Act claims brought under Section 11 and 12(a)(2) are asserted against the IPO Securities Defendants, i.e., the Company, the directors and/or officers who signed the IPO Registration Statement, and the IPO's underwriters. Also, Section 15 claims are brought against the IPO Individual Defendants due to their control of PACS—a violator of Sections 11 and 12(a)(2)—and the content of the IPO Offering Documents.

283. With respect to the SPO, the Securities Act claims brought under Section 11 and 12(a)(2) are asserted against the SPO Securities Defendants, i.e., the Company, the directors and/or officers who signed the SPO Registration Statement, and the SPO's underwriters. Also, Section 15 claims are brought against the SPO Individual Defendants due to their control of PACS—a violator of Sections 11 and 12(a)(2)—and the content of the SPO Offering Documents.

### B. Additional Substantive Allegations of Fact Supporting the Securities Act Claims

284. The straightforward elements of the Securities Act claims are easily met here based on the Company's own admissions in the Restatement that the Offering Documents contained materially false and misleading statements and omissions.

285. Specifically, after the Offerings, PACS issued the Restatement, reducing revenue for the quarter ended March 31, 2024 by $14.885 million, and reducing revenue for the quarter ended June 30, 2024 by $46.141 million, for the previously reported net revenue figures set forth in the SPO Offering Documents. For context, the SPO Offering Documents describe the Company's total GAAP net income as "$38.2 million" for the same six-month period. Because the SPO Offering Documents purported to disclose revenue for the quarters ending March 31, 2024 and June 30, 2024, and because the Company has now admitted that those disclosures were materially wrong by a minimum of $61 million, the SPO Offering Documents materially overstated PACS's revenue by an amount greater than the Company's entire profit for the same period. The content of the Restatement is tantamount to an admission that such the SPO Offering Documents violated the Securities Act.

286. In addition, PACS has admitted that the reason for the Restatement was "due to regulatory, compliance and Medicare Part B billing uncertainties," which were specifically uncertainties regarding "the Company's judgmental assessments of the compliance of its

respiratory and certain other therapy services" at the time of such assessments being made, dating back to the first quarter of 2024—i.e., ***before the IPO***. PACS has since admitted in its November 19, 2025 Restatement that revenue from key Medicare Part B services "should not have been recognized" during the periods before and during the offerings because the Company lacked adequate internal controls and processes to assess Medicare eligibility, constrain variable consideration under ASC 606, and identify compliance risks. Thus, this part of the Restatement is tantamount to an admission that SPO Offering Documents and the IPO Offering Documents materially omitted known uncertainties that materially undermined PACS's reported financial performance.

287. Overall, the Offering Documents significantly misstated PACS's revenue, profitability, and core operating metrics, misrepresented the true risks of investing in PACS, and concealed the underlying billing, regulatory, and accounting deficiencies that rendered the contents of the Offering Documents unreliable. Rather than disclosing the then-existing and unresolved Medicare Part B billing uncertainties and internal-control weaknesses affecting its ancillary service lines, the Offering Documents falsely presented PACS as a company with compliant billing practices, disciplined controls, full risk profile, and reliable financial reporting.

### C. The IPO Offering Documents and SPO Offering Documents Materially Omitted Known Trends and Uncertainties in Violation of Item 303

288. The IPO Offering Documents and SPO Offering Documents violated SEC Regulation S-K, Item 303, because they failed to disclose known trends, events, and uncertainties that were reasonably expected to have a material adverse impact on PACS's revenues, income, and operating performance.

289. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net

sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). This disclosure obligation is affirmative: once management is aware of a trend or uncertainty reasonably likely to materially affect financial results, the issuer must disclose it.

290. In negligent violation of Item 303, the IPO Offering Documents and SPO Offering Documents failed to disclose and misrepresented the following ***then-existing***, material events and adverse trends or uncertainties that PACS had already been experiencing at the time of the IPO and the SPO:

(a) PACS had experienced a significant change in Medicare reimbursement conditions with the termination of the COVID-19 Waiver, which the Company had relied on to obtain reimbursement for certain services that would not otherwise have qualified for Medicare Part A coverage. Because PACS had been over-exploiting the COVID-19 Waiver, its termination would have an outsized impact on PACS's net sales, revenues, and income. The financial impact of this regulatory shift was already unfolding prior to the IPO, making it a known trend.

(b) After the COVID-19 Waiver ended, PACS's Medicare Part B "ancillary services," including for "respiratory, sensory integration, and [other] therapy," were subject to ongoing "billing uncertainties" and elevated reversal risk. Specifically, such improper therapies "may not be eligible for reimbursement under Medicare Part B" and "may be subject to significant reversal in the future," making the Company's historical revenue trajectory unsustainable and rendering near-term collectability materially uncertain, as the Company precisely admitted in its Restatement.

(c) PACS's internal controls and compliance processes were inadequate to assess Medicare reimbursement eligibility and related regulatory requirements for these

respiratory, sensory, and other services, creating a known uncertainty that the Company's recognized revenue might later need to be reversed, constrained, or reclassified.

(d) With respect to the SPO Offering Documents, the financial statements included for the three months ended March 31, 2024 ("Q1 2024") as well as both the three months and six months ended June 30, 2024 ("Q2 2024" and "H1 2024") were based on revenue that PACS would later admit "should not have been recognized," resulting in restatement adjustments of approximately $15 million for Q1 2024 and approximately $46 million for Q2 2024; at the same time, PACS's refund liabilities were growing rapidly from $3.9 million to $30.6 million. These facts reflected a material known trend in declining revenue quality and increasing exposure to refund liabilities.[18]

(e) As a result, the IPO Offering Documents and SPO Offering Documents overstated PACS's business prospects, revenue trajectory, and financial stability, and failed to alert investors to known trends and uncertainties that were reasonably likely to materially impact future revenue, income, and profit.

(f) These omissions rendered the IPO Offering Documents and SPO Offering Documents materially misleading and noncompliant with Item 303, which required PACS to disclose these known trends and uncertainties at the time of both offerings.

291. The undisclosed trends and uncertainties described above were known to PACS management at the time of the IPO and SPO, presented a significant and ongoing uncertainty, and

---

[18] The SPO Offering Documents included PACS's interim condensed combined/consolidated financial statements for the three months ended March 31, 2024 as well as both the three months and six months ended June 30, 2024. The SPO Offering Documents represented that the included financial statements were prepared in conformity with U.S. generally accepted accounting principles ("GAAP") and the SEC's rules and regulations governing registration statements and prospectuses, and that they fairly presented, in all material respects, PACS's financial condition and results of operations for the periods presented.

created a known risk that PACS's previously reported and future revenue would be adversely impacted, requiring restatement, exposing the Company to refund-liability obligations, and subjecting PACS to regulatory scrutiny.

292. The Company's Restatement further confirmed the materiality of these trends and uncertainties. In its Restatement, PACS admitted that revenue associated with respiratory therapy, sensory integration therapy, and other Medicare Part B ancillary services "should not have been recognized" during the periods encompassing the IPO and SPO. PACS further disclosed significant restatement adjustments, including tens of millions of dollars in reversed revenue, more than 100% of its profit, the establishment of substantial refund liabilities, and corrections to multiple financial-statement captions, arising directly from the very uncertainties, risks, and control failures that existed at the time of the offerings. These admissions confirm that the trends and uncertainties omitted from the IPO and SPO Offering Documents were known to management during the IPO and SPO periods and were reasonably likely to (and ultimately did) materially affect the Company's revenues and income.

### D. The IPO and SPO Offering Documents Falsely Describes Certain Risks as Potential When Such Risks Had Already Manifested

293. Both the IPO Offering Documents and the SPO Offering Documents further misled investors by framing critical Medicare and regulatory-compliance risks as hypothetical, posed only as circumstances that ***could*** adversely affect PACS's revenue, profitability, and operations, when, in truth, these risks had already materialized, were actively impacting PACS's business at the time of each Offering. For example, both the IPO Registration Statement and Prospectus and the SPO Registration Statement and Prospectus warned:

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment***

> ***efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

294. This statement in ¶293 from the IPO Offering Documents and appearing identically in the SPO Offering Documents, was materially false and misleading when made. By the time of the IPO, coverage and reimbursement conditions for key ancillary services had already changed and already materially affected PACS's results, most prominently through the termination of the COVID-19 Waiver, which PACS had relied upon to obtain reimbursement for services that would not otherwise have qualified for Medicare Part B payment. In particular, this statement failed to disclose and misrepresented the following material adverse facts, trends, uncertainties, or risks that existed at the time of the IPO and the SPO:

(a) that when the COVID-19 Waiver already ended prior to the IPO, it had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been taking advantage of the COVID-19 Waiver;

(b) that the termination of the COVID-19 Waiver had already altered the reimbursement landscape for the ancillary services PACS was promoting as growth drivers, hence already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that PACS's past revenue levels were inflated by reimbursement for Medicare Part B services that PACS now admits were improper—due to PACS's own then-existing "billing uncertainties," as admitted in the Restatement, rather than changes Medicare might make—and that its financial performance was already guaranteed to be materially and adversely affected as a result. It was materially misleading to warn investors that reimbursement

changes might have adverse impacts when, in reality, such adverse impacts were already certain even without any changes to reimbursement practices.

295. This statement in ¶293 was also materially false and misleading when made because:

(a) It represented that revenue and profit could be materially impacted ***if*** reimbursement changed, when in fact at the time that PACS was overbilling Medicare and would likely have to return recognized revenue to Medicare for that billing;

(b) The refund liability described in the Restatement admits that, at the time this statement was made, the PACS's management knew that PACS would need to reimburse Medicare for the Company's widespread overbilling by a material amount;

(c) By warning only that such reimbursement changes might occur and "could" adversely impact revenue and profitability, this risk warning falsely implied that no such adverse changes had yet materialized, even though the risks had already taken effect and were adversely impacting PACS's revenue and profitability at the time of both the IPO and SPO Offerings; and

(d) This false implication is made stronger when considered in light of the overall context of the "Risk Factors" section in each of the IPO Offering Documents and SPO Offering Documents, because each specifically mentions the expiration of the COVID-19 Waiver, yet neglects to disclose that such expiration had already adversely impacted PACS's "revenue and profitability" to an outsized extent, much less by approximately $90 million per quarter for at least three quarters (Q3:2023, Q4:2023, and Q1:2024). Misleadingly, the Offering Documents referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement "operational changes," while omitting any disclosure of the materially adverse impacts on revenue or profitability. Specifically, a different part of the IPO Offering Documents

and SPO Offering Documents' "Risk Factors" stated: "Additionally, the expiration of the Emergency Waivers and other flexibilities allowed under the COVID-19 PHE, which ended as of May 11, 2023, have required, and may continue to require, operational changes, sometimes on short notices, and these reinstatements have not occurred simultaneously, requiring heightened monitoring to ensure compliance." Given that overall context, it was especially misleading to warn investors only that Medicare reimbursement changes might occur and "***could***" adversely impact revenue and profitability.

296. The IPO Registration Statement and Prospectus and the SPO Registration Statement and Prospectus also misleadingly framed PACS's extensive regulatory-compliance obligations as only ***potential*** risks, stating:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.***

297. The statement in ¶296 contained in the IPO Offering Documents and SPO Offering Documents falsely suggested that PACS ***might*** one day fall out of compliance. In reality, PACS was ***already*** out of compliance with Medicare Part B requirements at the time of the IPO and SPO, and the adverse consequences of that noncompliance had already materialized. For example, PACS's existing noncompliance was already improperly inflating revenue and profit, and was reflected in materially inaccurate financial statements that would later require restatement, among other adverse consequences.

298. As the Company later admitted in the Restatement, PACS had already been improperly billing Medicare Part B for respiratory therapy and other ancillary services that did not

satisfy eligibility requirements, and the Company had already recognized revenue that "should not have been recognized" under ASC 606. PACS later conceded:

(a) that its Q1 2024 revenue was overstated by approximately $15 million;

(b) that its Q2 2024 revenue was overstated by approximately $46 million; and

(c) that this improper revenue recognition spanned the period immediately prior to the April 2024 IPO, the period including and after the April 2024 IPO, and the period leading all the way up to the September 2024 SPO.

299. Thus, the IPO Offering Documents' and SPO Offering Documents' conditional phrasing misleadingly suggested that PACS was ***currently*** compliant when, in fact, it was already materially out of compliance and already generating financial results that would soon require restatement.

300. The IPO Offering Documents and SPO Offering Documents also omitted material information concerning the consequences of the COVID-19 Waiver's cessation. At the time of the IPO and SPO, PACS was already incurring significant operational and financial strain as it attempted to transition away from the improper billing practices it had relied upon during the COVID-19 Waiver period. The Company was already experiencing:

(a) the need to respond to federal investigations related to violations of the False Claims Act by submitting false claims to Medicare, including related costs and risks;

(b) the need to modify billing practices;

(c) increased compliance and documentation burdens;

(d) decreased revenue collectability; and

(e) adverse impacts on cash flows and profitability.

301. By failing to disclose these already-manifested impacts, the IPO Offering Documents and SPO Offering Documents misleadingly suggested that PACS's operations and financial performance had not yet been materially affected by the regulatory shift, when the opposite was true.

302. Further, the statement in ¶296 materially omitted the impact on the business from the cessation of the COVID-19 Waiver. At the time of the IPO, the Company was already required to make significant expenditures and/or changes to its operations as a result of the end of the COVID-19 Waiver. More information regarding the true impact of the COVID-19 Waiver on PACS's financial results, including the full extent to which PACS had improperly exploited the COVID-19 Waiver to achieve its past financial results and the full extent to which the cessation of the COVID-19 Waiver was already impacting PACS's performance, were necessary to make this statement not misleading. Accordingly, this statement misleadingly implied that PACS's operations, revenue, and profitability were not yet materially and adversely affected, when in fact they were already materially and adversely affected.

303. The IPO Offering Documents and SPO Offering Documents' generic risk-factors did not describe the specific and already-occurring risks associated with PACS's undisclosed billing practices, revenue-recognition uncertainties, and internal-control deficiencies. Instead, they framed already-manifested conditions as hypothetical.

304. The IPO Offering Documents and SPO Offering Documents also mischaracterized as potential the very risks that had already materialized, i.e., regulatory ineligibility, Medicare billing uncertainty, restatement exposure, and internal-control failures, concealing the extent to which PACS's financial results were vulnerable to adverse correction.

305. Because the same misleading conditional language appeared in both the IPO Offering Documents and SPO Offering Documents, those statements were false and misleading for the same reasons in both Offerings: they framed already-realized risks as hypothetical, omitted known trends and uncertainties that Regulation S-K required PACS to disclose, failed to disclose material facts that made an investment in PACS speculative and risky as required by Regulation S-K, and conveyed the misleading impression that PACS was operating within its regulatory obligations and maintaining stable reimbursement conditions, when neither was true.

**E. The IPO Offering Documents Also Contained Other Material Omissions**

306. The IPO Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation. They presented PACS as a company with disciplined controls, compliant Medicare billing practices, and reliable financial reporting, but failed to disclose facts demonstrating the opposite.

307. Specifically, the IPO Offering Documents were materially false and misleading in that they omitted to disclose numerous material risks, conditions, and practices that existed at the time of the IPO, including:

(a) that PACS's expanded Medicare Part B ancillary service lines, including respiratory therapy and sensory integration therapy, were billed and recognized amid significant regulatory uncertainty regarding beneficiary eligibility, permissible billing practices, and compliance with Medicare Part B requirements;

(b) that PACS lacked an effective regulatory-compliance infrastructure capable of assessing whether these services were billable in the first instance, including the absence of sufficient processes to identify, evaluate, and escalate compliance risks arising from new service lines;

(c) that PACS had not designed or maintained effective internal controls or disclosure controls around revenue recognition for these new services, including controls required by ASC 606 to assess variable consideration, reversal risk, and collectability;

(d) that PACS's revenue recognition for these Medicare Part B ancillary services involved known and unresolved questions about whether such revenue should be constrained, or recognized at all, under ASC 606, given the real and present risk that Medicare would deny or retract reimbursement for such services; and

(e) that PACS's internal-reporting systems and "***[r]obust culture of compliance,***" as described in the IPO documents, were in fact deficient, and that PACS lacked adequate processes to detect and escalate compliance concerns, including those deficiencies later revealed by the Audit Committee investigation.

308. These omissions were material because the IPO Offering Documents emphasized PACS's revenue growth, profit margin profile, and expansion into higher-acuity ancillary services, presenting those services as a strategic driver of both historical and future performance, while simultaneously assuring investors that PACS's billing, accounting, and compliance systems were robust. However, the IPO Offering Documents did not disclose that, at the time of the IPO, PACS's Medicare Part B billing practices for those very services were unvetted, at material risk of reversal, and subject to unresolved regulatory questions. The disclosure of audited 2023 financials and extensive assertions about disciplined controls and compliance reinforced this misleading impression.

309. The false and misleading nature of the IPO Offering Documents was later confirmed by PACS's Restatement. PACS admitted that, following an Audit Committee investigation and management's reassessment of regulatory eligibility and ASC 606 requirements,

the revenue from Medicare Part B respiratory therapy, sensory integration therapy, and other related services "should not have been recognized" during the periods immediately preceding and encompassing the IPO, due to unresolved regulatory eligibility issues and significant reversal risk.

310. The Restatement further disclosed that management was required to reconsider variable consideration estimates and the constraint requirement under ASC 606 for these services because PACS had recognized revenue despite lacking adequate support for the conclusion that Medicare billing was permissible. PACS ultimately reversed tens of millions of dollars of previously recognized revenue for the first and second quarters of 2024, directly undermining the IPO narrative that these service lines were growing legitimately and that the Company's systems supported reliable recognition of the associated revenue.

311. The Company also admitted that it should have recorded refund liabilities and reduced accounts receivable for improperly billed amounts, demonstrating that PACS lacked the "***robust controls***" necessary to identify when billed services were not collectible or eligible for Medicare reimbursement. These corrections contradicted the IPO Offering Documents' assurances of sound accounting practices and adequate controls.

312. Critically, the Restatement and accompanying disclosures admitted that PACS had material weaknesses in internal control over financial reporting and ineffective disclosure controls and procedures as of December 31, 2024, including failures to design and maintain adequate controls around revenue recognition for new service lines and to identify and communicate regulatory compliance risks. These same weaknesses existed during the IPO period but were not disclosed in the IPO Offering Documents, even as the Company touted its control environment and regulatory compliance posture.

313. The significance of these omissions is underscored by PACS's own description of the Restatement's breadth, which required revisions to revenue, accounts receivable, refund liabilities, expenses tied to overstated performance metrics, non-GAAP measures such as Adjusted EBITDA, and compensation awarded to executives under inflated metrics. These facts confirm that key aspects of PACS's business, operations, and controls were materially misrepresented or undisclosed at the time of the IPO.

314. These admissions confirm that the IPO Offering Documents omitted material information required by Regulation S-K and Regulation S-X, including information necessary to describe known trends, uncertainties, and risks relating to PACS's expanding ancillary service lines, internal controls, and revenue-recognition practices, and failed to disclose material facts that made an investment in PACS speculative and risky as required by Regulation S-K. The IPO Offering Documents' presentation of PACS's revenue growth, operational discipline, and compliance posture was materially incomplete and therefore misleading.

315. Had the IPO Offering Documents accurately disclosed that PACS's Medicare Part B ancillary services revenue was recognized despite unresolved compliance issues, including that PACS lacked an effective system of internal and disclosure controls, and including that these deficiencies would necessitate a restatement shortly after the IPO, reasonable investors would have viewed the omitted information as significantly altering the total mix of information available and would not have purchased PACS securities at the offering price.

### F. The SPO Offering Documents Also Contained Other Materially False and Misleading Statements and Omissions

316. The SPO Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not

prepared in accordance with the rules and regulations governing its preparation. Specifically, the SPO Offering Documents were materially false and misleading in that:

(a) they included PACS's financial statements for Q1 2024, Q2 2024, and H1 2024, financial statements **that PACS has since admitted were materially false, misstated, and not prepared in accordance with GAAP, requiring restatement**;

(b) they falsely represented that the financial statements fairly presented, in all material respects, PACS's financial condition and results of operations and were prepared in conformity with GAAP and applicable SEC requirements, when in fact they improperly recognized Medicare Part B ancillary services revenue that could not be recognized under ASC 606;

(c) they falsely represented that the revenue presented in Q1 2024 and Q2 2024 had been recognized in compliance with ASC 606, amounting to at least $61 million in overstated revenue, when that revenue was subject to significant reversal risk arising from unresolved Medicare Part B eligibility and regulatory compliance uncertainty, amounting to $30.4 million in improperly inflated accounts receivable and $30.6 million in undisclosed refund liabilities;

(d) they omitted to disclose and/or falsely represented that PACS maintained adequate internal controls, disclosure controls, and compliance processes over revenue recognition and Medicare Part B billing, when PACS in fact lacked effective controls to assess eligibility for Medicare reimbursement, to appropriately adjust revenue recognition for variable consideration, or to identify and escalate compliance risks;

(e) they falsely represented that the interim financials were accurate and reliable indicators of PACS's profit, earnings trajectory, revenue quality and quantity, and receivables, when they included millions of dollars of improperly recognized Medicare Part B

revenue that would later be reversed—including the material reversal of accounts receivable and the disclosure of material refund liabilities previously omitted from the balance sheet;

(f) they falsely represented that there were no then-existing refund liabilities in its financial statements, despite then-existing refund liabilities of $3.9 million as of the end of Q1 2024 and $30.6 million as of the end of Q2 2024—before these statements were made; and

(g) they falsely represented that the Q1 2024 and Q2 2024 financials would not require material revision, when PACS would be compelled, shortly after the SPO, to restate those very financial statements and correct multiple line items across its income statement, balance sheet, and cash-flow presentation.

317. The SPO Offering Documents included PACS's materially false financial statements for Q1 of 2024, Q2 of 2024 and for the first fiscal half of 2024, later restated:

| **Metric** (*dollars in thousands*) | **Period** | **Original** | **Restated** | **Percentage Change** |
|---|---|---|---|---|
| Revenue | 1Q2024 | $934,721 | $919,836 | -1.59% |
| | 2Q2024 | $981,846 | $935,705 | -4.70% |
| | 1H2024 | $1,916,567 | $1,855,541 | -3.18% |
| Net (Loss) Income | 1Q2024 | $49,140 | $34,819* | -29.13% |
| | 2Q2024 | $(10,910) | $(31,878)* | -192.19% |
| | 1H2024 | $38,232 | $2,943* | -92.30% |
| Net (loss) income per common share | 1Q2024 | $0.38 | $0.27* | -28.95% |
| | 2Q2024 | $(0.07) | $(0.21)* | -200% |
| | 1H2024 | $0.27 | $0.02* | -92.59% |
| Accounts receivable | 1Q2024 | $622,737 | $611,799 | -1.76% |
| | 2Q2024 | $610,577 | $580,137 | -4.99% |
| Refund liability | 1Q2024 | N/A ($0 implied) | $3,947 | N/A** |
| | 1H2024 | N/A ($0 implied) | $30,586 | N/A** |

318. In the "Restated" column above, PACS claims that even with the effect of the Restatement, it would still have been profitable to a vanishing degree, i.e., by less than $3 million or $0.02 cents per share. However, PACS's measurements of the magnitude of its own wrongdoing

represent only the smallest possible extent of wrongdoing to which they are willing to admit, and discovery may yet adduce evidence that these adjustments should be more dramatic, erasing all of PACS's claimed profitability. Accordingly, these items in the chart above are marked with an asterisk (*) to denote that they are pled in the alternative to the allegation that PACS would not have been profitable but for the conduct alleged herein. Indeed, the transaction costs necessitated by the conduct, including the costs of responding to multiple federal investigations, running a more-than year-long Audit Committee investigation, implementing its "recommended remedial measures and enhancements," conducting a full financial restatement including substantial attorneys' and other professional fees, and paying potential penalties—all of which should have happened before the Company went public to avoid harming investors—far exceed $3 million.

319. In the above chart's "Refund liability" row, "N/A" is used for "not applicable." Because PACS's Q1 and Q2 financial statements never previously reported refund liabilities, despite millions of dollars in refund liabilities existing at the time such statements were made, a percentage change from the implied $0 of refund liabilities, as originally stated, is impossible to calculate as a percentage increase. These items are marked with an double asterisk (**) in the chart above.

320. The SPO Offering Documents copied the financial statements that PACS previously released on two Form 10-Qs, the first and second quarters of 2024, which stated that the financial statements were prepared "in accordance with accounting principles generally accepted in the United States (U.S. GAAP)."

321. Those representations were materially false and misleading when made because, as PACS later admitted in its November 19, 2025 Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Form 10-K"), the Q1 2024 and Q2 2024 financial statements were

materially misstated and were not prepared in accordance with GAAP. The 2024 Form 10-K restated PACS's previously issued Q1 2024 and Q2 2024 financial statements. The Company admitted that, "as a result of the Audit Committee's independent investigation, and due to regulatory, compliance and Medicare Part B billing uncertainties," revenue from respiratory, sensory integration, and wound care ultrasound mist therapy services "should not have been recognized" and required material restatement under ASC 250. The Company reversed that revenue, reduced its accounts receivable, and recorded a previously omitted "refund liability" for cash already received associated with the reversed revenue that it now concedes will need to be refunded to Medicare.

322. PACS further disclosed in the 2024 Form 10-K that these restatement corrections materially reduced patient and resident service revenue for both Q1 2024 and Q2 2024. PACS also acknowledged that the improper recognition of Medicare Part B revenue impacted multiple balance sheet and other financial statement line items in the SPO Offering Documents. The false line items in the SPO Offering Documents ***income statements*** related to Medicare Part B were including but not limited to: "Patient and resident service revenue," "Total revenue," "general and administrative expense," "Operating income," "Net (loss) income," "Net (loss) income per share attributable to PACS Group, Inc.," and other line items. The false line items in the SPO Offering Documents ***balance sheets*** related to Medicare Part B were including but not limited to: "Accounts receivable, net," "Total current assets," "other assets," "Total assets," "Accrued payroll and benefits," "Other liabilities, "Total current liabilities," "Total liabilities," "Total equity," and other line items. PACS further acknowledged the need to include balance sheet captions omitted from the SPO Offering Documents, including line items for material "Refund liabilities."

323. These corrections materially altered the financial picture that the SPO Offering Documents presented to investors. For Q1 2024, PACS's previously reported net income of approximately $49.1 million was reduced by roughly $14.3 million (about 29%) to $34.8 million. For Q2 2024, the Company increased its reported net loss by approximately $21.0 million, nearly tripling the loss disclosed in the SPO Offering Documents. The total negative adjustment of restated revenue for the first half of 2024 related to Medicare Part B revenue, −$61,026,000, far exceeded the Company's reported net income for the same period of $38,232,000 according to its SPO Offering Documents; in other words, the Restatement changed the financial picture of the Company from a profitable one to an unprofitable one leading up to its September 2024 SPO.

324. The Company also recorded substantial refund liabilities associated with the Medicare Part B issues, including a significant current refund liability as of December 31, 2024. PACS admitted that these liabilities represented amounts the Company had previously collected but could not retain because the underlying services had not satisfied Medicare Part B eligibility criteria. The need to reduce a material portion of the Q1 2024 and Q2 2024 Medicare Part B revenue, reduce accounts receivable, and the omission of refund liabilities confirms that the interim financial statements used in the SPO were materially misstated and did not accurately describe the Company's financial statements or balance sheets.

325. The 2024 Form 10-K also contained further findings of the Company's Audit Committee investigation into the improper Medicare Part B billing practices that revealed the SPO Offering Documents to be false and misleading. It disclosed that management identified material weaknesses in internal control over financial reporting and ineffective disclosure controls and procedures during the Impacted Periods, namely, the first two fiscal quarters of 2024. These findings confirm that the SPO Offering Documents omitted material information regarding the

unreliability of PACS's financial statements and the inadequacy of its internal control environment.

326. The misstatements and omissions in the SPO Offering Documents were material. PACS's reported Q1 2024 and Q2 2024 financial results, including revenue, net income or loss, accounts receivable, refund liabilities, and equity, were important metrics for investors evaluating PACS's post-IPO trajectory, revenue quality, liquidity, leverage, and profitability. By containing financial statements inflated by improperly recognized Medicare Part B revenue and creating the false appearance of profitability, the SPO Offering Documents materially misrepresented PACS's financial performance and position during the periods leading up to, and most relevant to, the SPO.

327. The SPO Offering Documents also omitted to disclose the true extent of risks and uncertainties associated with PACS's Medicare Part B billing for respiratory, sensory integration, and ultrasound mist therapy services. PACS has now admitted that billing uncertainties made recognition of such revenue inappropriate during Q1 2024 and Q2 2024. The omission of these material facts rendered the Offering Documents' statements regarding revenue-recognition policies, regulatory compliance, and interim financial performance misleading.

328. Had the SPO Offering Documents disclosed the true state of PACS's financial condition, it would have shown that that PACS's existing Q1 2024 and Q2 2024 financial statements were materially misstated; that reported revenue and earnings depended on improper recognition of Medicare Part B ancillary services revenue; that internal controls and disclosure controls were inadequate; and that PACS would need to conduct a year-long internal investigation to materially restate those financial statements and admit significant refund liabilities, reasonable investors would have viewed the information as significantly altering the total mix of information available and would have declined to purchase PACS stock at the SPO offering price.

329. As a direct and proximate result, the SPO Offering Documents contained untrue statements of material fact, omitted to state material facts required to be stated therein or necessary to make the statements made not misleading, and were not prepared in accordance with GAAP or applicable SEC requirements, including Regulation S-K and Regulation S-X. The Restatement announced on November 19, 2025 and reflected in the 2024 Form 10-K constitutes PACS's admission that the SPO Offering Documents contained materially false and misleading financial statements, risk warnings, and omissions for Q1 2024 and Q2 2024.

**G. Additional Allegations of Materiality Under the Securities Act**

330. The misstatements and omissions described above were material within the meaning of Sections 11 and 12(a)(2) of the Securities Act and Regulation S-K. The omitted and misstated facts concerned core aspects of PACS's business and financial reporting, including (i) the legitimacy, collectability, and sustainability of Medicare Part B revenue, particularly from expanded ancillary service lines; (ii) the accuracy and reliability of PACS's reported GAAP and non-GAAP financial results; (iii) PACS's compliance profile and the existence of material compliance and billing uncertainties; (iv) the adequacy of PACS's internal control over financial reporting and disclosure controls; and (v) the credibility of management's public narrative and guidance regarding profitability, growth, and operational discipline.

331. The magnitude of the misstatements later corrected by the Restatement independently establishes materiality. PACS reversed tens of millions of dollars of previously recognized revenue for Q1 2024 and Q2 2024, recorded substantial refund liabilities, reduced accounts receivable, and corrected multiple income-statement and balance-sheet line items. These were not technical or cosmetic adjustments; they materially altered PACS's reported profitability, liquidity, and financial position during the periods immediately preceding and encompassing both the IPO and the SPO.

332. Under GAAP, immaterial errors need not be restated. PACS's decision, following the Audit Committee's investigation, to restate its Q1 2024 and Q2 2024 financial statements therefore constitutes an admission that the errors were material. The Restatement also confirmed that the accounting issues and related uncertainties existed before and during the IPO and SPO. Likewise, PACS's restated Q1 2024 and Q2 2024 financial statements were material because they flowed from "material weaknesses" in its internal controls for those time periods.[19]

333. PACS's admission that all restated items were material is supported by ASC 250-10-S99 and auditing standards, which recognize both quantitative and qualitative factors supporting their materiality here. In particular, ASC 250-10-S99's 5% "rule of thumb" quantitative threshold is met here and provides a basis for material restatement because PACS's revenue reversals and other items restated met or exceeded the 5% threshold, including under benchmarks ties to profit before tax, revenue, and assets. Independently, ASC 250-10-S99's recognition of qualitative factors for determining materiality are met here and provide a basis for material restatement, including the "potential effect of the misstatement on trends, especially trends in profitability," "an indication of a possible pattern of bias by management when developing and accumulating accounting estimates," and "a misstatement precipitated by management's continued unwillingness to correct weaknesses in the financial reporting process." Because PACS's Restatement meets both quantitative and qualitative factors, the admitted materiality of the restated items is confirmed.

[19] A company's internal controls cannot be considered effective if a "material weakness" exists. A "material weakness" in internal controls is "a deficiency, or a combination of deficiencies, in [internal control over financial reporting] such that **there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis**." (SEC Release No. 33-8810 § II.A, at 9) (emphasis added).

| *(in millions)* | FY22 | FY23 | FY24 |
|---|---|---|---|
| Materiality Guidance | **$10 - $20** | **$8 - $20** | **$5 - $20** |
| Profit Before Tax (5%) | **$10** | **$8** | **$5** |
| Revenue (1%) | $24 | $31 | $41 |
| Revenue (0.5%) | $12 | $16 | $20 |
| Assets (2%) | $49 | $70 | $105 |
| Assets (1%) | $25 | $35 | $52 |

334. The misstatements and omissions were also qualitatively material because they affected metrics emphasized in the Offering Documents and that investors and analysts closely tracked, including Adjusted EBITDA and EPS:

| *(in millions)* | Q1 2024 | Q2 2024 |
|---|---|---|
| Adjusted EBITDA | | |
| Actuals (Restated) | $74.1 | $62.3 |
| Actuals (Original) | $88.5 | $99.7 |
| Consensus | $76 | $87 |
| Beat / Miss (Restated) | Miss | Miss |
| Beat / Miss (Original) | Beat | Beat |
| EPS | | |
| Actuals (Restated) | $0.27 | ($0.21) |
| Actuals (Original) | $0.38 | ($0.07) |
| Consensus | $0.30 | $0.34 |
| Beat / Miss (Restated) | Miss | Miss |
| Beat / Miss (Original) | Beat | Miss |

335. For example, PACS's pre-Restatement reporting and related messaging allowed PACS to present a materially more favorable earnings narrative than investors would have received had the truth been disclosed. The Restatement altered key performance measures and the perceived trajectory of PACS's profitability, including Adjusted EBITDA and EPS outcomes relative to consensus expectations and PACS's guidance shared with investors as part of quarterly earnings materials.

336. The misstatements also impaired the credibility of management's profitability guidance. During PACS's Q2 2024 earnings release, the Company issued full-year 2024 guidance projecting revenue of $3.85 to $3.95 billion and Adjusted EBITDA of $370 to $380 million. When PACS's actual 2024 results were later disclosed, PACS reported Adjusted EBITDA of approximately $279.5 million—missing the midpoint of its Adjusted EBITDA guidance by approximately 25%. A failure to achieve management's Adjusted EBITDA guidance of this magnitude is material because Adjusted EBITDA is a core profitability metric relied upon by investors to evaluate operating performance, profit margin sustainability, leverage capacity, and valuation for PACS, and was particularly important to reasonable investors given PACS's status as a newly public company whose investment thesis rested on profitability and profit margin expansion. As discussed more fully below, Defendants Apt's and Murray's compensation was directly tied to Adjusted EBITDA performance, giving them a financial incentive to overstate this metric.[20]

337. The Restatement-related derecognition of Medicare Part B ancillary-services revenue had a disproportionate impact on profitability because PACS treated such services as high-margin components of its business. When that revenue was later derecognized under ASC 606, the effect on Adjusted EBITDA was magnified, undermining the earnings narrative presented to investors in the IPO and SPO.

338. PACS's Restatement further confirmed the materiality of collectability and refund exposure. PACS reported a rapidly growing refund-liability balance associated with Medicare Part B billing uncertainties, reflecting cash collected that PACS expected to refund to Medicare because the underlying services did not satisfy eligibility or documentation requirements. This refund

---

[20] *See, e.g.,* 2024 10-K, pp. 153-154.

exposure, reaching approximately $145.8 million by year-end, was material because it bore directly on the quality of PACS's reported revenue, the sustainability of PACS's margins, and the reliability of PACS's reported cash and liquidity profile.

339. PACS's undisclosed trend of ballooning refund liabilities is material. The continued quarter-over-quarter growth in refund liabilities beyond the periods captured by the initial $61 million revenue correction confirms that the risks omitted from the Offering Documents were ongoing and materially affecting PACS's earnings quality and cash profile without being disclosed to investors.

340. The omitted information was independently material under Item 303 of Regulation S-K. At the time of the IPO and SPO, PACS management was aware of known trends and uncertainties relating to Medicare Part B eligibility, billing uncertainties, revenue collectability, refund exposure, and the adequacy of internal controls governing new ancillary services. These uncertainties were not speculative; they were already affecting PACS's financial results and were reasonably likely to continue doing so. In fact, the continued increase in PACS's refund liability balance every quarter through Q3 2025 demonstrates that the uncertainty surrounding reimbursement persisted well beyond the initial restatement periods.

341. Management knew that revenue from these services was subject to significant uncertainties regarding eligibility for reimbursement and compliance; that PACS lacked adequate controls to assess and constrain revenue recognition; and that previously reported revenue might need to be reversed or reclassified as refund liabilities. Because these known uncertainties were reasonably likely to impact PACS's revenues and income, they were material within the meaning of Item 303.

342. The Restatement confirmed that these trends and uncertainties were known and material at the time of the offerings. PACS admitted that revenue from these services "should not have been recognized" at the time they were initially reported, that collectability was then uncertain, and that the Company was instead required to record substantial refund liabilities and restate its financial statements.

343. The misstatements and omissions were material to reasonable investors deciding whether to purchase PACS common stock in the IPO and SPO. The Offering Documents emphasized PACS's revenue growth, profitability, expansion into higher-acuity ancillary services, and disciplined compliance and control environment precisely because these categories were material to their investors.

344. Had the Offering Documents disclosed that a significant portion of PACS's reported revenue and earnings depended on improper Medicare Part B billing; that PACS lacked effective controls; that cash collected was subject to significant and growing refund exposure; and that these conditions undermined the Company's ability to meet its profitability guidance or indeed even be profitable at all, reasonable investors would have viewed the omitted information as significantly altering the total mix of information available.

345. Relatedly, Defendants' risk disclosures were materially misleading in context because they framed key regulatory and reimbursement risks as contingent or hypothetical while omitting that the relevant reimbursement dynamics, billing uncertainties, collectability risks, and compliance problems had already manifested and were already affecting the Company's results. Reasonable investors would have considered it important to know that PACS's reported performance depended on practices that carried a substantial risk of revenue reversal and refund exposure and that, as later confirmed, required restatement.

## IX. SECURITIES ACT CLAIMS

### COUNT I

### For Violation of Section 11 of the Securities Act Against the Securities Act Defendants

346. Plaintiffs incorporate ¶¶5, 8-10, 27-345 by reference as though fully set forth herein.

347. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, (i) in connection with the IPO Registration Statement on behalf of Detroit P&F and the Class against PACS, each of IPO Individual Defendants, and each of the IPO Underwriter Defendants, and (i) in connection with the SPO Registration Statement on behalf of Plaintiffs and the Class against PACS, each of the SPO Individual Defendants, and each of the SPO Underwriter Defendants.

348. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to PACS and negligence as to the other Securities Act Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statement of opinion of belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

349. PACS is the registrant and issuer of the common stock offered pursuant to the IPO Registration Statement and the SPO Registration Statement. As such, PACS is strictly liable for the materially inaccurate statements contained in the IPO Registration Statement and the SPO Registration Statement and the failure of the IPO Registration Statement and the SPO Registration Statement to be complete and accurate. By virtue of the IPO Registration Statement and the SPO

Registration Statement containing material misstatements and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading, PACS is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

350. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement or SPO Registration Statement were true and without omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading.

351. The IPO Individual Defendants each signed the IPO Registration Statement and caused its issuance and the SPO Individual Defendants each signed the SPO Registration Statement and caused its issuance. The IPO Individual Defendants and the SPO Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement and SPO Registration Statement, respectively. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading. By virtue of each of the IPO Individual Defendants and the SPO Individual Defendants failure to exercise reasonable care, the IPO Registration Statement and SPO Registration Statement contained material misstatements and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading. As such, each of the IPO Individual Defendants and each of the SPO Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

352. Each of the IPO Underwriter Defendants served as the underwriters for the IPO and each of the SPO Underwriter Defendants served as the underwriters of the SPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §

77b(a)(11). As such, the IPO Underwriter Defendants and the SPO Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the IPO Offering Documents and the SPO Offering Documents. Each of the IPO Underwriter Defendants, as an underwriter of the PACS common stock offered in the IPO, and each of the SPO Underwriter Defendants, as an underwriter of the PACS common stock offered in the SPO, had a duty to make a reasonable and diligent investigation of the truthfulness, accuracy, and completeness of the statements contained in the IPO Registration Statement and SPO Registration Statement, respectively. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the IPO Registration Statement and the SPO Registration Statement contained material misstatements and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

353. None of the untrue statements or omissions of material facts in the IPO Registration Statement or SPO Registration Statement alleged herein were forward-looking statements. Rather, each such statement or omission concerned existing facts. Moreover, the IPO Registration Statement and the SPO Registration Statement did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

354. Each of the IPO Securities Act Defendants and each of the SPO Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the IPO Registration Statement and SPO Registration Statement, respectively, which misstated and failed to disclose,

*inter alia*, the facts set forth in ¶¶5, 8-10, 27-345. By reason of the conduct alleged herein this Section, each Securities Act Defendant violated Section 11 of the Securities Act.

355. Detroit P&F and other members of the Class purchased or otherwise acquired PACS publicly traded common stock pursuant and/or traceable to the IPO Registration Statement. Plaintiffs and other members of the Class purchased or otherwise acquired PACS publicly traded common stock in the SPO and pursuant and traceable to the SPO Registration Statement.

356. Plaintiffs and other members of the Class have sustained damages. The value of PACS common stock has declined substantially subsequent to and due to the violation of Section 11 by the Securities Act Defendants.

357. At the time of their purchases, Plaintiffs and members of the Class were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

358. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time that this action commenced. Less than three years elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that this action commenced.

**COUNT II**

**For Violation of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants**

359. Plaintiffs incorporate ¶¶5, 8-10, 27-358 by reference as though fully set forth herein.

360. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), (i) in connection with the IPO Prospectus on behalf of Detroit P&F and the Class against PACS, each of IPO Individual Defendants, and each of the IPO Underwriter Defendants,

and (i) in connection with the SPO Prospectus on behalf of Plaintiffs and the Class against PACS, each of the SPO Individual Defendants, and each of the SPO Underwriter Defendants.

361. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to PACS and negligence as to the other Securities Act Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statement of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinions or belief when made.

362. Each of the IPO Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective IPO Prospectus. Each IPO Securities Act Defendant passed title to the Class, solicited the Class's purchases of the PACS common stock for gain, or both. The actions of solicitation by the IPO Securities Act Defendants included participating in the preparation of the false and misleading IPO Prospectus, roadshow, and marketing of PACS common stock to investors, such as Detroit P&F and other members of the Class. Each of the IPO Securities Act Defendants solicited the purchase of PACS common stock and were motivated in part by a desire to serve their own financial interests and those of the Company. In the absence of the IPO Securities Act Defendants' efforts to publicize the IPO and solicit common stock purchasers, the IPO could not have occurred.

363. Each of the SPO Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective SPO Prospectus. Each SPO Securities Act Defendant passed title to the Class, solicited the Class's purchases of the PACS common stock for gain, or both. The actions of solicitation by the SPO Securities Act Defendants

included participating in the preparation of the false and misleading IPO Prospectus, roadshow, and marketing of PACS common stock to investors, such as Plaintiffs and other members of the Class. Each of the SPO Securities Act Defendants solicited the purchase of PACS common stock and were motivated in part by a desire to serve their own financial interests and those of the Company. In the absence of the SPO Securities Act Defendants' efforts to publicize the SPO and solicit common stock purchasers, the SPO could not have occurred.

364. PACS also qualifies as a statutory seller under SEC Rule 159A, 17 C.F.R. §230.159A, because, among other things, the common stock offered in the IPO and SPO were sold by means of a prospectus.

365. The IPO Prospectus and the SPO Prospectus contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

366. None of the untrue statements or omissions of material facts in the IPO Prospectus or SPO Prospectus alleged herein were forward-looking statements. Rather, each such statement or omission concerned existing facts. Moreover, the IPO Prospectus and SPO Prospectus did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

367. Each of the IPO Securities Act Defendants and each of the SPO Securities Act Defendants owed to the purchasers of PACS common stock, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO Prospectus and SPO Prospectus, respectively, to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements made therein not misleading and no omission of material fact required by the rules and

regulations governing the IPO Prospectus's preparation and the SPO Prospectus's preparation. By virtue of each of the IPO Securities Act Defendants' and each of the SPO Securities Act Defendants' failure to exercise reasonable care, the IPO Prospectus and the SPO Prospectus, respectively, contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein. As such, each of these Securities Act Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and the Class.

368. Plaintiffs and other members of the Class did not know, nor in the exercise of reasonable diligence could Plaintiffs or other members of the Class have known, of the untruths and omissions contained in the IPO Prospectus or SPO Prospectus at the time Plaintiffs or other members of the Class purchased PACS common stock.

369. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time this action was commenced. Less than three years elapsed between the time the securities upon which this claim is brought were offered to the public and the time that this action was commenced.

370. By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased PACS common stock pursuant to the IPO Prospectus or SPO Prospectus sustained substantial damages. Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their common stock with the interest thereon or damages as allowed by law or in equity. Class members who have sold their PACS common stock seek damages to the extent permitted by law.

## COUNT III

**For Violation of Section 15 of the Securities Act against**
**<u>The IPO Individual Defendants and SPO Individual Defendants</u>**

371. Plaintiffs incorporate ¶¶5, 8-10, 27-370 by reference as though fully set forth herein.

372. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Detroit P&F as the IPO, Plaintiffs as to the SPO, and the Class against each of the IPO Individual Defendant in connection with the IPO and each of the SPO Individual Defendants in connection with the SPO.

373. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent. This claim is based on control person liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statement of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

374. Each of the IPO Individual Defendants and each of the SPO Individual Defendants were control persons of PACS by virtue of their positions as directors, senior officers, and/or controlling or significant stockholders of PACS. The IPO Individual Defendants and the SPO Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and or major shareholders.

375. Each of the IPO Individual Defendants and each of the SPO Individual Defendants participated in the preparation and dissemination of the IPO Offering Documents and SPO Offering Documents, respectively, and otherwise participated in the process necessary to conduct

the IPO and SPO, respectively. Because of their positions of control and authority as senior officers and/or directors, each of the IPO Individual Defendants and each of the SPO Individual Defendants were able to, and did, control the contents of the IPO Offering Documents and SPO Offering Documents, respectively, which contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein.

376. By virtue of their stock ownership and their designation of PACS's management and the member of the Board, and as alleged further herein, the Insider Selling/Controlling Stockholder Defendants controlled not only PACS but each of the other IPO Individual Defendants and SPO Individual Defendants.

377. As control persons of PACS, each of the IPO Individual Defendants is liable jointly and severally with and to the same extent as PACS for its violations of Sections 11 and 12(a)(2) of the Securities Act with respect to the IPO and the IPO Offering Documents.

378. As control persons of PACS, each of the SPO Individual Defendants is jointly and severally with and to the same extent as PACS for its violations of Sections 11 and 12(a)(2) of the Securities Act with respect to the SPO and the SPO Offering Documents.

379. As control persons of each of the other IPO Individual Defendants and SPO Individual Defendants, the Insider Selling/Controlling Stockholder Defendants is liable jointly and severally with and to the same extent as IPO Individual Defendants and the SPO Individual Defendants for their respective violations of Sections 11 and 12(a)(2) of the Securities Act.

## X. EXCHANGE ACT ALLEGATIONS

380. Congress passed the Exchange Act during the Great Depression, to substitute a philosophy of full disclosure for the then-prevailing philosophy of *caveat emptor* and, thus, to achieve a high standard of business ethics in the securities industry that remains the default rule to this day. The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities, as well as for fraudulent acts, courses of business, and schemes in connection with the same, to maintain confidence in our public securities markets. It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W. J. Howey Co.*, 328 U. S. 293, 299 (1946).

381. Here, the PACS Defendants' conduct in violation of the Exchange Act took multiple forms. First, they made fraudulent statements in violation of Section 10(b) and Rule 10b-5(b) promulgated thereunder. Second, they employed a scheme to defraud investors through deceptive acts and courses of business in violation of Section 10(b) and Rule 10b-5(a) and (c) promulgated thereunder. Third, PACS and the Insider Selling/Controlling Stockholder Defendants made insider sales with material, nonpublic information that violated Section 10(b) (including Rule 10b-5) as well as Section 20A. Finally, controlling shareholders Defendants Murray and Hancock controlled the Company at all times, exposing them to additional control person liability under Section 20(a).

### A. Defendants' Materially False and Misleading Statements and Omissions

382. To further implement Section 10(b), the SEC promulgated Rule 10b-5(b), which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

383. During the Class Period, the PACS Defendants made false and misleading statements and omissions in the IPO Offering Documents, the SPO Offering Documents, Press Releases, and conferences with investors, all in violation of Rule 10b-5(b). These class action claims are brought against Defendants PACS, Murray, Hancock, Apt, and Jergensen for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder on behalf of all persons and entities who or which purchased or otherwise acquired publicly traded PACS common stock during the Class Period, and were damaged thereby.

**1. The IPO Offering Documents**

384. As detailed below, the IPO Offering Documents, issued by PACS and signed by Defendants Murray, Hancock, and Apt, inaccurately described as potential certain risks—rather than disclosing the actual events and trends or uncertainties—that had already manifested and affirmatively misrepresented PACS's strength in the market. Further, the IPO Offering Documents contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements made therein not misleading. Specifically, they included the following false and misleading statements.[21]

a. **Misstatement No. 1—The IPO (April 11, 2024)**

385. The IPO Offering Documents highlighted that **if** Medicare coverage were changed, then PACS's "operations, revenue and profitability could be materially and adversely impacted":

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

[21] Plaintiff alleges that the statements highlighted in bold and italics within this Section were materially false, misleading, and omitted disclosure of material information.

386. Misstatement No. 1 was materially false and misleading when made because it failed to disclose that at the time of the IPO:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that a change in reimbursement was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and the end of the COVID-19 Waiver already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver;

(b) that the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened 10 months before Misstatement No. 1 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent;

(c) that the PACS Defendants knew about, or at a minimum were deliberately reckless about, PACS's revenue levels being inflated by reimbursement for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes to Medicare—and its financial performance already being guaranteed to be materially and adversely affected as a result. Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 1 was being made—otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 1; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

387. Misstatement No. 1 was also materially false and misleading when made because:

(a) it represented that revenue and profit could be materially impacted ***if*** reimbursement changed, when in fact the PACS Defendants knew, or were deliberately reckless about, at the time that PACS was overbilling Medicare and would likely have to return recognized revenue to Medicare for that billing;

(b) it warned investors that reimbursement changes ***"could"*** have adverse impacts when, in reality, such adverse impacts would have occurred, even if nothing changed regarding such reimbursements;

(c) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to refund Medicare for millions of dollars from the Company's widespread overbilling;

(d) by warning only that such reimbursement changes might occur and "***could***" adversely impact revenue and profitability, this risk warning falsely implied that no such adverse changes had yet materialized, even though they had already taken effect and were adversely impacting PACS's revenue and profitability at the time of both the Offerings; and

(e) this false implication is made stronger when considered in light of the overall context of the "Risk Factors" section in the IPO Offering Documents because it specifically mentions the expiration of the COVID-19 Waiver, yet neglected to disclose that such expiration had already adversely impacted PACS's "revenue and profitability" to an outsized extent by approximately $90 million per quarter for at least three quarters (Q3 2023, Q4 2023, and Q1 2024).

Misleadingly, the IPO Offering Documents referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement "operational changes," while omitting any disclosure of the materially adverse impacts on revenue or profitability. Specifically, a different part of the IPO Offering Documents' "Risk Factors" stated: "Additionally, the expiration of the Emergency Waivers and other flexibilities allowed under the COVID-19 PHE, which ended as of May 11, 2023, have required, and may continue to require, operational changes, sometimes on short notices, and these reinstatements have not occurred simultaneously, requiring heightened monitoring to ensure compliance." Given that overall context, it was especially misleading to warn investors only that Medicare reimbursement changes might occur and "***could***" adversely impact revenue and profitability.

388. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably understated risks to the Company's "operations, revenue and profitability," making materially false and misleading statements or omissions.

b. **Misstatement No. 2—The IPO (April 11, 2024)**

389. The IPO Offering Documents stated that, "from ***time to time***," there are "***instances*** of noncompliance" with billing processes:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs***.

390. Misstatement No. 2 was materially false and misleading when made because, at the time of the IPO:

(a) PACS leadership, including the PACS Defendants, had been pushing facilities across the Company to perform unnecessary respiratory therapies on thousands of patients, to drive up revenue at each facility from $150,000 to $1 million per month. This volume of respiratory therapy was impossible for SNF staff to perform, so they were forced to continually falsify their billing documentation procedures;

(b) PACS leadership, including the PACS Defendants, had been orchestrating the use of sensory rooms, devoid of any actual therapeutic tools, to overbill Medicare Part B for these treatments;

(c) at the time of the IPO, the PACS Defendants knew, or were deliberately reckless about, the overbilling practices pushed by PACS leadership at its facilities;

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes; and

(e) while the PACS Defendants represented that PACS was auditing and correcting these practices, and should have been, PACS did not begin doing so until the Hindenburg Report came out months later, on November 4, 2024, whereupon the late-initiated internal investigation found at least $61 million in noncompliance, requiring Restatement. Defendant Murray admitted that PACS's internal investigation only started in response to the Hindenburg Report. On November 6, 2024, PACS issued a press release where Defendant Murray disclosed: "We believe recent third-party allegations [in the Hindenburg Report] are misleading. However, in line with our commitment to holding ourselves to a high standard—in how we serve our patients, operate our business, and engage with stakeholders—the Company's Audit Committee, with assistance from external counsel, is conducting an investigation ***of the***

***allegations*.**" PACS Group, Inc., Current Report at Ex. 99.1 (Form 8-K) (Nov. 7, 2024) (emphasis added).

391. Misstatement No. 2 was also materially false and misleading when made because:

(a) it represented that there could be issues of noncompliance "from time to time," but omitted that it was knowable at the time, and would have become known if only the Company conducted such "review and audit," as it eventually would—that the Company was overbilling Medicare and would have to return recognized revenue to Medicare for that billing—otherwise, ASC 250 would not have required the Restatement;

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to refund Medicare for millions of dollars from the Company's widespread overbilling; and

(c) although PACS may well have addressed certain instances of noncompliance by its operating subsidiaries "from time to time," the statement omitted that, far from auditing and correcting noncompliance related to its operating subsidiaries' billing Medicare B for respiratory, sensory, and other therapy services, PACS was in fact directing such noncompliance through quotas, spreadsheets, incentives, company meetings, marketing and Administrator retreats, and other pressure on facility staff.

392. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS

Defendants culpably understated the extent of the Company's noncompliance, making materially false and misleading statements or omissions.

c. **Misstatement No. 3—The IPO (April 11, 2024)**

393. The IPO Offering Documents noted that, ***if*** PACS was "not operating in compliance with" laws and regulations, the Company "***could*** be required to make significant expenditures" as a result:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance***.

394. Misstatement No. 3 was materially false and misleading when made because it failed to disclose at the time of the IPO:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that changes in the laws and regulations with which it must comply was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and the end of the COVID-19 Waiver already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver in contravention of CMS guidelines;

(b) that the PACS Defendants knew, or were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened 10 months before Misstatement No. 3 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation

of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that Defendants knew, or were deliberately reckless, about PACS's revenue levels already being inflated by overbilling for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes in laws and regulations—as opposed to the mere potentiality "***[i]f we are not operating in compliance***…" Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 3 was being made—otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 3; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

395. The falsity of this statement is corroborated by the Restatement, which disclosed a material weakness regarding PACS's lack of compliance with issues received through the whistleblower hotline.

396. Misstatement No. 3 was also materially false and misleading when made because:

(a) it represented that ***if*** they were in noncompliance they ***could be*** forced to make significant expenditures or change operations, when in fact the Defendants knew at the time that they were overbilling Medicare and would likely have to recognize materially reduced revenue to Medicare for that billing; and

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that

the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling.

397. On April 8, 2024, PACS Services, the subsidiary run by Defendant Sanford, and Paradise Valley received a CID from the DOJ requesting information and documents relating to an investigation to determine whether PACS Services and Paradise Valley violated the False Claims Act by submitting false claims to Medicare, putting the PACS Defendants on notice of the same noncompliance which the Restatement admitted existed at the time. Thus, it was consciously misleading to state Misstatement No. 3 in terms of a mere potentiality ("if") of noncompliance.

398. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

#### d. Misstatement No. 4—The IPO (April 11, 2024)

399. The IPO Offering Documents inaccurately explained that the Company's growth was based on PACS's turnaround model for transforming underperforming SNFs:

> Our ***significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.***

400. Misstatement No. 4 was materially false and misleading when made because at the time of the IPO:

(a) the Company's expertise was not in transforming long-term custodial care facilities into SNFs, but rather in pushing aggressive practices to overbill Medicare, which would need to be materially restated once discovered;

(b) the Company's aggressive acquisition strategy gave the illusion of legitimate growth and transformation, but in reality, it was used to overbill taxpayer-funded government healthcare programs like Medicare and the PACS Defendants; and

(c) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

401. Misstatement No. 4 was also materially false and misleading when made because:

(a) while PACS may have taken underperforming long-term custodial care skilled nursing facilities and turned them into profitable SNFs, it failed to disclose that its success was based almost entirely on prioritizing profit over patient care and overbilling Medicare; and

(b) the supposedly transformed SNFs were only profitable because of the abuse of Medicare programs and the sheer volume of inappropriate respiratory, sensory, and other treatments improperly billed to Medicare.

402. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably misstated the Company's business model and value proposition to investors, making materially false and misleading statements or omissions.

e. **Misstatement No. 5—The IPO (April 11, 2024)**

403. The IPO Offering Documents stressed PACS's "decentralized, local operating model" for its business:

> We believe our success is driven in significant part by ***our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously*** and deliver excellence in clinical quality and a superior experience for our patients.

404. Misstatement No. 5 was materially false and misleading when made because:

(a) regardless of what the PACS Defendants believed drove their success, the operating model was not decentralized. Following their Restatement, PACS now no longer describes its operating model as fully decentralized. Instead, as of the latest earnings call on November 19, 2025, the Company claimed that "PACS operates with a locally led, centrally supported model" and did not describe it as fully decentralized;

(b) regardless of what the PACS Defendants believed drove their success, PACS did not empower local leaders to operate their SNF autonomously. Rather, PACS leadership, including the PACS Defendants, issued top-down directives to bill Medicare improperly, complete with quotas, spreadsheets, conference calls, and presentations that amounted to instructions on how to maximize the overbilling while avoiding detection;

(c) the PACS Defendants knew, or at a minimum were deliberately reckless, about their own operating model, a centralized approach based on top-down directives from the PACS Defendants to all PACS facilities; and

(d) as a result, PACS's financial results would foreseeably suffer negative, materially impacts due to improper Medicare overbilling schemes.

405. Misstatement No. 5 was also materially false and misleading when made because the Company would not have been nearly as profitable, or profitable at all, without the Medicare Part A COVID-waiver misconduct and the Medicare Part B respiratory and sensory misconduct; therefore, its short-term success was driven by its centralized and improper directives, not by a decentralized model.

406. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

f. **Misstatement No. 6—The IPO (April 11, 2024)**

407. The IPO Offering Documents touted the Company's "rigorous approach to billing integrity":

> ***Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust*** and collaboration that makes us a natural choice for payors.

408. Misstatement No. 6 was materially false and misleading when made because:

(a) at the time PACS made this statement, PACS leadership was orchestrating top-down billing schemes to overbill Medicare;

(b) the PACS Defendants therefore knew that, or were deliberately reckless about, the financial records of PACS were based on a series of improper billing practices that would need to be corrected;

(c) PACS had insider contacts within certain California auditing regions, and those California facilities were able to obtain advance notice of audits to avoid discovery of their Medicare overbilling practices; and

(d) as a result, PACS's financial results would foreseeably suffer negative material impacts due to improper Medicare overbilling schemes.

409. Misstatement No. 6 was also materially false and misleading when made because, while PACS may have had a rigorous approach to billing, the rigor was directed at overbilling respiratory and sensory therapies, regardless of patient need, and evading detection by Medicare and audits. As a result, PACS financial results would foreseeably suffer negative material impacts due to Medicare overbilling schemes.

410. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably overstated the Company's business and financial prospects as well as understated it risks, making materially false and misleading statements or omissions.

**2. PACS's First Quarter Report on Form 10-Q**

411. On May 13, 2024, PACS issued its quarterly report on Form 10-Q for the quarter ended March 31, 2024 (the "1Q:2024 Quarterly Report"), signed by Defendants Murray and Apt. This quarterly report contained PACS's unaudited condensed combined/consolidated financial statements for the first fiscal quarter of 2024 (ended March 31, 2024), which were false and misleading when made and omitted to state other facts necessary to make the statements made not misleading, as PACS admitted when it issued the Restatement for these financial statements in particular. In addition, this quarterly report repeated the same three false and misleading risk warnings in the IPO Offering Documents.

**a. Misstatement No. 7—May 13, 2024**

412. On May 13, 2024, PACS's Q1 2024 Quarterly Report contained the following false and misleading financial statement entitled "PACS GROUP, INC. AND SUBSIDIARIES CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS."

**Part I**

**Item 1. Financial Statements**

**PACS GROUP, INC. AND SUBSIDIARIES**
**CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS**
*(dollars in thousands, except for share values)*

| | *(unaudited)* March 31, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 81,213 | $ 73,416 |
| Accounts receivable, net | 622,737 | 547,807 |
| Other receivables | 66,014 | 52,259 |
| Prepaid expenses and other current assets | 61,761 | 48,665 |
| **Total Current Assets** | 831,725 | 722,147 |
| Property and equipment, net | 660,157 | 577,528 |
| Operating lease right-of-use assets | 2,175,169 | 2,007,812 |
| Insurance subsidiary deposits and investments | 25,201 | — |
| Escrow funds | 21,456 | 15,649 |
| Goodwill and other indefinite-lived assets | 65,291 | 65,291 |
| Other assets | 87,329 | 124,312 |
| **Total Assets** | $ 3,866,328 | $ 3,512,739 |
| **LIABILITIES AND EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 157,000 | $ 140,947 |
| Accrued payroll and benefits | 143,811 | 92,234 |
| Current operating lease liabilities | 113,617 | 109,438 |
| Current maturities of long term debt | 16,837 | 16,822 |
| Current portion of accrued self-insurance liabilities | 29,210 | 27,536 |
| Other accrued expenses | 71,073 | 69,949 |
| **Total Current Liabilities** | 531,548 | 456,926 |
| Long-term operating lease liabilities | 2,123,865 | 1,961,997 |
| Accrued benefits, less current portion | 6,738 | 6,738 |
| Lines of credit | 537,000 | 520,000 |
| Long-term debt, less current maturities, net of deferred financing fees | 230,855 | 195,708 |
| Accrued self-insurance liabilities, less current portion | 154,892 | 146,167 |
| Other liabilities | 147,837 | 123,477 |
| **Total Liabilities** | $ 3,732,735 | $ 3,411,013 |
| Commitments and contingencies (Note 11) | | |
| Equity: | | |
| PACS Group, Inc. stockholders' equity: | | |
| Common stock - 64,361,693,000 shares authorized, $0.001 par value, 128,723,386 shares issued and outstanding as of March 31, 2024 and December 31, 2023 | 129 | 129 |
| Accumulated other comprehensive income | 201 | — |
| Retained earnings | 127,661 | 95,997 |
| Total stockholders' equity | 127,991 | 96,126 |
| Noncontrolling interest in subsidiary | 5,602 | 5,600 |
| **Total Equity** | $ 133,593 | $ 101,726 |
| **Total Liabilities and Equity** | $ 3,866,328 | $ 3,512,739 |

See accompanying notes to unaudited condensed combined/consolidated financial statements.

3

413. Misstatement No. 7 was false and misleading when made because it had to be materially restated, as follows:

**PACS GROUP, INC. AND SUBSIDIARIES**
**RESTATED UNAUDITED CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS**
*(dollars in thousands, except for share and per share values)*

| | March 31, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | Category Reference | As Restated |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ 81,213 | $ — | | $ 81,213 |
| Accounts receivable, net | 622,737 | (10,938) | MPB | 611,799 |
| Other receivables | 66,014 | — | | 66,014 |
| Prepaid expenses and other current assets | 61,761 | — | | 61,761 |
| **Total Current Assets** | 831,725 | (10,938) | | 820,787 |
| Property and equipment, net | 660,157 | 6,745 | LEA | 666,902 |
| Operating lease right-of-use assets | 2,175,169 | (1,614) | LEA | 2,173,555 |
| Insurance subsidiary deposits and investments | 25,201 | — | | 25,201 |
| Escrow funds | 21,456 | — | | 21,456 |
| Goodwill and other indefinite-lived assets | 65,291 | — | | 65,291 |
| Other assets | 87,329 | — | | 87,329 |
| **Total Assets** | $ 3,866,328 | $ (5,807) | | $ 3,860,521 |
| **LIABILITIES AND EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ 157,000 | $ — | | $ 157,000 |
| Accrued payroll and benefits | 143,811 | — | | 143,811 |
| Current operating lease liabilities | 113,617 | (113) | LEA | 113,504 |
| Current maturities of long-term debt | 16,837 | — | | 16,837 |
| Current portion of accrued self-insurance liabilities | 29,210 | — | | 29,210 |
| Refund liability | — | 3,947 | MPB | 3,947 |
| Other accrued expenses | 71,073 | — | | 71,073 |
| **Total Current Liabilities** | 531,548 | 3,834 | | 535,382 |
| Long-term operating lease liabilities | 2,123,865 | (1,562) | LEA | 2,122,303 |
| Accrued benefits, less current portion | 6,738 | — | | 6,738 |
| Lines of credit | 537,000 | — | | 537,000 |
| Long-term debt, less current maturities, net of deferred financing fees | 230,855 | — | | 230,855 |
| Accrued self-insurance liabilities, less current portion | 154,892 | — | | 154,892 |
| Other liabilities | 147,837 | 6,242 | MPB, LEA[(1)] | 154,079 |
| **Total Liabilities** | $ 3,732,735 | $ 8,514 | | $ 3,741,249 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| PACS Group, Inc. stockholders' equity: | | | | |
| Common stock - 64,361,693,000 shares authorized, $0.001 par value, 128,723,386 shares issued and outstanding as of March 31, 2024 | 129 | — | | 129 |
| Accumulated other comprehensive income | 201 | — | | 201 |
| Retained earnings | 127,661 | (14,321) | | 113,340 |
| Total stockholders' equity | 127,991 | (14,321) | | 113,670 |
| Noncontrolling interest in subsidiary | 5,602 | — | | 5,602 |
| **Total Equity** | $ 133,593 | $ (14,321) | | $ 119,272 |
| **Total Liabilities and Equity** | $ 3,866,328 | $ (5,807) | | $ 3,860,521 |

(1) MPB: $(1,035), LEA: $7,277

414. Misstatement No. 7 was also materially false and misleading when made because:

(a) according to the Restatement, the false line items in the Q1 2024 Quarterly Report's **balance sheets** related to Medicare Part B were including but not limited to: "Accounts receivable, net," "Total current assets," "Total assets," "Total current liabilities," "Total liabilities," "Total equity," and other line items.[22] PACS further acknowledged the need to include

[22] According to the Restatement: "Restatement adjustments are reflected as follows: • Related to Medicare Part B revenue are labeled 'MPB' • Related to lease classification are labeled 'LEA.'"

balance sheet captions omitted from the Q1 2024 Quarterly Report, including line items for material "Refund liabilities."

(b) according to the Restatement, at least $14.9 million in recognized quarterly revenue on the income statement did not meet the criteria of revenue recognition under ASC 606 because of material uncertainties that existed at the time that were "not expected to be resolved for a long period of time" as of the time the financial statements were prepared. This had cascading effects, rendering line items on Misstatement No. 7 false, including by inflating "Accounts receivable," "Cash," and other balance sheet accounts, yet Defendants Murray and Apt certified under Section 302 of the Sarbanes-Oxley Act that the financial statements fairly presented PACS's financial condition and that they had disclosed to auditors and the Audit Committee all material uncertainties and deficiencies affecting financial reporting, when in fact they failed to disclose this known uncertainty;

(c) according to the Restatement, at least $3.9 million in undisclosed, material, and growing refund liability existed at the time the financial statements were prepared, which represented revenue PACS had sufficient information at that time to know it was obligated not to keep and would inevitably have to return to Medicare;

(d) per ASC 250 referenced by the Restatement, the material "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such material uncertainty existed by the time these statements were made, but were ignored and concealed;

(e) Defendants Murray and Apt, as the certifiers of these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all

material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(f) as a result, PACS financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

415. Misstatement No. 7 was also materially false and misleading when made because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases and profit were due in large part to Medicare overbilling across the Company and directed by PACS leadership.

416. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

b. **Misstatement No. 8—May 13, 2024**

417. On May 13, 2024, PACS's quarterly report on Form 10-Q for the quarter ended March 31, 2024 contained the following false and misleading financial statement entitled "PACS GROUP, INC. AND SUBSIDIARIES UNAUDITED CONDENSED COMBINED/ CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME."

PACS GROUP, INC. AND SUBSIDIARIES
UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
*(dollars in thousands, except for share and per share values)*

| | Three Months Ended March 31, 2024 | Three Months Ended March 31, 2023 |
|---|---|---|
| **Revenue** | | |
| Patient and resident service revenue | $ 934,298 | $ 707,826 |
| Additional funding | — | 375 |
| Other revenues | 423 | 241 |
| **Total Revenue** | $ 934,721 | $ 708,442 |
| Operating Expenses | | |
| Cost of services | 735,992 | 538,772 |
| Rent - cost of services | 63,961 | 45,104 |
| General and administrative expense | 46,906 | 59,442 |
| Depreciation and amortization | 7,902 | 5,829 |
| **Total Operating Expenses** | $ 854,761 | $ 649,147 |
| Operating Income | $ 79,960 | $ 59,295 |
| Other (Expense) Income | | |
| Interest expense | (15,391) | (10,636) |
| Gain on lease termination | 8,046 | — |
| Other income, net | 440 | 440 |
| **Total Other Expense, net** | $ (6,905) | $ (10,196) |
| Income before provision for income taxes | 73,055 | 49,099 |
| Provision for income taxes | (23,915) | (11,501) |
| **Net Income** | $ 49,140 | $ 37,598 |
| Less: | | |
| Net income attributable to noncontrolling interest | 2 | 1 |
| **Net income attributable to PACS Group, Inc.** | $ 49,138 | $ 37,597 |
| **Net income per common share attributable to PACS Group, Inc.** | | |
| Basic and diluted | $ 0.38 | $ 0.29 |
| **Weighted-average shares outstanding** | | |
| Basic and diluted | 128,723,386 | 128,723,386 |
| **Other comprehensive income, net of tax:** | | |
| Unrealized gain on available-for-sale debt securities, net of tax | $ 201 | $ — |
| Total other comprehensive income | 201 | — |
| **Comprehensive income** | $ 49,341 | $ 37,598 |
| Less: | | |
| Comprehensive income attributable to noncontrolling interest | 2 | 1 |
| **Comprehensive income attributable to PACS Group, Inc.** | $ 49,339 | $ 37,597 |

See accompanying notes to unaudited condensed combined/consolidated financial statements.

418. Misstatement No. 8 was materially false and misleading when made because it had to be materially restated, as follows:

PACS GROUP, INC. AND SUBSIDIARIES
RESTATED UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
*(dollars in thousands, except for share and per share values)*

| | Three Months Ended March 31, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | Category Reference | As Restated |
| Revenue | | | | |
| Patient and resident service revenue | $ 934,298 | $ (14,885) | MPB | $ 919,413 |
| Additional funding | — | — | | — |
| Other revenues | 423 | — | | 423 |
| **Total Revenue** | $ 934,721 | $ (14,885) | | $ 919,836 |
| Operating Expenses | | | | |
| Cost of services | 735,992 | — | | 735,992 |
| Rent - cost of services | 63,961 | (448) | LEA | 63,513 |
| General and administrative expense | 46,906 | — | | 46,906 |
| Depreciation and amortization | 7,902 | 214 | LEA | 8,116 |
| **Total Operating Expenses** | $ 854,761 | $ (234) | | $ 854,527 |
| Operating Income | $ 79,960 | $ (14,651) | | $ 65,309 |
| Other (Expense) Income | | | | |
| Interest expense | (15,391) | (705) | LEA | (16,096) |
| Gain on lease termination | 8,046 | — | | 8,046 |
| Other income, net | 440 | — | | 440 |
| **Total Other Expense, net** | $ (6,905) | $ (705) | | $ (7,610) |
| Income before provision for income taxes | 73,055 | (15,356) | | 57,699 |
| Provision for income taxes | (23,915) | 1,035 | | (22,880) |
| **Net Income** | $ 49,140 | $ (14,321) | | $ 34,819 |
| Less: | | | | |
| Net income attributable to noncontrolling interest | 2 | — | | 2 |
| **Net income attributable to PACS Group, Inc.** | $ 49,138 | $ (14,321) | | $ 34,817 |
| **Net income per common share attributable to PACS Group, Inc.** | | | | |
| Basic and diluted | $ 0.38 | $ (0.11) | | $ 0.27 |
| **Weighted-average shares outstanding** | | | | |
| Basic and diluted | 128,723,386 | — | | 128,723,386 |
| **Other comprehensive income, net of tax:** | | | | |
| Unrealized gain on available-for-sale debt securities, net of tax | $ 201 | $ — | | $ 201 |
| Total other comprehensive income | 201 | — | | 201 |
| **Comprehensive income** | $ 49,341 | $ (14,321) | | $ 35,020 |
| Less: | | | | |
| Comprehensive income attributable to noncontrolling interest | 2 | — | | 2 |
| **Comprehensive income attributable to PACS Group, Inc.** | $ 49,339 | $ (14,321) | | $ 35,018 |

419. Misstatement No. 8 was also materially false and misleading when made because:

(a) according to the Restatement, the false line items in the Q1 2024 Quarterly Report's **income statements** related to Medicare Part B were including but not limited to: "Patient and resident service revenue," "Total revenue," "Operating income," "Net (loss) income," "Net (loss) income per share attributable to PACS Group, Inc.," and other line items;

(b) according to the Restatement, at least $14.9 million in recognized revenue was uncertain and "not expected to be resolved for a long period of time" at the time the financial statements were prepared, and subject to significant reversal, yet Defendants Murray and Apt certified under Section 302 of the Sarbanes-Oxley Act that the financial statements fairly presented PACS's financial condition and that they had disclosed to auditors and the Audit Committee all

material uncertainties and deficiencies affecting financial reporting, when in fact they failed to disclose this known uncertainty;

(c) according to the Restatement, the additional revenue and profit PACS originally reported was the result of improper billing practices, including for respiratory and sensory therapies;

(d) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared,", hence such uncertainty existed by the time these statements were made, but were ignored and concealed;

(e) Defendants Murray and Apt, as the certifiers of these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(f) as a result, PACS's financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

420. Statement No. 8 was also materially false and misleading when made because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases and profit were due in large part to Medicare overbilling across the Company and directed by PACS leadership and the PACS Defendants.

421. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period

the PACS Defendants culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

c. **Misstatement No. 9—May 13, 2024**

422. The May 13, 2024 Form 10-Q highlighted that **if** Medicare coverage were changed, then PACS's "operations, revenue and profitability could be materially and adversely impacted":

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

423. Misstatement No. 9 was materially false and misleading when made because it failed to disclose:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that a change in reimbursement was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and that already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver;

(b) that the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened 11 months before Misstatement No. 9 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that the PACS Defendants knew about, or at a minimum were deliberately reckless about, PACS's revenue levels being inflated by reimbursement for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes Medicare might make—and that its financial performance was already guaranteed to be materially and adversely affected as a result. Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 9 was being made—Otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 9; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

424. Misstatement No. 9 was also materially false and misleading when made because:

(a) it represented that revenue and profit could be materially impacted ***if*** reimbursement changed, when in fact the PACS Defendants knew, or were deliberately reckless about, at the time that they were overbilling Medicare and would likely have to return recognized revenue to Medicare for that billing;

(b) it warned investors that reimbursement changes ***"could"*** have adverse impacts when the reality at the time was that there would be such adverse impacts even if nothing changed regarding such reimbursements;

(c) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling;

(d) by warning only that such reimbursement changes might occur and "could" adversely impact revenue and profitability, this risk warning falsely implied that no such adverse changes had yet materialized, even though they had already taken effect and were adversely impacting PACS's revenue and profitability at the time; and

(e) This false implication is made stronger when considered in light of the overall context of the "Risk Factors" section because it specifically mentions the expiration of the COVID-19 Waiver, yet neglects to disclose that such expiration had already adversely impacted PACS's "revenue and profitability" to an outsized extent, by approximately $90 million per quarter for at least three quarters (Q3:2023, Q4:2023, and Q1:2024). Misleadingly, the May 13, 2024 Form 10-Q referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement "operational changes," while omitting any disclosure of the materially adverse impacts on revenue or profitability. Specifically, a different part of the May 13, 2024 Form 10-Q's "Risk Factors" stated: "Additionally, the expiration of the Emergency Waivers and other flexibilities allowed under the COVID-19 PHE, which ended as of May 11, 2023, have required, and may continue to require, operational changes, sometimes on short notices, and these reinstatements have not occurred simultaneously, requiring heightened monitoring to ensure compliance." Given that overall context, it was especially misleading to warn investors only that Medicare reimbursement changes might occur and "***could***" adversely impact revenue and profitability.

425. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period

the PACS Defendants culpably understated risks to the Company's "operations, revenue and profitability," and making materially false and misleading statements or omissions.

d. **Misstatement No. 10—May 13, 2024**

426. The May 13, 2024 Form 10-Q stated that, "from ***time to time***," there are "***instances* of noncompliance" with billing processes:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs***.

427. Misstatement No. 10 was materially false and misleading when made because:

(a) PACS leadership, including the PACS Defendants, had been pushing facilities across the Company to perform unnecessary respiratory therapies on thousands of patients, to drive up revenue at each facility from $150,000 to $1 million per month. This volume of respiratory therapy was impossible for SNF staff to perform, so they were forced to continually falsify their billing documentation procedures;

(b) PACS leadership, including the PACS Defendants, had been orchestrating the use of sensory rooms, devoid of any actual therapeutic tools, to overbill Medicare Part B for these treatments;

(c) the PACS Defendants knew, or were deliberately reckless about, the overbilling practices pushed by PACS leadership at its facilities;

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes; and

(e) while the PACS Defendants represented that PACS was auditing and correcting these practices, and should have been, it did not begin doing so until the Hindenburg Report came out months later, on November 4, 2024, whereupon the late-initiated internal

investigation found at least $61 million in noncompliance, requiring Restatement. Defendant Murray admitted that PACS's internal investigation only started in response to the Hindenburg Report. On November 6, 2024, PACS issued a press release where Defendant Murray disclosed: "We believe recent third-party allegations [in the Hindenburg Report] are misleading. However, in line with our commitment to holding ourselves to a high standard—in how we serve our patients, operate our business, and engage with stakeholders—the Company's Audit Committee, with assistance from external counsel, is conducting an investigation ***of the allegations.***" PACS Group, Inc., Current Report at Ex. 99.1 (Form 8-K) (Nov. 7, 2024) (emphasis added).

428. Misstatement No. 10 was also materially false and misleading when made because:

(a) it represented that there could be issues of noncompliance "from time to time," but omitted that it was knowable at the time, and would have become known if only the Company conducted such "review and audit," as it eventually would later—that the Company was overbilling Medicare and would have to return recognized revenue to Medicare for that billing—otherwise, ASC 250 would not have required the Restatement;

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling; and

(c) although PACS may well have addressed certain instances of noncompliance by its operating subsidiaries "from time to time," the statement omitted that, far from auditing and correcting noncompliance related to its operating subsidiaries' billing Medicare B for respiratory, sensory, and other therapy services, the PACS Defendants in fact directing such

noncompliance through quotas, spreadsheets, incentives, company meetings, marketing and Administrator retreats, and other pressure on facility staff.

429. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

e. **Misstatement No. 11—May 13, 2024**

430. The May 13, 2024 Form 10-Q noted that, ***if*** PACS was "not operating in compliance with" laws and regulations, the Company "***could*** be required to make significant expenditures" as a result:

> We are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.***

431. Misstatement No. 11 was materially false and misleading when made because it failed to disclose:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that change in the laws and regulations with which it must comply was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and that already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver in contravention of CMS guidelines;

(b) that the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened 11 months before Misstatement No. 11 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that the PACS Defendants knew, or at minimum were deliberately reckless, about PACS's revenue levels already being inflated by overbilling for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes in laws and regulations—as opposed to the mere potentiality "***[i]f we are not operating in compliance***…" Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 11 was being made—otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 11; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

432. The falsity of this statement is corroborated by the Restatement, which disclosed a material weakness regarding PACS's lack of compliance with issues received through the whistleblower hotline.

433. Misstatement No. 11 was also materially false and misleading when made because:

(a) it represented that ***if*** they were in noncompliance they ***could be*** forced to make significant expenditures or change operations, when in fact the PACS Defendants knew, or at minimum were deliberately reckless, at the time that they were overbilling Medicare and would likely have to recognize materially reduced revenue to Medicare for that billing; and

(b) It omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling.

434. On April 8, 2024, PACS Services, the subsidiary run by Defendant Sanford, and Paradise Valley received a CID from the DOJ requesting information and documents relating to an investigation to determine whether PACS Services and Paradise Valley violated the False Claims Act by submitting false claims to Medicare, putting the PACS Defendants on notice of the same noncompliance which the Restatement admitted existed at the time. Thus, it was consciously misleading to state Misstatement No. 11 in terms of a mere potentiality ("if") of noncompliance.

435. For these reasons, the PACS Defendants knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period the PACS Defendants culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

### 3. May 13, 2024 PACS Press Release

436. On May 13, 2024, PACS announced its financial results for its first fiscal quarter. On that day, Defendant Apt issued a Current Report on Form 8-K attaching, as an exhibit, a press release also dated May 13, 2024 on behalf of the Company. That press release also quoted

Defendant Murray at length. The press release contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading. Specifically, the May 13, 2024 press release included the following false and misleading statements.

a. **Misstatement No. 12—May 13, 2024**

437. The May 13, 2024 press release contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading. In particular:

> • ***GAAP earnings per share for the quarter was $0.38, an increase of 31.0% over the prior year quarter.***
>
> • ***GAAP net income was $49.1 million, an increase of 30.7% over the prior year quarter.***
>
> • ***Consolidated GAAP revenue for the quarter was $934.7 million, an increase of 31.9% over the prior year quarter.***
>
> • ***EBITDA and Adjusted EBITDA for the quarter was $96.3 million and $88.5 million, representing increases of 47.0% and 34.0%, respectively, over the prior year quarter. Adjusted EBITDAR for the quarter was $152.5 million.***

438. Misstatement No. 12 was materially false and misleading when made because:

(a) Per the Restatement:

(i) GAAP earnings per share for the quarter was at most $0.27;

(ii) GAAP net income was at most only $34,819,000;

(iii) Consolidated GAAP revenue for the quarter was at most only $919,836,000; and

(iv) EBITDA and Adjusted EBITDA for the quarter were at most only $81,909,000 and $74,070,000;

(b) furthermore, all of the press release's purported increases compared to "the prior year quarter" were actually materially lower, as well;

(c) the additional revenue and profit PACS originally reported was the result of improper billing practices, including for respiratory and sensory therapies;

(d) per the Restatement, at least $14.9 million in recognized revenue was uncertain and "not expected to be resolved for a long period of time" at the time the financial statements were prepared, yet Defendants Murray and Apt certified under Section 302 of the Sarbanes-Oxley Act that the financial statements fairly presented PACS's financial condition and that they had disclosed to auditors and the Audit Committee all material uncertainties and deficiencies affecting financial reporting, when in fact they failed to disclose this known uncertainty;

(e) per the Restatement, at least $3.9 million in undisclosed, material, and growing refund liability existed at the time the financial statements were prepared, which represented revenue PACS had sufficient information at that time to know it was obligated not to keep and would inevitably have to return to Medicare;

(f) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such uncertainties existed by the time these statements were made, but were ignored and concealed;

(g) Defendants Murray and Apt, as the certifiers of these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(h) as a result, PACS financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

439. Misstatement No. 12 was also materially false and misleading when made because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases and profit were due in large part to Medicare overbilling across the Company and directed by PACS leadership, including the PACS Defendants.

440. For these reasons, the Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

### 4. May 14, 2024 PACS Earnings Call

441. The May 14, 2024 PACS earnings call contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. Specifically, the May 14, 2024 PACS earnings call included the following false and misleading statements and omissions.

#### a. Misstatement No. 13—May 14, 2024

442. Defendant Murray materially misled investors by making statements about increases in Medicare rates without disclosing that those rates increased due to artificial inflation and fraudulent behavior: "[O]ur average daily Medicare rates ***increased by 11% for the 3 months ended March 31, 2024 compared to the first quarter of 2023***."

443. Misstatement No. 13 was materially false and misleading when made because:

(a) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such uncertainties existed by the time this statement was made, but was ignored and concealed;

(b) Defendant Murray, as a certifier of the Company's contemporaneous quarterly report and financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, was personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time;

(c) the revenue from Medicare reported for PACS's Q1 2024 was the result of a Company-wide practice of overbilling Medicare, including for respiratory and sensory therapies;

(d) pursuant to the issuance of the Restatement, that information was knowable to PACS at the time the statement was made; and

(e) as a result, PACS financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

444. Misstatement No. 13 was also materially false and misleading when made because it failed to explain how the average daily Medicare rates had increased—namely, because PACS had issued its top-down, company-wide directives to overbill Medicare for respiratory, sensory, and other therapies, regardless of patient need, in order to increase revenue.

445. For these reasons, the Defendants Murray and PACS knowingly and/or recklessly withheld this information from investors on the chance that the misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling

Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

b. **Misstatement No. 14—May 14, 2024**

446. Defendant Apt similarly misled investors regarding Medicare rates: "[O]ur average Medicare revenue per patient day ***remained strong through Q1 at both our ramping and Mature facilities at $969 and $938 respectively, compared to '23 where our average Medicare revenue per patient day at Ramping ad Mature was [$]836 and [$]846, respectively***."

447. Misstatement No. 14 was materially false and misleading when made because:

(a) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such uncertainties existed by the time this statement was made, but were ignored and concealed;

(b) Defendant Apt, as a certifier of the Company's contemporaneous quarterly report and financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, was personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time;

(c) the revenue from Medicare reported for PACS's Q1 2024 was the result of a Company-wide practice of overbilling Medicare, including for respiratory and sensory therapies;

(d) pursuant to the issuance of the Restatement, that information was knowable to PACS at the time the statement was made; and

(e) as a result, PACS financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

448. Misstatement No. 14 was also materially false and misleading when made because it failed to explain how the average daily Medicare rates had increased—namely, because PACS had issued its top-down, company-wide directives to overbill Medicare for respiratory, sensory, and other therapies, regardless of patient need, in order to increase revenue.

449. For these reasons, Defendants Apt and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Apt and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

**5. PACS Q1 2024 Earnings Presentation**

450. The May 14, 2024 PACS earnings call was accompanied by a presentation containing untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading. Everyone who spoke on behalf of PACS at the May 14, 2024 PACS earnings call adopted the statements contained in the Q1 2024 earnings presentation as their own, including Defendants Murray, Apt, and Jergensen.

a. **Misstatement No. 15—May 14, 2024**

451. The May 14, 2024 earnings presentation represented to investors that: "Forward-looking statements are not guarantees of future results and are ***subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control***, and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statement, including...risks associated with our ***review and audit of the care delivery, record keeping and billing processes of our operating subsidiaries***...."

452. Misstatement No. 15 was materially false and misleading when made because:

(a) at the time the statement was made, the PACS Defendants knew, or at minimum were deliberately reckless, that it was committing widespread misconduct in its record keeping and billing processes—a course of conduct that was directed by PACS leadership, including the PACS Defendants, and widespread throughout its operating subsidiaries;

(b) at the time the statement was made, the false reporting of revenue was known or knowable by the PACS Defendants, as recognized by PACS's Restatement of its financials for Q1 and Q2 of 2024; and

(c) as a result, PACS's financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

453. Misstatement No. 15 was materially false and misleading when made because it mischaracterized known, widespread practices of overbilling Medicare as "uncertainties and assumptions" that were "beyond the Company's control," when the misconduct was, in fact, overseen and implemented company-wide by PACS leadership, including the PACS Defendants.

454. For these reasons, the Defendants Murray, Apt, Jergensen, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, Jergensen, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

b. **Misstatement No. 16—May 14, 2024**

455. The May 14, 2024 earnings presentation represented to investors that: "Model prioritizes ***local operational autonomy***, leveraging robust technology and support services for

responsive ***decision-making based on community needs, enhancing patient care and facility operations.***"

456. Misstatement No. 16 was materially false and misleading when made because:

(a) PACS's decision-making prioritized increasing profit, through improper overbilling of Medicare, rather than the care of patients or the compliant operation of facilities;

(b) PACS's business model prioritized profit over care and did so through top-down directives issued by PACS leadership, including the PACS Defendants, to bill Medicare improperly, complete with quotas, spreadsheets, conference calls, and presentations that amounted to instructions on how to maximize the overbilling while avoiding detection;

(c) The PACS Defendants knew, or at a minimum were deliberately reckless, that the Company's operating model was not based on local facility autonomy because they were the ones disseminating top-down directives for all of their facilities; and

(d) the Restatement admits that PACS's operating model was not locally autonomous. Following their Restatement, PACS now no longer describes its operating model as fully decentralized. Instead, as of the latest earnings call on November 19, 2025, the Company claimed that "PACS operates with a locally led, centrally supported model" and did not describe it as fully decentralized.

457. Misstatement No. 16 was also materially false and misleading when made because it claims that community needs and patient care were the primary focus of PACS's business model, when, in reality, the model was driven by a desire to drain as much revenue as possible from the Medicare system in total disregard for the needs or wellbeing of PACS's patients.

458. For these reasons, the Defendants Murray, Apt, Jergensen, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct

would never be discovered—or, at very least, not discovered before PACS and the Insider Selling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, Jergensen, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

### 6. PACS's Second Quarter Report on Form 10-Q

459. On August 12, 2024, PACS issued its quarterly report on Form 10-Q for the quarter ended June 30, 2024 (the "Q2 2024 Quarterly Report"), signed by Defendants Murray and Apt. This quarterly report contained PACS's unaudited condensed combined/consolidated financial statements for the second fiscal quarter and first half of 2024 (ended June 30, 2024), which were false and misleading when made and omitted to state other facts necessary to make the statements made not misleading, as PACS admitted when it issued the Restatement for these financial statements in particular. In addition, this quarterly report repeated the same three false and misleading risk warnings in the IPO Offering Documents.

#### a. Misstatement 17—August 12, 2024

460. On August 12, 2024, PACS's Q2 2024 Quarterly Report contained the following false and misleading financial statement entitled "PACS GROUP, INC. AND SUBSIDIARIES CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS."

Part I

**Item 1. Financial Statements**

**PACS GROUP, INC. AND SUBSIDIARIES**
**CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS**
*(dollars in thousands, except for share and per share values)*

| | (unaudited) June 30, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 73,374 | $ 73,416 |
| Accounts receivable, net | 610,577 | 547,807 |
| Other receivables | 50,396 | 52,259 |
| Prepaid expenses and other current assets | 66,301 | 48,665 |
| **Total Current Assets** | 800,648 | 722,147 |
| Property and equipment, net | 763,904 | 577,528 |
| Operating lease right-of-use assets | 2,112,914 | 2,007,812 |
| Insurance subsidiary deposits and investments | 35,476 | — |
| Escrow funds | 19,531 | 15,649 |
| Goodwill and other indefinite-lived assets | 65,291 | 65,291 |
| Other assets | 98,584 | 124,312 |
| **Total Assets** | $ 3,896,348 | $ 3,512,739 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 125,746 | $ 140,947 |
| Accrued payroll and benefits | 107,077 | 92,234 |
| Current operating lease liabilities | 113,278 | 109,438 |
| Current maturities of long term debt | 15,745 | 16,822 |
| Current portion of accrued self-insurance liabilities | 31,252 | 27,536 |
| Other accrued expenses | 75,003 | 69,949 |
| **Total Current Liabilities** | 468,101 | 456,926 |
| Long-term operating lease liabilities | 2,068,585 | 1,961,997 |
| Accrued benefits, less current portion | 6,738 | 6,738 |
| Lines of credit | 248,000 | 520,000 |
| Long-term debt, less current maturities, net of deferred financing fees | 227,107 | 195,708 |
| Accrued self-insurance liabilities, less current portion | 172,111 | 146,167 |
| Other liabilities | 127,472 | 123,477 |
| **Total Liabilities** | $ 3,318,114 | $ 3,411,013 |
| Commitments and contingencies (Note 11) | | |
| Equity: | | |
| PACS Group, Inc. stockholders' equity: | | |
| Common stock: $0.001 par value; 1,250,000,000 shares authorized, 152,399,733 shares issued and outstanding as of June 30, 2024, and 64,361,693,000 shares authorized, 128,723,386 shares issued and outstanding as of December 31, 2023 | 152 | 129 |
| Additional paid-in capital | 471,472 | — |
| Retained earnings | 100,504 | 95,997 |
| Total stockholders' equity | 572,128 | 96,126 |
| Non-controlling interest in subsidiary | 6,106 | 5,600 |
| **Total Equity** | $ 578,234 | $ 101,726 |
| **Total Liabilities and Equity** | $ 3,896,348 | $ 3,512,739 |

See accompanying notes to unaudited condensed combined/consolidated financial statements.

461. Misstatement No. 17 was materially false and misleading when made because it had to be materially restated, as follows:

PACS GROUP, INC. AND SUBSIDIARIES
RESTATED UNAUDITED CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS
*(dollars in thousands, except for share and per share values)*

| | June 30, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | Category Reference | As Restated |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ 73,374 | $ — | | $ 73,374 |
| Accounts receivable, net | 610,577 | (30,440) | MPB | 580,137 |
| Other receivables | 50,396 | — | | 50,396 |
| Prepaid expenses and other current assets | 66,301 | (6,539) | LEA | 59,762 |
| **Total Current Assets** | 800,648 | (36,979) | | 763,669 |
| Property and equipment, net | 763,904 | 92,919 | LEA | 856,823 |
| Operating lease right-of-use assets | 2,112,914 | (38,160) | LEA | 2,074,754 |
| Insurance subsidiary deposits and investments | 35,476 | — | | 35,476 |
| Escrow funds | 19,531 | — | | 19,531 |
| Goodwill and other indefinite-lived assets | 65,291 | — | | 65,291 |
| Other assets | 98,584 | 18,684 | MPB, LEA[(1)] | 117,268 |
| **Total Assets** | $ 3,896,348 | $ 36,464 | | $ 3,932,812 |
| **LIABILITIES AND EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ 125,746 | $ — | | $ 125,746 |
| Accrued payroll and benefits | 107,077 | (7,706) | MPB | 99,371 |
| Current operating lease liabilities | 113,278 | (2,848) | LEA | 110,430 |
| Current maturities of long-term debt | 15,745 | — | | 15,745 |
| Current portion of accrued self-insurance liabilities | 31,252 | — | | 31,252 |
| Refund liability | — | 30,586 | MPB | 30,586 |
| Other accrued expenses | 75,003 | 64 | LEA | 75,067 |
| **Total Current Liabilities** | 468,101 | 20,096 | | 488,197 |
| Long-term operating lease liabilities | 2,068,585 | (36,229) | LEA | 2,032,356 |
| Accrued benefits, less current portion | 6,738 | — | | 6,738 |
| Lines of credit | 248,000 | — | | 248,000 |
| Long-term debt, less current maturities, net of deferred financing fees | 227,107 | — | | 227,107 |
| Accrued self-insurance liabilities, less current portion | 172,111 | — | | 172,111 |
| Other liabilities | 127,472 | 87,886 | LEA | 215,358 |
| **Total Liabilities** | $ 3,318,114 | $ 71,753 | | $ 3,389,867 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| PACS Group, Inc. stockholders' equity: | | | | |
| Common stock: $0.001 par value; 1,250,000,000 shares authorized, 152,399,733 shares issued and outstanding as of June 30, 2024 | 152 | — | | 152 |
| Additional paid-in capital | 471,472 | — | | 471,472 |
| Retained earnings | 100,504 | (35,289) | | 65,215 |
| Total stockholders' equity | 572,128 | (35,289) | | 536,839 |
| Noncontrolling interest in subsidiary | 6,106 | — | | 6,106 |
| **Total Equity** | $ 578,234 | $ (35,289) | | $ 542,945 |
| **Total Liabilities and Equity** | $ 3,896,348 | $ 36,464 | | $ 3,932,812 |

(1) MPB: $18,635, LEA: $49

462. Misstatement No. 17 was also materially false and misleading when made because:

(a) according to the Restatement, the false line items in the Q2 2024 Quarterly Report's ***balance sheets*** related to Medicare Part B were including but not limited to: "Accounts receivable, net," "Total current assets," "other assets," "Total assets," "Accrued payroll and benefits," "Other liabilities, "Total current liabilities," "Total liabilities," "Total equity," and other line items. PACS further acknowledged the need to include balance sheet captions omitted from the 2Q:2024 Quarterly Report, including line items for material "Refund liabilities."

(b) according to the Restatement, at least $30.4 million in recognized quarterly revenue on the income statement did not meet the criteria of revenue recognition under ASC 606 because of material uncertainties that existed at the time that were "not expected to be resolved for a long period of time" as of the time the financial statements were prepared. This had cascading effects, rendering line items on Misstatement No. 17 false, including by inflating "Accounts receivable," "Cash," and other balance sheet accounts, yet Defendants Murray and Apt certified under Section 302 of the Sarbanes-Oxley Act that the financial statements fairly presented PACS's financial condition and that they had disclosed to auditors and the Audit Committee all material uncertainties and deficiencies affecting financial reporting, when in fact they failed to disclose this known uncertainty;

(c) according to the Restatement, at least $30.6 million in undisclosed, material, and growing refund liability existed at the time the financial statements were prepared, which represented revenue PACS had sufficient information at that time to know it was obligated not to keep and would inevitably have to return to Medicare;

(d) per ASC 250 referenced by the Restatement, the material "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such material uncertainty existed by the time these statements were made, but were ignored and concealed;

(e) Defendants Murray and Apt, as the certifiers of these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(f) as a result, PACS's financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

463. Misstatement No. 17 was also materially false and misleading when made because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases and profit were due in large part to Medicare overbilling across the Company and directed by PACS leadership.

464. For these reasons, Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

b. **Misstatement 18—August 12, 2024**

465. On August 12, 2024, PACS's Q2 2024 Quarterly Report contained the following false and misleading financial statement entitled "PACS GROUP, INC. AND SUBSIDIARIES UNAUDITED CONDENSED COMBINED/ CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME."

**PACS GROUP, INC. AND SUBSIDIARIES**
**UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF (LOSS) INCOME AND COMPREHENSIVE (LOSS) INCOME**
*(dollars in thousands, except for share and per share values)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Revenue | | | | |
| Patient and resident service revenue | $ 981,398 | $ 760,424 | $ 1,915,696 | $ 1,468,250 |
| Additional funding | — | — | — | 375 |
| Other revenues | 448 | 240 | 871 | 481 |
| **Total Revenue** | $ 981,846 | $ 760,664 | $ 1,916,567 | $ 1,469,106 |
| Operating Expenses | | | | |
| Cost of services | 762,147 | 590,815 | 1,498,139 | 1,129,587 |
| Rent - cost of services | 65,833 | 51,456 | 129,794 | 96,560 |
| General and administrative expense | 144,380 | 62,695 | 191,286 | 122,137 |
| Depreciation and amortization | 8,776 | 6,159 | 16,678 | 11,988 |
| **Total Operating Expenses** | $ 981,136 | $ 711,125 | $ 1,835,897 | $ 1,360,272 |
| Operating Income | $ 710 | $ 49,539 | $ 80,670 | $ 108,834 |
| Other (Expense) Income | | | | |
| Interest expense | (9,187) | (15,306) | (24,578) | (25,942) |
| Gain on lease termination | — | — | 8,046 | — |
| Other expense, net | (3,905) | (2,643) | (3,465) | (2,203) |
| **Total Other Expense, net** | $ (13,092) | $ (17,949) | $ (19,997) | $ (28,145) |
| (Loss) income before provision for income taxes | (12,382) | 31,590 | 60,673 | 80,689 |
| Benefit (provision) for income taxes | 1,474 | (10,370) | (22,441) | (21,871) |
| **Net (Loss) Income** | $ (10,908) | $ 21,220 | $ 38,232 | $ 58,818 |
| Less: | | | | |
| Net income attributable to noncontrolling interest | 2 | 2 | 4 | 3 |
| **Net (loss) income attributable to PACS Group, Inc.** | $ (10,910) | $ 21,218 | $ 38,228 | $ 58,815 |
| **Net (loss) income per share attributable to PACS Group, Inc.** | | | | |
| Basic | $ (0.07) | $ 0.16 | $ 0.27 | $ 0.46 |
| Diluted | $ (0.07) | $ 0.16 | $ 0.27 | $ 0.46 |
| **Weighted-average common shares outstanding** | | | | |
| Basic | 149,463,655 | 128,723,386 | 139,093,520 | 128,723,386 |
| Diluted | 149,463,655 | 128,723,386 | 139,684,618 | 128,723,386 |
| **Other comprehensive loss, net of tax:** | | | | |
| Unrealized loss on available-for-sale debt securities, net of tax | $ (201) | $ — | $ — | $ — |
| Total other comprehensive loss | (201) | — | — | — |
| **Comprehensive (loss) income** | $ (11,109) | $ 21,220 | $ 38,232 | $ 58,818 |
| Less: | | | | |
| Comprehensive income attributable to noncontrolling interest | 2 | 2 | 4 | 3 |
| **Comprehensive (loss) income attributable to PACS Group, Inc.** | $ (11,111) | $ 21,218 | $ 38,228 | $ 58,815 |

See accompanying notes to unaudited condensed combined/consolidated financial statements.

466. Misstatement No. 18 was materially false and misleading when made because it had to be materially restated, as the following two images from the Restatement show, for both the three months ended June 30, 2024 and the six months ended June 30, 2024:

PACS GROUP, INC. AND SUBSIDIARIES
RESTATED UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF (LOSS) INCOME AND COMPREHENSIVE (LOSS) INCOME
*(dollars in thousands, except for share and per share values)*

| | Three Months Ended June 30, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | Category Reference | As Restated |
| Revenue | | | | |
| Patient and resident service revenue | $ 981,398 | $ (46,141) | MPB | $ 935,257 |
| Additional funding | — | — | | — |
| Other revenues | 448 | — | | 448 |
| **Total Revenue** | $ 981,846 | $ (46,141) | | $ 935,705 |
| Operating Expenses | | | | |
| Cost of services | 762,147 | — | | 762,147 |
| Rent - cost of services | 65,833 | (1,024) | LEA | 64,809 |
| General and administrative expense | 144,380 | (7,706) | MPB | 136,674 |
| Depreciation and amortization | 8,776 | 478 | LEA | 9,254 |
| **Total Operating Expenses** | $ 981,136 | $ (8,252) | | $ 972,884 |
| Operating Income (Loss) | $ 710 | $ (37,889) | | $ (37,179) |
| Other (Expense) Income | | | | |
| Interest expense | (9,187) | (728) | LEA | (9,915) |
| Gain on lease termination | — | — | | — |
| Other expense, net | (3,905) | — | | (3,905) |
| **Total Other Expense, net** | $ (13,092) | $ (728) | | $ (13,820) |
| (Loss) income before provision for income taxes | (12,382) | (38,617) | | (50,999) |
| Benefit (provision) for income taxes | 1,474 | 17,649 | | 19,123 |
| **Net (Loss) Income** | $ (10,908) | $ (20,968) | | $ (31,876) |
| Less: | | | | |
| Net income attributable to noncontrolling interest | 2 | — | | 2 |
| **Net (loss) income attributable to PACS Group, Inc.** | $ (10,910) | $ (20,968) | | $ (31,878) |
| **Net (loss) income per share attributable to PACS Group, Inc.** | | | | |
| Basic | $ (0.07) | $ (0.14) | | $ (0.21) |
| Diluted | $ (0.07) | $ (0.14) | | $ (0.21) |
| **Weighted-average common shares outstanding** | | | | |
| Basic | 149,463,655 | — | | 149,463,655 |
| Diluted | 149,463,655 | — | | 149,463,655 |
| **Other comprehensive loss, net of tax:** | | | | |
| Unrealized loss on available-for-sale debt securities, net of tax | $ (201) | $ — | | $ (201) |
| Total other comprehensive loss | (201) | — | | (201) |
| **Comprehensive (loss) income** | $ (11,109) | $ (20,968) | | $ (32,077) |
| Less: | | | | |
| Comprehensive income attributable to noncontrolling interest | 2 | — | | 2 |
| **Comprehensive (loss) income attributable to PACS Group, Inc.** | $ (11,111) | $ (20,968) | | $ (32,079) |

**PACS GROUP, INC. AND SUBSIDIARIES**
**RESTATED UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF (LOSS) INCOME AND COMPREHENSIVE (LOSS) INCOME**
*(dollars in thousands, except for share and per share values)*

| | Six Months Ended June 30, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | Category Reference | As Restated |
| Revenue | | | | |
| Patient and resident service revenue | $ 1,915,696 | $ (61,026) | MPB | $ 1,854,670 |
| Additional funding | — | — | | — |
| Other revenues | 871 | — | | 871 |
| **Total Revenue** | $ 1,916,567 | $ (61,026) | | $ 1,855,541 |
| Operating Expenses | | | | |
| Cost of services | 1,498,139 | — | | 1,498,139 |
| Rent - cost of services | 129,794 | (1,472) | LEA | 128,322 |
| General and administrative expense | 191,286 | (7,706) | MPB | 183,580 |
| Depreciation and amortization | 16,678 | 692 | LEA | 17,370 |
| **Total Operating Expenses** | $ 1,835,897 | $ (8,486) | | $ 1,827,411 |
| Operating Income (Loss) | $ 80,670 | $ (52,540) | | $ 28,130 |
| Other (Expense) Income | | | | |
| Interest expense | (24,578) | (1,433) | LEA | (26,011) |
| Gain on lease termination | 8,046 | — | | 8,046 |
| Other expense, net | (3,465) | — | | (3,465) |
| **Total Other Expense, net** | $ (19,997) | $ (1,433) | | $ (21,430) |
| (Loss) income before provision for income taxes | 60,673 | (53,973) | | 6,700 |
| Benefit (provision) for income taxes | (22,441) | 18,684 | | (3,757) |
| **Net (Loss) Income** | $ 38,232 | $ (35,289) | | $ 2,943 |
| Less: | | | | |
| Net income attributable to noncontrolling interest | 4 | — | | 4 |
| **Net (loss) income attributable to PACS Group, Inc.** | $ 38,228 | $ (35,289) | | $ 2,939 |
| **Net (loss) income per share attributable to PACS Group, Inc.** | | | | |
| Basic | $ 0.27 | $ (0.25) | | $ 0.02 |
| Diluted | $ 0.27 | $ (0.25) | | $ 0.02 |
| **Weighted-average common shares outstanding** | | | | |
| Basic | 139,093,520 | — | | 139,093,520 |
| Diluted | 139,684,618 | — | | 139,684,618 |
| **Other comprehensive loss, net of tax:** | | | | |
| Unrealized loss on available-for-sale debt securities, net of tax | $ — | $ — | | $ — |
| Total other comprehensive loss | — | — | | — |
| **Comprehensive (loss) income** | $ 38,232 | $ (35,289) | | $ 2,943 |
| Less: | | | | |
| Comprehensive income attributable to noncontrolling interest | 4 | — | | 4 |
| **Comprehensive (loss) income attributable to PACS Group, Inc.** | $ 38,228 | $ (35,289) | | $ 2,939 |

467. Misstatement No. 18 was also materially false and misleading when made because:

(a) according to the Restatement, the false line items in the Quarterly Report's ***income statements*** related to Medicare Part B were including but not limited to: "Patient and resident service revenue," "Total revenue," "general and administrative expense," "Operating income," "Net (loss) income," "Net (loss) income per share attributable to PACS Group, Inc.," and other line items;

(b) according to the Restatement, at least $46.1 million in recognized quarterly revenue, as well as at least $61 million in six-month revenue, was uncertain and "not expected to be resolved for a long period of time" at the time the financial statements were prepared, and subject to significant reversal, yet Defendants Murray and Apt certified under Section 302 of the

Sarbanes-Oxley Act that the financial statements fairly presented PACS's financial condition and that they had disclosed to auditors and the Audit Committee all material uncertainties and deficiencies affecting financial reporting, when in fact they failed to disclose this known uncertainty;

(c) according to the Restatement, the additional revenue and profit PACS originally reported was the result of improper billing practices, including for respiratory and sensory therapies;

(d) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such uncertainty existed by the time these statements were made, but were ignored and concealed;

(e) Defendants Murray and Apt, as the certifiers of these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(f) as a result, PACS's financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

468. Misstatement No. 18 was also materially false and misleading when made because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases and profit were due in large part to Medicare overbilling across the Company and directed by PACS leadership, including the PACS Defendants.

469. For these reasons, Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be

discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

c. **Misstatement 19—August 12, 2024**

470. The August 12, 2024 Form 10-Q highlighted that ***if*** Medicare coverage were changed, then PACS's "operations, revenue and profitability could be materially and adversely impacted":

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

471. Misstatement No. 19 was materially false and misleading when made because it failed to disclose:

(a) That the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that a change in reimbursement was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and that already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver;

(b) That the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened over a year before Misstatement No. 19 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent

than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that the PACS Defendants knew about, or at a minimum were deliberately reckless about, PACS's revenue levels being inflated by reimbursement for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes Medicare might make—and that its financial performance was already guaranteed to be materially and adversely affected as a result. Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 19 was being made—Otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 19; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

472. Misstatement No. 19 was also materially false and misleading when made because:

(a) it represented that revenue and profit could be materially impacted ***if*** reimbursement changed, when in fact the PACS Defendants knew, or at minimum were deliberately reckless, at the time that they were overbilling Medicare and would likely have to return recognized revenue to Medicare for that billing;

(b) it warned investors that reimbursement changes ***"could"*** have adverse impacts when the reality at the time was that there would be such adverse impacts even if nothing changed regarding such reimbursements;

(c) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that

the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling;

(d) by warning only that such reimbursement changes might occur and "could" adversely impact revenue and profitability, this risk warning falsely implied that no such adverse changes had yet materialized, even though they had already taken effect and were adversely impacting PACS's revenue and profitability at the time; and

(e) this false implication is made stronger when considered in light of the overall context of the "Risk Factors" section because it specifically mentions the expiration of the COVID-19 Waiver, yet neglects to disclose that such expiration had already adversely impacted PACS's "revenue and profitability" to an outsized extent, by approximately $90 million per quarter for at least three quarters (Q3 2023, Q4 2023, and Q1 2024). Misleadingly, the May 13, 2024 Form 10-Q referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement "operational changes," while omitting any disclosure of the materially adverse impacts on revenue or profitability. Specifically, a different part of the May 13, 2024 Form 10-Q's "Risk Factors" stated: "Additionally, the expiration of the Emergency Waivers and other flexibilities allowed under the COVID-19 PHE, which ended as of May 11, 2023, have required, and may continue to require, operational changes, sometimes on short notices, and these reinstatements have not occurred simultaneously, requiring heightened monitoring to ensure compliance." Given that overall context, it was especially misleading to warn investors only that Medicare reimbursement changes might occur and "***could***" adversely impact revenue and profitability.

473. For these reasons, the Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would

never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably understated risks to the Company's "operations, revenue and profitability," and making materially false and misleading statements or omissions.

d. **Misstatement 20—August 12, 2024**

474. The August 12, 2024 Form 10-Q stated that, "from ***time to time***," there are "***instances*** of noncompliance" with billing processes:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs***.

475. Misstatement No. 20 was materially false because, at the time of the IPO:

(a) PACS leadership, including the PACS Defendants, had been pushing facilities across the Company to perform unnecessary respiratory therapies on thousands of patients, to drive up revenue at each facility from $150,000 to $1 million per month. This volume of respiratory therapy was impossible for SNF staff to perform, so they were forced to continually falsify their billing documentation procedures;

(b) PACS leadership, including the PACS Defendants, had been orchestrating the use of sensory rooms, devoid of any actual therapeutic tools, to overbill Medicare Part B for these treatments;

(c) the PACS Defendants knew, or at a minimum were deliberately reckless about, the overbilling practices pushed by PACS leadership at its facilities;

(d) as a result, PACS financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes; and

(e) while PACS represented that it was auditing and correcting these practices, and should have been, it did not begin doing so until the Hindenburg Report came out months later, on November 4, 2024, whereupon the late-initiated internal investigation found at least $61 million in noncompliance, requiring Restatement. Defendant Murray admitted that PACS's internal investigation only started in response to the Hindenburg Report. On November 6, 2024, PACS issued a press release where Defendant Murray disclosed: "We believe recent third-party allegations [in the Hindenburg Report] are misleading. However, in line with our commitment to holding ourselves to a high standard—in how we serve our patients, operate our business, and engage with stakeholders—the Company's Audit Committee, with assistance from external counsel, is conducting an investigation ***of the allegations***." PACS Group, Inc., Current Report at Ex. 99.1 (Form 8-K) (Nov. 7, 2024) (emphasis added).

476. Misstatement No. 20 was also materially false and misleading when made because:

(a) it represented that there could be issues of noncompliance "from time to time," but omitted that it was knowable at the time, and would have become known if only the Company conducted such "review and audit," as it eventually would later—that the Company was overbilling Medicare and would have to return recognized revenue to Medicare for that billing—otherwise, ASC 250 would not have required the Restatement;

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling; and

(c) although PACS may well have addressed certain instances of noncompliance by its operating subsidiaries "from time to time," the statement omitted that, far

from auditing and correcting noncompliance related to its operating subsidiaries' billing Medicare B for respiratory, sensory, and other therapy services, PACS was in fact directing such noncompliance through quotas, spreadsheets, incentives, company meetings, marketing and Administrator retreats, and other pressure on facility staff.

477. For these reasons, Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

e. **Misstatement 21—August 12, 2024**

478. The August 12, 2024 Form 10-Q noted that, ***if*** PACS was "not operating in compliance with" laws and regulations, the Company "***could*** be required to make significant expenditures" as a result:

> We are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.***

479. Misstatement No. 21 materially false and misleading when made because it failed to disclose:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that change in the laws and regulations with which it must comply was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and that already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS

had been over-using and taking advantage of the COVID-19 Waiver in contravention of CMS guidelines;

(b) that the PACS Defendants knew, or at a minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened over a year before Misstatement No. 21 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that the PACS Defendants knew, or at a minimum were deliberately reckless, about PACS's revenue levels already being inflated by overbilling for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes in laws and regulations—as opposed to the mere potentiality "***[i]f we are not operating in compliance***…" Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 21 was being made—otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 21; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

480. The falsity of this statement is corroborated by the Restatement, which disclosed a material weakness regarding PACS's lack of compliance with issues received through the whistleblower hotline.

481. Misstatement No. 21 was also materially false and misleading when made because:

(a) it represented that ***if*** they were in noncompliance they ***could be*** forced to make significant expenditures or change operations, when in fact the PACS Defendants knew, or at minimum were deliberately reckless, at the time that they were overbilling Medicare and would likely have to recognize materially reduced revenue to Medicare for that billing; and

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling.

482. On April 8, 2024, PACS Services, the subsidiary run by Defendant Sanford, and Paradise Valley received a CID from the DOJ requesting information and documents relating to an investigation to determine whether PACS Services and Paradise Valley violated the False Claims Act by submitting false claims to Medicare, putting the PACS Defendants on notice of the same noncompliance which the Restatement admitted existed at the time. Thus, it was consciously misleading to state Misstatement No. 21 in terms of a mere potentiality ("if") of noncompliance.

483. For these reasons, the Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

### 7. PACS's August 12, 2024 Press Release

484. On August 12, 2024, PACS announced its financial results for its second fiscal quarter. On that day, Defendant Apt issued a Current Report on Form 8-K attaching, as an exhibit, a press release also dated August 12, 2024 on behalf of the Company. That press release also quoted Defendant Murray at length.

#### a. Misstatement No. 22—August 12, 2024

485. The August 12, 2024 press release contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading. In particular:

> • ***GAAP net income (loss) was $38.2 million for the six months ended June 30, 2024 and $(10.9) million for the second quarter of 2024***, which was driven down by an increase in stock-based compensation expense of $90.9 million associated with restricted stock units, granted at the time of the Company's April 2024 initial public offering.
>
> • ***Consolidated GAAP revenue for the first six months of 2024 was $1.9 billion, an increase of 31% over the first six months of the prior year, driven largely by increased facility count and reimbursement rates, and for the second quarter of 2024 was $981.8 million, an increase of 29% over the second quarter of 2023 and an increase of 5% over the first quarter of 2024.***
>
> • ***Adjusted EBITDA was $188.2 million and $99.7 million for the first six months of 2024 and the second quarter of 2024, respectively.*** Adjusted EBITDAR was $318.0 million and $165.6 million over the same periods, respectively.

486. Misstatement No. 22 was materially false and misleading when made because:

(a) Per the Restatement:

(i) GAAP net income (loss) was at most only $2,943,000 for the six months ended June 30, 2024—and likely far less, in the negative—and it was three times as negative at $(31,876,000) for the second quarter of 2024;

(ii) Consolidated GAAP revenue for the half and quarter were at most only \$1,855,541,000 and \$935,705,000 respectively; and

(iii) Adjusted EBITDA for the half and quarter were at most only \$136,396,000 and \$62,326,000 respectively;

(b) Furthermore, all of the press release's purported increases compared to prior periods were actually materially lower, as well;

(c) the original revenue and profit reported was the result of improper overbilling practices, including respiratory and sensory therapies;

(d) pursuant to the Restatement, at least \$30.6 million in material, undisclosed, and growing refund liability existed at the time the financial statements were prepared, which represented revenue PACS had sufficient information at that time to know it was obligated not to keep and would inevitably have to return to Medicare;

(e) per ASC 250 referenced by the Restatement, the "uncertainties" requiring later restatement "existed at the time the financial statements were prepared," hence such uncertainties existed by the time these statements were made, but were ignored and concealed;

(f) Defendants Murray and Apt, as the certifiers of Quarterly Report containing these financial statements pursuant to Section 302 of the Sarbanes-Oxley Act, were personally responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, ensuring that all material information relating to PACS was made known to them, and for disclosing to auditors and the Audit Committee any material uncertainties or weaknesses that existed at the time; and

(g) as a result, PACS's financial results would foreseeably suffer negative, material impacts due to improper Medicare overbilling schemes.

487. Misstatement No. 22 was also materially false and misleading because it portrayed a company that appeared financially successful but failed to disclose that the revenue increases were due in large part to the abuse of Medicare billing across the Company and directed by PACS leadership, including the PACS Defendants.

488. For these reasons, the Defendants Murray, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

### 8. PACS's August 12, 2024 Earnings Call

489. The August 12, 2024 PACS earnings call contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading. Specifically, the August 12, 2024 PACS earnings call included the following false and misleading statement.

#### a. Misstatement No. 23—August 12, 2024

490. Defendant Murray materially misled investors by making statements about PACS's business model being decentralized: "In addition to training new leaders, ***the PACS leadership model allows our local leaders to make operational decisions as close to our patients and employees as possible,*** which is ultimately better for the residents and community in which they live."

491. Misstatement No. 23 was materially false and misleading when made because:

(a) Defendant Murray knew that local leaders were not allowed to make operational decisions in an autonomous manner because he was the one under whose authority the PACS Defendants disseminated top-down directives across PACS facilities in multiple states and regions; and

(b) PACS's operating model was not locally autonomous. Following their Restatement, PACS now no longer describes its operating model as fully decentralized. Instead, as of the latest earnings call on November 19, 2025, Defendant Murray stated that "PACS operates with a locally led, centrally supported model" and thereby admitted that PACS's operating model is not locally autonomous.

492. Misstatement No. 23 was also materially false and misleading when made because:

(a) it claims that local leaders were trained to make operational decisions for their facility, when, in reality, PACS was controlling leadership with top-down directives; and

(b) The leaders that did not comply with the directives from PACS leadership, including the PACS Defendants, were let go, and replaced with AITs who were incentivized with trips and outsized bonuses to follow along with the directives from the top.

493. For these reasons, the Defendants Murray and PACS knowingly and/or recklessly withheld this information from investors on the chance that the misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize financial personal gain. Accordingly, during the Class Period Defendants Murray and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

**9. PACS's Q2 2024 Earnings Presentation**

494. PACS's August 12, 2024 earnings call was accompanied by a presentation containing untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading. Everyone who spoke on behalf of PACS at the August 12, 2024 earnings call adopted the statements contained in the Q2 2024 earnings presentation as their own, including specifically Defendants Murray, Apt, and Jergensen.

a. **Misstatement No. 24—August 12, 2024**

495. The August 12, 2024 earnings presentation represented to investors that: "Forward-looking statements are not guarantees of future results and are ***subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control***, and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statement, including...***risks associated with our review and audit of the care delivery, recordkeeping and billing processes of our operating subsidiaries*** . . ."

496. Misstatement No. 24 was materially false and misleading when made because:

(a) at the time the statement was made, the PACS Defendants knew, or at minimum were deliberately reckless, that the Company was committing widespread misconduct in its record keeping and billing processes—a course of conduct that was directed by PACS leadership, including the PACS Defendants, and disseminated throughout its operating subsidiaries;

(b) at the time the statement was made, the false reporting of revenue was knowable by the Defendants, as recognized by PACS's Restatement of its financials for Q1 and Q2 of 2024; and

(c) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

497. Misstatement No. 24 was also materially false and misleading when made because it mischaracterized known, widespread practices of billing fraud as "uncertainties and assumptions" that were "beyond the Company's control," when the misconduct was, in fact, disseminated company-wide by PACS leadership, including the PACS Defendants.

498. For these reasons, Defendants Murray, Apt, Jergensen, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, Jergensen, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

b. **Misstatement No. 25—August 12, 2024**

499. The August 12, 2024 earnings presentation represented to investors that: "Model prioritizes ***local operational autonomy***, leveraging robust technology and support services for ***responsive decision-making based on community needs, enhancing patient care and facility operations***."

500. Misstatement No. 25 was materially false and misleading when made because:

(a) PACS's decision-making was based solely on increasing profit, through improper overbilling of Medicare, without any regard for the care of patients or the proper operation of facilities;

(b) PACS's business model prioritized profit over care and did so through top-down directives issued by PACS leadership to bill Medicare improperly, complete with quotas, spreadsheets, conference calls, and presentations;

(c) The PACS Defendants knew, or at a minimum were deliberately reckless, that the Company's operating model was not based on local facility autonomy because they were the ones disseminating top-down directives for all of their facilities; and

(d) the Restatement admits that PACS's operating model was not locally autonomous. Following their Restatement, PACS now no longer describes its operating model as fully decentralized. Instead, as of the latest earnings call on November 19, 2025, the Company claimed that "PACS operates with a locally led, centrally supported model" and did not describe it as fully decentralized.

501. Misstatement No. 25 was also materially false and misleading when made because it claims that community needs and patient care were the primary focus of PACS's business model, when, in reality, the model was driven by a desire to drain as much revenue as possible from the Medicare system in total disregard for the needs or wellbeing of PACS's patients.

502. For these reasons, Defendants Murray, Apt, Jergensen, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Apt, Jergensen, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

**10. The SPO Offering Documents**

503. The SPO Offering Documents, issued by PACS and signed by Defendants Murray, Hancock, and Apt, contained materially false and/or misleading statements of material facts, omitted to state other facts necessary to make the material statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation. Specifically, the SPO Offering Documents contained the same six false and misleading statements as the IPO Offering Documents.

a. **Misstatement No. 26—The SPO (September 3-6, 2024)**

504. The SPO Registration Statement and the SPO Prospectus highlighted that if Medicare coverage were changed, then PACS's "operations, revenue and profitability could be materially and adversely impacted":

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

505. Misstatement No. 26 was materially false and misleading when made because it failed to disclose:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that a change in reimbursement was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and the end of the COVID-19 Waiver already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver;

(b) that the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations,

revenue, and profitability, because it already happened over a year before Misstatement No. 26 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent;

(c) that the PACS Defendants knew about, or at a minimum were deliberately reckless about, PACS's revenue levels being inflated by reimbursement for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes to Medicare—and its financial performance already being guaranteed to be materially and adversely affected as a result. Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 26 was being made—Otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 26; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

506. Misstatement No. 26 was also materially false and misleading when made because:

(a) it represented that revenue and profit could be materially impacted ***if*** reimbursement changed, when in fact the Defendants knew at the time that they were overbilling Medicare and would likely have to return recognized revenue to Medicare for that billing;

(b) it warned investors that reimbursement changes ***"could"*** have adverse impacts when, in reality, such adverse impacts would have occurred, even if nothing changed regarding such reimbursements;

(c) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to refund Medicare for millions of dollars from the Company's widespread overbilling;

(d) by warning only that such reimbursement changes might occur and "could" adversely impact revenue and profitability, this risk warning falsely implied that no such adverse changes had yet materialized, even though they had already taken effect and were adversely impacting PACS's revenue and profitability at the time of the SPO; and

(e) this false implication is made stronger when considered in light of the overall context of the "Risk Factors" section in the SPO Offering Documents because it specifically mentions the expiration of the COVID-19 Waiver, yet neglects to disclose that such expiration had already adversely impacted PACS's "revenue and profitability" to an outsized extent by approximately $90 million per quarter for at least three quarters (Q3 2023, Q4 2023, and Q1 2024). Misleadingly, the SPO Offering Documents referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement "operational changes," while omitting any disclosure of the materially adverse impacts on revenue or profitability. Specifically, a different part of the SPO Offering Documents' "Risk Factors" stated: "Additionally, the expiration of the Emergency Waivers and other flexibilities allowed under the COVID-19 PHE, which ended as of May 11, 2023, have required, and may continue to require, operational changes, sometimes on short notices, and these reinstatements have not occurred simultaneously, requiring heightened monitoring to ensure compliance." Given that overall context, it was especially misleading to warn investors only that Medicare reimbursement changes might occur and "***could***" adversely impact revenue and profitability.

507. For these reasons, the Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably understated risks to the Company's "operations, revenue and profitability," making materially false and misleading statements or omissions.

b. **Misstatement No. 27—The SPO (September 3-6, 2024)**

508. The SPO Registration Statement and the SPO Prospectus stated that, "from ***time to time***," there are "***instances*** of noncompliance" with billing processes:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs***.

509. Misstatement No. 27 was materially false and misleading when made because, at the time of the SPO:

(a) PACS leadership had been pushing facilities across the Company to perform unnecessary respiratory therapies on thousands of patients, to drive up revenue at each facility from $150,000 to $1 million per month. This volume of respiratory therapy was impossible for SNF staff to perform, so they were forced to continually falsify their billing documentation procedures;

(b) PACS leadership, including the PACS Defendants, had been orchestrating the use of sensory rooms, devoid of any actual therapeutic tools, to overbill Medicare Part B for these treatments;

(c) At the time of the IPO, the PACS Defendants knew, or were deliberately reckless about, the overbilling practices pushed by PACS leadership at its facilities;

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes; and

(e) While PACS represented that it was auditing and correcting these practices, and should have been, it did not begin doing so until the Hindenburg Report came out months later, on November 4, 2024, whereupon the late-initiated internal investigation found at least $61 million in noncompliance, requiring Restatement. Defendant Murray admitted that PACS's internal investigation only started in response to the Hindenburg Report. On November 6, 2024, PACS issued a press release where Defendant Murray disclosed: "We believe recent third-party allegations [in the Hindenburg Report] are misleading. However, in line with our commitment to holding ourselves to a high standard—in how we serve our patients, operate our business, and engage with stakeholders—the Company's Audit Committee, with assistance from external counsel, is conducting an investigation ***of the allegations***." PACS Group, Inc., Current Report at Ex. 99.1 (Form 8-K) (Nov. 7, 2024) (emphasis added).

510. Misstatement No. 27 was also materially false and misleading when made because:

(a) it represented that there could be issues of noncompliance "from time to time," but omitted that it was knowable at the time, and would have become known if only the Company conducted such "review and audit," as it eventually would later—that the Company was overbilling Medicare and would have to return recognized revenue to Medicare for that billing—otherwise, ASC 250 would not have required the Restatement;

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that

the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling; and

(c) although PACS may well have addressed certain instances of noncompliance by its operating subsidiaries "from time to time," the statement omitted that, far from auditing and correcting noncompliance related to its operating subsidiaries' billing Medicare B for respiratory, sensory, and other therapy services, PACS was in fact directing such noncompliance through quotas, spreadsheets, incentives, company meetings, marketing and Administrator retreats, and other pressure on facility staff.

511. For these reasons, Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably understated the extent of the Company's noncompliance, and making materially false and misleading statements or Omissions.

c. **Misstatement No. 28—The SPO (September 3-6, 2024)**

512. The SPO Registration Statement and the SPO Prospectus noted that, ***if*** PACS was "not operating in compliance with" laws and regulations, the Company "***could*** be required to make significant expenditures" as a result:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance***.

513. Misstatement No. 28 was materially false and misleading when made because it failed to disclose:

(a) that the PACS Defendants knew, or at minimum were deliberately reckless, in claiming that change in the laws and regulations with which it must comply was a mere potentiality ("if") when the COVID-19 Waiver had already ended prior to the IPO, and that already had an outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver in contravention of CMS guidelines;

(b) That the PACS Defendants knew, or at minimum were deliberately reckless, about the termination of the COVID-19 Waiver, and its outsized impact on PACS's operations, revenue, and profitability, because it already happened over a year before Misstatement No. 28 was made, hence had already altered the reimbursement landscape for PACS's services and was already materially and adversely affecting PACS's "revenue and profitability" to a greater extent than the cessation of the COVID-19 Waiver would have if PACS had not been over-exploiting it to such an extent; and

(c) that PACS Defendants knew about PACS's revenue levels already being inflated by overbilling for Medicare Part B services that PACS now admits were improper—due to PACS's own acknowledgement of then-existing "billing uncertainties," as admitted in the Restatement, rather than changes in laws and regulations—as opposed to the mere potentiality "***[i]f we are not operating in compliance***…" Indeed, the Restatement admitted such "uncertainties" existed when Misstatement No. 28 was being made—otherwise, ASC 250 would not have required the Restatement—meaning that the PACS Defendants were aware of, and consciously disregarded, such uncertainties while making Misstatement No. 28; and

(d) as a result, PACS's financial results would foreseeably be materially impacted due to improper Medicare overbilling schemes.

514. The falsity of this statement is corroborated by the Restatement, which disclosed a material weakness regarding PACS's lack of compliance with issues received through the whistleblower hotline.

515. Misstatement No. 28 was also materially false and misleading when made because:

(a) it represented that ***if*** they were in noncompliance they ***could be*** forced to make significant expenditures or change operations, when in fact the PACS Defendants knew at the time that they were overbilling Medicare and would likely have to recognize materially reduced revenue to Medicare for that billing; and

(b) it omitted the material and growing refund liability described in the Restatement, which admitted that, at the time this statement was made, it was already known that the Company would need to return to Medicare for millions of dollars from the Company's widespread overbilling.

516. On April 8, 2024, PACS Services, the subsidiary run by Defendant Sanford, and Paradise Valley received a CID from the DOJ requesting information and documents relating to an investigation to determine whether PACS Services and Paradise Valley violated the False Claims Act by submitting false claims to Medicare, putting the PACS Defendants on notice of the same noncompliance which the Restatement admitted existed at the time. Thus, it was consciously misleading to state Misstatement No. 28 in terms of a mere potentiality ("if") of noncompliance.

517. For these reasons, the Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably

understated the extent of the Company's noncompliance, and making materially false and misleading statements or omissions.

d. **Misstatement No. 29—The SPO (September 3-6, 2024)**

518. The SPO Registration Statement and the SPO Prospectus inaccurately explained that the Company's growth was based on PACS's turnaround model for transforming underperforming SNFs:

> Our ***significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.***

519. Misstatement No. 29 was materially false and misleading when made because:

(a) the Company's expertise was not in transforming long-term custodial care facilities into SNFs, but rather in pushing aggressive practices to overbill Medicare, which would need to be materially restated once discovered;

(b) the Company's aggressive acquisition strategy gave the illusion of legitimate growth and transformation, but in reality, it was used to overbill taxpayer-funded government healthcare programs like Medicare and enrich the PACS Defendants.

520. Misstatement No. 29 was also materially false and misleading because:

(a) while PACS may have taken underperforming long-term custodial care skilled nursing facilities and turned them into profitable SNFs, it failed to disclose that its success was based almost entirely on prioritizing profit over patient care and overbilling Medicare; and

(b) the supposedly transformed SNFs were only profitable because of the abuse of Medicare programs and the sheer volume of inappropriate respiratory, sensory, and other treatments improperly billed to Medicare.

521. For these reasons, Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Inside Selling/Controlling Stockholder Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably misstated the Company's business model and value proposition to investors, making materially false and misleading statements or omissions.

e. **Misstatement No. 30—The SPO (September 3-6, 2024)**

522. The SPO Registration Statement and the SPO Prospectus stressed PACS's "decentralized, local operating model" for its business:

> We believe our success is driven in significant part by ***our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously*** and deliver excellence in clinical quality and a superior experience for our patients.

523. Misstatement No. 30 was materially false and misleading when made because:

(a) regardless of what the PACS Defendants believed drove their success, the operating model was not decentralized. Following their Restatement, PACS now no longer describes its operating model as fully decentralized. Instead, as of the latest earnings call on November 19, 2025, the Company claimed that "PACS operates with a locally led, centrally supported model" and did not describe it as fully decentralized;

(b) regardless of what they believe drove their success, PACS did not empower local leaders to operate their SNF autonomously. Rather, PACS leadership, including the PACS Defendants, issued top-down directives to bill Medicare improperly, complete with quotas, spreadsheets, conference calls, and presentations that amounted to instructions on how to maximize the overbilling while avoiding detection;

(c) the PACS Defendants knew, or at a minimum were deliberately reckless, about their own operating model, a centralized approach based on top-down directives from the PACS Defendants to all PACS facilities; and

(d) as a result, PACS's financial results would foreseeably suffer negative, materially impacts due to improper Medicare overbilling schemes.

524. Misstatement No. 30 was also materially false and misleading when made because the Company would not have been nearly as profitable, or profitable at all, without the Medicare Part A COVID-19 Waiver misconduct and the Medicare Part B respiratory and sensory misconduct; therefore, its short-term success was driven by its centralized and improper directives, not by a decentralized model.

525. For these reasons, Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably overstated the Company's business and financial prospects, making materially false and misleading statements or omissions.

f. **Misstatement No. 31—The SPO (September 3-6, 2024)**

526. The SPO Registration Statement and the SPO Prospectus touted the Company's "rigorous approach to billing integrity":

> ***Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust*** and collaboration that makes us a natural choice for payors.

527. Misstatement No. 31 was materially false and misleading when made because:

(a) at the time PACS made this statement, PACS leadership, including the PACS Defendants, was orchestrating top-down billing schemes to overbill Medicare;

(b) the PACS Defendants therefore knew that, or were deliberately reckless about, the financial records of PACS were based on a series of improper billing practices that would need to be corrected;

(c) PACS had insider contacts within certain California auditing regions and those California facilities were able to obtain advance notice of audits to avoid discovery of their Medicare overbilling practices; and

(d) as a result, PACS's financial results would foreseeably suffer negative material impacts due to improper Medicare overbilling schemes.

528. Misstatement No. 31 was also materially false and misleading when made because, while PACS may have had a rigorous approach to billing, the rigor was directed at overbilling respiratory and sensory therapies, regardless of patient need, and evading detection by Medicare and audits. As a result, PACS financial results would foreseeably suffer negative material impacts due to Medicare overbilling schemes.

529. For these reasons, the Defendants Murray, Hancock, Apt, and PACS knowingly and/or recklessly withheld this information from investors on the chance that their misconduct would never be discovered—or, at very least, not discovered before PACS and the Insider Selling/Controlling Defendants were able to realize substantial financial gain. Accordingly, during the Class Period Defendants Murray, Hancock, Apt, and PACS culpably overstated the Company's business and financial prospects as well as understated it risks, making materially false and/or misleading statements and failing to state information required to be stated therein.

### 11. The PACS Defendants Acted With Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder

530. As alleged herein, the PACS Defendants acted with scienter in that they: (i) knew, or were deliberately reckless in not knowing, that the public documents and statements issued in the name of the Company were materially false and misleading; (ii) knew, or were deliberately reckless in not knowing, that such statements or documents would be issued to the investing public; and (iii) knowingly (or with deliberate recklessness) and substantially participated or acquiesced in the issuance of such statements or documents as primary violations of the federal securities laws.

531. The PACS Defendants permitted PACS to release these false and misleading statements and failed to timely file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock. As set forth herein, the PACS Defendants, by virtue of their receipt of information reflecting the true facts regarding PACS, their control over, receipt, and modification of the Company's allegedly materially misleading statements and omissions, and their positions with the Company that made them privy to material non-public information concerning PACS, participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the Exchange Act as alleged herein.

532. When taken as a whole, numerous facts alleged herein give rise to the strong inference of scienter that, throughout the Class Period, the PACS Defendants knew or were severely reckless in disregarding that their Class Period statements were materially false and misleading.

a. **The PACS Defendants Knew, or Were Reckless in Not Knowing, the Extent of PACS's Underlying Wrongdoing**

533. The public was surprised by the wrongdoing credibly exposed by the Hindenburg Report. The PACS Defendants' knowledge of this wrongdoing was confirmed two days later, when Defendant Murray responded to the Hindenburg Report by calling its revelations ***not false*** but "misleading." Their knowledge of this wrongdoing was further confirmed later in the same statement when Defendant Murray announced that the Company was not only investigating these allegations, but also cooperating with multiple federal investigations into similar "reimbursement" practices that, Defendant Murray admitted, "may or may not be related" to Hindenburg's revelations—federal investigation which dated back to April 8, 2024 (pre-IPO).[23] And most definitively, the PACS Defendants' knowledge of this wrongdoing was confirmed when the more-than-year-long internal investigation concluded that the Company would need to materially restate at least $61 million in revenue due to improper recognition of reimbursement revenue from Medicare Part B, at least $30.6 million of which was known as of June 30, 2024 because it was internally recorded as a known "refund liability" at the time.

534. The PACS Defendants' knowledge of this wrongdoing was also directly confirmed by former employees' direct accounts of the PACS Defendants' participation in the underlying wrongdoing:

[23] Whether the federal investigations into reimbursement practices were or were not related is negative news for PACS either way. If they are related, news of the investigation lends credibility to and corroborates the Hindenburg Report's revelations. If they are unrelated, news of the investigation indicates that there is the potential for even more wrongdoing related to "reimbursement" practices occurring at the Company. Further, Defendant Murray's affirmation that the federal investigations may be related to the wrongdoing asserted by the Hindenburg Report is, itself, an admission that neither he nor anyone at PACS saw enough of a difference to conclude that they were unrelated.

(a) According to FE-10, there was ongoing pressure from PACS "leadership" to bring in more admissions and to bill as much as possible. FE-10 explained that PACS "presidents" encouraged improper documentation to be submitted to Medicare to increase revenue, even if the service was not provided to the patient. FE-10 also noted that C-suite executives instructed Administrators to never provide auditors with more than they asked for, only summaries rather than the actual documentation.

(b) FE-10 recalled from speaking to C-suite executives in person in Utah that when PACS went public, the pressure from the C suite increased. FE-10 said that PACS CFO at that time, Defendant Apt, sent emails with reminders highlighting which facilities needed to improve their revenue. FE-10 stated that PACS executives "pushed" Administrators to focus on billing Medicare Part B to increase revenue.

(c) The PACS Defendants because of their positions within the Company each had the ability to direct PACS's course of business with respect to its Medicare reimbursement practices. Indeed, they have never denied knowledge of the underlying wrongdoing, and admitted that the underlying wrongdoing was real and material enough to require both (i) delaying release of its SEC-require financial results and risk delisting from the NYSE and (ii) a restatement of its previously announced financial results.

### b. Motive and Opportunity—Highly Unusual Stock Sales Create a Strong Inference of Scienter

535. Independently establishing a strong inference of scienter, the Insider Selling/Controlling Stockholder Defendants sold their PACS stock as if they knew about the underlying wrongdoing before the date of the IPO and SPO.

536. Defendant Murray and Defendant Hancock reaped extraordinary profits from their stock sales. On April 11, 2024, Defendant Murray and Defendant Hancock each sold 1,607,142

shares in the Company's IPO at $21 per share, reaping a total of $67.5 million in proceeds ($33,749,982 each). Mere months later, on September 6, 2024, the Defendants Murray and Hancock negotiated for a 1-month shortening of the IPO lockup for themselves and each sold 8,128,352 shares in the SPO at $36.25 per share, generating an additional $589.3 million in proceeds total ($294,652,760 each). Collectively, these two transactions yielded $656.8 million in cash proceeds for the two co-founders alone—a staggering windfall.

537. Defendant Murray and Defendant Hancock each reduced their ownership stake from 50% pre-IPO to approximately 35.2% post-SPO. Put differently, these insiders initially owned the Company outright and unloaded approximately 30% of the entire Company in a period of less than five months, which was under two months before news emerged of PACS's improprieties in the Hindenburg Report. Such significant reductions in ownership percentages by the Company's co-founders who exercised absolute control are strong indica of suspicious trading.

538. The timing of these insider sales increases their suspiciousness. Prior to their sales on April 11, 2024, neither Defendant Murray nor Defendant Hancock had sold, traded, or otherwise divested ***any*** of their PACS shares. However, during the Company's first five months as a public company, they unloaded approximately 30% of the Company's entire supply of stock. Indeed, these co-founders specifically requested and received special permission from the Underwriter Defendants to make their SPO sales more than a month early by obtaining a waiver of the six-month lockup period normally in place (and here, initially in place) following an IPO. The rapid and coordinated disposal of nearly 20 million shares, to realize hundreds of millions of dollars in profit, represented a dramatic and unprecedented change in their trading patterns. Further, their SPO sale suspiciously occurred less than a month after the Company's release of financial results for the second quarter of 2024—the same quarter which would later be restated

by $46 million due to then-existing uncertainties surrounding PACS's Medicare billing and then-existing material weaknesses in internal controls—and even more suspiciously, less than two months before news of PACS's improprieties emerged in the credible Hindenburg Report. The proximity of Defendants Murray's and Hancock's sales to the release of the Hindenburg Report is particularly suspicious given that Hindenburg Research's five-month investigation into PACS, including Hindenburg's interviewing of at least eighteen former PACS employees and competitors, had already been ongoing for months at the time of the SPO sales.

539. Further increasing the suspiciousness of these sales, both the IPO and SPO sales occurred ***after*** Defendants PACS, Murray, and Sanford, and the other PACS Defendants, received notice of investigations by the DOJ into whether PACS was violating the False Claims Act. Their advanced notice was confirmed by Defendant Murray himself, who on November 6, 2024 (two days after the Hindenburg Report's release) was referring to himself and the Company when he stated publicly: "We've received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report," referring to the Hindenburg Report. Their notice in advance of the IPO is confirmed by the Company's long-delayed 2024 Annual Report, which admitted that PACS first received "a Civil Investigative Demand ('CID') from the U.S. Department of Justice ('DOJ') requesting information and documents relating to an investigation of Paradise Valley and Providence to determine whether Paradise Valley and Providence [Administrative Consulting Services] violated the False Claims Act by submitting false claims to Medicare" on "April 8, 2024," prior to the IPO. Defendant Sanford therefore also had knowledge of these facts on or before April 8, 2024, as he was both the former administrator of Paradise Valley and the contemporaneous President of PACS Services.

540. Finally, these are the only insider sales Defendants Murray and Hancock made to the public during the Class Period, and none of these Defendants ever made any insider sales ever again (as of the date hereinunder). Such timing of sales by the Company's controlling co-founders and the President of its main operating subsidiary are further strong indicia of suspicious trading.

541. Defendant Hancock's and Defendant Murray's sales in the SPO occurred on September 6, 2024, mere weeks before the Hindenburg Report exposed the truth, and mere weeks before PACS announced a government investigation and delayed its Q3 2024 earnings release. By selling at inflated prices before the truth was revealed, the co-founders avoided hundreds of millions of dollars in losses. The close temporal nexus between Defendant Hancock's and Defendant Murray's massive stock sales and the revelation of the adverse information evidences suspicious timing.

542. Defendant Hancock and Defendant Murray sold their SPO shares in a narrow time period that represented a unique opportunity to reap outsized financial gains: after the Company went public and announced two quarters of high and profitable revenue, yet before Hindenburg would reveal that these financial results were ill-gotten and before the Company would be forced to admit that its financial results for those quarters were not profitable and would have to be materially restated lower. The SPO sales also occurred mere weeks before the Company announced that it was the subject of multiple federal investigations, strongly implying the co-founders' knowledge of the subjects of those investigations prior to their SPO sales.

543. Defendant Murray's and Defendant Hancock's sales were not executed pursuant to a Rule10b5-1 trading plan, removing any pretext of pre-scheduled trading and underscoring the opportunistic nature of the transaction.

544. Noted in the IPO Offering Documents and SPO Offering Documents, Defendant Hancock and Defendant Murray represented PACS's sole controlling stockholder. As controlling stockholder with unparalleled access to internal information and unbridled influence over the Company's disclosures, Defendant Hancock's and Defendant Murray's simultaneous and unusual disposition reflects opportunistic trading at the expense of public investors.

545. As alleged herein, these sales occurred while Defendant Hancock and Defendant Murray knew of widespread billing misconduct and unsustainable operations within PACS. In fact, Defendant Murray twice certified financial statements as true pursuant to Section 302 of the Sarbanes-Oxley Act, despite the fact that they were false at the time, and despite the fact that as the Restatement would later admit, PACS and Defendant Murray (as the certifying signatory) had uncertainty about PACS's reported revenue recognition as of March 31, 2024 and again on June 30, 2024, but twice ignored it, and concealed it from both the April IPO and September SPO so as to not interfere with his insider sales.

546. Furthermore, in connection with the IPO, six more Company insiders received extraordinary grants of stock, although they were unable to sell such stock due to back-to-back lockup periods following both Offerings. Defendant Apt, its Chief Financial Officer, received 1,313,830 restricted stock units ("RSUs")[24] in the IPO for $0 total, 25% of which vested immediately and the remainder of which would vest in five substantially equal annual installments thereafter. Defendant Lewis, its Chief Accounting Officer, received 375,380 RSUs in the IPO for $0 total, 25% of which vested immediately and the remainder of which would vest in five substantially equal annual installments thereafter. Defendant Jergensen, its President and Chief

[24] Regarding all the RSUs discussed in this paragraph: each RSU represents a contingent right to receive one share of PACS Common Stock and had no expiration date.

Operating Officer, received 3,003,039 RSUs in the IPO for $0 total, 25% of which vested immediately and the remainder of which would vest in five substantially equal annual installments thereafter. Defendant Sanford, Vice-President of Finance and President of PACS's primary operating subsidiary Providence Administrative Consulting Services, received 1,501,520 RSUs in the IPO for $0 total, 25% of which vested immediately and the remainder of which would vest in five substantially equal annual installments thereafter.

c. **Executive Departures Strengthen the Inference of Scienter**

547. Sudden and abrupt executive departures at meaningful times can strengthen the inference of scienter. Here, the conclusion that Defendants Sanford and Apt were culpable for the misconduct alleged herein is strengthened by their abrupt departures from PACS while the Company's internal investigation was concluding and around the time PACS was announcing its Restatement

548. On August 15, 2025, PACS abruptly announced that Defendant Sanford, President of PACS's operating facility, PACS Services, resigned from his role, effective that day.[25] This revelation came just weeks after PACS announced it would need to restate its financials.

549. The sudden departure of Defendant Sanford is especially notable given he oversaw PACS Services, the hub that connected central PACS leadership with its individual SNFs via PACS's Regional Vice Presidents, who reported directly to Sanford. PACS Services provided PACS's facilities with accounting, finance, human resources, payroll, legal, technology, and data consulting services, but the regional vice presidents were also often the means through which PACS leadership, including the PACS Defendants, coordinated and implemented the misconduct alleged herein. Accordingly, Sanford's abrupt departure supports the conclusion of his culpability

[25] PACS Group, Inc., Current Report (Form 8-K) (Aug. 15, 2025).

for the facts underlying PACS's restatement of financials—including shared responsibility for the material weaknesses in PACS's internal controls and at least $61 million in revenues overbilled to Medicare B—and supports a strong inference of Sanford's scienter.

550. Then only weeks later, on September 8, 2025, PACS abruptly announced that Defendant Apt, CFO of the Company, had resigned after being investigated by the Company's Audit Committee, being found to have violated its code of conduct, and being asked by the Board for his resignation.[26] Because his improprieties were discovered during the Company Audit Committee's internal investigation into the Hindenburg Report disclosures, it strongly indicates that Apt's shared responsibility for the material weaknesses in PACS's internal controls and at least $61 million in revenues overbilled to Medicare B due to then-existing, but ignored, uncertainties. It further indicates that any other stated reasons for Defendant Apt's resignation were pretextual or redundant—specifically the Company's indication that Apt's resignation was related to accepting improper gifts. Because Apt's departure occurred between the Company's announcement that there would need to be a financial restatement and the issuance of the Restatement itself, regarding the time period in which Defendant Apt served as Chief Financial Officer and twice certified PACS's admittedly false-when-made financial statements as true pursuant to Section 302 of the Sarbanes-Oxley Act, these facts alone support the conclusion that Defendant Apt bore some culpability for the facts underlying the Company's restatement, and that the Company was holding Apt at least partially responsible for the failures that resulted in the need for a financial restatement, regardless of whatever reasons the Company stated publicly. Accordingly, the timing and nature of Apt's departure strengthens the inference of Apt's scienter.

[26] PACS Group, Inc., Current Report (Form 8-K) (Sept. 8, 2025).

d. **Decisions to Delay Releasing 3Q 2024 Financial Results Two Days after the Hindenburg Report, Followed by Delay of All Financial Results for More Than a Year, Strengthens the Inference of Scienter**

551. As alleged above, the Company delayed its release of financial results for more than a year following the Hindenburg Report's revelations. At the same time, the Company was under multiple federal investigations related to its Medicare reimbursement practices.

552. Defendant Murray announced this decision without denying the truth of either the Hindenburg Report or the pending federal investigations. Instead, he described the Hindenburg Report as "misleading."

553. The resulting delay was immediate and lengthy. This immediate and lengthy nature of the delay supports the inference that PACS Defendants strongly suspected, if not outright knew, that their financial statements would need to be restated and that there were material weaknesses in their processes for publishing financial results, extensive enough to take significant time to untangle. Put differently, if the PACS Defendants had confidence in their financial reporting and internal controls, as well as in their Medicare billing practices, there would have been no reason to delay mandatory release of financial results—by a day or by a year.

554. Furthermore, if there was no truth to the Hindenburg Report's findings, Defendant Murray would have denied its accuracy and kept releasing financial results in compliance with SEC regulations and as required by law. The fact that he did not do so shows that he knew at least some of the Hindenburg Report's findings were true.

e. **Defendant Murray's and Defendant Apt's Sarbanes-Oxley Certifications Further Support Scienter**

555. Defendant Murray's and Defendant Apt's scienter is further supported by their execution of certifications pursuant to Section 302 of the Sarbanes-Oxley Act in connection with

PACS's 1Q24 10-Q and 2Q24 10-Q (the "SOX Certifications").[27] These certifications expressly identified Defendant Murray's and Defendant Apt's personal responsibility for the design, supervision, maintenance, and effectiveness of PACS's disclosure controls and procedures, as well as their responsibility for ensuring that all material information was communicated to them during the preparation of the very reports at issue covering the first two fiscal quarters of 2024, January 1, 2024 through June 30, 2024.

556. Specifically, the SOX Certifications signed by Defendants Murray and Apt each certified that:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]

557. These SOX Certifications are probative of scienter here because Defendants Murray and Apt affirmatively took responsibility for PACS's disclosure controls "ensur[ing]" that all material information "is made known to us by others within" PACS, including PACS's billing practices, revenue recognition, and internal controls relevant for preparing the 1Q 2024 and 2Q 2024 10-Qs. However, as PACS subsequently admitted in its Restatement under ASC 250, material "uncertainties" regarding the Company's recognition of Medicare Part B revenue for respiratory, sensory, and other therapies during those periods "existed at the time the financial

[27] PACS Group, Inc., Quarterly Report (Form 10-Q), Exhibit 31.1 (May 13, 2024); PACS Group Inc., Quarterly Report (Form 10-Q), Exhibit 31.2 (May 13, 2024); PACS Group, Inc., Quarterly Report (Form 10-Q), Exhibit 31.1 (April 12, 2024); PACS Group, Inc., Quarterly Report (Form 10-Q), Exhibit 31.2 (April 12, 2024).

statements were prepared" to the extent of at least $61 million of previously recognized revenue which "should not have been recognized." ¶¶ 254-266. Either the material, then-existing uncertainties were "made known to" Defendants Murray and Apt through the processes they designed and took responsibility for, or Defendants Murray and Apt designed those processes in such a way that would avoid those precise, material, then-existing uncertainties being "made known to" them. Thus, their own attestations in their SOX certifications affirm that they either knew about these uncertainties at the time they certified the false financial statements, or they were deliberately avoiding that information.

558. The same holds true for the weaknesses in internal controls that Defendants Murray and Apt hereby took responsibility for in their SOX certifications.

559. Given the materiality of the billing misconduct and refund liability later disclosed and restated, it was precisely the type of "material information" that Defendants Murray and Apt certified had been designed to be made known to them during the reporting process. Therefore, the SOX Certifications support a strong inference that they either knew of the improper billing practices and revenue-recognition uncertainties at the time they certified the financial statements, or were deliberately reckless in disregarding red flags so obvious that their failure to make such information "known to us" was highly unreasonable.

560. This inference is further reinforced by the timing of the SOX Certifications, which cover periods immediately preceding PACS's IPO and SPO—transactions that would have been jeopardized had the undisclosed billing misconduct and revenue uncertainty been revealed—and during which Defendant Murray sold significant amounts of his PACS stock. Properly viewed, the SOX Certifications constitute compelling evidence of Defendants Apt's and Murray's scienter by

establishing their contemporaneous responsibility for, and access to, the very information that was both existing at the time and rendered PACS's public statements false and misleading.

**12. Connection to a Purchase/Sale of Securities and Presumption of Reliance**

561. At all relevant times, the market for PACS common stock was an efficient market for the following reasons, among others:

(a) PACS common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a result of the Offering, the Company had 43,677,338 shares issued and trading in the market during the Class Period, demonstrating a very active and broad market for PACS common stock;

(c) As a regulated issuer, PACS filed periodic public reports with the SEC;

(d) PACS regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press release on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) PACS was followed by numerous securities analysts employed by major brokerage firms, such as Macquarie, UBS, Truist, Oppenheimer, J.P. Morgan, RBC Capital, and Citibank, who wrote reports that were distributed the brokerage firms' sales forces and the public.

562. As a result of the foregoing, the market for PACS common stock promptly digested information regarding PACS from publicly available sources and reflected such information in PACS's common stock price. Accordingly, all persons and entities who purchased or otherwise acquired PACS's common stock during the Class Period did so at artificially inflated prices. Under these circumstances, a presumption of reliance applies to all Class members' purchases of PACS common stock, including Plaintiffs'.

### 13. Loss Causation

#### a. Loss Causation Is Shown Through a Series of Partial Corrective Disclosures

563. The truth about PACS's fraudulent billing practices and inflated financial condition first began to emerge on November 4, 2024, when short-seller Hindenburg Research published the Hindenburg Report. Hindenburg's five-month investigation, supported by interviews with former PACS employees, an analysis of over 900 facility-level cost reports, and extensive review of publicly available Medicare data, revealed that PACS's business model relied on pervasive, undisclosed fraud.

564. The Hindenburg Report disclosed, among other things, that PACS had artificially inflated its revenues and profits by: (i) abusing the COVID-19 Waiver to improperly convert entire buildings to Medicare billing based on a single COVID-positive resident; and (ii) fraudulently billing thousands of unnecessary respiratory and sensory-integration therapy services to Medicare Part B, regardless of clinical need. These revelations directly contradicted PACS's representations throughout the Class Period about its revenues, including the extent to which such reported revenues were compliant, properly recognized, and supported by internal controls; about its other financial results including profit; and about its business model.

565. Investors reacted immediately. On November 4, 2024, PACS's stock price fell 27.78%, declining from $42.94 to $31.01, on unusually heavy trading volume. Analysts withdrew recommendations and flagged the allegations as serious and credible. Despite this partial corrective disclosure, PACS's stock remained inflated because investors still lacked complete information concerning the depth, duration, and regulatory consequences of PACS's misconduct.

566. On November 5, 2024, PACS's stock price declined another 4.74%, falling to $29.54 per share, on heavy volume. This significant drop reflected the market's continued

absorption following the November 4 revelations and the Company's continued nondenial of the same.

567. As multiple analysts reported, investors spent November 5 evaluating the credibility and implications of the Hindenburg Report, including its detailed Medicare billing analysis, substantial documentary evidence, and statements from former PACS administrators confirming that PACS pressured facilities to flip entire buildings onto Medicare based on a single COVID case.

568. Typically, after a short seller report is filed regarding a given company's stock, the sell-side stock analysts who follow that company file reports the same day or the next day defending the company and expressing skepticism about the short report. One reason is because the stock analysts understand the company well and are able to quickly evaluate the credibility of a short seller report. Another reason is that stock analysts want to discredit non-meritorious or otherwise non-credible short seller reports to avoid market overreactions in the stocks of the companies they follow. Another reason is that it is common practice for a company's officers, immediately after the publication of a short seller report about their company, to reach out to the stock analysts and try to convince them that the report is non-meritorious or otherwise non-credible, as well as try to convince the analysts to quickly publish reports concluding the same. Here, however, not a single stock analyst following PACS issued a report defending PACS or discrediting the Hindenburg Report. This absence of analyst defense indicated to the market that none of the typical factors were present; in other words, it indicated that the Hindenburg Report was credible and meritorious, that the analysts did not believe that PACS's stock price decline was an overreaction, and that PACS's insiders did not convince the analysts to publish such reports. Because it is a direct and foreseeable result of PACS's wrongdoing that stock analysts would learn

about it and not defend the company, the fraud proximately caused investor losses on November 5, 2024.

569. On November 6, 2024, PACS and Defendants Murray and Apt themselves corroborated core allegations of the Hindenburg Report, including by failing to disavow them. They also supplied new, corrective information. In a Form 8-K, PACS and Defendant Murray announced that:

(a) The Company was postponing its Q3 2024 earnings release and investor call;

(b) Its Audit Committee, assisted by external counsel, had launched an investigation into the "recent third-party allegations,"

(c) PACS had received multiple civil investigative demands from the federal government concerning its "reimbursement and referral practices," which they conceded may be related to the content of the Hindenburg Report, and

(d) Defendant Murray stated that while they viewed the Hindenburg Report's content as "misleading," the Company nonetheless deemed necessary both the investigation and postponement of its planned release of financial results.

570. These corrective disclosures substantially corroborated the Hindenburg Report, added new information about governmental scrutiny, and revealed that PACS's prior representations about compliance and internal controls were misleading.

571. The market reacted sharply. On November 6, 2024, PACS's stock fell another 38.76%, declining from $29.54 to $18.09 per share, on extremely heavy trading volume. Analysts described the federal inquiry as a "surprise," "binary," and materially increasing PACS's

regulatory risk. UBS placed its rating and price target "Under Review," citing PACS's failure to respond substantively to the allegations.

572. On December 17, 2024, J.P. Morgan, PACS's own underwriter and major creditor, downgraded PACS's stock rating, citing the substantial "overhang" caused by the ongoing federal investigation into PACS's reimbursement and referral practices and the Company's continued inability to provide clarity regarding the allegations.

573. J.P. Morgan reported that the pending federal inquiry created material uncertainty regarding PACS's Medicare billing practices, compliance structure, and sustainability of earnings, uncertainty that undermined PACS's prior assurances and confirmed that the misconduct revealed in early November posed long-term financial and regulatory consequences.

574. J.P. Morgan's downgrade was a direct and foreseeable result of PACS's wrongdoing. PACS's November 6 corroboration of the core allegations of the Hindenburg Report further convinced stock analysts of the wrongdoing and not to defend the Company. Because it is a direct and foreseeable result of PACS's wrongdoing that stock analysts would learn about it and downgrade PACS's stock rating, the fraud proximately caused investor losses on December 17, 2024.

575. In response to J.P. Morgan's announcement, PACS's stock price fell 8.1%, or $1.23, closing at $13.95 per share on December 17, 2024, on unusually heavy trading volume.

576. Through these four partial disclosures occurring on November 4, 5, and 6, 2024, and December 17, 2024, the truth about PACS's fraudulent Medicare billing schemes, improper revenue recognition, internal-control failures, and regulatory jeopardy was gradually revealed to the market. Each disclosure revealed additional, non-redundant information correcting prior misstatements, and each caused a statistically significant decline in PACS's stock price. As a direct

and foreseeable result of this series of partial disclosures, PACS's stock price declined dramatically, causing losses to Plaintiffs and the Class.

**b. In the Alternative, Loss Causation Is Demonstrated Because the Undisclosed Risks Materialized**

577. That the fraud caused investor losses on these dates is also sufficiently explained by the extent to which the very risks that PACS misrepresented or concealed materialized on these dates and, in turn, caused Plaintiffs' and the Class's losses. Because the materializations of concealed risks in this case are another way to view the same events and revelations described *ante* on November 4-6 and December 17, 2024, they are pled in the alternative.

578. Throughout the Class Period, PACS repeatedly warned investors in vague, boilerplate language that it ***could*** face risks related to Medicare billing, ***could*** encounter regulatory scrutiny, and ***could*** experience fluctuations in revenue related to reimbursement practices. But PACS omitted the far more significant fact that these risks had already materialized internally, and were increasingly likely, and in some cases guaranteed, to eventually materialize in public, harming investors. PACS was engaging in improper Medicare A and Medicare B billing practices, lacked the internal controls needed to detect or prevent such misconduct, affirmatively directed such misconduct, and had accumulated millions of dollars in improperly recognized revenue at a minimum that would later require restatement. That is, PACS's warnings failed to disclose that it was secretly engaged in the very practices it described only as future contingencies.

579. The risks PACS concealed were not abstract or speculative. They were active, ongoing conditions that eventually materialized in the exact ways that caused PACS's stock price to collapse:

(a) The natural and probable effects of PACS's years-long abuse of the COVID-19 Waiver;

(b) The natural and probable effects of PACS's improper Medicare Part B overbilling for respiratory and sensory therapies;

(c) The natural and probable effects of PACS's weak internal controls;

(d) PACS's growing, concealed refund liabilities;

(e) PACS's exposure to federal investigations and regulatory enforcement actions; and

(f) PACS's need, all along, to restate previously issued financial statements due to "facts that existed at the time the financial statements were prepared," per ASC 250 (as admitted by the Restatement).

580. These concealed conditions materialized harmfully in the form of:

(a) The Hindenburg Report credibly doubting and deflating PACS's inflated revenue, profit, and share price;

(b) Multiple investment analysts issuing negative coverage, downgrades to PACS's stock, and/or not defending PACS's revenue, profit, and share price as uninflated;

(c) PACS's inability to timely publish financial results as investors expect and as the law and regulations require;

(d) Everyone's inability to rely on previously issued financial statements;

(e) Regulatory scrutiny in the form of multiple federal investigative demands;

(f) Revenue collapse following the expiration of the COVID-19 Waiver, exposing PACS's inability to generate sustainable revenue absent improper billing practices;

(g) Internal investigations by PACS's Audit Committee and outside counsel, confirming the existence and magnitude of improper billing practices that PACS previously represented as compliant; and

(h) The Company's Restatement of its Q1 and Q2 2024 financial statements, acknowledging that tens of millions of dollars in revenue were improperly recognized and that PACS's purportedly robust controls were weak and had failed.

581. Each of these events constituted a materialization of the very risks that PACS misrepresented and concealed, risks that investors reasonably believed were hypothetical, remote, or properly monitored because of PACS's assurances. When these risks materialized, they foreseeably caused PACS's stock price to decline.

582. When these concealed risks materialized, through publication of the Hindenburg Report, various stock analyst responses, information regarding federal investigations, potential for revenue declines, internal investigative findings, executive departures, and the Restatement, PACS's stock price fell dramatically. Those price declines were neither random nor attributable to market forces; they were the direct and foreseeable result of the very risks PACS concealed.

#### c. In the Alternative, Loss Causation Is Demonstrated By a Mix of Corrective Disclosures and Undisclosed Risks Materializing

583. In the alternative and for the avoidance of doubt, the events occurring on November 4, 5, and 6, 2024, and December 17, 2024, described herein, constituted a mix of corrective disclosures and materializations of risks that PACS misrepresented and/or concealed. Because such events harming investors, described herein, were caused directly by the PACS Defendants' fraud, and in the same causal chain by the very facts about which the PACS Defendants dissembled, loss causation is pled regardless of whether viewed as corrective disclosures, materializations of risk, or a mix thereof.

### B. The PACS Defendants Perpetuated a Stock Scheme in Violation of SEC Rule 10b-5 (a) and (c)

584. To further implement Section 10(b), the SEC also promulgated Rule 10b-5(a) and (c), which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud...or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a) and (c).

585. The PACS Defendants' deceptive and manipulative acts and practices detailed herein, which overstated Company-wide revenue and profit, had no justification except to conceal the true state of PACS's financial condition and artificially inflate the price of PACS common stock, hence they constituted a scheme in connection with the purchase and sale of PACS common stock in violation of subsections (a) and (c) of Rule 10b-5.

### 1. The PACS Defendants Committed Wrongful Acts and Courses of Business During the Class Period

586. As part of the fraudulent scheme, the Defendants PACS, Murray, Hancock, Apt, Sanford, and Jergensen caused PACS to artificially inflate its revenue, profit, and share price through a series of deceptive acts and courses of business. Under the leadership and control of Defendants Murray and Hancock and the other PACS Defendants throughout the entire Class Period, the wrongful acts and courses of business alleged herein had no legitimate purpose and no purpose other than to artificially bolster PACS's profits—by improperly inflating revenue, reducing costs, or both—to inflate PACS's share price.

587. The scheme manifested through the following deceptive acts, practices, and courses of business, all of which were performed by, sanctioned by, or ratified by Defendants Murray and Hancock, and all of which fall squarely within Rule 10b-5(a) and (c).

a. **Deceptive And Manipulative Act/Practice No. 1: Dissemination and Maintenance of False Information**

588. The PACS Defendants disseminated the numerous false and misleading statements and omissions identified above—including statements about PACS's financial results (including various measures of revenue and profit), billing practices, internal controls, compliance infrastructure, revenue quality, and sustainability of earnings.

589. Even if a PACS Defendant did not personally author or have ultimate authority over a particular misstatement, each PACS Defendant is liable under Rule 10b-5(a) and (c) because they permitted, endorsed, and benefited from PACS's dissemination of false information while knowing, or recklessly disregarding, that such information was materially false or misleading.

590. Due to their positions of authority within the Company, the PACS Defendants had the ability and the duty to prevent or correct PACS's dissemination of the thirty-one false and misleading statements.

b. **Deceptive And Manipulative Act No. 2: Creating the False Appearance of Profitability Through Improper Medicare Billing and Falsified Documentation**

591. The PACS Defendants devised and implemented a fraudulent scheme to create the false appearance of legitimate and rapidly growing revenue and profitability, thereby inflating PACS's stock price and enabling PACS's controlling insiders to sell securities at artificially inflated levels during the IPO and SPO.

592. For example, the PACS Defendants orchestrated a systematic abuse of the COVID-19 Waiver by contriving a means to use it to inflate revenue and profit. Rather than use the COVID-19 Waiver as it was intended, to help patients in emergency situations, ease the burdened om overwhelmed hospitals, and preserve community resources during the COVID pandemic hospitals, PACS instead used it to "flip" entire SNF buildings onto Medicare coverage based on a single,

non-emergency, positive COVID test—an improper practice that generated an enormous amount of additional revenue with "nearly zero additional cost," according to former PACS personnel. Hindenburg Report at 13. PACS's course of business abusing the COVID-19 Waiver had no medical or other proper justification; indeed, the AHCA made it clear that a positive COVID test was an insufficient justification for accessing skilled nursing care coverage from Medicare Part A through the COVID-19 Waiver. Instead, PACS engaged in the course of conduct purely to inflate its revenue, profit, and share price. The PACS Defendants concealed that this practice was unsustainable, improper, and rendered PACS's reported financial performance artificially inflated.

593. When the COVID-19 Waiver expired in May 2023 and PACS's high-margin revenues from abusing it disappeared, the PACS Defendants implemented a second fraudulent scheme: billing thousands of unnecessary and unjustified respiratory and sensory therapies under Medicare Part B. The PACS Defendants deployed the Company's Regional Vice Presidents to its SNF to ensure that these services were widely performed despite the lack of medical necessity, using quotas, spreadsheets, conference calls, and presentations that amounted to instructions on how to maximize the overbilling while avoiding detection. PACS now admits that revenue from Medicare Part B for such services was improperly recognized, resulting in tens of millions of dollars of overstated revenue and loss of profit for the first half of 2024.

594. The PACS Defendants created, directed the creation of, or permitted falsified therapy documentation, patient charts, and billing records designed to justify improper Medicare reimbursement and evade detection as described above. These falsified records were a core component of the scheme, enabling PACS to submit false claims and recognize revenue it knew or should have known was reversible under ASC 606.

595. The sole purpose of these secretive, affirmative acts was to inflate the Company's revenue, profit, and share price—and, by extension, to enrich themselves through insider stock sales and bonuses calculated as a direct percentage of Adjusted EBITA as alleged below.

c. **Deceptive And Manipulative Course of Business No. 3: Implementing a Fraudulent Business Model Dependent on Improper Medicare Revenue**

596. The PACS Defendants further implemented a fraudulent business model that used PACS's SNFs as vehicles to improperly recognize revenue from Medicare, creating the appearance of explosive growth, profitability, and operational excellence.

597. PACS was billing Medicare and reporting as recognized revenue from respiratory and sensory therapies that it has now admitted were either of such "uncertain" medical justification ***at the time*** that actually collecting this revenue not probable under ASC 606, or if such revenue was collected, ***at the time*** knew would eventually have to be returned to Medicare as a "refund liability"—yet improperly reported at least $61 million of such revenue anyway for the first half of 2024 alone.

598. Indeed, PACS achieved practically all of its purported net income, if not more, through improper recognition of high-margin Medicare revenue for unjustified and otherwise false medical procedures—revenue that PACS now acknowledges must be reversed.

599. This business model was fraudulent, unsustainable, and exposed PACS to severe undisclosed risks, including regulatory enforcement, substantial repayment liability, and eventual financial restatement.

600. The fraudulent business model also exposed PACS to material costs and liabilities, including:

(a) the costs of internal investigations and remediation;

(b) costs of responding to federal investigative demands;

(c) costs of repaying improperly obtained Medicare funds;

(d) costs of performing the underlying respiratory and sensory therapies themselves;

(e) civil penalties; and

(f) reputational harm and investor flight once the misconduct was revealed.

601. Moreover, the business model was predicated on avenues of revenue that PACS knew were likely to be cut off. When Medicare A revenue abruptly collapsed after expiration of the COVID-19 Waiver, PACS immediately lost approximately $90 million in quarterly revenue. Similarly, when the truth emerged regarding PACS's improper Medicare B billing, the Company was forced to restate revenue and subsequently admitted to sharp, undisclosed revenue declines of at least $61 million.

602. Each of these concealed risks and costs, as well as their eventual materialization, harmed investors and formed an integral part of the deceptive scheme prohibited by Rule 10b-5(a) and (c).

#### 2. The Scheme Was Designed To and Did Artificially Inflate PACS's Stock Price

603. Through these coordinated acts, practices, and courses of business, including improper billing schemes, falsified documentation, dissemination of false information, suppression of adverse facts, and concealment of known compliance failures, the PACS Defendants created the false appearance of sustainable revenue growth, profitability, and operational strength, thereby inflating PACS's stock price.

604. If the PACS Defendants had been honest about its "billing uncertainties" from the time they first existed, which was March 31, 2024 (the end of the first restated quarter and before the IPO, as the Restatement admitted through its reference to ASC 250), then PACS would have

had to at minimum corrected its financial statements and amend its credit facility agreement prior to the IPO. In doing so, PACS likely would not have been able to IPO at $21/share by April 11, 2024.

605. This artificial inflation directly benefited the PACS Defendants by allowing PACS and the Insider Selling/Controlling Stockholder Defendants to complete their insider sales in connection with the IPO and SPO on favorable terms while shielding knowledge of PACS's materially worse financial condition from investors until the truth began to emerge after the SPO.

**3. The PACS Defendants Acted With Scienter When They Controlled, Orchestrated, Committed, or Otherwise Caused these Wrongful Acts**

606. As set forth herein in detail, the PACS Defendants, by virtue of their receipt of information reflecting the true facts regarding PACS, their control over, receipt, and modification of PACS's allegedly materially misleading statements and their associations with the Company that made them privy to material non-public information concerning the Company, participated in the fraudulent scheme alleged herein.

607. PACS and the other PACS Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased PACS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding PACS's business, operations, and management and the intrinsic value of the Company's common stock and caused Plaintiffs and other members of the Class to purchase PACS common stock at artificially inflated prices.

**a. The PACS Defendants Undertook Those Deceptive and Manipulative Acts and Practices with Scienter**

608. As described hereinabove, the PACS Defendants knew, or were reckless in not knowing, the full extent of PACS's underlying wrongdoing. Indeed, Defendant Murray did not

deny the allegations of the Hindenburg Report, but instead suspended the Company's financial reporting pending a more than year-long internal investigation, culminating in a restatement due to then-existing "uncertainties" resulting in Medicare overbilling and then-existing weaknesses in internal controls, which Defendants Murray and Apt took responsibility for when signing SOX certifications during the Class Period. Former PACS employees confirmed the PACS Defendants' direct participation in the underlying wrongdoing related to overbilling Medicare. For the same reasons, they knew, or recklessly disregarded, that their acts and courses of business were deceptive and manipulative. Indeed, there is no innocent explanation for these acts.

609. As described hereinabove, the PACS Defendants knew, or recklessly disregarded, that they were directing the Company to artificially inflate its revenue and profit. These wrongful acts and courses of business had no legitimate purpose and no purpose other than to artificially bolster PACS's profits—by improperly inflating revenue, reducing costs, or both—to inflate PACS's share price and personally enrich the PACS Defendants.

610. Furthermore, as described hereinabove, PACS leadership, including the PACS Defendants, engaged in a pattern of firing people who protested the PACS Defendants' deceptive and manipulative acts. Such facts show both the PACS Defendants' knowledge of wrongdoing being protested, and culpable mental state by being involved with covering it up. In light of the Restatement's admissions that the uncertainties giving rise to the conclusion that millions of dollars of revenue recognition were improper at the time the financial statements were prepared, there can be no opposing inference of the PACS Defendants' innocence while engaged in such activity. Furthermore, by their inherently deceptive nature, there can be no innocent explanation for such deliberate acts and practices constituting the scheme.

### b. Motive and Opportunity—Highly Unusual Stock Sales Create a Strong Inference of Scienter

611. As detailed herein, the extraordinarily profitable, opportune, and suspicious insider stock sales by Defendants Murray and Hancock create an independently strong inference of scienter.

612. In addition, Defendants Murray, Hancock, Apt, Jergensen, and Sanford had another unusual motive to inflate PACS's revenue and profit during the Class Period. In addition to the equity awards given to Defendants Apt, Jergensen, and Sanford, pursuant to the Company's "2024 Management Bonus Program," these five insider Defendants would be paid bonuses as a percentage of the Company's reported Adjusted EBITDA starting in April 1, 2024. As described by the Company's Definitive Proxy Statement:

> The 2024 Management Bonus Program established an aggregate bonus pool equal to 8% of Company's Adjusted EBITDA for each quarter of fiscal 2024 commencing April 1, 2024. Each Covered Officer's target bonus opportunity was equal to a specified percentage of the bonus pool.[[28]] Bonuses were earned quarterly, and could be increased by an aggregate of 10% of the Covered Officer's target bonus opportunity based on the achievement of certain financial guidance metrics related to annual revenue and Adjusted EBITDA, and could be further increased by an aggregate of 10% of the Covered Officer's target bonus opportunity based on the achievement of certain quality metrics.

(Footnote added.)

613. Put simply, the more these five insider PACS Defendants inflated PACS's revenue and profit starting in "April 1, 2024"—prior to the IPO—the higher quarterly bonus they would receive under PACS's 2024 Management Bonus Program.

---

[28] PACS's named executive officers were allocated the following percentages of the bonus pool: Jason Murray, 15%; Mark Hancock, 15%; Derick Apt, 13.5%; Josh Jergensen, 15%; John Mitchell, 8%; and PJ Sanford, 13.5%.

614. This inflation of Company profit is precisely what occurred in 2Q 2024. According to the same Proxy Statement:

> Prior to the Restatement, the Company's Adjusted EBITDA for the second quarter of fiscal 2024 was $99,737,000. In connection with preparing the 2024 Annual Report, the Audit Committee determined that Adjusted EBITDA for the second quarter of fiscal 2024 was overstated by $37,411,000 when taking into account the Restatement, thus reducing Adjusted EBITDA for the second quarter of fiscal 2024 to $62,326,000. This adjustment reduced the aggregate bonus pool under the 2024 Management Bonus Program for the second quarter of fiscal 2024 from $7,978,960 to $4,986,080, which reduced the bonuses earned by the Covered Officers for the second quarter of fiscal 2024 by an aggregate of $3,844,660. This amount reflects (i) a decrease based on the revised Adjusted EBITDA for the second quarter as a result of the Restatement and (ii) the loss of the upward adjustment in connection with the achievement of financial guidance metrics (which were ultimately not achieved as a result of the Restatement).

615. Thus, Defendants Murray, Hancock, Apt, Jergenson, and Sanford earned a total of $3,844,660 in bonuses as a direct result of the Company's scheme to overbill Medicare B alone. They were directly incentivized to inflate PACS's Adjusted EBITDA during the Class Period, not just with millions of dollars, but indeed with a bonus that would be a direct percentage of any inflated financial results they were able to materialize in a given fiscal quarter.

616. As of the Proxy Statement's date of November 25, 2025, Defendants Murray and Hancock had still not returned the $613,510 **each** in erroneous bonuses that they were required to return to the Company under its Clawback Policy, which the Proxy Statement confirmed remained "outstanding and unpaid" by Defendants Murray and Hancock alone. This flouting of the policy further evidences Defendants Murray's and Hancock's scienter, as well as their continuing control over the Company.

**c. Executive Departures Strengthen the Inference of Scheme Scienter**

617. As detailed above, the timing and abruptness of departures by Defendants Apt and Sanford, alleged herein to be significant participants in the scheme, strengthens the inference of their scienter.

**d. Decisions to Delay Releasing 3Q 2024 Financial Results Two Days after the Hindenburg Report, Followed by Delay of All Financial Results for More Than a Year, Strengthens the Inference of Scienter**

618. As detailed above, the timing of the PACS Defendants' collective decision to delay releasing financial results, first upon publication of the Hindenburg Report and then for more than a year thereafter, strengthens the inference that they had reason to anticipate, if not already knew, some or all of the facts that would cause such financial results to need to be materially restated—which, indeed, eventually happened.

**4. Connection with the Purchase or Sale of Securities**

619. The deceptive and manipulative acts and practices during the Class Period were done in connection with all Class purchases and sales of securities.

620. Whenever investors buy a share of a company, they are necessarily buying into that company's business model. When public investors purchased a share of PACS during the Class Period, they were unknowingly buying into the Company's model of using its SNFs as vehicles to recognize improper revenue from Medicare, even though they thought they were buying into a business model focused instead on strategically acquiring underperforming SNFs and transforming them into better individual businesses. Whereas the business model of strategically acquiring underperforming assets to transform them into higher-performing assets is a well-known and legitimate business model among publicly traded companies, and PACS presented itself as such a company not only through its statements and actions, such was not an accurate description of its

true business model. Rather, prior to and during its entire existence as a public company, PACS achieved more than 100% of its purported net income from improperly recognizing revenues from Medicare A and B. Indeed, following PACS's restatement of revenue due to improper Medicare billing practices, PACS never achieved better profitability than a mere $0.02 per share—essentially breakeven even in its own self-assessment—as of its SPO, hence failed to actually transform the underperforming SNFs it acquired into profitable businesses by that time. Thus, PACS's deceptive acts in furtherance of its true business model were connected with all investor decisions to purchase PACS securities during the Class Period.

621. Furthermore, any purchase or sale of a share in a public company is inextricably connected to that company's profitability. Because PACS's course of business improperly recognizing revenues from Medicare created a false appearance of high profitability to investors, that course of business was connected with all investor decisions to purchase PACS common stock during the Class Period.

622. Whereas the business model of strategically acquiring underperforming SNFs to transform them into higher-performing SNFs is a legitimate business model, the business model of improperly recognizing revenues from Medicare is not. The latter is illegal, and investors can and do view illegal enterprises as materially different than legal ones when making decisions whether to purchase or sell securities.

623. For public investors, there is a material difference between the legitimate business model in which one thinks they are investing in, and the illegitimate business model they are actually and unknowingly investing in. First, business models based on illegitimate or illegal behavior necessarily carry additional material risks including the risk of enforcement actions, the risk of liabilities to compensate victims of company wrongdoing, and the risk that public investors

will sell company shares to avoid supporting activities they find morally objectionable. Second, illegitimate or illegal business models necessarily carry additional material costs including the cost of defending against enforcement actions, the cost of paying ultimate liabilities to victims of company wrongdoing, and the negative impact on share prices when public investors sell company shares to avoid supporting activities they find morally objectionable. Third, illegitimate or illegal business models are inherently less unsustainable than legitimate legal business models, because as they grow, they inevitably face having their illegitimate or illegal avenues of business cut off through governmental intervention.

624. Here, all three such material differences between PACS's actual illegal and illegitimate business model and the different model they purported to employ were present. As set forth above, many of the material risks that PACS concealed materialized and negatively impacted investors. Additional connections between PACS's underlying misconduct and Class purchases of PACS stock include the risks and costs of responding to multiple federal investigations, the risks and cost of PACS's own more-than year-long internal investigation and Restatement, and the inevitable cessation of its improper revenue recognition from Medicare Parts A and B.

625. Each of the deceptive and manipulative acts and practices enumerated above occurred at all times throughout the Class Period. As confirmed by the Restatement, the improper recognition of revenue from Medicare Part B overstated the Company's financial health, including revenue, growth, and profitability – and hence artificially inflated the price of PACS's securities – throughout the first half of 2024. Indeed, given the size of restatement that resulted from PACS's wrongful acts constituting the scheme, such acts had no reasonable justification except to artificially inflate PACS's share price. Furthermore, the Defendants' acts and course of business coincided with every Class purchase or sale of securities.

626. Accordingly, the PACS Defendants' acts and practices inflated PACS's share price at all times during the Class Period and were connected with all Class purchases and sales during the Class Period.

**5. Reliance**

a. **Presumption of Reliance**

627. A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in the Defendants' material omissions in the context of their affirmative duties to disclose material, adverse facts, including all of the deceptive and manipulative acts and practices enumerated above. Because this scheme involves the PACS Defendants' failure to disclose material adverse information regarding the Company's fraudulent business model, overstated revenue from overbilling Medicare, significantly lower profit, false financial statements, and weak internal controls, among other material facts—information that the PACS Defendants were obligated to disclose—proof of positive reliance is not a prerequisite to discovery. All that is necessary to plead reliance is that the facts withheld were material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the Company's admission of the materiality of the facts giving rise to its material restatement of financial results, and for the other reasons set forth below, that requirement is satisfied here.

628. The PACS Defendants had a duty to cause PACS to disclose these material adverse facts due to the fact that the IPO and SPO involved insider sales. According to the U.S. Court of Appeals for the Second Circuit:

> As we stated in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir.1968) (en banc), any insider "in possession of material inside information must either disclose it to the investing public, or, if he

> is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." ***This insider's duty to disclose*** arises from the "relationship of trust and confidence" between corporate insiders and shareholders. *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001) (emphasis added). The U.S. Supreme Court has similarly upheld an insider's duty to disclose all material nonpublic information before trading. *United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997) ("officers, directors, and other permanent insiders of a corporation" have "a duty to disclose" or else to abstain from trading "because of the 'necessity of preventing a corporate insider from ... tak[ing] unfair advantage of…uninformed…stockholders.'" (alterations original) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).

629. In addition, the PACS Defendants had a duty to cause PACS to disclose these material adverse facts due to PACS's duty to disclose complete and accurate billing information to Medicare as a requirement to receiving reimbursement from Medicare, which thereby becomes publicly available once submitted. Specifically, 42 CFR § 424.32 operates to ensure the accuracy of Medicare claims submissions by SNFs by requiring proper forms, electronic submission, medical necessity documentation, coding, and validation to prevent improper payments. Such claims must include complete, accurate supporting documentation and coding, including appropriate HCPCS codes and the SNF's Medicare provider number for all Part B services furnished to SNF residents. 42 CFR § 424.32(a)(5). Additionally, 42 CFR Part 483, Subpart B, particularly § 483.20 and § 483.21, require accurate clinical records and MDS submissions that underpin claims, ensuring services are "reasonable and necessary" per 42 U.S.C. § 1395y(a)(1)(A). Had PACS fully complied with these provisions, as required, the omitted facts would have been

publicly available throughout the Class Period, and accordingly, investors may be presumed to have relied on their absence.

630. Because the news contained in the Hindenburg Report, and news of federal investigations into potentially related conduct, could have become public at any time during the Class Period, and indeed did, no reasonable investor would have paid the inflated Class Period prices for PACS shares if they had known the true extent to which PACS's SNFs overbilled Medicare.

631. But for the deceptive and manipulative acts and practices enumerated above, Class members would not have purchased PACS shares at the inflated prices they paid throughout the Class Period. The PACS Defendants undertook these wrongful acts precisely to induce the Class's purchases and sales.

632. Accordingly, investors are entitled to a presumption of reliance based on the Insider Selling/Controlling Stockholder Defendants' omission of the material adverse facts alleged herein, including the uncertainties with respect to Medicare billing, existing at the time PACS's financial statements were prepared during the Class Period, that necessitated material restatement of PACS's revenue and profit.

b. **Direct Reliance**

633. There would not have been an IPO or SPO but for the fraudulent acts alleged herein. Because the PACS Defendants misled investors about the Company's very business model, and because the fraud drove approximately all of the Company's profit, the concealment of these facts constituting the fraud directly and proximately caused the IPO and every public stock transaction that it enabled.

634. Further, as evidenced by PACS's admitted inability to publish accurate financial results or make available materially compliant quarterly and annual reports as required by law

once its underlying misconduct started to become known, there could not have been a compliant IPO at all during the Class Period. Not until PACS finished its internal investigation, restated its financial results, and regained compliance with SEC and NYSE quarterly and annual reporting obligations on November 19, 2025—well after the end of the Class Period—could there have been an IPO untainted by fraud. Accordingly, the fraud enabled and caused all of the Class transactions at issue.

635. PACS would not have been able to conduct an IPO at $21/share, much less an SPO at $36.25/share, were it not for the fraud. Indeed, following revelation of these undisclosed facts, the Company's share price collapsed to below its IPO price and indeed to below its entire trading history.

636. Therefore, the fraudulent scheme caused all transactions in PACS securities during the Class Period.

**6. Defendants' Deceptive and Manipulative Acts Caused Investor Losses**

637. Investors in PACS common stock lost hundreds of millions of dollars, or more, as a result of the scheme. Because the fraudulent scheme caused all transactions in PACS securities during the Class Period, the fraudulent scheme was directly responsible for all trading losses during the Class Period.

638. The U.S. Court of Appeals for the Second Circuit does not require that a complaint alleging violations of Rule 10b-5(a) or (c) plead economic loss or loss causation.[29]

639. Plaintiffs need not plead Class losses nor loss causation to recover for the share price declines during the Class Period.

---

[29] *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021); *accord Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023); *In re Overstock Sec. Litig.*, 119 F.4th 787, 801 (10th Cir. 2024).

640. In the alternative, the PACS Defendants' deceptive and manipulative acts and courses of business proximately causally contributed to investor losses.

a. **The PACS Defendants' Scheme Proximately Caused Investor Losses on November 4–6 and December 17, 2024**

641. Exactly as with the PACS Defendants' materially false and misleading statements, their related scheme was also an independently sufficient factor in proximately causing investor losses on November 4–6 and December 17, 2024.

b. **Defendants' Scheme Proximately Caused Additional Investor Losses on November 14, 2024 and Other Dates**

642. While Plaintiffs are not required to plead loss and causation in connection with its claims arising under Rule 10b-5(a) and (c), in the alternative and/or in addition to other allegations of loss and causation herein, all investor losses during the Class Period could have been avoided but for the PACS Defendants' fraud.

643. The PACS Defendants' deceptive and manipulative acts were ongoing throughout the Class Period, and artificially inflated PACS's revenue, profit, and share price at all relevant times. There would not have been a $21/share IPO or a $36.25/share SPO but for the PACS Defendants' deceptive and manipulative acts. Indeed, as evidenced by PACS's admitted inability to publish accurate or reliable financial results within the Class Period, as well as by PACS's inability to make compliant quarterly and annual reports as required by law, there could not have been an IPO at all during the Class Period without these inadequacies concealed by PACS's wrongdoing detailed herein. Not until PACS finished its internal investigation, restated its financial results, and regained compliance with SEC and NYSE quarterly and annual reporting obligations on November 19, 2025—well after the end of the Class Period—could there have been an IPO untainted by fraud, hence only then could Class losses due to fraud been avoided.

644. Further, the scheme caused investor losses on November 14, 2024.

645. Eight days after PACS declared that it would not be producing 3Q 2024 financial results or filing a timely quarterly report on SEC Form 10-Q, on November 14, 2024, PACS's creditors and PACS amended their 2023 Amended and Restated Credit Agreement, because PACS would otherwise have breached the credit agreement as a direct result of PACS's failure to keep current on its SEC reporting requirements and provide timely and accurate financial statements to its creditors. The creditors to that agreement were significant holders of PACS stock: Underwriter Defendants Citigroup, J.P. Morgan, Truist, RBC, Regions, and KeyBanc. According to the Company's own admissions, the November 14, 2024 credit agreement "[a]mendment modifies the affirmative covenant requiring the Borrower [PACS] to deliver unaudited quarterly financial statements to the Administrative Agent (for distribution to the Lenders) within 45 days of the end of a fiscal quarter." Further, under the amendment, PACS "must deliver unaudited financial statements for the fiscal quarter ended September 30, 2024 within 52 days of the end of such fiscal quarter."

646. The amendment of the 2023 Amended and Restated Credit Agreement on November 14, 2024 proximately caused investor losses. Indeed, such was the only significant development that day for the Company. Also on that date, the price of PACS securities significantly declined more than 10%, falling $2.06 per share, to close at $18.43, on unusually high trading volume. It was foreseeable that overbilling Medicare would inevitably cause PACS difficulty with its obligations to timely provide its creditors with accurate financial statements, as required by the 2023 Amended and Restated Credit Agreement. Further, it was foreseeable that breaching the 2023 Amended and Restated Credit Agreement would proximately cause its creditors to reduce their significant holdings of PACS stock to reduce their overall exposure to the Company, creating the November 14, 2024 sell-off that caused further Class losses. Thus, the share

price decline on November 14, 2024 was the foreseeable and proximate effect of the PACS Defendants' deceptive and manipulative acts and practices, namely, creating the false appearance of profitability and implementing a fraudulent business model dependent on improperly overbilling Medicare, which would soon cause PACS to amend its credit agreement with major PACS stockholders and precipitate a sell-off of PACS stock on November 14, 2024, harming the Class.

### C. The Insider Selling/Controlling Stockholder Defendants' and PACS's Insider Sales Violated Section 10 and SEC Rule 10b-5(a) and (c)

#### 1. Insider Selling

647. In addition to the proceeds raised by the Company itself in the Offerings, the Insider Seller/Controlling Stockholder Defendants collectively made profits of approximately $627 million by selling PACS stock while in possession of material, nonpublic information concerning the Company's true financial condition, inflated accounts receivable, existing refund liabilities, and undisclosed Medicare overbilling schemes. Their trades were large, suspiciously timed, inconsistent with prior trading behavior, and executed at artificially inflated prices before the truth began to be revealed to the market.

648. Defendants Murray and Hancock received their stock in PACS for an extraordinarily low price far beneath the value of the Company at the time they were granted all of their insider shares. According to the IPO Prospectus:

> On March 24, 2023, we entered into subscription agreements with Messrs. Murray and Hancock, pursuant to which Messrs. Murray and Hancock each purchased 64,361,693 shares of our common stock for a purchase price of $10.00, or $0.001 per share, in a private placement concurrent with our incorporation in the State of Delaware and in anticipation of effecting our reorganization on June 30, 2023.

649. As such, Defendants Murray and Hancock each spent only $10 ***total*** for all 64,361,693 PACS shares they each owned, creating a cost basis far below $0.001 per share, mathematically closer to $0.000000155 per share, which the IPO Prospectus generously rounded up to $0.001 per share. This extremely low cost basis allowed Defendants Murray and Hancock to reap extraordinary profits in the IPO and SPO.

650. In the IPO, Defendants Murray and Hancock were selling stockholders, offering up to 3,214,284 personally held shares as part of the underwriters' overallotment option, which was exercised in full. These sales allowed Murray and Hancock to monetize significant personal holdings at inflated offering prices, even as they withheld from investors the adverse information later revealed in the Hindenburg Report and the Company's later announcements, including its Restatement.

651. During the IPO, the Insider Seller/Controlling Stockholder Defendants Murray and Hancock sold massive amounts of stock at $21 per share, the artificially inflated IPO price. Specifically, they each sold 1,607,142 shares on the offering date at the inflated $21.00/share offering price, for ***$67.5 million*** in proceeds.

652. In addition, the Company sold 21,428,572 shares on the offering date at the inflated $21.00/share offering price, for more than ***$450 million*** in proceeds. Factoring in underwriting discounts and commissions of $1.26/share, or approximately $27 million, the Company expected net proceeds of approximately ***$423 million***.

653. These insider IPO sales took place while PACS's materially inflated revenue, Medicare billing uncertainties that would require material reduction in recognized revenue by approximately $15 million, materially growing refund liabilities of $3.9 million, poor profitability, and weaknesses in internal controls were known internally but concealed from investors.

654. Defendants Murray and Hancock reaped further profits in the SPO. The underwriters fully exercised their overallotment option, enabling Defendants Murray and Hancock, the only individual selling stockholders in the SPO, to sell 8,128,352 shares each, for a total of 16,256,704 personally held shares. In addition, the Company sold 2,777,778 shares.

655. In addition, the Company sold 2,777,778 shares.

656. Following all of the materially deceptive acts, fraudulent courses of business, and false and misleading statements under the Exchange Act alleged herein, the public offering price for the SPO was even further inflated to $36.25. Thus, Defendants Murray and Hancock received gross proceeds in excess of ***$589 million*** from the investing public, and after deducting the underwriting discount of $1.540625/share, Murray and Hancock each received net proceeds of approximately ***$282.1 million*** in cash, or more than ***$564 million*** combined, from their personal sales in the SPO alone.

657. In parallel, the Company received gross proceeds over ***$100 million*** from the investing public, or net proceeds over ***$96 million***, which it stated it intended to use to repay amounts outstanding under its Amended and Restated 2023 Credit Facility. Once again, these insider trades allowed the founders and Company to capture enormous personal profits on the basis of publicly overstated revenue and profit, concealed receivables problems, undisclosed refund liabilities, and improper Medicare billing practices.

658. In fact, these SPO trades garnered at a far greater share price despite the material worsening of PACS's known but concealed problems with inflated revenue, Medicare billing uncertainties, growing refund liabilities, poor profitability, and weaknesses in internal controls. Indeed, these concealed, material issues had only grown worse since the IPO: from March 31, 2024 to June 30, 2024, revenue that PACS could no longer recognize due to then-existing billing

uncertainties was inflated by a greater amount (from $15 to $46 million), refund liabilities had ballooned enormously (from $3.9 million to $30.6 million), and weaknesses in internal controls went even longer preventing the Company's disclosure controls and procedures from being effective and avoiding restatement.

**2. Contemporaneous Trading**

659. Plaintiff Detroit P&F purchased PACS common stock contemporaneously (within the meaning of §20A of the Exchange Act, 15 U.S.C. §78t-1) with the Insider Seller/Controlling Stockholder Defendants' and PACS's sales of PACS stock during the IPO on April 11, 2024.

660. The following table shows the purchases during the relevant time period by additional Plaintiff Detroit P&F:

| Transaction Type | Trade Date | Shares | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 4/11/2024 | 4,987 | $21.00 | ($104,727) |
| Purchase | 4/11/2024 | 2,200 | $23.00 | ($50,600.00) |
| Purchase | 9/6/2024 | 2,060 | $36.25 | ($74,675) |

661. Lead Plaintiff 1199SEIU Pension Fund purchased PACS common stock contemporaneously (within the meaning of §20A of the Exchange Act, 15 U.S.C. §78t-1) with PACS's and the Insider Seller/Controlling Stockholder Defendants' and PACS's sales of PACS stock during the SPO.

662. The following table shows the purchases during the relevant time period by Lead Plaintiff 1199SEIU Pension Fund:

| Transaction Type | Trade Date | Shares | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 9/6/2024 | 20,326 | $36.25 | ($736,817.50) |
| Purchase | 9/20/2024 | 1,935 | $40.58 | ($78,531.59) |

### 3. The Insider Selling/Controlling Stockholder Defendants and PACS Possessed Material, Nonpublic Information When They Traded

663. At the time of their insider sales, the Insider Seller/Controlling Stockholder Defendants and PACS possessed adverse, material nonpublic information concerning PACS's true financial condition. This material nonpublic information included:

(a) that PACS's business model did not generate profit by acquiring underperforming SNFs and transforming them, but rather, by using them as vehicles to systematically overbill Medicare;

(b) that PACS was the subject of federal investigations into its Medicare billing practices dating back to April 8, 2024, before the IPO;

(c) that material uncertainties regarding the Company's overbilling of Medicare, including recognition of Medicare Part B revenue for respiratory, sensory, and other therapies during those periods, existed at the time the financial statements were prepared—to the extent of at least $15 million as of the IPO and at least $61 million as of the SPO—creating then-known amounts of previously recognized revenue which should not have been recognized;

(d) that substantial, undisclosed, and growing refund liabilities already existed arising from Medicare billing improprieties—internally known to the extent of at least $3.9 million as of the IPO and at least $30.6 million as of the SPO, which would reach $84 million as of September 30, 2024, mere weeks after the SPO;

(e) that improper Medicare billing practices resulted in materially overstated and uncollectible accounts receivable—internally known to the extent of at least $10.9 million as of the IPO and at least $30.4 million as of the SPO;

(f) that there were material weaknesses in internal controls, which Defendant Murray specifically took responsibility for establishing and maintaining in two SOX

Certifications—on May 13, 2024 and again on August 12, 2024—"to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities"; and

(g) that PACS's profitability was dependent on high-margin revenue generated through overbilling Medicare Parts A and B, despite the heightened regulatory risk and diminished collectability associated with its overbilling practices.

664. None of this information was disclosed to investors by the time of the insider sales, even though it rendered PACS's reported financial performance, revenue growth, and internal-control assurances materially false and misleading.

665. Before selling PACS common stock, the Insider Seller/Controlling Stockholder Defendants and PACS were aware of the above adverse, material nonpublic information.

666. The Insider Seller/Controlling Stockholder Defendants and PACS understood that these adverse, material facts exposed the Company to significant regulatory and financial risk, including the inevitable need to restate its previously issued financial statements upon external discovery of such facts.

667. The Restatement's reversal of improperly recognized revenue and resulting elimination of profitability confirmed what was already well known internally prior to the Offerings: that internal uncertainty about PACS's revenue recognition existed as of March 31, 2024, and grew to a greater extent by June 30, 2024, but was ignored it, and concealed it from PACS's financial statements leading up the SPO.

668. The Insider Seller/Controlling Stockholder Defendants and PACS were further aware that PACS's apparent growth and profitability before and during the Offerings depended heavily on overbilling Medicare Part B for respiratory, sensory, and other therapy, and historically

depended on abuse of the temporary COVID-19 Waiver flexibilities that were no longer available at the time of the IPO and SPO. They also knew that these service lines carried heightened regulatory risk, uncertain billability following the COVID-19 Waiver's expiration, and substantial exposure to liability under the False Claims Act.

669. By selling their shares while in possession of this undisclosed, adverse information about PACS's Medicare Part B billing risks, revenue quality, profitability, and true financial condition, the Insider Seller/Controlling Stockholder Defendants and PACS obtained substantial proceeds as ill-gotten gains before the truth was revealed to the market.

**D. Additional Allegations of Materiality Under the Exchange Act**

670. The false and misleading statements and omissions described above were material because they concerned core aspects of PACS's business model and financial reporting, including (i) the legitimacy, collectability, and sustainability of Medicare Part B revenue, particularly from expanded ancillary service lines; (ii) the accuracy and reliability of PACS's reported GAAP and non-GAAP financial results; (iii) PACS's compliance profile and the existence of material compliance and billing uncertainties; (iv) the adequacy of PACS's internal control over financial reporting and disclosure controls; and (v) the credibility of management's public narrative and guidance regarding profitability, growth, and operational discipline.

671. The magnitude of the misstatements later corrected by the Restatement independently establishes materiality. PACS reversed tens of millions of dollars of previously recognized revenue for the first and second quarters of 2024, recorded substantial refund liabilities, reduced accounts receivable, and corrected multiple income-statement and balance-sheet line items. These were not technical or cosmetic adjustments; they materially altered PACS's reported profitability, liquidity, and financial position throughout the Class Period.

672. Under GAAP, immaterial errors need not be restated. PACS's decision, following the Audit Committee's investigation, to restate its Q1 2024 and Q2 2024 financial statements therefore constitutes an admission that the errors were material. The Restatement also confirmed that the accounting issues and related uncertainties existed before and during the periods when Defendants issued the challenged statements, including the IPO and SPO periods and the subsequent earnings communications. Likewise, PACS's restated Q1 2024 and Q2 2024 financial statements were material because they flowed from "material weaknesses" in its internal controls for those time periods.[30]

673. PACS's admission that all restated items were material is supported by ASC 250-10-S99 and auditing standards, which recognize both quantitative and qualitative factors supporting their materiality here. In particular, ASC 250-10-S99's "rule of thumb" quantitative threshold is met here and provides a basis for material restatement because PACS's revenue reversals and other items restated met or exceeded the 5% threshold, including under benchmarks tied to profit before tax, revenue, and assets. Independently, ASC 250-10-S99's recognition of qualitative factors for determining materiality are met here and provide a basis for material restatement, including the "potential effect of the misstatement on trends, especially trends in profitability," "an indication of a possible pattern of bias by management when developing and accumulating accounting estimates," and "a misstatement precipitated by management's continued unwillingness to correct weaknesses in the financial reporting process." Because PACS's

[30] A company's internal controls cannot be considered effective if a "material weakness" exists. A "material weakness" in internal controls is "a deficiency, or a combination of deficiencies, in [internal control over financial reporting] such that **there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis**." (SEC Release No. 33-8810 § II.A, at 9) (emphasis added).

restatement meets both the quantitative and qualitative factors, the admitted materiality of the restated items is confirmed.

| *(in millions)* | FY22 | FY23 | FY24 |
|---|---|---|---|
| Materiality Guidance | **$10 - $20** | **$8 - $20** | **$5 - $20** |
| Profit Before Tax (5%) | **$10** | **$8** | **$5** |
| Revenue (1%) | $24 | $31 | $41 |
| Revenue (0.5%) | $12 | $16 | $20 |
| Assets (2%) | $49 | $70 | $105 |
| Assets (1%) | $25 | $35 | $52 |

674. The misstatements and omissions were also qualitatively material because they affected metrics and narratives emphasized by PACS during the Class Period and that investors and analysts closely tracked, including Adjusted EBITDA:

| *(in millions)* | Q1 2024 | Q2 2024 |
|---|---|---|
| Adjusted EBITDA | | |
| Actuals (Restated) | $74.1 | $62.3 |
| Actuals (Original) | $88.5 | $99.7 |
| Consensus | $76 | $87 |
| Beat / Miss (Restated) | Miss | Miss |
| Beat / Miss (Original) | Beat | Beat |
| | | |
| EPS | | |
| Actuals (Restated) | $0.27 | ($0.21) |
| Actuals (Original) | $0.38 | ($0.07) |
| Consensus | $0.30 | $0.34 |
| Beat / Miss (Restated) | Miss | Miss |
| Beat / Miss (Original) | Beat | Miss |

675. For example, PACS's pre-Restatement reporting and related messaging allowed PACS to present a materially more favorable earnings narrative than investors would have received had the truth been disclosed. The Restatement altered key performance measures and the perceived

trajectory of PACS's profitability, including Adjusted EBITDA and EPS outcomes relative to consensus expectations and PACS guidance shared with investors as part of quarterly earnings materials.

676. The misstatements also impaired the credibility of management's profitability guidance. During PACS's Q2 2024 earnings release, the Company issued full-year 2024 guidance projecting revenue of $3.85 to $3.95 billion and Adjusted EBITDA of $370 to $380 million. When PACS's actual 2024 results were later disclosed, PACS reported Adjusted EBITDA of approximately $279.5 million—missing the midpoint of its Adjusted EBITDA guidance by approximately 25%. A failure to achieve management's Adjusted EBITDA guidance of this magnitude is material because Adjusted EBITDA is a core profitability metric relied upon by investors to evaluate operating performance, profit margin sustainability, leverage capacity, and valuation for PACS, and was particularly important to reasonable investors given PACS's status as a newly public company whose investment thesis rested on profitability and profit margin expansion. Defendants Apt's and Murray's compensation was directly tied to Adjusted EBITDA performance, giving them a financial incentive to overstate this metric.

677. The Restatement-related derecognition of Medicare Part B ancillary-services revenue had a disproportionate impact on profitability because PACS treated such services as high-margin components of its business. When that revenue was later derecognized under ASC 606, the effect on Adjusted EBITDA was magnified, undermining the earnings narrative and guidance credibility that Defendants promoted during the Class Period.

678. PACS's Restatement further confirmed the materiality of collectability and refund exposure. PACS reported a rapidly growing refund-liability balance associated with Medicare Part B billing uncertainties, reflecting cash collected that PACS expected to refund to Medicare because

the underlying services did not satisfy eligibility or documentation requirements. This refund exposure, reaching approximately $145.8 million and $181.1 million by December 31, 2024 and September 30, 2025, was material because it bore directly on the quality and sustainability of PACS's margins and the reliability of PACS's reported cash and liquidity profile.

679. PACS's undisclosed trend of ballooning refund liabilities is material. The continued quarter-over-quarter growth in refund liabilities beyond the periods captured by the initial $61 million revenue correction confirms that the risks omitted from the challenged statements were ongoing and materially affecting PACS's earnings quality and financial condition without being disclosed to investors.

680. The misstatements and omissions were also material because they concealed the inadequacy of PACS's compliance and control environment. Defendants repeatedly conveyed that PACS maintained rigorous billing integrity, robust compliance functions, and effective review and audit processes, while omitting that PACS lacked effective controls and processes to assess Medicare eligibility, account for variable consideration, evaluate collectability, and escalate compliance risks for newly expanded ancillary service lines such as respiratory and sensory therapies. Investors reasonably view material weaknesses in internal controls and ineffective disclosure controls as important because such deficiencies increase the risk that reported financial results are unreliable and subject to adverse correction. PACS's investors during the Class Period were no exception; they would have regarded the truth about these items at PACS as significantly altering the total mix of information available and would not have purchased PACS securities at inflated prices.

681. Relatedly, Defendants' risk disclosures were materially misleading in context because they framed key regulatory and reimbursement risks as contingent or hypothetical while

omitting that the relevant reimbursement dynamics, billing uncertainties, collectability risks, and compliance problems had already manifested and were already affecting the Company's results. Reasonable investors would have considered it important to know that PACS's reported performance depended on practices that carried a substantial risk of revenue reversal and refund exposure and that, as later confirmed, required restatement.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUSTION DOCTRINE

682. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PACS who knew that the statement was false when made.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT IV

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (False and Misleading Statements) Against the PACS Defendants (Except Defendant Sanford)

683. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

684. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §240.10b-5, on behalf of Plaintiffs and the Class, against each of the PACS Defendants (except Defendant Sanford).

685. During the Class Period, Defendant PACS and each of the other PACS Defendants (except for Defendant Sanford) made, caused to be made, approved, or disseminated materially false and misleading statements and omissions of material fact concerning, *inter alia*, PACS's revenue, profitability, refund liabilities, accounts receivable, billing practices, and compliance with Medicare requirements.

686. These statements were materially false and misleading when made because they misrepresented and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

687. Defendant PACS is liable for the materially false and misleading statements issued in its name during the Class Period.

688. Each of the PACS Defendants (except for Defendant Sanford) are liable for the false and misleading statements they made, signed, approved, or caused to be disseminated, and for statements they controlled or had authority over by virtue of their senior executive positions.

689. Each of the PACS Defendants had actual knowledge of the falsity of the statements or acted with reckless disregard for the truth. At a minimum, the misleading nature of the

statements was so obvious that the PACS Defendants must have been aware of it. The above allegations, as well as the allegations pertaining to the overall scope and breadth of fraud at PACS, establish a strong inference that the PACS Defendants acted with scienter.

690. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, the purchased PACS common stock and were harmed when the truth about PACS negatively impacted the price of that stock. Plaintiffs and the Class would not have purchased PACS common stock at the prices they paid, or at all, had they been aware of the truth about PACS

691. As a direct and proximate result of the PACS Defendants' misrepresentations and omissions, Plaintiffs and the Class purchased PACS common stock at artificially inflated prices and suffered economic loss when the truth was revealed and damages under the federal securities laws.

692. This claim is brought within the applicable statute of limitations.

**COUNT V**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Scheme Liability) Against the PACS Defendants**

693. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

694. This Count is asserted pursuant Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (c) on behalf of Plaintiffs and the Class against each of the PACS Defendants.

695. During the Class Period, Defendant PACS and each of the other PACS Defendants engaged in a fraudulent scheme, course of conduct, and business practices that operated as a fraud and deceit upon purchasers of PACS common stock.

696. The scheme consisted of a series of deceptive and manipulative acts and practices that went well beyond isolated misstatements and were designed to create and maintain an artificial appearance of profitability, regulatory compliance, and sustainable growth.

697. Each of the PACS Defendants disseminated and maintained false information concerning PACS's revenue, profitability, and compliance with Medicare rules, and knowingly failed to correct those falsehoods despite contrary internal data.

698. Each of the PACS Defendants created the false appearance of profitability by recording revenue derived from improper Medicare billing practices, including billing unsupported services and relying on non-compliant or falsified documentation, thereby masking refund liabilities and overstating financial performance.

699. Each of the PACS Defendants implemented and promoted a business model that depended on improper and unsustainable Medicare revenue, while concealing that PACS's reported profitability would collapse once those revenue streams were curtailed.

700. Each of the PACS Defendants knew or recklessly disregarded that their conduct distorted PACS's financial results and misled investors regarding the Company's true business and financial condition.

701. As a direct and proximate result of the PACS Defendants' scheme, PACS common stock traded at artificially inflated prices during the Class Period.

702. Plaintiffs and the Class suffered damages when the truth regarding PACS's operations and financial condition was revealed.

703. This claim is brought within the applicable statute of limitations.

**COUNT VI**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Inside Selling) Against the Insider Selling/Controlling Stockholder Defendants and PACS**

704. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

705. This Count is asserted pursuant to Section 10(b) of the Exchange act, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. §240.10b-5(a), (c), on behalf of Plaintiffs and the Class, against each of the Insider Selling/Controlling Stockholder Defendants and PACS.

706. During the Class Period, the Insider Selling/Controlling Stockholder Defendants and PACS possessed adverse, material nonpublic information concerning PACS's true financial condition, including materially overstated accounts receivable, substantial undisclosed refund liabilities, improper Medicare billing practices, internal-control deficiencies, and the Company's dependence on unsustainable Medicare revenue, as alleged herein.

707. While in possession of this material nonpublic information, and in breach of their fiduciary duties to PACS and its stockholders, the Insider Selling/Controlling Stockholder Defendants and PACS sold PACS common stock at artificially inflated prices during the IPO and SPO.

708. These insider sales were suspiciously timed, unusually large, inconsistent with prior trading behavior, and executed before the truth regarding PACS's revenue quality, refund liabilities, and Medicare billing practices began to be revealed to the market.

709. By trading while in possession of material nonpublic information, the Insider Selling/Controlling Stockholder Defendants and PACS employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business that operated as a fraud or deceit upon purchasers of PACS common stock.

710. Plaintiffsand the Class relied on the integrity of the market price of PACS common stock, which was artificially inflated by the PACS Defendants' concealment of adverse information, and purchased shares at prices that did not reflect PACS's true financial condition.

711. The Insider Selling/Controlling Stockholder Defendants acted with scienter in selling PACS securities while in possession of material nonpublic information.

712. As a direct and proximate result of the Insider Selling/Controlling Stockholder Defendants' and PACS's wrongful conduct, Plaintiffs and the Class suffered economic damages.

713. This claim is brought within the applicable statute of limitations.

**COUNT VII**

**Violation of Section 20A of the Exchange Act Against the Insider Selling/Controlling Stockholder Defendants and PACS**

714. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

715. This Count is asserted pursuant to Section 20A of the Exchange Act, 15 U.S.C. §78t-1, on behalf of Plaintiffs and the Class, against each of the Insider Selling/Controlling Stockholder Defendants and PACS.

716. Each of the Insider Selling/Controlling Stockholder Defendants and PACS violated Section 10(b) of the Exchange Act and Rule 10b-5 by either making false and misleading statements, engaging in a fraudulent scheme, or trading in PACS securities while in possession of material nonpublic information, as alleged in Count IV, Count V, and Count VI.

717. At the time of their trades, the Insider Selling/Controlling Stockholder Defendants and PACS possessed material nonpublic information concerning PACS's overstated revenue and receivables, undisclosed refund liabilities, improper Medicare billing practices, and unsustainable business model, which information was confidential and not available to the investing public.

718. The Insider Selling/Controlling Stockholder Defendants and PACS obtained this material nonpublic information through their positions as founders, executives, and senior officers of PACS, and owed fiduciary duties, or duties arising from relationships of trust and confidence, to PACS and its shareholders to keep that information confidential.

719. PACS, through its officers and employees, was in possession of material, nonpublic information at the time PACS sold shares in the IPO and SPO.

720. While in possession of this material nonpublic information, the Insider Selling/Controlling Stockholder Defendants and PACS sold PACS securities on or about April 11, 2024 and September 6, 2024, generating extraordinary profits.

721. Plaintiffs and members of the Class purchased PACS common stock contemporaneously with the Insider Selling/Controlling Stockholder Defendants' and PACS's sales, within the meaning of Section 20A, including during the IPO and SPO.

722. As a direct and proximate result of the Insider Selling/Controlling Defendants' insider trading, Plaintiffs and the Class suffered damages.

723. By virtue of the foregoing, the Insider Selling/Controlling Stockholder Defendants and PACS are jointly and severally liable to Plaintiffs and the Class for damages under Section 20A of the Exchange Act.

724. This claim is brought within the applicable statute of limitations.

## COUNT VIII

## Violation of Section 20(a) of the Exchange Act Against the Insider Selling/Controlling Stockholder Defendants

725. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

726. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Plaintiffs and the Class, against each of the Insider Selling/Controlling Stockholder Defendants.

727. As set forth above, each of the Insider Selling/Controlling Stockholder Defendants were each controlling persons of the Company and the other PACS Defendants within the meaning of Section 20(a) of the Exchange Act. The Insider Selling/Controlling Stockholder Defendants acted as controlling persons of PACS and the other PACS Defendants within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Insider Selling/Controlling Stockholder Defendants had the power to influence and control and did, directly and indirectly, influence and control the decision making of the Company and the other PACS Defendants, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Insider Selling/Controlling Stockholder Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

728. In particular, the Insider Selling/Controlling Stockholder Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about PACS and the action of PACS and its employees. Moreover, the Insider Selling/Controlling Stockholder Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by PACS during the Class Period. As a result of the foregoing, the Insider

Selling/Controlling Stockholder Defendants were controlling persons of PACS and the other PACS Defendants within the meaning of Section 20(a) of the Exchange Act.

729. As alleged above, PACS and the other PACS Defendants violated Section 10(b) of the Exchange Act. By virtue of their positions as controlling persons of PACS and the other PACS Defendants and as a result of their own aforementioned conduct, the Insider Selling/Controlling Stockholder Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company and the other PACS Defendants arei liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired PACS common stock. Moreover, as alleged above, during the respective times that the Insider Selling/Controlling Stockholder Defendants served as officers and/or directors of PACS, each of the Insider Selling/Controlling Stockholder Defendants culpably participated PACS's and the other PACS Defendants' violation of Section 10(b), as set forth above.

730. As a direct and proximate result of the Insider Selling/Controlling Stockholder Defendants wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of PACS common stock during the Class Period.

## XIII. CLASS ACTION ALLEGATIONS

731. Subject to the exclusions below, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock during the period from April 11, 2024 through December 16, 2024, inclusive, and were damaged thereby (the "Class"), including:

(a) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock pursuant and/or traceable to the IPO Offering Documents

issued in connection with PACS's April 11, 2024 IPO, during the period from April 11, 2024 through September 5, 2024, inclusive, and were damaged thereby, for violations of Sections 11 and 12(a)(2) by the IPO Securities Act Defendants and Section 15 of the Securities Act by the IPO Individual Defendants;

(b) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock in PACS's September 6, 2024 SPO, on that date, and pursuant and traceable to the SPO Offering Documents issued in connection with the SPO, and were damaged thereby, for violations of Sections 11 and 12(a)(2) of the Securities Act by the SPO Securities Act Defendants and Section 15 of the Securities Act by the SPO Individual Defendants;

(c) all persons and entities who or which purchased or otherwise acquired PACS publicly traded common stock during the Class Period for violations of Section 10(b) and Rule 10b-5 promulgated thereunder by the PACS Defendants and Section 20(a) of the Exchange Act by the Insider Selling/Controlling Stockholder Defendants; and

(d) all persons and entities who or which purchased or otherwise acquired PACS securities contemporaneously with PACS's and the Insider Selling/Controlling Stockholder Defendants' insider sales on April 11, 2014 and September 6, 2024, for violations of Section 20A of the Exchange Act by PACS and the Insider Selling/Controlling Stockholder Defendants.

732. Excluded from the Class are (i) Defendants; (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of any Defendant. For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are

controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of PACS employees.

733. The members of the Class are so numerous that joinder of all members is impracticable. Commencing on the IPO and throughout the Class Period, PACS's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PACS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

734. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

(a) whether Defendants' misrepresentations and omission as alleged herein violated the federal securities laws;

(b) Whether Defendants' statements and omitted material facts were material;

(c) whether Defendants' misrepresentations and omissions as alleged herein caused the Class to suffer a compensable loss; and

(d) whether members of the Class have sustained damages, and the proper measure of damages.

735. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

736. Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Plaintiffs have no interests that conflict with those of the Class.

737. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

738. **WHEREFORE**, Plaintiffs respectfully pray for judgment against the Defendants as follows:

(a) Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff and Detroit P&F as Class Representatives, and appointing Labaton Keller Sucharow LLP as Class Counsel pursuant to Rule 23(g);

(b) Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(c) Awarding Plaintiffs and the Class damages equal to disgorgement of Defendants wrongful gains, i.e., the profits they obtained with the stock sales at issue herein;

(d) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(e) Granting such other and further relief as this Court may deem just and proper.

739. Plaintiffs expressly preserve all remedies at law and equity and do not elect among them herein. The precise forms of legal and equitable relief will be determined upon further factual development, and Plaintiffs reserve the right to seek all remedies authorized under the Securities Act, the Exchange Act, and federal common law principles governing remedies.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: December 19, 2025

Respectfully submitted,

*/s/ Alfred L. Fatale III*

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Jeffrey A. Dubbin
Jessica N. Goudreault
Wesley A. Mann
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
jdubbin@labaton.com
jgoudreault@labaton.com
wmann@labaton.com

*Lead Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I certify that this 19th day of December 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

*/s/ Alfred L. Fatale III*
Alfred L. Fatale III