**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER MANCHIN, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> PACS GROUP, INC., JASON MURRAY, DERICK APT, MARK HANCOCK, MICHELLE LEWIS, JACQUELINE MILLARD, TAYLOR LEAVITT, EVELYN DILSAVER, P.J. SANFORD, JOSHUA JERGENSEN, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO. LLC, STEPHENS INC., KEYBANC CAPITAL MARKETS INC., OPPENHEIMER & CO. INC., UBS SECURITIES, LLC, and REGIONS SECURITIES, LLC, <br><br> Defendants. | No. 1:24-cv-8636-LJL <br><br> ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iv

TABLE OF DEFINED TERMS AND ABBREVIATIONS ........................................................ xi

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    LEGAL STANDARDS .................................................................................. 3

       A.    Facts at the Pleading Stage ...................................................... 3

       B.    Facts and Opinions Under Recent Second Circuit Law .......................... 3

III.   SUBSTANTIVE ALLEGATIONS OF FACT ................................................... 5

       A.    Overview of PACS's Business ................................................... 5

       B.    PACS's Medicare Part A Scheme During the COVID-19 Pandemic ..................... 7

       C.    By Q1 2024, Pre-IPO, PACS Had Begun its Medicare Part B Billing Scheme ..... 9

             1.    The Restatement Showed the Medicare B Scheme Was Company-
                   Wide, Already Material Pre-IPO, and Accelerating for the SPO .............. 9

             2.    The Restatement Admitted Materially Weak Internal Controls .............. 10

             3.    PACS FEs and Hindenburg Corroborate and Detail Wrongdoing ........... 11

       D.    April 2024: PACS Conducts Its IPO at $21 per Share ........................................ 13

       E.    April – August 2024: PACS's First Five Months as a Public Company.............. 14

       F.    September 2024: PACS Conducts Its SPO at $36.25 per Share........................... 15

       G.    November – December 2024: PACS's Wrongdoing Causes Investor Losses...... 16

       H.    Post-Class Period Developments ......................................................................... 18

IV.    ARGUMENT................................................................................................................... 18

       A.    Defendants Abuse Judicial Notice, Especially with Exhibits 6 and 12 ................ 18

       B.    Securities Act Claims........................................................................................... 20

1.      Legal Standards Under the Securities Act ............................................... 20

2.      Rule 8 Governs Pleading of Securities Act Violations ............................ 20

3.      The Securities Act Claims Do Not Sound in Fraud ................................. 21

4.      The Restatement Shows the Offering Documents' Material Falsity ........ 22

5.      The Challenged Statements Are Statements of Fact, Not Opinions ......... 24

6.      Even If Statements Are Treated as Opinions, the Complaint Adequately

        Pleads Falsity Under *Omnicare* ................................................................ 26

7.      The Offering Documents' Omissions Violated Item 303 ......................... 28

8.      Defendants' Risk Factors Misled Because Risks Already Materialized .. 30

9.      Defendants Are Statutory Sellers Under Section 12(a)(2) ........................ 31

10.     The Complaint Adequately Pleads Section 15 Control Person Liability.. 32

C.      Exchange Act Claims ....................................................................................... 32

1.      Legal Standard ........................................................................................... 32

2.      The Complaint Pleads Misstatement Nos. 1–31 Violated Rule 10b-5(b). 33

        a.      All 31 Misstatements Were Materially False and/or Misleading . 33

        b.      These Statements Were Made With Scienter .............................. 38

        c.      The Complaint Sufficiently Pleads PACS's Wrongdoing

                Caused Investor Losses ................................................................ 49

3.      The Complaint Pleads a Stock Scheme Violating Rule 10b-5(a)/(c) ....... 52

        a.      Pleading Standard for Schemes ................................................... 52

        b.      The Complaint Pleads Three Groups of Acts Furthering the

                Scheme (Elements 1–2) ............................................................... 53

        c.      The Complaint Pleads Scheme Scienter (Element 3) .................. 56

ii

d.    The Complaint Pleads Investor Reliance on the Scheme ............. 57

e.    Defendants Concede All Other Scheme Elements........................ 58

4.    The Complaint Pleads Control Person Liability Under Section 20(a)...... 58

5.    The Complaint Pleads a Violation of Section 20A ................................. 59

V.    CONCLUSION ...................................................................................................... 60

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)............................................................................................ *passim*

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972)..........................................................................................................57

*Afr. v. Jianpu Tech.*,
2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)..................................................................24

*In re Alstom S.A. Sec. Litig.*,
454 F. Supp. 2d 187 (S.D.N.Y. 2006)..............................................................................42

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)................................................................................32

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)............................................................................. *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................................... 42-43

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)............................................................................................8, 58

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)..................................................................45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................20

*Carlson v. Xerox*,
392 F. Supp. 2d 267 (D. Conn. 2005)...............................................................................47

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001)..............................................................................................57

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)..........................................................................................................60

*Chapman v. Mueller Water Prods.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).............................................................................. *passim*

iv

*Chen v. Missfresh Ltd.*,
701 F. Supp. 3d 236 (S.D.N.Y. 2023)................................................................23, 31

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ........................................................45

*CITGO Petro. v. Ascot Underwriting*,
158 F.4th 368 (2d Cir. 2025) ................................................................................18

*City of Pontiac Gen. Emps. ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...................................................................53

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011)...........................................................40

*In re Computer Assocs. Sec. Litig.*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) ......................................................................41

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018).............................................................................................20

*In re DiDi Glob. Inc. Sec. Litig.*,
2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) .......................................................60

*Doe v. Uber Techs., Inc.*,
551 F. Supp. 3d 341 (S.D.N.Y. 2021)...................................................................26

*Doron Precision Sys. v. FAAC*,
423 F.Supp.2d 173 (S.D.N.Y. 2006).....................................................................19

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..................................................................................41

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015).......................................................................... *passim*

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................30

*Fain v. USA Techs*,
707 F. App'x 91 (3d Cir. 2017) ............................................................................46

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)....................................................................................4

*Fresno Cnty. Emps. Ret. Ass'n v. comScore*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................23, 24, 39

v

*In re Gentiva Sec. Litig.*,
　932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................................51

*Gimpel v. The Hain Celestial Group, Inc.*,
　156 F.4th 121 (2d Cir. 2025) .................................................................................. *passim*

*Glaser v. The9, Ltd.*,
　772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................................................46

*Herman & MacLean v. Huddleston*,
　459 U.S. 375 (1983)........................................................................................................20, 55

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
　818 F.3d 85 (2d Cir. 2016)....................................................................................................30

*Janbay v. Canadian Solar, Inc.*,
　2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .........................................................................50

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011)...............................................................................................................53

*Lentell v. Merrill Lynch & Co.*,
　396 F.3d 161 (2d Cir. 2005)...................................................................................................52

*Lewis v. M&T Bank*,
　2022 WL 775758 (2d Cir. Mar. 15, 2022)..............................................................................19

*Litwin v. Blackstone Grp., L.P.*,
　634 F.3d 706 (2d Cir. 2011)..............................................................................................20, 23

*Lorenzo v. S.E.C.*,
　587 U.S. 71 (2019).....................................................................................................52, 54, 55

*In re Lottery.com, Inc. Sec. Litig.*,
　715 F. Supp. 3d 506 (S.D.N.Y. 2024)....................................................................................26

*Lozada v. TaskUs, Inc.*,
　710 F. Supp. 3d 283, 328 (S.D.N.Y. 2024)............................................................................60

*Maher v. Global Factors LLC*,
　2024 WL 3356985 (S.D.N.Y. July 8, 2024) ..........................................................................59

*Matrixx Init. v. Siracusano*,
　563 U.S. 27 (2011)..................................................................................................................21

*Meyer v. Jinkosolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014).......................................................................................30, 31, 38

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................................38

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)...............................................................20, 21, 23

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................25, 33

*New Eng. Carp's Guar'd Annuity & Pension Funds v. DeCarlo*,
   122 F.4th 28 (2d Cir. 2024) ................................................................ *passim*

*N.J. Carptenters Health Fund v. Royal Bank of Scoland Grp.*,
   709 F.3d 109, 120–121 (2d Cir. 2013).............................................. *passim*

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................3, 43

*Omnicare v. Labor. Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................. *passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010).................................................................50, 51

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007).........................................................60

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................41

*Padilla v. Cnty. Health Sys., Inc.*,
   2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ....................................33

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012).................................................................28, 29

*Pappas v. Qutoutiao*,
   2024 WL 4588491 (2d Cir. Oct. 28, 2024)........................................21, 22

*Pension Tr. Fund For Operating Eng's v. Clarivate Plc*,
   2026 WL 866240 (E.D.N.Y. Mar. 30, 2026).............................................24

*Pinter v. Dahl*,
   486 U.S. 622 (1988)....................................................................................31

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ...............................................................52, 53

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..................................................................................35, 36, 37

*S.E.C. v. Penn*,
  225 F. Supp. 3d 225 (S.D.N.Y. 2016)...............................................................................55

*S.E.C. v. Rio Tinto plc*,
  41 F.4th 47, 52 (2d Cir. 2022) .....................................................................................52, 54

*S.E.C. v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020)................................................................................55

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).............................................................46, 47, 56

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024)...............................................................................43, 49

*In re Shanda Games Ltd. Sec. Litig.*,
  128 F.4th 26 (2d Cir. 2025) ..........................................................................................4, 60

*Sjunde AP Fonden v. Goldman Sachs Grp.*,
  798 F. Supp. 3d 416 (S.D.N.Y. 2025)..................................................................................44

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)........................................................................................37, 38

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008)...................................................................................................57, 58

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................................60

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)..............................................................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................................. *passim*

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..............................................................................................4, 20

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022)...............................................................................56, 58

*In re Ultrafem, Inc. Sec. Litig.*,
  91 F. Supp., 2d 679,690 (S.D.N.Y. 2000) .........................................................................22

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..................................................................52

*In re Weight Watchers Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)..................................................40

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)....................................................................32

*zCap Equity Fund LLC v. LuxUrban Hotels*,
    792 F. Supp. 3d 407 (S.D.N.Y. 2025)................................................. *passim*

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1 ............................................3

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)................................3, 32

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c)....................................38

Section 302 of the Sarbanes-Oxley Act, 15 U.S.C. §7241 .......................................................11, 42

Section 11 of the Securities Act, 15 U.S.C. § 77k................................................................ *passim*

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).................................................. *passim*

Section 15 of the Securities Act, 15 U.S.C. § 77o.......................................................................32

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b)...................................... *passim*

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) ..................................................58

Section 20A of the Securities Exchange Act, 15 U.S.C. § 78t-1.......................................3, 59, 60

**Rules and Regulations**

Fed. R. Civ. P. 8.................................................................................................... *passim*

Fed. R. Civ. P. 9(b) ..........................................................................................21, 53

Fed. R. Civ. P. 12(b)(6).........................................................................................8

SEC Item 303 of Regulation S-K, 17 C.F.R. § 229.303 .......................................................28, 29

SEC Item 601 of Regulation S-K, 17 C.F.R. § 229.601 ............................................................34

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................................................32, 59

SEC Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).........................................................52, 53, 55

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5(b)................................................................................52

SEC Rule 10b-5(c), 17 C.F.R. §240.10b-5(c)....................................................................52, 53, 55

**Other Authorities**

ASC 250.............................................................................................................................. *passim*

ASC 605..............................................................................................................................5, 25

ASC 606.............................................................................................................................. *passim*

## TABLE OF DEFINED TERMS AND ABBREVIATIONS

| Term | Definition |
|---|---|
| ASC | Accounting Standards Codification |
| CID | Civil Investigative Demand |
| CMS | The Centers for Medicare and Medicaid Services |
| Company | PACS Group, Inc. |
| Complaint | Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 63 |
| Conflicted Underwriter Defendants | Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Truist Securities, Inc., RBC Capital Markets, LLC, Regions Securities LLC, and KeyBanc Capital Markets Inc |
| COVID-19 Waiver or Waiver | Temporary suspension of the three-day hospital stay required for Part A SNF coverage under Section 1812(f) of the Social Security Act |
| DOJ | Department of Justice |
| FASB | Financial Accounting Standards Board |
| FE | Former Employee |
| Hindenburg Report | Hindenburg Research's "PACS Group: How to Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" |
| IPO Offering Documents | IPO Registration Statement and IPO Prospectus |
| Motions | Defendants' motions to dismiss and memoranda, ECF Nos. 82–85 |
| PACS | PACS Group, Inc. |
| PACS Br. | The PACS Defendants' Brief in support of their motion to dismiss, ECF No. 83 |
| PACS Defendants | PACS Group, Inc., Jason Murray, Derick Apt, Mark Hancock, Michelle Lewis, Jacqueline Millard, Taylor Leavitt, Evelyn Dilsaver, P.J. Sanford, and Joshua Jergensen |
| PACS Services | Providence Administrative Consulting Services, Inc. |
| RVP | Regional Vice President |
| Smith Declaration | Declaration of Colleen C. Smith, ECF No. 88 |
| SNF | Skilled Nursing Facility |
| SOX | The Sarbanes-Oxley Act of 2002 |
| SPO Offering Documents | SPO Registration Statement and SPO Prospectus |
| Underwriter Defendants | Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Truist Securities, Inc., RBC Capital Markets, LLC, Goldman Sachs & Co. LLC, Stephens Inc., KeyBanc Capital Markets Inc., Oppenheimer & Co. Inc., UBS Securities LLC, and Regions Securities LLC |
| UW Br. | The Underwriter Defendants' Brief in support of their motion to dismiss, ECF No. 85 |

xi

## I.    PRELIMINARY STATEMENT

When PACS restated its newly public financials, it was not a typical restatement, though Defendants' Motions pretend otherwise.[1] Rather than face the Complaint as pled, Defendants offer attorney-invented facts, and worse, attorney-invented law. Thus, the Motions must be denied.

For example, the Motions in 60 pages contain no mention of ASC 250, the rule for when restatements are required and stated basis for the Restatement here. ASC 250 is central to the Complaint (cited 35 times) because it conveys much about what was happening at PACS, and when. The Restatement's admission of material "Medicare Part B billing uncertainties" about recognizing revenue "from billings for such services" (¶148) necessarily also meant, in the words of ASC 250, that those uncertainties "existed at the time the financial statements were prepared," otherwise, no restatement would be required. ¶259.

The combination of ASC 250 and "uncertainties" is unusually revealing. When combined with the fact that Defendants PACS, CEO Murray, and CFO Apt were preparing the later-restated financials by March 31, 2024, it anchors their material "uncertainties" in time ***before the IPO*** and becomes inculpatory. As pled, recognizing revenue despite material "Medicare Part B billing uncertainties," then restating it per ASC 250, was an "admission that Defendants PACS, Apt, and Murray had uncertainty about PACS's revenue recognition by March 31, 2024 at the latest, but ignored it, and concealed it" until the Restatement. ¶¶259–62. The Motions ***ignore*** these key allegations and thus concede materiality, falsity, scheme, and scienter.

Additional facts make this case even more straightforward. Defendants PACS, Apt, and Murray concealed "Medicare Part B billing uncertainties" ***all Class Period long***, rather than do

---

[1] Capitalized terms are defined in the Table of Defined Terms and Abbreviations and in the Complaint. Citations denoted "¶" are to paragraphs in the Complaint. Unless otherwise indicated, all emphasis is added and all internal quotations marks and citations are omitted.

what reasonable investors expect: conduct a meaningful inquiry to investigate and address uncertain billing before recognizing it as revenue. While concealing that, PACS conducted two public offerings (the IPO and SPO) for the billion-dollar benefit of insider-selling co-founder Defendants and PACS itself, creating extraordinary motive for wrongdoing. The SPO included later-restated financials, which alone suffices for Securities Act liability. Moreover, the restated amounts turned a PACS that appeared quite profitable into one that was not (another point the Motions concede). Ultimately, PACS's share price dramatically collapsed on multiple dates causally related to the alleged wrongdoing (three of which the Motions also concede).

This conceded connection between alleged wrongdoing and investor losses eliminated so much inflated value that PACS's stock took more than a year to reclaim its offering prices. PACS needed that year for an internal investigation to address company-wide misconduct, resolve uncertainties, overhaul materially weak internal controls, and fire key officers, including the CFO, among other efforts—precisely the meaningful inquiry not done for the Offerings—to address Defendants' long list of violations in PACS's short public history. PACS's Motion often mentions its current stock price, but in this context, it is no defense. That is the value of meaningful inquiry.

Altogether, the Complaint pleads three categories of violations. *First*, the material misstatements and omissions in the Offering Documents, including now-restated financials in the SPO Offering Documents, violated the strict liability provisions of Securities Act Sections 11 and 12(a)(2) under any pleading standard, though Rule 8 applies. *Second*, the PACS Defendants' false and misleading statements and deceptive course of business served no legitimate or conceivable purpose except to inflate PACS's revenue, profit, and stock. Combined with the Restatement's admission that "uncertainties" were knowingly concealed and the suspicious unloading of significant stock, *inter alia*, the Complaint also pleads violations of Exchange Act Sections 10(b)

and 20A. *Third*, some Defendants also face control person liability for these violations.

## II.    LEGAL STANDARDS

### A.    Facts at the Pleading Stage

The Complaint's facts are true for the purpose of evaluating the Motions. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). PACS supposes this rule does not apply to facts based on former employees or short sellers in a securities action. PACS Br. at 17. Not so; *Tellabs* itself was a securities action. While facts from anonymous sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," the Complaint does so. *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000). Moreover, this PSLRA-based requirement applies **only** to Exchange Act **misstatement** claims. *Id.* at 313–14.[2] It does not apply to Securities Act claims, or to **non-statement** stock schemes and insider trading claims under the Exchange Act.[3]

Insofar as all facts are adequately pled under even the highest standard, such parsing becomes unnecessary. The Complaint sufficiently alleges each FE's basis for their accounts. *E.g.*, ¶¶98–108. The Hindenburg Report also credibly supplies its bases (¶¶235–36, 563) and independently corroborates the Complaint's FEs. For many allegations, the Restatement itself corroborates FEs' and Hindenburg's accounts. *E.g.*, ¶¶130–31, 154, 232–33. Should the Court still find a fact lacks adequate basis, it may be disregarded **only** for the 31 Exchange Act misstatements (*see* Fatale Decl. Ex. A) and not for any of the Complaint's other claims.

### B.    Facts and Opinions Under Recent Second Circuit Law

A fact is "a thing done or existing or an actual happening," while an opinion is "a belief, a

---

[2] The PLSRA sets a heightened particularity requirement only for "[m]isleading statements and omissions . . . arising under this chapter" of the Exchange Act. 15 U.S.C. § 78u-4(b)(1).

[3] There is no parallel heightened standard in the Securities Act or for Exchange Act scheme (non-statement) claims. *See* 15 U.S.C. § 78u-4(b); 15 U.S.C. § 77z-1; *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp. ("RBS")*, 709 F.3d 109, 120–121 (2d Cir. 2013) (holding Securities Act claims are subject to Rule 8).

view, or a sentiment which the mind forms." *Omnicare v. Labor. Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). A fact "expresses certainty;" an opinion does not. *Id.*[4] *Omnicare* "altered" the Second Circuit's standard for opinions and expanded "liability for making a false statement of opinion" where: (1) "the speaker did not hold the belief she professed" or (2) "the supporting fact she supplied were untrue" or (3) "the speaker omits information . . . mak[ing] the statement misleading." *Tongue v. Sanofi*, 816 F.3d 199, 209, 214 (2d Cir. 2016) (recognizing *Omnicare* supplanted *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)).

Three recent Second Circuit decisions interpret *Omnicare*'s categories. The Motions ignore two of these decisions,[5] relegate the third to an incorrect footnote,[6] and tends to cite older district court decisions, *Fait,* and other inapplicable cases instead. PACS Br. at 22–24, 26–30. Following the three decisions, *Omnicare*'s three paths are now better lit. First, an opinion misleads if the speaker "did not believe [it] to be accurate," such as management projecting low revenue for an asset despite calling it "a massive success" and its internal testing "fabulous." *Shanda Games*, 128 F.4th at 46. Second:

> A statement structured, "I believe that x is so because y has occurred," contains the factual and falsifiable statement, "y has occurred." If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete "statement of a material fact" . . . can be proven false [or misleading].

*Abramson*, 965 F.3d at 175. For example, projections described as "reasonable" and reflecting "best available estimates" were misleading opinions "when the method used to . . . prepar[e] the estimates violated basic and accepted accounting principles." *Shanda Games*, 128 F.4th at 44–45.

---

[4] Opinions often include qualifying language ("I believe" or "I think") that "conveys a lack of certainty about the thing being expressed, [and] marks the statement as reflecting the speaker's impression or point of view rather than an objective truth" *New Eng. Carp's Guar'd Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40–41 (2d Cir. 2024).
[5] The Motions do not cite *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) or *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 46 (2d Cir. 2025).
[6] PACS Br. at 28 n.5 (purporting to distinguish *DeCarlo*, a case directly on point, as discussed below).

The third category, where an opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement," *Omnicare*, 575 U.S. at 189, has received the most clarification. In *Abramson*, the Second Circuit distilled it: "plaintiffs can allege that a statement of opinion . . . implied facts that can be proven false." 965 F.3d at 175. *DeCarlo* then applied this test to AmTrust's restated financial statements—defended as opinions—finding two groups of statements actionable. 122 F.4th at 45–47. First were statements related to how AmTrust recognized revenue for "extended warranty contracts" under "ASC 605," defended as "inherently subjective" opinions and "a quintessential question of judgment" (despite restating them). *Id*. at 43–44. These were actionable because ASC 605 permitted such judgment "only if some historical evidence justified doing so," hence implied the existence of such evidence, even though "there was in fact no[ne]." *Id.* at 45. Second, restated financial statements based on expensing bonuses in the year paid rather than earned—also defended as "subjective judgment"—were actionable because "there was no basis" for such treatment, hence the financial statements were not based on the meaningful inquiry such statements imply, and did not "fairly align[] with the information in the issuer's possession at the time." *Id.* at 46.

Thus, the Second Circuit has held that "subjective judgment" is neither the beginning nor the end of the inquiry. What matters is what the statement implied, and in the precise context of a restated financial statement, that means whether the original financial statement was based on meaningful inquiry or fairly aligned with information in ***the company's*** possession (not a particular speaker's possession) at the time. The Motions disregard this recent law at their peril.

## III.    SUBSTANTIVE ALLEGATIONS OF FACT

### A.    Overview of PACS's Business

Murray and Hancock founded PACS in 2013 and began acquiring "underperforming"

SNFs, claiming to transform them into better businesses. ¶¶89–90. Contrary to PACS's claim now that it lets "each facility operate[] independently" (PACS Br. at 5–6), PACS controlled its SNFs (¶¶201–33) with top-down directives across its regions, enforced by RVPs. ¶¶138, 140, 150, 154, 166, 191.

PACS's main operating subsidiary, PACS Services, centrally operates PACS's main office in Utah with each PACS Defendant. ¶91. It was the hub connecting PACS leadership to SNFs through RVPs, who reported directly to PACS Services President Sanford, who in turn reported directly to Hancock and Murray. ¶¶91, 112, 138, 140, 549; *contra* PACS Br. at 32 (disputing RVP reporting, but not Sanford's reporting); ¶205 (Annual Report described PACS's RVPs as connecting Sanford's "PACS Services" to "our facilities"). PACS Services is how "PACS's central leadership controlled all SNFs." ¶214. The C-suite issued, and Sanford's RVPs implemented, top-down directives on SNF administrators. ¶¶205–13. FE-10, an Arizona administrator until July 2024, reported that PACS "presidents" (Sanford's title) "encouraged improper documentation to be submitted to Medicare to increase revenue, even if the service was not provided to the patient" (¶208); he received emails from Apt "highlighting which facilities needed to improve their revenue" (¶210); and he was pressured by "C-suite executives in person in Utah . . . to focus on billing Medicare Part B to increase revenue" after PACS went public. *Id*. He "had direct contact with C-suite executives if his facility was not meeting its 'targets'" (¶209), disproving Defendants' claim that no FE "had a conversation with any of the PACS Defendants." PACS Br. at 4, 32. Similarly, FE-2 and FE-7—who oversaw many SNFs in different regions (¶¶99, 104)— corroborated how central leadership deployed RVPs to implement directives. ¶¶207, 211.

PACS had a "policy of firing employees who disagreed with its improper directives" (¶233), independently corroborated by multiple FEs and the Hindenburg Report. *See* ¶¶122, 142,

6

212, 224–33. The Restatement confirmed "'we did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues received through the hotline process,' *i.e.*, by employees reporting such compliance issues up the chain . . . prior to the IPO." ¶232. Instead of listening to employees who reported misconduct, PACS fired them and replaced them with employees who would "run its SNFs with fewer compunctions." ¶¶ 232, 176.

Because it often was PACS's licensed employees who objected and were fired, PACS developed tricks to skirt state licensing requirements. *See* ¶¶176–91, 224–33. States "require SNFs to be run by licensed administrators," so after PACS fired them, it would "fool regulators" by "hanging" the license of an administrator in another state to cover unlicensed SNFs. ¶176; *see* ¶¶177–91. Overall, "FE-2, FE-6, FE-10, FE-5, and the Hindenburg Report independently corroborate" this "top-down effort . . . across the Company" to have unlicensed employees unscrupulously implement PACS's various schemes throughout the Class Period. ¶¶176–91.

PACS favored this policy over a materially strong internal "hotline" control, showing "both the PACS Defendants' knowledge of wrongdoing being protested, and culpable mental state by being involved with covering it up." ¶610. Neither Motion addresses PACS's hotline dysfunction, in place by "March 30, 2024 at the latest" (¶232), conceding it lasted all Class Period.

### B.     PACS's Medicare Part A Scheme During the COVID-19 Pandemic

PACS was still private when COVID-19 hit, a crisis it exploited. CMS announced the COVID-19 Waiver, allowing Medicare Part A to cover SNF care in COVID emergencies without patients first needing to spend three days in a hospital. ¶¶11, 109. From March 1, 2020 through May 11, 2023, PACS would "regularly and improperly rely on insufficient justifications—often just a single positive COVID test—to flip an entire facility from Medicaid to Medicare, improperly increasing the revenue line of that facility by as much as a factor of three at an extremely high

profit margin." ¶119. The FEs observed this practice Company-wide, and the Hindenburg Report corroborated it. ¶¶121–27. PACS's SNFs increased skilled care Medicare revenue by 190% during the pandemic versus just 23% for a comparable competitor. ¶127. The Restatement disclosed that PACS received a CID and subpoena from DOJ about "submitting false claims to Medicare for reimbursement under the COVID-19 related Hospital Stay Waiver." ¶264.

PACS's own financial data hit a chasm when the Waiver ended. Over 2023, its quarterly Medicare revenue declined from ~$340 million in Q1 (before the Waiver ended), to ~$317 million in Q2 (when it tapered off), to only ~$271.8 million in each of Q3 and Q4 (without the Waiver)[7]— yet PACS never disclosed that its overuse of the Waiver contributed. ¶¶128–29. PACS derived at least $68 million per quarter from this scheme ($274 million annually), and likely closer to $90 million after removing the revenue boosting effects of newly acquired SNFs. ¶¶126, 128. The Company's operating income in 2023 was only $207 million (and $229 million in 2022); thus, PACS would not have been profitable in 2022 or 2023 without its exploitation of the Waiver. ¶129.

Defendants claim that their internal investigation concluded no restatement was required for Waiver revenue (PACS Br. at 10), but the Restatement *did not say so*. It never mentions the Waiver scheme except when summarizing this Action and DOJ's ongoing inquests. *See generally* Ex. 12 & at 67–68. The Motions cite no facts showing that PACS's internal investigation *even looked into* the Waiver allegations.[8] As pled, PACS abused the Waiver and overbilled Medicare Part A by hundreds of millions of dollars, an extent that exceeded its profit. ¶¶117–29.

---

[7] The $271.8 million number is derived mathematically by taking the Company-disclosed revenues of "$1,200,801[,000]" from Medicare in 2023, minus "657,287[,000]" from Medicare for the "Six Months Ended June 30" of 2023, to calculate $543,514,000 for second half of that year, and then dividing that by two to approximate the third and fourth quarters as about $271,757,000 each. *See* Smith Decl. Ex.4 at F-17 & F-49.

[8] It is implausible that PACS would have exonerated itself without ever mentioning it until *a brief*. The Restatement's silence more plausibly suggests the investigation did *not* support PACS's innocence. *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007) (on 12(b)(6) motions, courts "draw[] all reasonable inferences in the plaintiff's favor").

8

C. **By Q1 2024, Pre-IPO, PACS Had Begun its Medicare Part B Billing Scheme**

The COVID-19 Waiver ended on May 11, 2023, and PACS's ability to improperly boost revenue and report any profit disappeared with it. ¶111. PACS needed a new way to artificially inflate revenue and return to seeming profitability before an IPO, and Medicare Part B was its next trick. *Id.* The Restatement admitted that PACS was over-billing Medicare B for respiratory, sensory, and other therapies by at least $14.9 million in Q1 2024 pre-IPO, and by at least $46.1 million in Q2 2024, totaling at least $61 million pre-SPO. These proceeds exceed the Company's reported profit of $38.2 million for the same six-month period. ¶¶130–31.

The Complaint's FE accounts and the Hindenburg Report independently corroborate this scheme. PACS employees had no medical or other legitimate justification to perform unnecessary therapies—precisely why PACS had to restate such revenue—hence, the only conceivable reason for this conduct was that PACS leadership required it, to regain the appearance of profitability for the IPO and SPO. ¶¶116; 597. The only people who stood to gain were primarily PACS, Murray, and Hancock (due to insider sales, ¶¶535–45), and also Apt, Jergensen, and Sanford (¶¶612–16). The Motions offer no alternate motivations, and as pled, none existed. ¶625.

1. **The Restatement Showed the Medicare B Scheme Was Company-Wide, Already Material Pre-IPO, and Accelerating for the SPO**

Following an internal investigation, PACS issued its Restatement admitting that due to "Medicare Part B billing uncertainties," certain revenue should not have been recognized pre-IPO under "ASC 606." ¶254; *see* Fatale Decl. Ex. C. It identified "ASC 250" as the rule requiring restatement, which applies to errors based on "facts that existed ***at the time the financial statements were prepared***." ¶259; *see* Fatale Decl. Ex. B.

The Restatement reversed $14.9 million in Medicare B revenue for Q1 2024 and $61 million for the first half. ¶130. It disclosed that PACS had concealed material and growing refund

9

liabilities[9] of $3.9 million for Q1 and $30.6 million for the first half. ¶265. Because ASC 250 required these revelations, the at least $14.9 million of overbilling and $3.9 million in refund liability "existed at the time the financial statements were prepared," by March 31, 2024, ***before the IPO***, hence were concealed all Class Period long. ¶259. Similarly, the $61 million in Medicare B overbilling came with a surprise $30.6 million in material refund liabilities that existed by June 30, 2024, ***before PACS announced financial results it later restated*** (mid-August) ***and before the September SPO***. Thus, the Restatement admitted that Medicare B overbilling was materially underway before the April 11, 2024 IPO, and accelerating up to the SPO.

Importantly, this $61 million exceeded the Company's $38.2 million profit over the same pre-SPO period, hence PACS would not have been profitable at this key time without the Medicare B scheme. ¶¶130–31. Going back to August 12, 2024, when PACS announced it achieved management's profitability guidance for the quarter leading up to the SPO, the Restatement later revealed PACS actually failed to meet that guidance. ¶132. As a result, the scheme conveniently avoided a significant hit both to profitability and management's credibility ***right before the SPO***. *Id*. The Motions do not dispute these facts. Instead, they irrelevantly remark four times that only "3.2%" of revenue was restated—neglecting that this exceeded all reported profit and ignoring that immaterial matters need not be restated. PACS Br. at 2, 11, 14, and 15.

### 2.    The Restatement Admitted Materially Weak Internal Controls

The Restatement also concluded that "we did not design and maintain an effective internal control environment commensurate with the financial reporting requirements of a public company." ¶254. It found two material weaknesses. First, PACS's "compliance . . . hotline" was ineffective. ¶256. Second, its "controls within the revenue process" were not "adequate . . . to

---

[9] A refund liability is a financial statement line item that measures cash PACS received for Medicare B therapies but expected to return to Medicare, making them objectively improper to recognize as revenue. ¶258.

appropriately recognize revenue for new services in accordance with [ASC] 606." ¶257. These materially weak internal controls preexisted the IPO, making the Restatement precisely not the result of hindsight, new facts, or changed circumstances. ¶¶254, 259. The Motions strive to improperly contradict these facts by insisting that the Restatement was required because reasonable opinions changed (e.g., PACS Br. at 11, 26, 29–31; UW Br. at 2–3), but if this was only a matter of differing opinions and not "facts that existed at the time the financial statements were prepared" (per ASC 250), then there would have been no required restatement. ¶259.

Putting together ASC 250 with the "Medicare Part B billing uncertainties" and two material weaknesses in internal controls, the Restatement amounted to a momentous concession: these facts all "existed at the time the financial statements were prepared," hence March 31, 2024, at the latest. ¶¶259–60. The act of recognizing revenue despite having "uncertainties" about it "at the time" is not only a fact, but also a mental state: the preparers of PACS's financial statements were "uncertain about every dollar of the [$14.9 and] $61 million being recognized" as of "March 31, 2024" and continuing throughout the Class Period. ¶261. This uncertain state of mind attached to Defendants Apt and Murray, who prepared the erroneous financial statements and certified them twice under SOX Section 302, as well as Defendant PACS itself. ¶261. All three "had uncertainty about PACS's revenue recognition" all along but "ignored it, and concealed it from the April IPO and everything thereafter." ¶262. The PACS Motion does not address these well-pled facts.

### 3.    PACS FEs and Hindenburg Corroborate and Detail Wrongdoing

Apart from the Restatement, the Complaint pleads additional facts from the credible Hindenburg Report and contemporaneous FEs that corroborate and detail this scheme.

***Overbilling Medicare B for Respiratory Therapy.*** "FE-9, FE-3, FE-5, FE-1, FE-6, the Hindenburg Report, and the . . . Restatement independently corroborate that PACS centrally implemented a top-down effort to improperly bill Medicare B for unnecessary respiratory therapies

11

across the Company." ¶¶133–50. Multiple FEs described coordinated meetings across Arizona, Colorado, and California (containing more than half of PACS's SNFs) where PACS sent personnel to instruct Administrators how to overbill and evade detection. FE-10, a PACS Arizona administrator from pre-IPO to July 2024 (¶107), recalled a virtual "respiratory training" about specific strategies to overbill Medicare for such therapies even when "***not actually performed***." ¶137. FE-5, an Interim Executive Director at a PACS SNF in Colorado from pre-IPO to October 2024 who filled vacant administrator roles in multiple SNFs (¶102) attended a four-hour, state-wide, in-person lecture in May 2024 led by California Administrator Jona Ashcroft, whom PACS flew to Colorado to teach how to increase respiratory therapy billing using specific codes to exceed regulatory caps yet pass audits. ¶139; *see also* ¶¶134–36 ("video conference[]" training with billing "quotas" and "spreadsheets" per FE-3). The Hindenburg Report similarly described "widespread, top-down directive[s] to perform unnecessary respiratory therapies . . . on thousands of patients, regardless of clinical need or outcomes." ¶¶146–47. These coordinated efforts across large regions in a fully controlled Company support an inference of centrally directed wrongdoing. ¶140.

*Overbilling Medicare B for Sensory Therapy.* Like the Restatement, FE-10 and the Hindenburg Report independently described similar "top-down" misconduct with "unnecessary ***sensory*** therapies across the Company to inflate revenue, profits, and PACS's share price throughout the Class Period." ¶¶151–54; *see also* ¶114.

*Census-Maximizing.* Four FEs detailed how "PACS centrally implemented a top-down effort to increase its number of patients across the Company for nonmedical reasons but rather to inflate revenue, profits, and PACS's share price," including tricks to extend patient stays like giving them "Frappuccinos" to spike blood sugar and a process called "regeneration," or sending patients to hospitals with "no legitimate reason," to reset their Medicare coverage. ¶¶155–66.

12

These practices became known internally as "keeping heads in beds." ¶158.

*Falsification of Records*. "FE-2, FE-1, FE-10, [and] FE-9 independently corroborate that PACS management demanded that employees falsify records and engage in other deceptive billing practices across the Company." ¶¶167–73. FE-10, in Arizona, described being taught to document treatments "not performed at all" (¶170); FE-9 in California described administrators like him being coached to bill respiratory and sensory therapy twice a day using overlapping codes (¶171); Hindenburg quoted a former regional-level PACS clinical leader reporting that management instructed him "whatever you need to do to get these numbers and get this filled out, do it." ¶147.

### D.      April 2024: PACS Conducts Its IPO at $21 per Share

By the end of Q1 2024, PACS was still owned outright by Murray and Hancock, 50%–50%. While the Medicare B misconduct was underway to the extent of at least $14.9 million, and while Murray, Apt, and PACS concealed material uncertainties about recognizing such revenue, PACS raised hundreds of millions of dollars from public investors to pay off the Underwriter Defendants and enrich its founders with an IPO on April 11, 2024. It occurred just three days after PACS, PACS Services, and a PACS SNF received a DOJ CID into whether they "'violated the False Claims Act by submitting false claims to Medicare.'" ¶¶264(a), 434.

The April 8, 2024 CID was significant. PACS attempts to minimize it as pertaining only to a single facility and unrelated misconduct.  PACS Br. at 39. However, it inquired whether the facility *and PACS Services* "submitt[ed] false claims to Medicare"—the very conduct at the heart of this litigation. ¶264(a). And PACS Services was the headquarters-housing "hub" Sanford ran. ¶¶91, 205, 549. As pled, Sanford knew of the CID by April 8, 2024, being both President of PACS Services and former administrator of the facility it mentioned. ¶539. Because Sanford reported directly to Hancock and Murray, it is more than plausible that the highest levels of PACS leadership knew of the DOJ's investigation before a single IPO share was sold.

13

Three days later, Murray and Hancock caused PACS to register and sell to the public 21,428,572 shares, plus 3,214,284 of their own shares, at $21.00 each. ¶¶651–52. They essentially gifted more than 21 million shares to the Company to use 89% or "$371.4 million of the net proceeds . . . to repay amounts outstanding under our Amended and Restated 2023 Credit Facility," the creditors of which were the six Conflicted Underwriter Defendants—effectively funneling hundreds of millions of dollars to them. ¶18 & n.4. This value was in addition to the $31 million in fees and underwriter discounts that all the Underwriter Defendants split. ¶73. The IPO yielded proceeds of $450 million to PACS and $67.5 million to Murray and Hancock. ¶¶651–52.

Adding in the other allegations at the time: Defendants Murray, Apt, and PACS were the uncertain parties; Defendants PACS and Sanford had already received DOJ's CID; and insider sales gave Murray and Hancock extraordinary motive. Based on these additional facts, six fraudulent IPO statements also violated the Exchange Act. ¶¶384–410 (Misstatement Nos. 1–6).

Once PACS went public, any deceptive conduct with no purpose other than to artificially inflate PACS's share price violated the Exchange Act's prohibitions on schemes, including disseminating fraudulent statements (¶¶588–90), billing tactics to create the false appearance of higher revenue and any profitability (¶¶591–95), and implementing a fraudulent business model that used PACS's SNFs as vehicles to overbill Medicare (¶¶596–602). Nonspeaking acts included every unnecessary respiratory therapy (¶593), every falsified document facilitating reimbursement or avoiding detection (¶594), and every threat of termination (¶610) throughout the Class Period. *See also* ¶¶619–26 (pleading facts connecting such misconduct to the purchase/sale of securities, an element the Motions concede). As pled, neither the IPO nor SPO would have been possible at the times and prices at which they occurred without these schemes. ¶¶603–05, 633–36.

E.      **April – August 2024: PACS's First Five Months as a Public Company**

According to the Restatement, PACS's Medicare overbilling continued and accelerated

14

following the IPO. Over three months, refund liabilities swelled to $30.6 million (from $3.9 million), revenue was now being overstated by $61 million—exceeding stated profit of only $38.2 million for the same period—and no inquiry addressed the "uncertainties." ¶¶258, 285–86.

In May of 2024, PACS filed its first Form 10-Q with the SEC, issued its first earnings press release, and held its first earnings call. These announced Q1 2024 financial results, including what PACS later restated, and eight other misstatements. ¶¶411–58 (Misstatement Nos. 7–16).

In August of 2024, PACS continued with its next Form 10-Q, earnings press release, and earnings call for Q2 2024 financial results, including more later-restated financials and seven other misstatements. ¶¶459–502 (Misstatement Nos. 17–25). Meanwhile, PACS's refund liabilities continued accelerating toward reaching a staggering $84 million by September. ¶265.

**F.      September 2024: PACS Conducts Its SPO at $36.25 per Share**

In September 2024, less than five months after the IPO, Murray and Hancock requested and received special permission from the Underwriter Defendants to sell more stock in an SPO by obtaining a waiver of the six-month post-IPO lockup period. ¶538. Thus, on September 6, 2024, PACS's SPO registered another 19,034,482 shares and sold them to the investing public at $36.25 per share. ¶35. Most of the shares (16,256,704) were from Murray's and Hancock's personal holdings for gross proceeds exceeding $589 million. ¶656. They gifted the remainder (2,777,778 shares) for the Company to sell (¶655), for gross proceeds over $100 million, of which it immediately routed approximately $96 million back to the Conflicted Underwriter Defendants by again paying down the same credit facility. ¶657. Such value was in addition to the $29 million in fees and underwriter discounts that all the SPO Underwriter Defendants split. ¶74.

The SPO Offering Documents were negligently prepared for the same reasons as before, and further violated the Securities Act for an additional reason: they now contained precisely the false financial statements that PACS later had to materially restate. As with the IPO, the SPO

15

Offering Documents repeated six fraudulent statements. ¶¶503–29 (Misstatement Nos. 26–31).

### G.     November – December 2024: PACS's Wrongdoing Causes Investor Losses

The truth about PACS's fraudulent billing and inflated financial condition first began to emerge on *November 4, 2024*, when short-seller Hindenburg Research published the Hindenburg Report. Hindenburg's five-month investigation, including FE interviews and objective forensic analysis of PACS's financial disclosures, 900 facility-level cost reports, and public Medicare data, revealed that PACS's business model relied on pervasive, undisclosed fraud. ¶563.

Its revelations included that PACS had artificially inflated its revenues and profits by: (i) abusing the COVID-19 Waiver to improperly convert entire buildings to Medicare Part A coverage; and (ii) fraudulently billing thousands of unnecessary respiratory and sensory therapy services to Medicare Part B regardless of clinical need. ¶564. Investors reacted immediately: PACS's stock price fell 27.78% that day, from $42.94 to $31.01, on unusually heavy trading volume. Analysts withdrew recommendations and flagged Hindenburg's allegations as serious and credible. ¶565. The Motions do not dispute that the Complaint adequately pleads that the alleged fraud, including Misstatement Nos. 1–31, caused investor losses on November 4, 2024.

Investors spent *November 5* evaluating the credibility and implications of the Hindenburg Report. ¶567. Most significant was the total absence of any denial by PACS, skepticism by stock analysts, or refutation by anyone of any facts from the Hindenburg Report—*i.e.*, the typical responses expected after a short report. ¶568. Instead, "not a single stock analyst following PACS issued a report defending PACS or discrediting the Hindenburg Report," which communicated to the market that the Report was uncommonly credible and meritorious, that analysts did not believe PACS's stock decline was an overreaction, and that no analyst would publish a refutation. *Id.*

An analyst affiliated with Defendant Underwriter Truist (PACS's own underwriter and major creditor) reported that PACS's share price decline was due to "the bear thesis suggesting

16

utilization of COVID-waivers . . . were used to drive higher Medicare revenue / reimbursement, unnecessary care in respiratory/sensory integration therapy and issues around staffing." ¶246. The PACS Motion claims this report contained no new information (PACS Br. at 28), missing the well-pled importance of the news that no analysts defended the Company, and that PACS itself did not refute or even deny the Hindenburg Report's facts, adding unusual credibility to it.

On November 5, 2024, PACS's stock price declined another 4.74%, to $29.54 per share, on heavy volume. ¶566. It was a direct and foreseeable result of PACS's concealed wrongdoing that stock analysts would eventually learn about it and not defend the Company. ¶568.

On *November 6, 2024*, Defendants PACS, Murray, and Apt themselves corroborated core allegations of the Hindenburg Report, both by failing to refute them and by supplying new, corrective information. ¶569. Murray announced: PACS was postponing its Q3 2024 earnings release and investor call; its Audit Committee, assisted by external counsel, had launched an investigation; PACS had received *multiple* federal CIDs concerning its "reimbursement and referral practices," which "may be" related to Hindenburg's allegations; and he and management viewed the Hindenburg Report's content as "misleading," as opposed to false. *Id.* The market reacted sharply: PACS's stock fell another 38.76%, from $29.54 to $18.09 per share, on extremely heavy trading volume. ¶571. Analysts described the news of multiple federal investigations as a "surprise" that materially increased PACS's regulatory risk. UBS placed its rating and price target "Under Review," citing PACS's failure to substantively respond. *Id.*; *see also* ¶¶249–50 (analyst reactions). The Motions do not dispute that the Complaint adequately pleads that the alleged fraud, including Misstatement Nos. 1–31, caused investor losses on November 6, 2024.

On *December 17, 2024*, an analyst affiliated with Defendant J.P. Morgan (PACS's own underwriter and major creditor) downgraded PACS's stock. ¶572. Among the report's reasons

17

were "overhang" from the federal investigations and PACS's continued inability to provide clarity

regarding the allegations. *Id.* It added that the pending federal inquiry created material uncertainty

regarding PACS's Medicare billing practices, compliance structure, and sustainability of earnings,

confirming the Hindenburg Report posed long-term financial and regulatory consequences. ¶573.

In response, PACS's stock price fell 8.1%, or $1.23, closing at $13.95 per share that day,

on unusually heavy trading volume. ¶575. As alleged, it was "a direct and foreseeable result of

PACS's wrongdoing that stock analysts would learn about it and downgrade PACS's stock rating."

¶574. Defendants want this Court to judicially notice that this report contained no new information,

PACS Br. at 5 n.1, 29 (not even supplying the report as an exhibit), missing both the allegation

that J.P. Morgan's report added credibility to the Hindenburg Report, and that it was a foreseeable

result of PACS's wrongdoing materializing that day in any event.

### H.    Post-Class Period Developments

PACS's internal investigation continued for more than a year, and the PACS Motion adds

that it was "costly." PACS Br. at 4. In addition to the Restatement, there were two other important

developments: PACS fired Defendants Sanford and Apt. On August 15, 2025, PACS announced

Sanford's immediate resignation. ¶252. Then on September 8, 2025, PACS abruptly announced

that Apt resigned at the Board's request as part of the investigation, including a finding that he

violated PACS's Code of Conduct by receiving high-value items. ¶253.

## IV.    ARGUMENT

### A.    Defendants Abuse Judicial Notice, Especially with Exhibits 6 and 12

The Smith Declaration lists sixteen exhibits for judicial notice. PACS Br. at 5 n.1. Exhibit

6 should not be noticed at all, and the remaining exhibits' contents must not be accepted as true.

"Under Federal Rule of Evidence 201(b), a court may take judicial notice of a fact that is

not subject to reasonable dispute." *CITGO Petro. v. Ascot Underwriting*, 158 F.4th 368, 387–88

18

(2d Cir. 2025). "[C]aution must be used in determining that a fact is beyond controversy." *Id.* Websites whose "authenticity is [] in dispute" or not "capable of accurate and ready determination" are not noticeable. *Doron Precision Sys. v. FAAC*, 423 F.Supp.2d 173, 179 n.8 (S.D.N.Y. 2006).

The Complaint does not reference Ex. 6, an article whose authenticity is not "capable of accurate and ready determination." *Id*. Its biased source, Skilled Nursing News, is owned by a company[10] focused on "influenc[ing] key decision-makers and industry experts."[11] The article discusses nursing homes generally, not PACS, and Defendants improperly rely on it to prove how much the COVID-19 Waiver's expiration impacted PACS's profit margins. PACS Br. at 7, 13; *but see* ¶¶127–28 (impact on PACS exceeded industry as a whole). Such use is inappropriate.

For the other exhibits, when courts judicially notice public documents, "they must do so to determine what statements [the documents] contained" and "not for the truth of the matters asserted." *Lewis v. M&T Bank*, 2022 WL 775758, at *1 (2d Cir. Mar. 15, 2022). The Court should not accept as facts Defendants' arguments interpreting their exhibits. *See id*. Noticing SEC filings (Exs. 3, 4, 7, 9, 12, 13, and 15) can show only that their contents were public. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 240 (S.D.N.Y. 2023) (Liman, J.). Defendants impermissibly offer Ex. 3—the IPO Prospectus—to assert (in the words of the brief) that they "disclosed negative *effects* stemming from the [COVID-19 Waiver] expiration" in a risk factor that only divulged (in the words of Ex. 3) hypothetical "*risk[s]* of noncompliance." PACS Br. at 7. They are not entitled to judicial notice that a disclosure of risk equaled disclosure of negative effects, particularly where the Complaint alleges specific materialized, negative effects of the expiration, including loss of profitability, remained concealed. *See* ¶¶302, 394, 431, 479, 513.

Also improperly, Defendants say Ex. 12 (PACS's post-Class-Period Annual Report) merits

---

[10] *About Skilled Nursing News*, SKILLED NURSING NEWS, https://skillednursingnews.com/about/ (Fatale Decl. Ex. D).
[11] *See About Us*, WTWH MEDIA, https://www.wtwhmedia.com/about-us/ (Fatale Decl. Ex. E).

judicial notice that PACS's controversial respiratory and sensory therapies gave patients concrete health benefits. PACS Br. at 7. Yet the allegation is that such services were either not performed or not medically appropriate. ¶¶137, 143–44, 146, 168. Defendants also offer Exhibit 12 for another improper purpose: to have the Court judicially notice their reading of DOJ's April 8, 2024 CID as being unrelated to Hindenburg's revelations over the Complaint's reading, which is more detailed. *Compare* PACS Br. at 39 *with* ¶533 & n.23. Defendants' citations to other SEC filings are similarly inappropriate. *See, e.g.*, PACS Br. at 25–26 (Exs. 9 and 15), 29 (Ex. 9), 50 (Ex. 4).

### B.    Securities Act Claims

#### 1.    Legal Standards Under the Securities Act

Congress passed the Securities Act to require "companies offering securities to the public to make 'full and fair disclosure' of relevant information." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 421 (2018). Its Sections 11 and 12(a)(2) hold issuers strictly liable for material misstatements or omissions in registration statements and prospectuses; underwriters and individuals "may be held liable for mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Once plaintiffs meet the "minimal burden" to show a material misstatement or omission, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). These claims "do not require a showing of scienter, reliance, or loss causation." *Tongue*, 816 F.3d at 209.

#### 2.    Rule 8 Governs Pleading of Securities Act Violations

Securities Act claims are "subject only to the 'short and plain statement' requirements of [Rule] 8(a)." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). A complaint need only allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which facts get taken "as true," *Tellabs*, 551 U.S. at 322. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

20

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And "a reasonable inference need not be as compelling as any opposing inference one might draw from the same factual allegations." *RBS*, 709 F.3d at 119–21. Thus, "the existence of other, competing inferences" is usually irrelevant; they "do not prevent the plaintiff's desired inference from qualifying as reasonable" and being "draw[n]" in plaintiff's favor. *Id.* In determining whether a reasonable inference exists, courts view factual allegations holistically. *Morgan Stanley*, 592 F.3d at 365–66. So long as the facts alleged "raise a reasonable expectation that discovery will reveal evidence" supporting a Securities Act claim, Rule 8 is satisfied. *AppHarvest*, 684 F. Supp. 3d at 236; *Matrixx Init. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

Defendants argue that because the Complaint's Securities Act and Exchange Act claims use some overlapping factual allegations, then the Securities Act claims sound in fraud and must meet Rule 9(b)'s heightened particularity standard. PACS Br. at 47–48. However, the "Rule 8 notice pleading standard applies [to Securities Act claims] where the plaintiff alleges negligent preparation of the registration statement and prospectus" instead of "fraud." *Pappas v. Qutoutiao*, 2024 WL 4588491, at *1 (2d Cir. Oct. 28, 2024). "Nothing . . . forecloses pleading Section 10(b) fraud and Section 11 negligence as alternatives with the former claim to be governed by Rule 9(b) and the latter by Rule 8." *Id*. When a complaint asserts violations of both, "[a] plaintiff may retain the application of the Rule 8 . . . by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Id*. at *2. Thus, "a Securities Act claim sounding in negligence or strict liability will not be subjected to the heightened standard of Rule 9(b) merely because of the complaint's other claims." *Id*.

### 3.    The Securities Act Claims Do Not Sound in Fraud

The Complaint strictly adheres to the Second Circuit's template for alternative pleading in

21

*Qutoutiao*. It "expressly disclaims fraud, scienter, and the intent of Defendants to defraud investors" in its Securities Act claims. *Id*. at *2; *see* ¶¶9, 290, 348, 361. It further "painstakingly segregates the fraud and negligence claims," such that "[e]ach claim is set forth under its own heading and incorporates only certain factual allegations such that, although all claims follow a general recitation of the factual background, the Securities Act claims expressly do not incorporate the allegations supposedly supporting a finding of scienter and reliance." *Qutoutiao*, 2024 WL 4588491, at *2; *see* ¶¶274–379.[12] It followed *Qutoutiao*'s instruction to allege "Defendants failed to satisfy their duty to make [a] reasonable and diligent investigation to ensure that the offering documents did not contain misstatements or omissions." 2024 WL 4588491, at *2; *see* ¶¶351–52. "Such allegations would be evaluated under Rule 8 if contained in a stand-alone complaint alleging violations only of the Securities Act." *Qutoutiao*, 2024 WL 4588491, at *2. The Securities Act claims here should "not be held to a higher standard because Plaintiff[s] also exercised [their] right to sue Defendants for securities fraud under the Exchange Act." *Id.*

To plead its Securities Act claims, the Complaint draws largely on matters PACS's Restatement has already admitted, as opposed to circumstances of fraud such as Murray's and Hancock's insider sales. Still, the Complaint's allegations meet any standard, because for the purposes of evaluating Securities Act claims, all allegations (including based on FEs and Hindenburg) must be taken as true no matter what pleading standard is applied.[13]

### 4.   The Restatement Shows the Offering Documents' Material Falsity

The Restatement directly admitted that PACS's Q1 and Q2 2024 financial statements were

---

[12] Thus, Defendants' reliance on *In re Ultrafem Inc. Securities Litigation*, PACS Br. at 48, is unavailing. *Ultrafem*'s complaint made "little, if any, effort to differentiate" its claims. 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000).

[13] "[C]ourt have generally sustained pleadings where independent factual allegations corroborated the factual allegations in the complaint drawn from short-sellers." *zCap Equity Fund LLC v. LuxUrban Hotels*, 792 F. Supp. 3d 407, 436 (S.D.N.Y. 2025).

materially wrong. During the IPO and SPO, PACS management harbored "uncertainties" about how certain services "may not be eligible for reimbursement," but unqualifiedly recognized that revenue anyway. ¶¶9, 148, 251, 254–55, 257. The Restatement therefore reduced reported revenue by approximately $14.89 million for Q1 2024 and $46.14 million for Q2 2024—over $61 million in total. ¶¶284–85. These facts alone establish the falsity of the SPO Offering Documents, which incorporated those later-restated financial statements. *Id.* Where a restatement confirms that previously issued financial statements were materially wrong, and where those financials appear in offering documents, Section 11 and 12(a)(2) liability follows. *See, e.g.*, *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 246 (S.D.N.Y. 2023).

There is no question that PACS restating revenue and profitability was material. Courts routinely find restating such core metrics *per se* material. *See zCap Equity*, 792 F. Supp. 3d at 423 (restatement of "key" financial metrics established material falsity); *Fresno Cnty. Emps. Ret. Ass'n v. comScore*, 268 F. Supp. 3d 526, 544–45 (S.D.N.Y. 2017) (restatement of revenue metrics established material falsity). The Restatement conceded materiality, because "only . . . material accounting errors" need be restated. *Chapman v. Mueller Water Prods.*, 466 F. Supp. 3d 382, 414 (S.D.N.Y. 2020) (Liman, J.).

The Restatement was quantitatively material. PACS reported $38.2 million in net income for the same six-month period in which it overstated revenue by over $61 million, meaning the reversed revenue exceeded 100% of reported profit. ¶¶261, 285; *see also* ¶¶317–18 (Restatement reduced net income "-192.19%" and "-92.30%" for periods), ¶¶331–39 (other significantly reduced amounts). These amounts far exceed the presumed 5% threshold for materiality. *Litwin*, 634 F.3d at 719. "Because the materiality element presents a mixed question of law and fact, it will rarely be dispositive in a motion to dismiss." *Morgan Stanley*, 592 F.3d at 360.

And while the IPO Offering Documents did not contain financial statements, so were not technically restated, that does not mean (as Defendants contend) that the Restatement is irrelevant to the IPO claims. PACS Br. at 49–50; UW Br. at 2–3. The Restatement contained more than redone financial statements; it also lifted the veil from what was really going on at PACS during both Offerings. It made substantive admissions conflicting with the IPO and SPO Offering Documents, including that improper billing and concealed revenue recognition "uncertainties" existed *during* both Offerings (¶¶306–15) in violation of the Securities Act, as detailed below.

### 5.        The Challenged Statements Are Statements of Fact, Not Opinions

Defendants attempt to recast many challenged statements, particularly PACS's financial reports, as non-actionable opinions. *See* PACS Br. at 24–27, 49–50; UW Br. at 2. They fail.

A company's report of objective, numerical line items as financial results is "a thing done or existing or an actual happening" that "expresses certainty about a thing," and not "a belief, a view, or a sentiment which *the mind* forms." *Omnicare*, 575 U.S. at 183 (emphasis added). Even after *Omnicare*, courts routinely treat as factual statements: (i) financial statements presented in accordance with GAAP; (ii) reported revenue figures; (iii) descriptions of business practices; and (iv) representations concerning regulatory compliance. *See comScore*, 268 F. Supp. 3d at 546 (restated "revenue in the financial statements . . . were false and misleading statements of objective fact."); *Afr. v. Jianpu Tech.*, 2022 WL 4537973, at *9 (S.D.N.Y. Sept. 28, 2022) ("[M]isreported financial data are . . . false statements of fact."); *see Pension Tr. Fund For Operating Eng's v. Clarivate Plc*, 2026 WL 866240, at *14 (E.D.N.Y. Mar. 30, 2026) (restated financials were not opinions under *Omnicare*). Here, the SPO Offering Documents made such objectively false representations. They misreported specific figures for "Revenue," "Net (Loss) Income," "Accounts receivable," and other data (¶317)—*objectively* wrong figures that had to be restated based on "*facts* exist[ing] at the time," per ASC 250. ¶¶8, 317–26. PACS reported them as facts,

24

not a "speaker's impression or point of view." *DeCarlo*, 122 F.4th at 40–41.

Defendants primarily contend that revenue recognition under ASC 606 is inherently subjective, thus an opinion and therefore non-actionable. PACS Br. at 24–31, 49. The defense misstates both the accounting standard and the law. While ASC 606 can involve judgment in certain circumstances, it also requires extensive objective factual analysis. *See DeCarlo*, 122 F.4th at 40–41 (restated revenue recognition under ASC 606's predecessor, ASC 605, was actionable regardless of potential to have been based on "subjective judgment"); *zCap Equity*, 792 F. Supp. 3d at 428, 438–39 (defendants' failure to properly recognize revenue under ASC 606 "is fairly pled as a false statement of fact"); *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1007, 1014 (N.D. Cal. 2020) (ASC 606 imposes objective "restraints" on variable consideration recognition, upholding revenue misstatements).

*Omnicare* does not convert financial statements into non-actionable opinions simply because accounting standards ***occasionally*** make space for judgment calls. Critically, Defendants never identify any actual subjective judgment that drove PACS's improper revenue recognition here. Nor do they explain how subjective judgments could require restatement when ASC 250 required restatement here due to "***facts*** exist[ing] at the time." Instead, they ask the Court to infer that the Restatement was driven purely by an unidentified change in subjective judgment under ASC 606. Such a "competing inference[]" is not permitted. *RBS*, 709 F.3d at 120–21.

The allegations foreclose that inference, anyway. Revenue from performing unnecessary therapies objectively cannot be recognized—precisely the "facts exist[ing] at the time" that made restatement necessary. ¶¶8, 148, 254, 259–62, 289–97. The Restatement admitted factual error, not revised opinion. *See zCap Equity*, 792 F. Supp. 3d at 438 (restatement "did not reveal a difference in opinion with respect to the method of revenue recognition").

PACS's Motion (at 49–50) identifies **other parts** of the Offering Documents that use "we believe" language, but this does not transform distinct financial statements into opinions.[14] Statements measuring revenue and profit as specific, reported results remain actionable non-opinions where they convey concrete information about the company's condition. *See AppHarvest*, 684 F. Supp. 3d at 260–61; *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021). At bottom, the challenged statements conveyed factual assertions about PACS's revenue and profit, which were later restated and never opinions, hence were false and misleading when made.

### 6. Even If Statements Are Treated as Opinions, the Complaint Adequately Pleads Falsity Under *Omnicare*

Even if the Court treats some challenged statements as opinions, dismissal would still be improper because the Complaint alternatively pleads their falsity under all three *Omnicare* routes.

Under *Omnicare*, an opinion is actionable where: (1) the speaker did not believe it; (2) it embeds an untrue fact; or (3) it implied false facts to a reasonable investor, *e.g.*, about the speaker's basis or meaningful inquiry. 575 U.S. at 185–86; *DeCarlo*, 122 F.4th at 41–42; *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 545–46 (S.D.N.Y. 2024) (restated financials were not opinions and actionable under *Omnicare*); *zCap Equity*, 792 F. Supp. 3d at 439 (same).

*First*, the Complaint plausibly alleges that Defendants lacked a reasonable basis for every challenged statement that was restated. ¶¶317–22 (listing restated items); ¶¶323–28 (describing inaccuracies). PACS initially disclosed these inflated amounts despite internal "Medicare Part B billing uncertainties" when it prepared these statements. These contemporaneous uncertainties make it "quite plausible that the [] Defendants did not base the company's statements . . . on a meaningful inquiry, that their statements did not fairly align with the information in the issuer's

---

[14] The brief here attacks two allegations, "¶316(b)" and "¶316(d)," by pretending—incorrectly—that the Complaint "omits . . . 'Management *believes*'" language. But these Complaint paragraphs are not quoting anything, much less misquoting Defendants; *no part* of the full quote is *ever* asserted as a misstatement. The accusation is wrong, and low.

possession at the time, and that there was no basis for" PACS to report them as initially inflated. *DeCarlo*, 122 F.4th at 46; *zCap Equity*, 792 F. Supp. 3d at 439 (magnitude of restatement supported finding that the defendants lacked a reasonable basis or failed to meaningfully inquire). Reasonable investors do not expect revenue recognition uncertainties to be ignored; they expect a meaningful inquiry to address such uncertainties—which presumably would have reached the same conclusions that PACS's internal investigation eventually reached.

*Second*, statements are actionable because they omitted material facts that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. PACS's accounting misstatements materially omitted growing refund liabilities, falsely implying none existed (¶258), yet the Restatement admitted there were material ones based on "information in the issuer's possession at the time." *See DeCarlo*, 122 F.4th at 46. For the same reason, the Offering Documents' representations that "revenue and profitability could be materially and adversely affected" "if coverage or reimbursement . . . changed" (¶293) and "[i]f we are not operating in compliance . . . we could be required to make significant expenditures or change our operations" (¶296) were misleading, because they omitted: (i) widespread, improper billing practices, *e.g.*, COVID-19 Waiver abuse and overbilling Medicare B for unnecessary therapies; (ii) material and growing refund liabilities; (iii) material weaknesses in internal controls; and (iv) the Company's exposure to significant revenue reversal. ¶¶9, 148, 254, 259–62, 265, 289–97. These omissions directly conflict with what a reasonable investor would understand about the basis for Defendants' statements, rendering even opinions misleading under *Omnicare*.

*Third*, ASC 606 is irrelevant. It may sometimes involve "subjective judgment" based on "imperfect information" (PACS Br. at 24–25), but because ASC 250 here required revenue to be recognized differently, "facts at the time" plainly foreclosed any contrary subjective judgment.

27

The *DeCarlo* defendants also emphasized how their accounting standard required "classic exercise of subjective judgment," which the Second Circuit rejected because the objective facts requiring restatement showed the original accounting "was objectively improper rather than an exercise of subjective judgment . . . as AmTrust's restatement eventually acknowledged." 122 F.4th at 46. Here, too, PACS's revenue recognition was objectively improper because uncertainties and refund liabilities require revenue not to have been recognized, no matter what else ASC 606 says. ¶258.

### 7.    The Offering Documents' Omissions Violated Item 303

The SEC's Item 303, 17 C.F.R. § 229.303(b)(2)(ii), requires offerings to disclose "known trends or uncertainties," the omission of which creates "liability under §§ 11 and 12(a)(2)." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Here, all of the Offering Documents actionably omitted known trends and uncertainties.

PACS's Restatement admitted that by March 31, 2024 (pre-IPO) its "Medicare Part B billing ***uncertainties***" meant it recognized revenue from "respiratory services and certain other therapy services billed under Medicare Part B" that "should not have been recognized." ¶148; *see also* ¶¶9, 254, 259–62. These "uncertainties" were material: first, immaterial matters need not be restated (*accord* ¶332 *and Chapman*, 466 F.Supp.3d at 414); and second, they required $15 million in revenue for Q1 2024 and $46 million for Q2 2024 to be restated, exceeding PACS's profit. ¶¶289–97. The Restatement also revealed a compounding ***trend***: a known, pre-IPO refund liability already increasing (from $3.9 to $30.6 million) during the IPO, and accelerating (to $84 million) the month of the SPO. ¶¶265, 290–92. PACS "concurrently expected to refund" this money to Medicare while improperly recognizing it as revenue. ¶265. These were not risks but concrete conditions that existed for both offerings and were reasonably likely to (and did) materially affect PACS's financials. *See Panther Partners*, 681 F.3d at 121–22. Item 303 required their disclosure, and their omission means "liability under §§ 11 and 12(a)(2)." *See id.* at 120.

Defendants respond that they disclosed Medicare reimbursement risks, regulatory complexity, and general billing uncertainty. PACS Br. at 51–53. They miss the difference between abstract risks and existing, adverse facts. The latter is what was omitted: improperly recognized revenue from unnecessary therapies and escalating refund liabilities. ¶¶259–66, 290–93.

Item 303 requires disclosure of known trends and uncertainties, not generic warnings about potential future risks. Boilerplate disclosures about general regulatory complexity or the possibility of reimbursement disputes do not discharge Item 303's duty to disclose specific uncertainties that had already materialized. *Panther Partners*, 681 F.3d at 122; *see* ¶260 (PACS's uncertainties known by "March 31, 2024"). Nor do Defendants dispute the undisclosed refund liability as a known trend (¶¶265, 290–92), conceding its material omission from all four Offering Documents.

Defendants ask the Court to believe PACS's SNFs were "independently managed" and find it plausible PACS lacked knowledge. PACS Br. at 53–54. This is precisely the "competing inference" that gets Securities Act dismissals reversed. *RBS*, 709 F.3d at 120–21 & n.5 (reinstating Securities Act claims because "the existence of other, competing inferences" was irrelevant).

The Complaint will not bear that inference. The idea that PACS SNFs were "independently managed" is contradicted by the allegation that corporate leadership directed billing practices across facilities, not ignored them. ¶¶135, 201–14. The Restatement alone defeats this competing inference: PACS admitted that the relevant "billing uncertainties" and refund liabilities "existed at the time the financial statements were prepared," which necessarily establishes that PACS knew about them before the IPO and the SPO. ¶¶259–66, 290–92. If everyone was truly ignorant about improper billing, then whence the uncertainty? PACS itself actually knew about the uncertainties, or else no restatement would have been required. ¶¶262–63.

The Securities Act does not require scienter, and Item 303's "known trends or

uncertainties" standard concerns only "the registrant's actual knowledge" generally. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). At the pleading stage, Plaintiffs need only allege a reasonable inference of pre-offering knowledge, and the Complaint does. *See* ¶¶290–92.

### 8.    Defendants' Risk Factors Misled Because Risks Already Materialized

Defendants contend the Offering Documents adequately disclosed all relevant risks with sufficiently cautionary language. PACS Br. at 20–21. But risk disclosures framed hypothetically cannot shield liability where "undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516–18 (S.D.N.Y. 2013) (risk factor warnings "were misstatements of present fact, warning that something 'may' occur when that event 'had' already occurred").

The Offering Documents warned of potential risks related to Medicare billing generally, overall regulatory compliance, and nonspecific reimbursement uncertainty. ¶¶293–305. They warned that "[i]f coverage or reimbursement for services are changed . . . profitability could be materially and adversely affected" (¶293) and "we could be required to . . . change our operations" in response to regulatory "change[s]" (¶296). They glaringly omitted the fresh, profit-eliminating impact of the COVID-19 Waiver ending (¶294(a)–(b), ¶302), falsely implying no such effect occurred because other parts of the "Offering Documents referenced the expiration of the COVID-19 Waiver only to disclose that it required the Company to implement 'operational changes,' while omitting any disclosure of the materially adverse impacts on revenue or profitability" (¶295(d)). These same warnings neglected to mention that, at the time of the IPO, PACS was already over-recognizing revenue from Medicare Part B therapies—by at least $14.9 million for the IPO, growing to $61 million for the SPO—amidst already concrete and quantifiable "uncertainties" whether that specific revenue could properly be recognized. ¶¶9, 148, 254, 259–62, 289–99. Such

30

warnings were ***themselves*** misleading because they described generic risks as contingent while concealing specific manifestations that were ongoing. *See Jinkosolar*, 761 F.3d at 251.

Defendants variously point to ***other*** risk factors, such as warnings that controls may not "prevent or detect all errors and all fraud" or avoid "potential future material weaknesses." PACS Br. at 49–51.[15] They seek to argue these general warnings save the faulty ones, which no case they cite holds. The warnings were particularly ineffective given two material weaknesses in internal controls that the Restatement admitted existed contemporaneously: a failure to design and maintain effective "hotline" processes to identify and communicate compliance risks, and a failure to maintain adequate controls over revenue recognition under ASC 606. ¶¶254, 259–62; *see Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 140, 151 (2d Cir. 2025) (restatement's admission supported falsity and scienter under higher pleading standards). As Judge Rakoff put it in rejecting an identical argument, issuers have "an affirmative duty to accurately report [] financial results," and "cannot avoid that . . . duty by warning that the information they were providing may be inaccurate." *Missfresh*, 701 F. Supp. 3d at 249. Because such warnings cannot absolve ongoing wrongdoing, including inaccurate information, the Offering Documents were still misleading.

### 9.    Defendants Are Statutory Sellers Under Section 12(a)(2)

Section 12(a)(2) extends liability not only to those who pass title, but also to those who "solicit" purchases of securities for financial gain. *See Pinter v. Dahl*, 486 U.S. 622, 641–47 (1988). Defendants contend that Millard, Leavitt, Dilsaver, Lewis, and Apt are not statutory sellers. PACS Br. at 55–56. This defense fails because the Complaint plausibly alleges that each directly solicited investors' purchases of PACS securities for their own financial benefit.

The Complaint alleges these Defendants prepared and signed the Offering Documents, as

---

[15] Defendants repeat the argument as an Exchange Act defense. *See* PACS Br. at 12–15. It fails for the same reasons.

well as made the misleading statements therein. ¶¶54, 56. They reviewed and approved those materials and "conducted the roadshow . . . to solicit the purchase of PACS common stock . . . to serve their financial interests and those of PACS." ¶¶55, 57. They gained financially from the Offerings' success as officers and directors receiving equity awards. ¶¶43, 47–50. Taken as true, it is plausible they solicited the Offerings for gain. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996) (Alito, J.) (allegations "defendants 'solicited plaintiffs' . . . are factual . . . not bare legal conclusions."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 438–39 (S.D.N.Y. 2000) (applying *Westinghouse*, upholding allegation defendants "actively solicited the sale of [] shares" sufficient to plead them as statutory sellers).

### 10.     The Complaint Adequately Pleads Section 15 Control Person Liability

The Motions assert only a lack of primary violations for control liability, which fails as set forth above. They do not dispute the relevant actual control. The Section 15 claims may proceed.

### C.     Exchange Act Claims

### 1.     Legal Standard

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Chapman*, 466 F. Supp. 3d at 396. Under the PSLRA, 15 U.S.C. § 78u-4(b)(1)–(2), a plaintiff must plead each misleading statement, explain why it is misleading, and allege "particulari[zed] facts giving rise to a strong inference" of scienter that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 326. In evaluating whether a complaint gives rise to a "strong inference" of scienter, courts draw "inferences favoring the plaintiff" and consider "all of the facts alleged, taken collectively," not in isolation. *Id.* at 324. The inference of scienter need not be irrefutable or a "smoking-gun." *Id.*

32

**2.　　The Complaint Pleads Misstatement Nos. 1–31 Violated Rule 10b-5(b)**

**a.　　All 31 Misstatements Were Materially False and/or Misleading**

(1)　　The Complaint pleads eight materially false and misleading accounting misstatements (Nos. 7–8, 12–14, 17–18, 22).

These misstatements are PACS's financial and accounting statements for Q1 and Q2 2024 reporting revenue, net income, and other financial results. These statements did not express a "view" per *Omnicare*; they presented verifiable quantities that were objectively wrong based on "***facts*** that existed at the time" because the Restatement reduced them. ¶¶254, 259. The improperly recognized $14.9 and $61 million in Medicare B revenue underlies them all. *See* ¶¶413–14, 418–19, 438, 443, 447, 461–62, 466–67, 486 (reasons why each statement was false). These financial and accounting statements are actionable as facts and as misleading opinions under *Omnicare*.

(a)　　The eight accounting statements are not opinions.

Defendants argue that because ASC 606 contains subjective parts, any determination under it is an opinion and thus non-actionable. For the same reasons PACS's financial statements were not opinions, *see* Part IV.B.4, *supra*, these numerical misstatements were not opinions.

First, ASC 606 imposes objective constraints on revenue recognition, including that variable consideration may be recognized only if it is probable that a significant reversal "***will not occur***." *See* Fatale Decl. Ex. C, ASC 606-10-32-11; *Mulderrig*, 492 F. Supp. 3d at 1014 (ASC 606 "warns that an entity ***must consider*** all the factors that could increase the likelihood an estimate will need to be reversed"); *Padilla v. Cnty. Health Sys., Inc.*, 2022 WL 3452318, at *4 (M.D. Tenn. Aug. 17, 2022) ("ASC 606 allows entities to recognize revenue ***only to the extent*** that the entity expects to receive the recognized amount"). As pled, refund liabilities objectively cannot be recognized as revenue under ASC 606, regardless of judgment. ¶258. Nor do Defendants identify any specific judgment they exercised—unsurprising, because the Restatement confirms the error

33

arose from "facts that existed at the time." ¶259.

Second, Defendants refer vaguely to "facts learned" during its internal investigation and "revisit[ing] its determination" (PACS Br. at 11, 27) without identifying what facts or why its determinations changed, essential to show subjectivity. The Restatement forecloses that argument: under ASC 250, restatements correct errors based on information that existed when the financials were prepared, not later-acquired facts. *See* Fatale Decl. Ex. B, ASC 250-10-20. By invoking ASC 250, PACS admitted its original accounting in these eight statements misapplied GAAP based on contemporaneous facts (uncertainties, refund liabilities), not new information or changed opinions.

Third, the potential for judgment under ASC 606 does not transform its numerical outputs into opinions. *See DeCarlo*, 122 F.4th at 44–45 (holding potential accounting subjectivity was neither necessary nor sufficient for opinion defense). None of these eight misstatements say "we believe" or include indicia of "Medicare Part B billing uncertainties"; each is an objective number, wrong in light of facts at the time. Management, particularly SOX signatories, had a duty to inquire and account for known uncertainties based on contemporaneous facts. *See* 17 C.F.R. § 229.601(b)(31). Recognizing revenue despite those uncertainties is not opinion—it is fraud.

           (b)       <u>The eight accounting misstatements are misleading.</u>

Whether opinions or not, these eight misstatements were misleading under *Omnicare* for the same reasons as under the Securities Act, *see* Part IV.B.5, *supra*. Each implied the existence of, but was not based on, "meaningful . . . inquiry," and each did not "fairly align[] with the information in ***the issuer's*** possession at the time." *DeCarlo*, 122 F.4th at 46. These statements purported to announce financial results but held back conflicting facts in PACS's possession: their inclusion of uncertain revenue from Medicare B services (respiratory and sensory therapies), as well as material growing refund liabilities. And PACS's admittedly weak internal controls for revenue recognition is synonymous with a lack of meaningful inquiry to support these numbers.

34

(2)  The Complaint pleads 23 other misstatements (Nos. 1–6, 9–11, 15–16, 19–21, and 23–31).

The remaining 23 misstatements are false and misleading for similar reasons. Defendants group the misstatements into three categories: Medicare risks (Nos. 1, 9, 19, 26); compliance and billing practices (Nos. 2–3, 6, 10–11, 15, 20–21, 24, 27–28, 31); and business model descriptions (Nos. 4–5, 16, 23, 25, 29–30). PACS Br. at 12–17. But each is rendered materially false and misleading by the same facts: (1) the Restatement's admission that material "Medicare Part B billing uncertainties" existed at the time the financial statements were prepared" (¶¶254, 259); (2) concealed and escalating refund liabilities and inflated revenue exceeding reported profit (¶¶130–31, 148, 265); and (3) detailed FE accounts establishing that PACS's overbilling was a centrally coordinated, Company-wide enterprise led by Murray, Hancock, Apt, and Sanford (¶¶13, 112, 133–44, 201–14, 593). These facts, taken as true, defeat Defendants' category-specific defenses.

(a)  PACS's statements about Medicare changes

Defendants warned four times: "If coverage or reimbursement for services are changed, reduced or eliminated" by the government, "our operations, revenue and profitability could be materially and adversely affected," and now defend these as forward-looking statements. PACS Br. at 8–10. This argument fails because "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). The statements concealed two ongoing problems as mere risks.

First, CMS had already ended the COVID-19 Waiver, in a way that reduced PACS's quarterly revenue by $90 million, far exceeding peers and eliminating profitability, which this warning implied was mere possibility. *See* ¶¶12, 111, 127–29. That implication was particularly strong because the same document mentioned the Waiver's expiration, but only to disclose that it led to "operational changes," omitting its material financial impact. ¶¶387(e), 424(e), 472(e),

35

506(e). Second, PACS was recognizing revenue that "should not have been recognized" due to billing uncertainties. ¶¶254, 261–62. The problem worsened with each repeated warning, growing from $14.9 million in inflated revenue and $3.9 million in concealed refund liabilities to $61 and $30.6 million, respectively—all later restated. ¶¶130–31, 148, 265. By presenting these issues as what "could be" in the event of "change[]," Defendants misled: PACS's "revenue and profitability" were already "materially and adversely affected" by "coverage or reimbursement" issues. ¶¶295, 424, 472, 504. *See Rombach*, 355 F.3d at 173.

(b)    Statements about billing review and compliance

Defendants group Misstatement Nos. 2, 3, 6, 10, 11, 15, 20, 21, 24, 27, 28, and 31, but it amounts to two separate defenses, neither of which withstand scrutiny. PACS Br. 14–15.

First, PACS warned four times (Nos. 3, 11, 21, and 28) that it "could be required to make significant expenditures or change[s]" if "not operating in compliance," and Defendants point to other language in the same risk factor warning of "allegations of impropriety or illegality," defending that as "what happened." PACS Br. at 14. But the Complaint does not challenge the other language. The statements' falsity lies in presenting noncompliance as hypothetical ("if") while it was occurring. Defendants' other assertion, that Restatement reduced revenue by "only 3.2%," ignores that this exceeded 100% of reported profit and is *per se* material given that immaterial amounts need not be restated. ¶¶334–35; *see* Fatale Decl. Ex. B, ASC 250-10-50-4 ("[D]isclosure is required if the effect of a change in the estimate is material."); *id.* 250-10-50-12.

Second, as to statements touting the effectiveness of PACS's "reviews," "billing audits," "billing integrity," and "billing processes" (Nos. 2, 6, 10, 15, 20, 24, 27, and 31), Defendants contend these were not false because PACS did have billing review processes, even if imperfect. PACS Br. at 15. They miss the point. These statements conveyed that PACS was detecting and correcting noncompliance by representing that its audits "from time to time detect instances of

36

noncompliance that we attempt to correct," ¶¶389, 423, 471, 508, and touting its "regular facility billing audits." ¶¶407, 526. Those misled because PACS was directing—through quotas, training sessions on how to maximize overbilling while evading detection, and terminating employees who objected—the very noncompliance such procedures were meant to prevent. ¶¶113, 137–40, 205–07. "[C]autionary language that is misleading in light of historical fact cannot be meaningful." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 n.5 (2d Cir. 2010); *Rombach*, 355 F.3d at 173.

Further, the admitted material weakness in PACS's compliance "hotline process" conflicted with these representations. ¶¶149, 232, 254–56. FEs confirmed that those who raised concerns about improper billing were terminated (¶¶224–31), while those who "play[ed] the game" were rewarded. ¶¶215–23. PACS's compliance hotline was designed to fail and prevent PACS's "reviews," "billing audits," and "billing processes" from being meaningful. *See DeCarlo*, 122 F.4th at 46 (statements are actionable where they are not based on a "meaningful . . . inquiry" and did not "fairly align[] with the information in *the issuer's* possession at the time").

(c)    PACS's statements describing its business model

Defendants contend that the seven business model statements are "not false" and constitute "inactionable puffery." PACS Br. at 15–16, 23–24. Both arguments fail.

These statements (Nos. 4–5, 16, 23, 25, 29–30) are false because they misrepresented how PACS generated profit. PACS's success did not come, as claimed, from "transforming" underperforming SNFs (¶¶399, 518) or being "decentralized" (¶¶403, 522) or "allow[ing] our local leaders to make operational decisions" (¶490). Even if treated as opinions, those embedded facts were false: PACS's model drove profitability through top-down directives to improperly overbill Medicare. ¶¶112, 146, 150, 154, 166, 191. *See Abramson*, 965 F.3d at 175 (opinions with "embedded but complete statement of a material fact . . . can be proven false"). Confirming the statements' inaccuracy, PACS has since abandoned the "decentralized" description of its model

37

for "locally led, centrally supported." ¶¶456(d), 523(a). Further, senior leadership knew that they issued top-down directives, and could not have "actually h[e]ld[] the stated belief" that PACS was decentralized. *Omnicare*, 575 U.S. at 184.

These statements are not puffery. They describe verifiable operational features—how PACS generated revenue, the "primar[y] drive[r]" of past financials, and who controlled decision-making—matters central to investors' assessment of value and risk. *See* ¶¶112, 138, 140, 205–14; *see In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (statements about defendants' "independence [being] a cornerstone of [their] business" not puffery but "verifiable").

### (3)    The Safe Harbor and Bespeaks Caution Defenses Fail

Defendants invoke the PSLRA's safe harbor and the bespeaks caution doctrine. PACS Br. at 20–21. Neither applies. The safe harbor protects only genuinely forward-looking statements, not these statements that misrepresented present or historical fact. 15 U.S.C. § 78u-5(c); *Slayton*, 604 F.3d at 766; *AppHarvest*, 684 F. Supp. 3d at 252 ("[M]ixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present."). Nor can cautionary language "be meaningful" when it conceals then-existing problems. *Jinkosolar*, 761 F.3d at 251. As shown above, PACS's risk factors warned of the ***possibility*** of noncompliance and the hypothetical risk to profits if Medicare changed, while concealing that PACS had already been actively engaged in such noncompliance through top-down directives and Company-wide billing schemes that would require restatement even if Medicare remained unchanged (as it did).

### b.    These Statements Were Made With Scienter

### (1)    Motive and Opportunity Alone Pleads Scienter

PACS itself, along with Apt, Jergensen, Sanford, and especially Murray and Hancock, each

had unusual motives and of course the opportunity[16] to commit the alleged fraud.

*Unusual Stock Sales*. Murray's and Hancock's unusual stock sales are the most significant allegations of motive, sufficient to plead a strong inference of their scienter. Courts consider seven factors: "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants[] selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.'" *Chapman*, 466 F. Supp. 3d at 411. Every factor supports suspiciousness here.

Murray and Hancock reaped extraordinary *profits*. From the IPO, they gained "a total of $67.5 million in proceeds ($33,749,982 each)," and then, once the Underwriters granted them special early release from the IPO lockup for the SPO, they realized "an additional $589.3 million in proceeds total ($294,652,760 each)." ¶¶536–37. Because their cost basis for their entire PACS holdings was a nominal $10 *total* (¶649), it was pure profit: their total windfall was $656.8 million. ¶536. Courts have held far less profitable insider sales suspicious enough for a strong inference of scienter. *E.g.*, *Gimpel*, 156 F.4th at 144 (two defendants selling a combined $104.3 million in stock suspicious); *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308–09 (2d Cir. 2015) (two defendants profiting $49 million suspicious); *comScore*, 268 F. Supp. 3d at 554–55 ($53 million in stock sales suspicious). Among all cases any brief cites for motive, Hancock's and Murray's profits are highest—unusual indeed.

As to *percentage of holdings*, Defendants claim Murray and Hancock "each sold only 15% of their respective holdings," PACS Br. at 37, a figure nowhere in the Complaint. Their estimate

---

[16] Defendants do not contest their opportunity, which this Circuit "generally presume[s]" for "high-level corporate insiders, such as C-suite executives," anyway. *Gimpel*, 156 F.4th at 144.

39

ignores how Murray and Hancock also gifted substantially from their own holdings to PACS to sell in both Offerings, making their overall reduction in ownership 28.8% apiece (¶41)—exceeding the percents found insufficient in all four cases Defendants cite. PACS Br. at 37. Because of those gifts, it is more appropriate to consider percentage points of ownership reduced, where courts find similar sized sales support scienter. *E.g.*, *In re Weight Watchers Sec. Litig.*, 504 F. Supp. 3d 224, 256–57 (S.D.N.Y. 2020) (sale that "reduced [individual's] ownership from approximately 44%" to "22%" for $1 billion gross proceeds "clearly support scienter").

The remaining factors go the ***timing***, which support suspiciousness from every angle. Murray and Hancock made these sales within PACS's "first five months as a public company" at the same time as, or less than a month after, making or controlling Misstatement Nos. 1–6 and 17–31; their sales occurred within a month of filing PACS's March 31 and June 30, 2024 quarterly reports yet "less than two months before news of PACS's improprieties emerged in the credible Hindenburg Report"; and they never had "any insider sales ever again," definitionally unusual. ¶¶538, 540. Moreover, Murray and Hancock began to unload their shares three days after their direct report, Sanford, "received notice of investigations by the DOJ," ¶539, and eleven days after Murray's "uncertainties" about "Medicare Part B" revenue recognition manifested. ¶262.

Defendants argue that sales during "public offerings" *per se* cannot be unusual. PACS Br. 37–38. That is not the law; the Second Circuit has held that offerings like these can create illicit motives supporting scienter. *Blanford*, 794 F.3d at 303, 309 (motive pled by alleging "[d]uring this ***offering***, Blanford and three other directors sold 410,456 shares for gross proceeds of $29 million"); *see also City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011) (insider sales during "IPO and July 2008 Offering" unusual and suspicious). They knew since the Waiver ended in 2023 that PACS's profitability depended on overbilling

40

Medicare (¶¶386(b), 668), which no Motion disputes. Hancock and Murray hastened the SPO sales by more than a month during pending investigations, to occur suspiciously less than two months before almost all the fraud-caused loss events. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (scienter supported by suspicious stock sales "two months before the devastating . . . press release and in the midst of an investigation" into "accounting irregularities and internal control deficiencies"). No sales here were under 10b5-1 trading plans. ¶543. Their timing supports a strong inference of scienter.

*Motive for Apt, Jergensen, and Sanford*. PACS's unusual "2024 Management Bonus Program" paid Murray, Hancock, Apt, Jergensen, and Sanford $3,844,660 in bonuses as a pure percentage (8%) of PACS's reported profit, creating a direct motive to report inflated profit like Misstatements 8, 12, 18, and 22. ¶¶612–14. Far from standard "incentive compensation" as defended (PACS Br. at 36), this bespoke program rewarded them with a "concrete and personal" benefit for inflating the precise metric they overstated. *See Gimpel*, 156 F.4th at 145 (scienter pled where bonuses "were tied to [] very metrics that [company] admittedly overstated"). It is nothing like the "generalized" bonuses rejected in *ECA*. PACS Br. at 36 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009)).

Apt, Jergensen, and Sanford each received multimillion-dollar stock grants "in the IPO for $0 total" (¶546), an IPO that could not have happened without fraud (¶635). This "mammoth grant incentive strongly supports . . . motive." *In re Computer Assocs. Sec. Litig.*, 75 F. Supp. 2d 68, 74 (E.D.N.Y. 1999). They claim their lack of sales "undermines" scienter (PACS Br. at 36), forgetting "they were unable to sell [their] stock due to back-to-back lockup periods" that the Underwriters unusually lifted for Hancock and Murray *only* (¶¶538, 546), a fact that makes the timing of the arrangement more suspicious.

41

(2)    Restatement Under ASC 250 Directly Evidences Scienter

Independently, the Restatement gave powerful, direct evidence of scienter. It invoked "ASC 250" as its sole basis (¶259), which requires restatement only when prior financial statements contain an "oversight or misuse of facts that existed at the time the financial statements were prepared"—not for changed circumstances or information learned later. Fatale Decl. Ex. B at 250-10-05. Thus, when the Restatement reversed $61 million in revenue due to "Medicare Part B billing uncertainties" (¶254), ASC 250 necessarily meant those "uncertainties" existed at the time the Q1 2024 financial statement was prepared, by March 31, 2024 at the latest. ¶¶259–62.

As pled and undisputed, the uncertainty belonged to three Defendants: Murray and Apt, who prepared and certified the financial statements under SOX Section 302, and PACS itself. ¶261–62. Each of them necessarily had uncertainty about PACS's revenue recognition before the April IPO but ignored it and concealed it from the April IPO and everything thereafter. ¶262. Recognizing revenue despite material "uncertainties" about its recognizability is not merely a fact—it is a mental state. It means these Defendants were uncertain about all $61 million being recognized, and never used meaningful inquiry to find certainty, all Class Period long. ¶261.

The Motions totally ignore ASC 250 and instead claim PACS "exercised its judgment" under ASC 606 and later "revised" that judgment. PACS Br. at 3, 30. But this argument is foreclosed by the Restatement being necessitated by "facts that existed at the time the financial statements were prepared" (ASC 250)—contemporaneous facts including uncertainties and refund liabilities—not facts later learned or changed opinions. ¶259.

Restatements show scienter where, as here, they reveal information about the responsible party's state of mind or undermine profitability based on facts at the time financials were prepared. *See In re Alstom S.A. Sec. Litig.*, 454 F. Supp. 2d 187, 201 (S.D.N.Y. 2006) (scienter pled where underlying "fraud was the reason for the earnings restatement"); *In re Atlas Air Worldwide*

42

*Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (scienter pled where large restatement "transformed" company from one with positive "retained earnings" to one "with an accumulated deficit"). Here, Defendants maintained uncertainty by avoiding inquiry to certify wrong financials all Class Period long, supporting a strong inference of deliberate recklessness at least. *See Novak*, 216 F.3d at 308 (scienter includes where "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud").

Viewed holistically with the Defendants' unusual motives not to investigate uncertainties, the ASC 250 concession makes the inference of scienter at least as compelling as innocence. *See Tellabs*, 551 U.S. at 324. The remaining scienter allegations strengthen that conclusion.

(3)    <u>Regional Vice Presidents Implementing Defendants' Top-<br>Down Directives Supports Strong Inference of Scienter</u>

A complaint pleads conscious misbehavior or recklessness "where defendants . . . engaged in deliberately illegal behavior" or "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306.

The Complaint explains how Medicare overbilling got to be Company-wide: RVPs reporting to Defendant Sanford implemented top-down directives to perform unnecessary therapies in ways that avoided Medicare's detection and benefitted only Hancock and Murray. ¶¶133–50. The cogent inference is that Hancock and Murray issued those directives, thus had direct knowledge of PACS's overbilling. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024) ("cogent and compelling inference" CEO and CFO "orchestrated or knew about and approved" conduct causing restatement because "their direct reports executed the scheme"). FE-10 corroborated direct participation by Apt, Sanford, and the "C-suite": "PACS 'presidents' [Sanford's title] encouraged improper documentation to be submitted to Medicare to increase revenue, even if the service was not provided to the patient,"

43

and FE-10 "had direct contact with C-suite executives if his facility was not meeting its 'targets,'" including "Apt, [who] sent emails with reminders highlighting which facilities needed to improve their revenue," which preexisted the IPO and "increased" "from the C suite" after it. ¶¶208–10.

Additionally, Defendants had easy access to information about their SNFs overbilling Medicare. RVPs enforced "the directive to over-bill Medicare B" Company-wide by somehow implementing the same "respiratory training programs" in different regions (¶138) with region-wide "lectures" led by Administrators flown in from other regions about how to overbill Medicare B (¶139), coordination which only makes sense considering they "report[ed] directly to Defendant Sanford, who reported directly to Defendants Hancock and Murray" (¶140), making these facts well-known by at least Sanford, if not also his direct supervisors Murray and Hancock (¶¶138, 140). Sanford "oversaw PACS Services, the hub that connected central PACS leadership with its individual SNFs via PACS's [RVPs]." ¶549. Thus, Sanford, Murray, and Hancock had a direct line on the information that their directives to overbill Medicare were being implemented by their RVPs, conflicting with their statements and supporting the inference of scienter. ¶¶112, 138, 140, 205, 549. *See Blanford*, 794 F.3d at 306.

Defendants cite the *Dynex* case to argue that Sanford's "mere position in the corporate hierarchy" does not plead scienter. PACS Br. at 32. But the Complaint pleads more: Sanford's reporting position between RVPs and the co-founders, the top-down nature of the fraudulent directives going through him (¶¶138, 140, 208–10), his unusual motive (¶¶612–14), and his departure (¶549, *see infra*).[17] Defendants next contend that no FEs had contact with Individual

---

[17] Sanford is not a defendant for misstatement claims, but his scienter is imputable to PACS, who is. "[T]he most straightforward," but not only "way to raise such an inference [of scienter] for a corporate defendant will be to plead it for an individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also Sjunde AP Fonden v. Goldman Sachs Grp.*, 798 F. Supp. 3d 416, 436 (S.D.N.Y. 2025) ("[T]he knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation."). Sanford is a defendant for scheme claims. ¶694.

44

Defendants (PACS Br. at 32–33), which is wrong because FE-10 did (¶¶208–10), and courts routinely uphold allegations based on FEs whose probative accounts did not include interacting with individual defendants. *E.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (that FEs "lacked direct contact with the Individual Defendants does not undermine their . . . knowledge" of "information made available to senior executives"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that [FEs] cannot be believed because none had direct contact with any individual Defendant is contrary to law.").

Moreover, the FE allegations prove that PACS maintained a company-wide policy of firing employees who objected to its improper directives. This is independently corroborated by FE-1, -5, -6, -7, -8, -10, and the Hindenburg Report. ¶¶122, 142, 224–33. This retaliatory firing policy was not the product of local decision-making; it was a systematic, centralized effort to populate the Company with the employees who would not resist the top-down directives to overbill Medicare. ¶¶15, 233. This policy being Company-wide demonstrates that the Individual Defendants likely knew about and were actively concealing the misconduct. ¶610. The Restatement's admission that PACS's compliance hotline was materially deficient confirms this: PACS "did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues received through the hotline process." ¶¶232, 254–56. This was not an innocent failure; it was designed to suppress employee reports of PACS's overbilling. ¶232; *See Gimpel*, 156 F.4th at 148 ("company culture of secrecy and fear, and poor internal controls" including firing employees questioning scheme "insinuates [defendants'] knowledge of wrongdoing" for scienter).

(4)    PACS's Executive Departures Strengthen Scienter

Executive departures "add to the total mix of circumstantial evidence of fraud

45

when . . . highly unusual and suspicious," *Gimpel*, 156 F.4th at 149, *e.g.*, "when independent facts indicate that the resignation was somehow tied to the fraud alleged." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011). The timing of Sanford's and Apt's departures was suspicious. Both departed abruptly, during the Audit Committee's investigation, two months after PACS announced financial statements "could no longer be relied upon," and two months before the Restatement. ¶¶251–54. No other high-ranking executives took responsibility; the reasonable inference is Apt and Sanford were made to by Murray and Hancock, their controllers. *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (executive "'manning the wheel' at [company] when it was engaging in allegedly fraudulent conduct [who] retired two months later," during audit committee and SEC investigations, supported scienter).

Sanford "oversaw PACS Services, the hub that connected central PACS leadership with its individual SNFs via PACS's Regional Vice Presidents, who reported directly to Sanford." ¶549. Sanford reported directly to Murray and Hancock, and numerous FEs independently corroborated that Sanford's direct-report RVPs coordinated the same illicit activities across otherwise unconnected PACS regions—spanning California, Arizona, and Colorado, which contained more than half of PACS's SNFs. ¶¶138, 140, 205–14. Defendants claim Sanford's post-departure consulting agreement with PACS lessens the plausibility of his scienter (PACS Br. at 33), but neglect that PACS gave no reason for Sanford's departure and no description of the consulting job, making it only more suspicious in the context of the imminent restatement (distinguishing *Fain v. USA Techs*, 707 F. App'x 91 (3d Cir. 2017), the nonprecedential case Defendants cite).

Meanwhile Apt, as CFO, had direct responsibility for the Company's financial statements. With Defendant Murray, he "twice certified [] admittedly false-when-made financial statements," precisely those being restated at the time of his forced resignation. ¶550. The Board demanded his

46

resignation based on information "discovered during the Company Audit Committee's internal investigation into the Hindenburg Report disclosures," including that he accepted improper gifts. *Id.* A CFO forced out during restatement of the financial statements he certified is the archetypal nexus between departure and fraud. *See Salix Pharms.*, 2016 WL 1629341, at *15.

Accordingly, Sanford's and Apt's departures support strong inferences of scienter.

(5)     PACS's delayed financial reporting supports scienter

On November 6, 2024—just two days after the Hindenburg Report became public—PACS announced it would postpone its release of financial results and conference call with investors indefinitely. The Company did not release these results until its Restatement more than one year later. This is not the behavior of a C-Suite confident in the accuracy of its financial statements. It signifies that Defendants had more reason to doubt their financial statements than doubt Hindenburg. Murray, Apt, and PACS had "uncertainties" about Medicare B billing since before the IPO through the SPO. *See supra* Section IV.C.2.b.(2). PACS's decision to delay confirms those uncertainties. The strongest inference is that they were hoping not to get caught rather than conduct any meaningful inquiry. *Tellabs*, 551 U.S. at 322 (all reasonable inferences in plaintiffs' favor).

Defendants argue that the delay and investigation support their innocence, PACS Br. at 34, but this gets the inference backwards. Murray announced this decision to delay financial results without denying the merit of either the Hindenburg Report or the pending federal investigations. ¶554. If there was no truth to Hindenburg's findings, Murray would have denied its accuracy and kept releasing financial results on schedule. *Id*. Scienter is strengthened where defendants' delayed financial reporting resulted from their "knowledge of facts and access to information contradicting their public statements," including the inference that defendants "knew the company was underperforming and used accounting manipulations to bridge the gap between actual versus desired financial results." *Carlson v. Xerox*, 392 F. Supp. 2d 267, 277, 284–85 (D. Conn. 2005).

47

The year-long delay culminated in a $61 million restatement on two material weaknesses in internal controls, and the termination of high-ranking executives. These outcomes significantly undercut any inference of innocence. A CEO who had already conducted a meaningful inquiry and believed in the internal controls would have responded to Hindenburg by promptly defending PACS and releasing quarterly results on schedule. Instead, PACS suspended its financial reporting and began investigation—a "costly" one that lasted over a year. PACS Br. at 17, 71. The length and findings of that investigation demonstrate that PACS's leaders knew—or were deliberately reckless in not knowing—that PACS's financial statements lacked such support when made.

Murray's response to the Hindenburg Report is itself probative of scienter. When the Hindenburg Report was published on November 4, 2024, he did not deny its accusations. Two days later, he characterized it as merely "misleading"—not false or inaccurate. This careful word choice is significant. Investors reasonably expect a company wrongly accused of pervasive Medicare fraud to issue an immediate, unequivocal denial. ¶568. Instead, Murray implicitly acknowledged the truth of at least some of Hindenburg's findings and attempted simply to minimize their significance. Murray also disclosed that PACS had received multiple CIDs from the federal government regarding its "reimbursement and referral practices" that "may or may not be related" to the Hindenburg Report. ¶¶247, 533. Murray's admission that the federal investigations "may" be related is an admission that there were no obvious differences. The combination of Murray's nondenial, his disclosure of ongoing federal investigations, and the immediate postponement of financial results strongly supports the inference of scienter.

(6)    Murray's and Apt's SOX Certifications support scienter

Defendants Murray and Apt, in signing the SOX certifications, "affirmatively took responsibility for PACS's disclosure controls" and assured "that all material information is made known to [them] by others within PACS, including PACS's billing practices, revenue recognition,

48

and internal controls." ¶557. These are the same materially weak controls that led to PACS's financial statements omitting a material and growing refund liability and recording enough revenue to make PACS appear profitable despite "uncertainties" about whether such millions of dollars could even be recognized under ASC 606—facts existing as of March 30, 2024 (pre-IPO). Murray and Apt designed these controls yet prepared financial statements with "uncertainties"—not confidently wrong misapprehensions—therefore they knew that the controls did not result in meaningful inquiry. *See id.* ¶¶557–59.

Defendants contend that SOX certifications, standing alone, cannot support an inference of fraudulent intent. PACS Br. at 34. True, but the certifications here do not stand alone. They stand with the Restatement, ASC 250, and "uncertainties." These facts together mean either: (a) adverse facts were "made known to" Murray and Apt so they knew the financial statements were false; or (b) Murray and Apt designed and took responsibility for controls to avoid surfacing adverse information that would pop the bubble of their then-existing "uncertainties." Either inference supports scienter. *See Dentsply*, 732 F. Supp. 3d at 320 (signing even "boilerplate" SOX certifications "at least adds to the total mix" to support scienter).

### c.    The Complaint Sufficiently Pleads PACS's Wrongdoing Caused Investor Losses

The Complaint must "plausibly plead loss causation," *i.e.*, "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Abramson*, 965 F.3d at 179. "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Id*. Complaints may plead these theories "in the alternative," *id.*, as the Complaint does here. ¶583.

The Complaint pleads loss causation on four dates. Defendants challenge only two—

49

November 5, 2024, and December 17, 2024, arguing those dates were not "corrective disclosures" because the news merely "repackaged" what was already public. PACS Br. at 41–42. That argument fails for each date, and Defendants do not move to dismiss Plaintiffs' alternative materialization-of-risk theories for these (or any) dates at all.

*November 4, 2024.* That day, the Hindenburg Report exposed PACS's pervasive Medicare billing schemes. ¶¶21–23, 234–40. It revealed that PACS had abused the COVID-19 Waiver and fraudulently billed unnecessary Medicare Part B therapies Company-wide. ¶¶237–40, 564. PACS stock price fell 27.78%. ¶241. Defendants do not dispute this was a corrective disclosure.

*November 5, 2024.* The next day, PACS's stock declined 4.74% more. ¶245. Defendants contend that stock analysts' discussions that day of the Hindenburg Report merely "repackaged" it. PACS Br. at 41. But this argument ignores the significance of PACS's silence that day in the face of serious, credible allegations. ¶¶245, 566–68. In the twenty-four hours after the Hindenburg Report's publication, PACS issued no response—neither rebuttal nor denial, as would be typical. ¶566. Defendants' silence was new information, confirming the market's emerging assessment that the Report was credible. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010) (corrective disclosures need not take any particular form).[18]

This defense also misses the importance of how stock analysts regarded the Hindenburg Report as "credible and meritorious" without defending PACS. ¶568. Typically, analysts will promptly publish reports defending a company after a questionable short-seller report, but no analyst did so here. *Id*. This conspicuous absence, particularly from Underwriter Truist's analyst, further indicated to the market that the Report was credible. *Id.* PACS's wrongdoing caused the

---

[18] Defendants' reliance on *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) is misplaced. There, "speculation by analysts" did not reveal fraud. But the corrective information here was not analyst speculation—it was the absence of anyone defending PACS, including PACS itself.

November 5 price decline because it was foreseeable that analysts would learn about it but not defend the Company—a materialization of risk Defendants do not dispute. *See Abramson*, 965 F.3d at 179 (loss causation pled where a concealed fact "foreseeably caused" negative news leading to share price declines).

*November 6, 2024.* The next day, Defendants PACS, Murray, and Apt corroborated the Hindenburg Report. PACS announced that it was (1) postponing its Q3 2024 earnings release, signaling it could not stand behind its financials; (2) launching an Audit Committee investigation into Hindenburg's claims, indicating the accusations were not baseless; and (3) disclosing multiple DOJ CIDs concerning PACS's "reimbursement and referral practices," conceding they "may or may not be related" to the Report. ¶569. Murray characterized the Report as "misleading" rather than false, which itself was corrective news. PACS's stock collapsed 38.76% (¶¶248, 571). Defendants do not dispute loss causation that day. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (the announcement of investigations pleads a corrective disclosure).

*December 17, 2024.* Soon thereafter, J.P. Morgan—PACS's own underwriter and a major creditor with a direct financial interest in the Company's success—downgraded the Company's stock rating, citing the "overhang" from the ongoing federal investigation and PACS's continued inability to provide clarity. ¶¶572–73. When a company's own underwriter publicly downgrades a stock, it sends a qualitatively different signal; here, it was news that PACS's close financial partner could no longer support the stock. *See Omnicom*, 597 F.3d at 511–12. The downgrade also reflected the significance of six weeks of silence; no denial of the Hindenburg Report, no quarterly financial results, and no clarity on the investigations. ¶¶572–73. If PACS had robust controls and evidence of clean billing, it would have responded decisively. This new, corrective information sent PACS's stock down 8.1%. ¶575.

51

Like November 5, loss causation on December 17 is pled alternatively under a materialization-of-risk theory, which Defendants do not move to dismiss. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (loss causation pled where "the risk that caused the loss was within the zone of risk concealed by the misrepresentations"). The Complaint alleges that the Hindenburg Report's publication, analyst downgrades, and PACS's prolonged inability to respond were materializations of concealed risk. ¶¶577–82. Each event was the natural and foreseeable consequence of PACS's concealed misconduct resulting in share price declines. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (materialization of a concealed risk was sufficient basis for loss causation).

### 3. The Complaint Pleads a Stock Scheme Violating Rule 10b-5(a)/(c)

Under S.E.C. Rule 10b-5(a) and (c), it is unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). "Scheme liability" under these subdivisions contrasts "false and misleading statements" under Rule 10b-5(b), despite "considerable overlap among" these categories. *Lorenzo v. S.E.C.*, 587 U.S. 71, 71 (2019). "To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

#### a. Pleading Standard for Schemes

The Court must take all allegations as true, even if based on FE accounts or the Hindenburg Report, because "the heightened pleading standard of the [PSLRA] . . . does not apply to allegations of scheme liability." *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 52 (2d Cir. 2022). Defendants do not dispute this, but take issue with what they call "impermissible group pleading" for scheme liability. PACS Br. 55–56. This defense fails. First, neither case Defendants cite mentions "group

pleading"; they merely apply the Rule 9(b) pleading standard, which the Complaint meets. *Id.* Second, "group pleading" is not prohibited. *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (group pleading "is alive and well").[19] Third, this argument does not dispute scheme liability for PACS itself, the corporate entity bound by all scheme defendant acts.

### b.    The Complaint Pleads Three Groups of Acts Furthering the Scheme (Elements 1–2)

"To maintain a 10b–5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Danske Bank*, 11 F.4th at 105. Defendants do not dispute the scheme's "effect" was pled; it "created the false appearance of sustainable revenue growth, profitability, and operational strength, thereby inflating PACS's stock price" (¶603) and making possible an IPO and SPO that were highly lucrative for Murray and Hancock (¶¶604–05) and disastrous for investors (¶637). The Complaint distills deceptive and manipulative (nonspeaking) acts by specific Defendants into three categories.

***Dissemination.*** Six Defendants disseminated the 31 Misstatements. For example, Misstatements Nos. 15, 16, 24, and 25 were made in PACS's presentation materials during quarterly earnings calls where Defendants Murray, Apt, and Jergensen presented false (later restated) financial results. ¶¶450–58, 494–502. The Complaint asserts that these three Defendants and PACS itself "adopted" such presentations (¶¶450, 494) yet alternatively that "even if" these Defendants "did not personally author or have ultimate authority over" those statements, they disseminated them. ¶589. Similarly, twelve misstatements (Nos. 1–6 and 26–31) are in offering

---

[19] Courts speculate if *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), a decision about misstatements, limits group pleading **for misstatements**. *See Lockheed*, 875 F. Supp. 2d at 374 (rejecting such limit but collecting cases). Defendants cite zero cases with special rules about grouping Defendants for pleading **schemes**.

documents "signed by Defendants Murray, Hancock, and Apt" (¶¶384, 503), so were either made or disseminated by these specific Defendants (and by PACS itself). ¶589. "Misstatements and omissions alone are not enough for scheme liability, [but] *Lorenzo* tells us that dissemination is one example of something extra that makes a violation a scheme." *Rio Tinto*, 41 F.4th at 54.

 ***The Medicare Overbilling Itself.*** As alleged, PACS was never profitable without "systematic abuse of the COVID-19 Waiver" with "no medical or other proper justification." ¶592. Once the Waiver ended, PACS would not have returned to profitability pre-IPO without "billing thousands of unnecessary and unjustified respiratory and sensory therapies under Medicare Part B." ¶593. The latter was implemented Company-wide by "top-down directives from" Defendants Murray, Hancock, Apt, Jergensen, Sanford, and PACS itself, "to perform unnecessary respiratory therapies on thousands of patients, regardless of clinical need or outcome." ¶112. Together, these six people "coordinated this effort all Class Period by sending [PACS's RVPs]—each of whom reported directly to Defendant Sanford—to various facilities to push such unnecessary respiratory treatments" (*id.*) and "ensure that these services were widely performed despite the lack of medical necessity using quotas, spreadsheets, conference calls, and presentations that amounted to instruction on how to maximize the overbilling while avoiding detection." ¶593. All six of them "permitted falsified therapy documentation, patient charts, and billing records designed to justify improper Medicare reimbursement and evade detection" (¶594), including pressure that forced "staff . . . to continually falsify documentation." ¶113; *see also* ¶173 (PACS "demanded[] that its employees falsify records . . . to inflate revenue, profits and PACS's share price"). Thus, they caused PACS to overbill Medicare B by at least $14,885,000 by March 31, 2024 and at least $61 million by June 30, 2024, to nobody's benefit but their own. ¶131.

 Such "sham transactions" including "falsified" documents that "served no legitimate

54

purpose" are "inherently deceptive" and "sufficient to establish the first element of liability under Rule 10b–5(a) and (c)." *S.E.C. v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016); *accord S.E.C. v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) (defendants who "condoned the creation of the falsified [] documents" liable under scheme theory). As detailed in the following section, ***only*** these six PACS Defendants had any incentive to make such practices happen—and significant incentive—so it is more plausible they perpetrated it than anyone else.

The PACS Motion seeks dismissal because "these are the same theories undergirding the alleged falsity" of the 31 Misstatements. PACS Br. at 43. But such "overlap" is not problematic. *Lorenzo*, 587 U.S. at 72; *Huddleston*, 459 U.S. at 383 ("[I]t is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct."). Whether PACS's share price later deflated from a credible exposé, government enforcement, or a restatement, it was a fraud on investors even if nobody made any statements.

***PACS's Deceitful Business Model.*** A company may not conduct a "course of business which operates . . . as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(c). As alleged, Defendants Murray, Hancock, Apt, Jergensen, Sanford, and PACS itself "reconfigured the ostensibly compliant SNFs it acquired into facilities designed to exploit Medicare . . . using top-down directives like quotas and a Company-wide policy of firing anyone who[] . . . sp[oke] out against, or otherwise reject[ed], PACS's improper profit-generating procedures." ¶7; *see supra* Part III.A. This deceptive aspect of PACS's true business model enabled misconduct responsible for more than 100% of PACS's profit, and PACS had to restate the resulting revenue. ¶¶129–31. It operated as a deceit on PACS's patients, on Medicare, and on investors. ¶¶620–25. It injured investors directly, gave six specific Defendants concrete and personal benefits, and benefitted nobody else. ¶586 (scheme served "no purpose other than to artificially bolster PACS's

profits . . . to inflate PACS's share price"); ¶¶603–05 (scheme artificially inflated profit and stock).

Again, the PACS Motion's only substantive response is that these allegations are based on "the same theories" as misstatements, PACS Br. at 43, which is no defense, *see supra*.

### c.    The Complaint Pleads Scheme Scienter (Element 3)

"Scheme liability claims are subject to the PSLRA pleading standard with respect to scienter." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022). This includes "alleging facts showing that (1) the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Gimpel*, 156 F.4th at 144. Here, the facts supporting the PACS Defendants' misstatement scienter, especially insider sales and "uncertainties," equally support scheme scienter, with two additions.

First, Murray, Hancock, Apt, Jergensen, and Sanford had another unusual motive to inflate PACS's reported profits: "the Company's 2024 Management Bonus Program" paid them "bonuses as a percentage of the Company's reported Adjusted EBITDA starting in April 1, 2024"—a direct share in the same profit that would have been nonexistent without the scheme. ¶612. Clawback provisions revealed they received "$3,844,660 in bonuses as a direct result of the Company's scheme to overbill Medicare B alone." ¶¶614–15; *see Gimpel*, 156 F.4th at 145 (executive defendants "had the motive to commit fraud because bonuses they received were tied to the very metrics that [company] admittedly overstated," which shows the defendants "benefitted in some concrete and personal way from the purported fraud"); *Salix Pharms.*, 2016 WL 1629341, at *15 ("Board's decision to exercise the clawback against the Individual Defendants . . . weighs in favor of a strong inference of scienter."). Further evidencing Murray's and Hancock's culpability and control, they have flouted the clawback and not returned their portion of these illicit bonuses. ¶616.

Second, the inference of scienter need be only "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Yet Defendants offer no innocent

56

explanation why a single SNF would overbill Medicare B for unnecessary, medically unjustified therapies, why the scheme would occur across the Company to the extent of at least $61 million, or why it would occur when Defendants Murray, Apt, and PACS itself were "uncertain[]" about whether such revenue could even be recognized. No mistake that harms investors is so lucrative.

### d.     The Complaint Pleads Investor Reliance on the Scheme

The PACS Motion disputes the element of reliance *only* for scheme claims against Jergensen and Sanford, whose actions it says were not "communicated to the public in any way." PACS Br. at 44–46 (citing *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)). *Stoneridge* is inapposite, and Defendants misinterpret it.

In *Stoneridge*, the Court held that litigants could not "apply *Basic*'s presumption of reliance" to their scheme claim against non-primary, third-party violators. *Stoneridge*, 552 U.S. at 160. Fortunately, the Complaint here takes *other* routes to plead reliance, none of which go through *Basic*, alleviating *Stoneridge*'s concerns and side-stepping the PACS Motion's reasoning.

First, unlike in *Stoneridge*, the scheme claim here does not invoke *Basic* but rather the distinct *Affiliated Ute* presumption of reliance. ¶627. Thereunder, investors are presumed to rely on secret stock schemes perpetrated by entities who have a duty to disclose material information to them—including any material schemes they conceal. *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). Here, Defendants had two such duties, and the Motions dispute neither. One is the insider's duty to disclose: the insider sellers PACS, Hancock, and Murray had a duty to disclose all material nonpublic information before selling stock, which they each neglected to do for both the IPO and SPO. ¶628. It is well-established in this circuit that an insider's duty to disclose triggers the *Affiliated Ute* presumption. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001) ("This insider's duty to disclose arises from the relationship of trust and confidence between corporate insiders and shareholders."). The second trigger is PACS's duty to disclose

57

"complete and accurate billing information" publicly "as a requirement to receiving reimbursement from Medicare," imposed by multiple laws. ¶629. "Had PACS fully complied with these provisions, as required, the omitted facts would have been publicly available throughout the Class Period, and accordingly, investors may be presumed to have relied on their absence." *Id*.

Second, unlike in *Stoneridge*, the Complaint also pleads reliance directly, through facts independent from any presumption. A key allegation here is that without the acts furthering the scheme, there would have been no IPO or SPO at the times and prices at which they occurred here, and PACS never would have been profitable. ¶¶633–36. Defendants' "indirect chain" (PACS Br. at 58–59) is a strawman based on inapplicable law about when the behavior of a "secondary actor" (*id.*)—not primary actors Jergensen and Sanford—avoids reliance. *Stoneridge* is distinguished.[20]

Each of the above sufficiently pleads reliance—especially after the Motions conceded them—so Defendants' other arguments can be ignored.

### e.    Defendants Concede All Other Scheme Elements

Defendants do not dispute reliance on the actions of the other four Defendants, or that the alleged acts furthered the scheme, or that the scheme caused investor losses, or that it was connected to the purchase or sale of securities during the Class Period.

### 4.    The Complaint Pleads Control Person Liability Under Section 20(a)

Because Plaintiffs have stated a viable claim under Section 10(b), the Section 20(a) claim survives. *See ATSI*, 493 F.3d at 108. Defendants' argument that Murray and Hancock did not "control" specific statements by Apt conflates statement-level control with control of a primary violator as called for by Section 20(a). Here PACS and Apt are both primary violators as the

---

[20] *Stoneridge* concerned scheme claims against a company's suppliers and customers—secondary actors—who helped the company mislead its auditor and investors, which the Court rejected because investor reliance the third parties' actions was "too remote." 552 U.S. at 161; *see also Turquoise Hill*, 625 F. Supp. 3d at 254 (applying *Stoneridge* to dismiss scheme claims against third parties). Here, the scheme Defendants are exactly the opposite of third parties.

58

"makers" of these statements and Defendants do not seriously dispute Murray's and Hancock's alleged controlled of *both*. ¶¶267–73, 727–29 (undisputed facts of Murray's and Handock's control of the PACS Defendants); *see Maher v. Global Factors LLC*, 2024 WL 3356985, at *27 (S.D.N.Y. July 8, 2024) (Liman, J.) (finding defendant liable as a control person for statements he did not make; "[c]ontrol over a primary violator may be established by showing that the defendants possessed the power to direct or cause the direction of the management and polices of a person").

### 5.    The Complaint Pleads a Violation of Section 20A

Defendants' Section 20A arguments fail. First, the Complaint adequately pleads primary violations of Rule 10b-5, satisfying Section 20A's predicate requirement. *Contra* PACS Br. at 46.

Second, Section 20A requires "contemporaneous trading" and "possession of material, nonpublic information." 15 U.S.C. § 78t-1. Defendants concede the former, and dispute the latter simply by attempting to label the allegations "conclusory." PACS Br. at 46–47. But the Complaint pleads possession of material nonpublic information with particularity. By March 31, 2024, before the Offerings, Murray knew PACS's "Medicare Part B billing" was "uncertain[]" but improperly recognized it as revenue anyway, requiring future restatement. ¶¶259–62. By April 8, 2024, still pre-IPO, Hancock's and Murray's direct-report Sanford received DOJ's investigative demand concerning PACS's submission of false claims to Medicare. ¶264(a). Murray and Hancock controlled PACS and its operations during pervasive, Company-wide misconduct that artificially inflated PACS's revenue and profitability, including Medicare overbilling schemes, falsified documentation, materially weak internal controls, and swelling refund liabilities—which benefitted primarily Murray and Hancock. ¶¶109–16, 201–33, 265, 586, 597. Meanwhile, numerous FEs across multiple regions independently corroborated Hindenburg's credible Report that directives to overbill Medicare came top-down from management. ¶¶98–108, 112–16, 130–50, 201–14. Overbilling Medicare had been solely responsible for making PACS profitable—

59

PACS's true business model (¶¶596–605)—from 2023 when the Waiver ended (¶¶386(b), 668) through these insider sales in 2024 (¶¶130–31), all of which Hancock and Murray knew from overseeing operations, financial reporting, and the Offerings themselves. ¶¶41, 272, 531, 534; *see Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 328 (S.D.N.Y. 2024) (upholding Section 20A claims against individual to the same extent as a strong inference of scienter pled under Section 10(b)).

Defendants' only other arguments are strawmen: identifying other potential sources for Murray's and Hancock's knowledge that the Complaint does not even plead, like the Hindenburg Report and the internal investigation, which postdated the SPO. PACS Br. at 46–47.[21] They ignore direct pre-trading knowledge of "uncertainties" and refund liabilities (¶¶260–62), federal investigation (¶533), responsibility for designing materially weak internal controls (¶¶557–58), and top-down directions to overbill Medicare that benefitted nobody else (¶¶535–45).

Finally, Hancock and Murray also gifted millions of dollars' worth of shares to PACS, who in turn sold them while indisputably in possession of all the above material nonpublic information. Indeed, though PACS's insider trading is clearly pled as a distinct Section 20A violation (¶¶715–23), for which companies are proper defendants,[22] ***Defendants do not dispute it***.

## V.    CONCLUSION

The Motions should be denied entirely. They ignore recent Second Circuit authority, including *DeCarlo*, *Shanda Games*, and *Abramson*, and ignore the Complaint's most meaningful allegations. Should the Court nevertheless find any pleading deficiencies, Plaintiffs respectfully request leave to amend, which should "be freely given." *Shanda Games*, 128 F.4th at 59.

---

[21] Unlike the cases Defendants cite, Plaintiffs do not rely on bare, boilerplate assertions of knowledge. PACS Br. at 46–47 (citing *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007), and *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 310–11 (S.D.N.Y. 2008)).

[22] *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 179 (1994) ("§20A, added in 1988, prohibits ***any person*** from engaging in insider trading," whereas other sections apply only to "owners, directors, and officers"); *see also In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *18–19 (S.D.N.Y. Mar. 14, 2024).

Dated: April 20, 2026                           Respectfully submitted,


                                                /s/ Alfred L. Fatale III
                                                **LABATON KELLER SUCHAROW LLP**
                                                Alfred L. Fatale III
                                                Jeffrey A. Dubbin
                                                Jessica N. Goudreault
                                                Wesley A. Mann
                                                140 Broadway
                                                New York, New York 10005
                                                Telephone: (212) 907-0700
                                                afatale@labaton.com
                                                jdubbin@labaton.com
                                                jgoudreault@labaton.com
                                                wmann@labaton.com

                                                *Lead Counsel for Plaintiffs and the Class*

61

**CERTIFICATE OF COMPLIANCE**

I, Alfred L. Fatale III, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 2(I) of the Honorable Lewis J. Liman's Individual Practices in Civil Cases, that the Parties have reached agreement on reasonable page limits for the briefing of Defendants' Motions to Dismiss and agreed that Plaintiffs may file a Memoranda of Law that shall not exceed 60 pages in total. The foregoing Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Consolidated Class Action Complaint was prepared using Microsoft Word and is 60 pages long. In making this calculation, I have relied on the page count of the word-processing program used to prepare the document.

Dated: April 20, 2026
New York, New York

_/s/ Alfred L. Fatale III_
Alfred L. Fatale III