USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/04/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTOPHER MANCHIN, *individually and on behalf of all others similarly situated*,

Plaintiff,

-v-

PACS GROUP, INC., JASON MURRAY, DERICK APT, MARK HANCOCK, JACQUELINE MILLARD, TAYLOR LEAVITT, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, TRUIST SECURITIES, INC., RBC CAPITAL MARKETS, LLC, GOLDMAN SACHS & CO. LLC, STEPHENS INC., KEYBANC CAPITAL MARKETS INC., OPPENHEIMER & CO. INC., and REGIONS SECURITIES LLC,

Defendants.

24-cv-8636 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants PACS Group, Inc. ("PACS" or the "Company"), Jason Murray ("Murray"), Derick Apt ("Apt"), Mark Hancock ("Hancock"), Michelle Lewis ("Lewis"), Jacqueline Millard ("Millard"), Taylor Leavitt ("Leavitt"), Evelyn Dilsaver ("Dilsaver"), Joshua Jergensen ("Jergensen"), and P.J. Sanford ("Sanford") (collectively the "PACS Defendants" or "Exchange Act Defendants") and the Underwriter Defendants[1] move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the Consolidated Class Action Complaint, Dkt. No. 63

[1] The Underwriter Defendants can be broken into two groups. The Initial Public Offering ("IPO") Underwriter Defendants are Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Truist Securities, Inc.; RBC Capital Markets, LLC; Goldman Sachs & Co. LLC; Stephens Inc.; Oppenheimer & Co. Inc.; KeyBanc Capital Markets Inc.; and Regions Securities, LLC (the "IPO Underwriter Defendants"). The Secondary Public Offering ("SPO") Underwriter Defendants are Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Truist Securities, Inc.; RBC Capital Markets, LLC; Goldman Sachs & Co. LLC; UBS Securities LLC; Stephens Inc.; and Oppenheimer & Co. Inc., LLC (the "SPO Underwriter Defendants").

("CCAC"). *See* Dkt. Nos. 82, 84. For the reasons that follow, the motions to dismiss are granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the CCAC as supplemented by the documents incorporated by reference.[2]

### I. Relevant Parties

PACS is a Delaware corporation headquartered in Farmington, Utah. CCAC ¶ 33. The Company was founded by Murray and Hancock in 2013 as a provider of skilled nursing facilities ("SNF") to meet the growing demand for long-term care and rehabilitation services across the United States. *Id.* ¶ 89. From April 11, 2024 to December 16, 2024 (the "Class Period"), it served more than 30,000 patients daily through its network of approximately 212 to 314 facilities across seventeen states and employed over 40,000 staff members. *Id.* ¶ 90. Its common stock trades on the NYSE under the ticker symbol "PACS." *Id.* ¶ 33.

The main operating subsidiary of PACS is Providence Administrative Consulting Services, Inc. ("PACS Services"). *Id.* ¶ 91. During the Class Period, PACS generated revenue for patient and resident services, such as skilled nursing services and senior assisted living

[2] "The Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020) (quoting *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013)), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("a plaintiff's *reliance* on the terms and effect of a document in drafting the compliant" permits "the court's consideration of the document on a dismissal motion"); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of securities filings and associated documents). The Court considers below whether, and to what extent, certain exhibits of the declaration attached to Defendants' motions to dismiss may be considered. For the purposes of this section, the Court draws from the CCAC with attributions to the underlying sources relied on therein.

services, through governmental programs including Medicare and Medicaid, patients, and other third-party payors. *Id.* ¶ 93. Skilled nursing services were a key driver of revenue and profit, contributing over 98% of PACS's revenue in 2023 and 2024. *Id.* ¶ 94. In those same years, Medicare contributed 47% and 37% of the Company's total revenue respectively. *Id.* ¶ 96.

Murray was PACS's Chief Executive Officer ("CEO") and Chairman of the Board during the Class Period, and Hancock was Director and Executive Chairman of the Board of Directors during that same period. *Id.* ¶ 42. Apt was PACS's Chief Financial Officer ("CFO"). *Id.* ¶ 43. Jergensen was PACS's President and Chief Operating Officer. *Id.* ¶ 44. P.J. Sanford was PACS's Vice-President of Finance and subsequently the President of PACS Services. *Id.* ¶ 45. Lewis was PACS's Chief Accounting Officer during the Class Period. *Id.* ¶ 47. Millard, Leavitt, and Dilsaver were members of PACS's Board of Directors. *Id.* ¶¶ 48–50.

Citigroup Global Markets Inc. ("Citigroup"), J.P. Morgan Securities LLC ("JP Morgan"), Truist Securities, Inc. ("Truist"), RBC Capital Markets, LLC ("RBC"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Stephens Inc. ("Stephens") and Oppenheimer & Co. Inc. ("Oppenheimer") are financial institutions that served as underwriters and financial advisors for PACS's initial public offering ("IPO") and secondary public offering ("SPO"). *Id.* ¶¶ 59–64, 66. KeyBanc Capital Markets Inc. ("KeyBanc") and Regions Securities, LLC ("Regions") are financial institutions that acted as financial advisor and underwriters for PACS's IPO. *Id.* ¶¶ 65, 67. UBS Securities LLC ("UBS") was an underwriter and financial advisor for PACS's SPO. *Id.* ¶ 68.

Lead Plaintiff 1199SEIU Health Care Employees Pension Fund ("Pension Fund") is a multi-employer Taft-Hartley defined benefit plan. *Id.* ¶ 31. It purchased PACS common stock during the Class Period traceable to the IPO and the SPO. *Id.* Additional plaintiff Police and

Fire Retirement System of the City of Detroit ("Detroit P&F" and, together with Lead Plaintiff, "Plaintiffs") purchased shares in the IPO and SPO. *Id.* ¶ 32.

## II. IPO & Subsequent Developments

The pertinent chronology is as follows: On April 11, 2024, PACS launched its IPO of 24,642,856 shares, including an overallotment of 3,214,284 insider shares that were split evenly between Defendants Murray and Hancock, at $21.00 per share. *Id.* ¶ 18. The IPO priced each share at $21.000 and generated approximately $423 million in net proceeds for the Company and approximately $63.4 million for Murray and Hancock together. *Id.* ¶ 34.

On September 6, 2024, PACS engaged in a SPO, registering 19,034,482 shares, including the overallotment option of 2,482,758, of which 2,777,778 shares were sold by the Company for net proceeds of over $94 million, and the other 16,256,704 shares were sold by Murray and Hancock with net proceeds exceeding $564 million. *Id.* ¶¶ 5(b), 19.

On November 4, 2024, a report about PACS was published by short seller Hindenburg Research LLC (the "Hindenburg Report" or "Report").[3] *Id.* ¶ 234; *see also* Dkt. No. 88-10 (copy of Hindenburg Report). Based on a purported "5-month investigation, including interviews with 18 former employees, competitors, and an analysis of 900+ detailed facility-level cost reports," the Hindenburg Report asserted that "PACS'[s] 'turnaround' strategy largely boils down to systematically scamming taxpayer-funded healthcare programs." Dkt. No. 88-10 at 2; *see also* *id.* at 8.[4] The Report posited that PACS's earnings derived largely if not entirely from schemes that improperly took advantage of the COVID-19 waiver program that loosened restrictions for SNFs to access high-paying skilled-care Medicare benefits for their patients through mid-2023,

[3] "A short seller speculates that a particular stock will go down in price and seeks to profit from that drop." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 n.1 (S.D.N.Y. 2015) (internal quotation marks omitted), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (summary order).
[4] Citations to Dkt. Nos. 88-3, 88-4, 88-8, 88-10, and 88-12 refer to ECF pagination.

and after the program's expiration in May 2023, the Company pivoted towards billing unnecessary therapies. *Id.* at 8–9, 18–19. In the wake of the publication of the Hindenburg Report, PACS's share price dropped 27.78% from $42.94 to $31.01, on unusually heavy trading volume. CCAC ¶ 241. The following day, on November 5, 2024, PACS's share price dropped another 4.74%, or $1.47, closing at $29.54 a share, on unusually heavy trading volume. *Id.* ¶ 245.

On November 6, 2024, PACS issued a press release on Form 8-K in which it announced, among other things, that its Audit Committee had commenced an investigation into the allegations of the Hindenburg Report. *Id.* ¶ 247. That same day, PACS also disclosed that it had received civil investigative demands ("CIDs") from the federal government regarding the Company's reimbursement and referral practices. *Id.* PACS's share price fell $11.45, or 38.76%, to close at $18.09 per share on November 6, 2024, on unusually heavy trading volume. *Id.* ¶ 248.

On June 16, 2025, PACS filed a Form 8-K announcing that the Company's previously issued financial statements for the first and second quarters in 2024 could no longer be relied upon and needed to be restated. *Id.* ¶ 251; *see also* Dkt. No. 88-7.

Because the IPO registration statement and prospectus ("IPO Offering Documents"), the SPO registration statement and prospectus ("SPO Offering Documents"), and the November 2025 restated annual report for fiscal year 2024 (the "Restatement") are core to understanding Plaintiffs' claims, the Court provides further detail on each below.

### A. IPO Offering Documents

The IPO Offering Documents incorporated the audited "combined/consolidated balance sheets of PACS Group, Inc. and subsidiaries . . . as of December 31, 2023 and 2022, the related combined/consolidated statements of income, stockholders' equity (deficit) and cash flows for

each of the three years in the period ended December 31, 2023, and the related notes." Dkt. No. 88-3 at 180, 182–83.

The IPO prospectus makes clear that PACS's revenue "depend[s] upon reimbursements from third-party payors," which refers to "Medicare, Medicaid and other government healthcare programs and private insurance organizations." *Id.* at 14. In its summary of risk factors, the prospectus specifically warns, *inter alia*, that:

> If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.

*Id*.

PACS disclosed that, because it makes money through reimbursements, the Company calculates revenue pursuant to generally accepted accounting principles ("GAAP"), "based on contractually agreed-upon amounts or rates, excluding the estimates of variable consideration under . . . Financial Accounting Standards (FASB) Accounting Standards Codification (ASC) Topic 606." *Id.* at 83; *see also id.* at 101 ("Revenue recognized from healthcare services is adjusted for estimates of variable consideration to arrive at the transaction price."). To comply with GAAP, ASC Topic 606 ("ASC 606") provides a five-step revenue framework for recognizing revenue when there are "uncertainties" that will bear on cash collection. *See* CCAC ¶ 258; *see also* Dkt. No. 90-3 (ASC 606). In other words, PACS adjusts the agreed-upon rate in its contracts to account for the "variability relating to the consideration promised by a customer." Dkt. No. 88-8 at 29 (discussing ASC 606-10-32-7). In the IPO prospectus, PACS described its revenue recognition methodology and detailed that it excludes payments for which "it is probable that a significant reversal in the amount of cumulative revenue recognized" will occur. CCAC ¶ 258 n.15 (quoting Dkt. No. 88-3 at 194).

### B. SPO Offering Documents

The SPO Offering Documents contain language nearly identical to the IPO Offering Documents with respect to describing PACS's revenue recognition methodology, risk factors, and internal compliance. CCAC ¶¶ 293–94, 296–97; *compare* Dkt. No. 88-3 *with* Dkt. No. 88-4. In addition to financial statements for the periods incorporated in the IPO Offering Documents, the SPO Offering Documents incorporated financial statements that were current though the six-month period that ended on June 30, 2024, including a quarterly breakdown.[5] *See* Dkt. No. 88-4 at 22, 246.

### C. Restatement

On November 19, 2025, PACS issued its 2024 Annual Report (Form 10-K), which included a restatement of its financial results for the first two quarters of 2024. CCAC ¶ 254; *see* Dkt. No. 88-12. In its explanatory note, the Company stated that it "determined that the revenue associated with the provision of respiratory services and other therapy services billed under Medicare Part B should not have been recognized as revenue in accordance with ASC 606 in the periods discussed below." CCAC ¶ 254; Dkt. No. 88-12 at 4. After receiving information that "certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, may not be eligible for reimbursement under Medicare Part B" because there was risk of "significant reversal in the future," "[i]n accordance with ASC 250," the financial statements for the first two quarters "required restatement." CCAC ¶ 254.

Under GAAP, ASC Topic 250 ("ASC 250") requires that a company report any material error in the financial statements of a prior period discovered after the financial statements are

[5] Though not listed separately, the metrics for the March 31, 2024 quarterly income statement can be calculated from the income statement columns reported for the half-year period and quarter period that ended on June 30, 2024. *See* Dkt. No. 88-4 at 223.

issued as an error correction by restating the prior-period financial statements, including errors resulting from mathematical mistakes, mistakes in the application of GAAP, or the oversight or misuse of facts that existed at the time the financial statements were prepared. CCAC ¶¶ 259, 332–33; *see also Glantz v. James River Grp. Holdings, Ltd.*, 2025 WL 278440, at *7 (S.D.N.Y. Jan. 23, 2025) (discussing ASC 250).

The explanatory note, in a separate section titled "Material Weakness," discussed that "management identified control deficiencies that, individually or in the aggregate, constitute material weaknesses in [the Company's] internal control over financial reporting." Dkt. No. 88-12 at 5. The Restatement listed two: first, that the Company had not "design[ed] and maintain[ed] sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues received through the hotline process;" and second, that it had not "design[ed] and maintain[ed] adequate controls within the revenue process to appropriately recognize revenue for new services in accordance with" ASC 606. *Id.*

The Restatement reduced the revenue PACS recognized for the first quarter of 2024 by approximately $14.9 million, and the revenue PACS recognized for the second quarter of the same year by approximately $46.1 million. CCAC ¶ 285. Because PACS's operating expenses did not vary significantly in the restated financials, the contracted revenue led to large changes in previously reported bottom-line metrics. For Q1 2024, PACS restated its net income from $49.1 million to $34.8 million, decreasing it by over a fourth. Dkt. No. 88-12 at 143. For Q2 2024, PACS's restated its net loss of $10.9 million to a loss of nearly $31.9 million, almost tripling in magnitude. *Id.* at 144; *see also* CCAC ¶ 317 (chart listing changes between line items as originally reported versus restated).

Among other revelations, the 2024 Annual Report also disclosed that PACS had been subject to multiple federal CIDs and a subpoena concerning its "reimbursement and referral practices." Dkt. No. 89 at 17 (quoting CCAC ¶ 569). First, on April 8, 2024, three days before the IPO, the Company received a CID from the U.S. Department of Justice ("DOJ") concerning both PACS Services and one facility, Paradise Valley Healthcare Center ("Paradise Valley") and whether "Paradise Valley and [PACS Services] violated the False Claims Act by submitting false claims to Medicare." Dkt. No. 88-12 at 73. Then on September 11, 2024, five days after the SPO, PACS received a CID related to the DOJ's investigation of PACS's California SNFs to determine if false claims were made under the "patient-driven payment model for nursing and rehabilitation services." *Id.* On September 30, 2024, PACS received its third CID concerning a Providence Group, Inc. ("Providence Group") and a specific facility, Bishop Care Center ("Bishop"); the CID concerned whether Providence Group had submitted false claims under the COVID-19 waiver, with a specific request for information about the practices at Bishop. *Id.* And lastly, PACS disclosed that, on February 26, 2025, it had received a subpoena from the DOJ concerning PACS's "COVID Waiver practices, billing of Medicare Part B for respiratory and sensory integration therapy services, change of insurance enrollment, cost waivers for co-pays, deductibles, and co-insurance, and claim reimbursement from Medicare for bad debt." *Id.* at 74.

## III. PACS's Purported Wrongdoing

According to Plaintiffs, as reported in the Hindenburg Report and substantiated by several former employees, PACS's fraudulent activities began well before its IPO and continued beyond the SPO.

The allegations of wrongdoing begin in March 2020, when the Centers for Medicare & Medicaid Services ("CMS") announced a COVID-19 waiver for certain Medicare programs. CCAC ¶ 11. Ordinarily, PACS's skilled nursing care service through its SNFs is covered by

Medicare Part A only if a patient first spends three days in a hospital before moving to one of PACS's facilities.[6] *Id.*; *see also* 42 U.S.C. § 1395x(i) (defining "post-hospital extended care services" to require that an individual first be an "inpatient for not less than 3 consecutive days" at a hospital before discharging to a SNF). To respond to the public health crisis during the COVID-19 pandemic, CMS suspended the three-day hospital stay requirement in March 2020 pursuant to Sections 1135 and 1812(f) of the Social Security Act. CCAC ¶ 11; 42 U.S.C. § 1320b–5 (authorizing the Secretary of Health and Human Services "to temporarily waive or modify the application of" requirements under various statutory provisions and regulations); *id.* § 1395d(f) (allowing the agency discretion to "provide for coverage . . . of extended care services which are not post-hospital extended care services" provided that certain conditions are met). However, facilities still needed to provide sufficient justification for Part A SNF coverage (*e.g.*, skilled medical necessity). CCAC ¶ 118. A positive COVID test alone would not suffice, yet "PACS facilities would regularly and improperly rely on . . . often just a single positive COVID test" in an effort to increase revenues at a facility, at times threefold, "at an extremely high profit margin." *Id.* ¶ 119. From 2021 to 2023, the Company's net income more than doubled, going from $48 million to $113 million. *Id.* ¶ 110.

Plaintiffs allege that PACS's abusive Part A billing created a cliff for when the waiver program ended on May 11, 2023, with a 100-day tapering period, resulting in an impending collapse in improperly inflated revenues.[7] *Id.* ¶¶ 110, 117–19, 129. The Hindenburg Report

[6] Generally, Medicare Part A covers hospital and inpatient services whereas Medicare Part B covers outpatient medical services (*e.g.*, preventative care, therapies). *See* CCAC ¶ 84.
[7] Under the COVID-19 waiver program, beneficiaries would be able to receive up to one hundred days of reimbursable care at an SNF. PACS could therefore expect to see revenues attributable to the waiver program for up to one hundred days after the end of the program on May 11, 2023. CACC ¶ 117, 124.

calculated that "PACS was generating hundreds of millions of dollars a year in Medicare revenue from the COVID waiver scheme, allowing it to go public with the illusion of rapid, legitimate growth and profitability." *Id.* ¶ 128 (quoting Dkt. No. 88-10 at 17). As corroboration, Plaintiffs provide allegations from confidential witnesses ("CWs") who are former PACS employees (each referred to as "FE" with a dashed number designation).[8] FE-1 and FE-10 noted that PACS sought to switch patients from private insurers to Medicare and within Medicare to different sources or coverage types so that the Company could "maximize billing." *Id.* ¶ 121–23. Comparing similar facilities between PACS and its competitor, The Ensign Group, Inc., the Hindenburg Report calculated that PACS's comparative facilities reported "a 190% growth" while its similarly situated competitor only showed a 23% increase in Medicare revenue. *Id.* ¶ 127.

Plaintiffs assert that although the Part A waiver expired in mid-May 2023, because "PACS would lose its appearance of profitability and growth right as it was preparing to go

[8] There are ten CWs that were employed by PACS during some part of the Class Period at one or more of the Company's facilities. CCAC ¶ 98–108, nn.7–8. Their characteristics are as follows: (1) FE-1 was Director of Admissions at a PACS facility (undisclosed location) from November 2023 to August 2024; (2) FE-2 was Assistant Regional Director of Clinical Services at a California facility for several years during the Class Period, overseeing fifteen facilities and, at one point, supervising five; (3) FE-3 was Business Office Manager of a California facility from October 2023 to August 2024, overseeing payments and claims for that facility; (4) FE-4 was Director of Medical Records at an Arizona facility from September 2024 to February 2025, allegedly resigning because of PACS's legal violations; (5) FE-5 is a Licensed Nursing Home Administrator and was Interim Executive Director at a Colorado facility from March to October 2024; (6) FE-6 was Executive Director of an Arizona facility from April to June 2024; (7) FE-7 was a PACS Regional Marketing Director in 2024 for the Southwest region; (8) FE-8 was Director of Business Development at a Colorado facility from April 2024 to April 2025; (9) FE-9 was an Administrator at a California facility from the second half of 2023 to 2025 and reported to Chad Nielsen, PACS Regional Vice President of Operations; and (10) FE-10 was an Administrator at an Arizona facility from September 2023 to July 2024. *Id.* ¶¶ 98–107. The CWs worked "at distinct SNFs within PACS covering 28 of PACS's 212 to 314 SNFs" during the Class Period. *Id.* ¶ 108. All CWs are referred to by masculine pronouns to mirror the CCAC's chosen convention. *Id.* at 32 n.7.

public" via its April 2024 IPO, *id.* ¶ 129, the Company sought another avenue to inflate revenue and sustain its growth story in that gap. Plaintiffs allege (and the Hindenburg Report claimed) that the Company found that avenue in Medicare Part B which it improperly billed via two primary tactics: (1) performing unnecessary respiratory and sensory therapies, and (2) "regenerating patients," *i.e.*, cycling patients to a hospital and then the SNF to restart Medicare coverage. *Id.* ¶¶ 130, 151, 156. Plaintiffs assert that the most significant of these schemes was improperly billing respiratory therapies under Medicare Part B, which was referenced explicitly in the November 2025 Restatement. *Id.* ¶ 130 (noting that the Restatement reduced previously stated "revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B" (quoting Dkt. No. 88-12 at 4)).

Allegations from CWs purportedly corroborate the shift to improperly billing Medicare Part B for respiratory services. *Id.* ¶¶ 133–45 (recounting statements from and experiences of FE-1, FE-3, FE-5, FE-6, FE-9, and FE-10). The allegations range from the problematic to the anodyne. For instance, FE-9, who was an Administrator at a California facility from the second half of 2023 to 2025, characterized PACS's push for respiratory therapy as a "Ponzi scheme," where respiratory therapists were given bonuses depending on how much revenue they could collect by providing additional services, and stated that respiratory therapists were highly incentivized to get "everyone" on respiratory therapy. *Id.* ¶ 133. FE-3, who was Business Office Manager of a California facility from October 2023 to August 2024, noticed in his role overseeing accounts receivable, that respiratory therapies were billed separately after PACS "initiate[d]" its push of the services. *Id.* ¶ 134. FE-3 also noted that the initiative began around May 2023 with a regionwide Zoom meeting, led by "Corporate Level Management," where quotas were discussed and a regional vice president ("RVP") instructed the "staff to perform

respiratory therapy and how to bill for it." *Id.* ¶ 135. FE-5, who was a Licensed Nursing Home Administrator and was Interim Executive Director at a Colorado facility from March to October 2024, recalled a meeting for Colorado administrators by RVPs to ensure billing for respiratory therapy would pass audits, including how to bill for additional treatments in excess of the regulatory cap on treatments per patient per day. *Id.* ¶ 139. Specifically, he stated that PACS pushed Administrators to provide ten times the number of treatments per patient per day than permitted solely to generate profits and that "those who did not push these treatments were fired." *Id.* ¶ 142. And FE-10, who was an Administrator at an Arizona facility, recalled a Zoom meeting on respiratory training wherein staff were instructed on how to document treatments at a set rate or that "were not actually performed." *Id.* ¶ 137. Because FE-3 and FE-10 were located in distinct PACS regions and reported to different RVPs, Plaintiffs assert that "the directive to over-bill Medicare B for respiratory therapies using a centrally-designed and centrally-distributed scheme came from above Company's regional leadership and therefore came from the Company's central leadership." *Id.* ¶ 138. Plaintiffs further assert that given Defendant Sanford's positionality as the overseer of RVPs, and that Sanford reported directly to Defendants Murray and Hancock, Sanford must have at least known of the abusive billing tactics if not also his supervisors. *Id.* ¶¶ 138, 140; *see also id.* ¶ 146 (Hindenburg Report indicated the "scheme began with California facilities and then was pushed out to facilities across the PACS network").

Plaintiffs allege that "[b]eginning in the Company's first fiscal quarter of 2024 (prior to the IPO) and continuing through its second fiscal quarter (including and after the IPO)," the Company also boosted revenues by pushing gratuitous sensory therapies. *Id.* ¶ 151. Plaintiffs assert that sensory therapies were among the services for which PACS erroneously recognized revenue given that the Restatement's explanatory note referenced not only respiratory service but

also "certain other therapy services." *Id.* (citing Dkt. No. 88-12 at 4). To bolster these allegations, Plaintiffs assert that FE-10, an Administrator at an Arizona facility from September 2023 to July 2024, indicated that a RVP told him to bill Medicare for sensory therapies even if a patient only spent 15 minutes inside of a makeshift mobile cart that served as a "sensory room[]." *Id.* ¶ 152. The Hindenburg Report also quoted a former administrator who said patients were being "put" on "sensory integration, even if it's not really applicable." *Id.* ¶ 153 (quoting Dkt. No. 88-10 at 19).

FE-9, who was an Administrator at a California facility from the second half of 2023 to 2025, recounted that PACS pushed facilities to cycle patients in and out of facilities (*i.e.*, send a patient to a hospital for a few days then re-admit into a SNF) to reboot a patient's Medicare coverage, which would pay more than other insurance policies in instances where a patient received over 100 days of skilled therapy coverage. *Id.* ¶¶ 155–57. If a patient could not be "regenerated" in this manner, PACS allegedly pressured employees to ensure that stays were extended without sufficient cause or under manufactured pretenses.[9] *Id.* ¶ 158. FE-9 indicated that he had a direct call with Chad Nielsen, PACS Regional Vice President of Operations, who instructed him to "'regenerate' more patients or offer bonuses to marketers to increase admissions." *Id.* ¶ 162. FE-1 "confirmed that the issues he observed at his facility were happening Company-wide and definitely throughout the state of California," and he left because of his qualms with PACS's business practices. *Id.* ¶ 161. FE-4, FE-9, and FE-10 generally supported FE-1's allegations, with FE-1 averring that there was "leadership" pressure to keep SNFs filled at or near max capacity. *Id.* ¶¶ 162–66.

---

[9] As FE-1 explained, "staff would get Frappuccinos for patients, which would cause the patients' blood sugar to spike which gave the facility an excuse to keep the patient longer for monitoring." CCAC ¶ 159.

Plaintiffs claim that PACS's exploitation was not limited to these primary schemes. Other deceptive or improper practices included: (i) miscellaneous overbilling, (ii) patient neglect, (iii) skirting licensing requirements; (iv) violating medical records requirements; (v) cheating staffing ratio requirements, and (vi) frustrating state audits. *See generally id.* ¶¶ 167–200. On false billing, FE-1, FE-2, FE-4, FE-9, and FE-10 recount instances in which PACS would isolate patients without a medical need due to higher rates, provide physical therapy when unnecessary, misleadingly document and overcharge treatments, and bill for unreceived care or prescriptions. *Id.* ¶¶ 168–73. As for patient neglect, FE-4, a Director of Medical Records at an Arizona facility, commented that at times PACS subordinated patient care to profit, mistreating their patients which sometimes led to preventable harm. *Id.* ¶ 174. According to the Hindenburg Report and FE-2—and as verified by FE-5, FE-6, and FE-9—PACS evaded its licensing requirements, including its obligation to ensure each SNF was run by a licensed administrator by, *inter alia*, sharing individual administrator licenses across a number of facilities and allowing unlicensed administrators to oversee facilities in violation of state law, which placed strict limitations on how many facilities a licensed administrator may run and in what geographic area.[10] *Id.* ¶¶ 176–79, 185–90. For example, FE-9 allegedly ran a facility for over a year without his license, and Nielsen was aware of that fact. *Id.* ¶ 185–86. With respect to medical record requirements, FE-4 observed that over one hundred unsigned consent forms were improperly placed in patients' files, that there were instances in which PACS employees would improperly sign forms on behalf of patient, and that Medicare and Medicaid reimbursement requests went unsigned by treating providers in violation of reimbursement requirements. *Id.* ¶¶ 192–93.

---

[10] FE-2 identified Chad Nielsen, among others, as an individual whose license was reused improperly across several facilities. CCAC ¶ 179.

Citing only the Hindenburg Report, Plaintiffs also allege that PACS misrepresented how many certified nursing assistants were employed across its network by counting all nurse aides thereby overreporting certain staffing-to-patient ratios. *Id.* ¶¶ 196–198. PACS was apparently also able to avoid audits in California by receiving "advance notice of a state inspection" through personal relationships.[11] *Id.* ¶¶ 199–200.

Based on reports from various CWs, Plaintiffs also contend that PACS's business did not utilize a "decentralized, local operating model." *Id.* ¶¶ 201–403. Instead, corporate leadership and in particular Defendant Sanford, who ran PACS Services and reported directly to Murray and Hancock, organized and controlled the company as a top-down pyramid hierarchy. *Id.* ¶¶ 205–33. The Company's culture rewarded wrongdoing, and employees that "refus[ed] to go along with the Company's unethical practices" were fired. *See id.* ¶ 227. FE-9 explained that PACS was singularly focused on maximizing reimbursement and that administrators were treated to lavish monthly meetings that centered on discussing money-generating plans, as indicated from direction and interactions with Nielsen, and permitted to misuse company credit cards for wasteful expenses.[12] *Id.* ¶¶ 203–04, 216–19. FE-2 described a chain of command that ran from PACS's leadership to Nielsen and from Nielsen to team leaders of the Arizona region. *Id.* ¶ 207. FE-10 relayed feelings of pressure to increase revenues both pre- and post-IPO, including emails from Defendant Apt that highlighted lagging facilities. *Id.* ¶¶ 209–10. The CWs also reported instances, either experienced firsthand or understood secondhand, where

[11] This allegation is one paragraph in the CCAC, which relies on FE-2's claim that one nutritionist maintained a relationship with a surveyor who provided the tips. CCAC ¶ 200.

[12] FE-9 relayed that he spoke with Nielsen around the time that PACS was "in the process of going public," where Nielsen told him that "PACS's current owners had a plan to own the Company for three to four years," after which the billing practices would change. CCAC ¶ 204.

various employees were fired if they would not comply with the Company's improper practices or sought to report misconduct. *See id.* ¶¶ 224–33.

## IV. Alleged Misstatements[13]

In the context of PACS's alleged abuse of the Medicare system, Plaintiffs allege that thirty-one statements by PACS in its IPO and SPO offering documents, as well as Form 10-Q filings, press releases, earnings call, and presentations concerning their financial performance in the first and second quarters of 2024, are actionable and give rise to liability under the Exchange Act.[14] The Court provides the list in full below, which contains some statements that are similar if not identical across time periods.

- <u>IPO Offering Documents (April 11, 2024)</u>

  1. "We rely on payments from third-party payors, including Medicare, Medicaid, and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.*" CCAC ¶ 385.

  2. "We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs*." *Id.* ¶ 389.

  3. "We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make*

[13] Plaintiffs have indicated in a footnote, *see* CCAC ¶ 384 n.21, that the "statements highlighted in bold and italics within" certain paragraphs of the CCAC are alleged to be actionable misstatements under the Exchange Act. The Court has maintained italics to note here which exact portions Plaintiffs allege are actionable. Where a statement listed below does not include any italics, the whole statement is challenged.

[14] Plaintiffs separately challenge the financial statements and risk disclosures from the IPO and SPO Offering Documents under the Securities Act.

*significant expenditures or change our operations in order to bring our facilities and operations into compliance.*" *Id.* ¶ 393.

4. "Our *significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.*" *Id.* ¶ 399.

5. "We believe our success is driven in significant part by *our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously* and deliver excellence in clinical quality and a superior experience for our patients." *Id.* ¶ 403.

6. "*Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust* and collaboration that makes us a natural choice for payors." *Id.* ¶ 407.

- <u>2024 Q1 10-Q (May 13, 2024)</u>

7. PACS's Q1 2024 Quarterly Report's "Condensed Combined/Consolidated Balance Sheets." *Id.* ¶ 412 (emphasis omitted).

8. PACS's Q1 2024 Quarterly Report's "Unaudited Condensed Combined/Consolidated Statements of Income and Comprehensive Income." *Id.* ¶ 418 (emphasis omitted).

9. "We rely on payments from third-party payors, including Medicare, Medicaid, and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.*" *Id.* ¶ 422.

10. "We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.*" *Id.* ¶ 426.

11. "We are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*" *Id.* ¶ 430.

- <u>May 13, 2024 Press Release</u>

12. The following four sentences, *id.* ¶ 437:

    i. "GAAP earnings per share for the quarter was $0.38, an increase of 31.0% over the prior year quarter."

    ii. "GAAP net income was $49.1 million, an increase of 30.7% over the prior year quarter."

    iii. "Consolidated GAAP revenue for the quarter was $934.7 million, an increase of 31.9% over the prior year quarter."

    iv. "EBITDA and Adjusted EBITDA for the quarter was $96.3 million and $88.5 million, representing increases of 47.0% and 34.0%, respectively, over the prior year quarter. Adjusted EBITDAR for the quarter was $152.5 million."

- <u>May 14, 2024 Earnings Call</u>

13. Murray stated: "[O]ur average daily Medicare rates *increased by 11% for the 3 months ended March 31, 2024 compared to the first quarter of 2023*." *Id.* ¶ 442.

14. Apt stated: "[O]ur average Medicare revenue per patient day *remained strong through Q1 at both our ramping and Mature facilities at $969 and $938 respectively, compared to '23 where our average Medicare revenue per patient day at Ramping and Mature was [$]836 and [$]846, respectively*." *Id.* ¶ 446.

- <u>Q1 2024 Earnings Presentation (May 14, 2024)</u>

15. "Forward-looking statements are not guarantees of future results and are *subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control,* and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statements, including . . . risks associated with our *review and audit of the care delivery, record keeping and billing processes of our operating subsidiaries* . . . ." *Id.* ¶ 451.

16. "Model prioritizes *local operational autonomy*, leveraging robust technology and services for responsive *decision-making based on community needs, enhancing patient care and facility operations*." *Id.* ¶ 455.

- <u>2024 Q2 10-Q (August 12, 2024)</u>

17. PACS's Q2 2024 Quarterly Report's "Condensed Combined/Consolidated Balance Sheets." *Id.* ¶ 460 (emphasis omitted).

18. PACS's Q2 2024 Quarterly Report's "Unaudited Condensed Combined/Consolidated Statements of Income and Comprehensive Income." *Id.* ¶ 465 (emphasis omitted).

19. "We rely on payments from third-party payors, including Medicare, Medicaid, and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.*" *Id.* ¶ 470.

20. "We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.*" *Id.* ¶ 474.

21. "We are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*" *Id.* ¶ 478.

- <u>August 12, 2024 Press Release</u>

22. The following three sentences, *id.* ¶ 485:

    i. "GAAP net income (loss) was $38.2 million for the six months ended June 30, 2024 and $(10.9) million for the second quarter of 2024 . . . ."

    ii. "Consolidated GAAP revenue for the first six months of 2024 was $1.9 billion, an increase of 31% over the first six months of the prior year, driven largely by increased facility count and reimbursement rates, and for the second quarter of 2024 was $981.8 million, an increase of 29% over the second quarter of 2023 and an increase of 5% over the first quarter of 2024."

    iii. "Adjusted EBITDA was $188.2 million and $99.7 million for the first six months of 2024 and the second quarter of 2024, respectively. . . ."

- <u>August 12, 2024 Earnings Call</u>

23. Murray stated: "In addition to training new leaders, *the PACS leadership model allows our local leaders to make operational decisions as close to our patients and employees as possible*, which is ultimately better for the residents and community in which they live." *Id.* ¶ 490.

- <u>Q2 Earnings Presentation (August 12, 2024)</u>

24. "Forward-looking statements are not guarantees of future results and are *subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control,* and that could cause the Company's

actual results to materially and adversely differ from those expressed in any forward-looking statements, including . . . risks associated with our *review and audit of the care delivery, record keeping and billing processes of our operating subsidiaries* . . . ." *Id.* ¶ 495.

25. "Model prioritizes *local operational autonomy*, leveraging robust technology and services for responsive *decision-making based on community needs, enhancing patient care and facility operations*." *Id.* ¶ 499.

- SPO Offering Documents (September 3–6, 2024)[15]

26. "We rely on payments from third-party payors, including Medicare, Medicaid, and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.*" *Id.* ¶ 504.

27. "We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs*." *Id.* ¶ 508.

28. "We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*" *Id.* ¶ 512.

29. "Our *significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.*" *Id.* ¶ 518.

30. "We believe our success is driven in significant part by *our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously* and deliver excellence in clinical quality and a superior experience for our patients." *Id.* ¶ 522.

31. "*Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a*

[15] The Form S-1 for the SPO was filed on September 3, 2024, and it was declared effective, alongside the prospectus, on September 5, 2025. CCAC ¶ 35.

> *foundation of trust* and collaboration that makes us a natural choice for payors." *Id.* ¶ 526.

In their briefing on the motions to dismiss, the parties have split these alleged misstatements (individually referred to as "Stmt.") into one of two categories: accounting statements (Stmts. 7–8, 12–14, 17–18, 22) or narrative statements. *See* Dkt. No. 89 at 33–35 (Plaintiffs accepting Defendants' framing). Within the set of narrative statements, the parties have decided on three mutually exclusive subgroups of the narrative statements by topic: (i) Medicare risks (Stmts. 1, 9, 19, 26); (ii) compliance and billing practices (Stmts. 2–3, 6, 10–11, 15, 20–21, 24, 27–28, 31); and (iii) business model descriptions (Stmts. 4–5, 16, 23, 25, 29–30).

**PROCEDURAL HISTORY**

Plaintiffs initiated this case by complaint filed on November 13, 2024. Dkt. No. 1.

On February 11, 2025, the Court issued an order appointing 199SEIU Health Care Employees Pension Fund (the "Pension Fund") as lead plaintiff and its counsel, Labaton Keller Sucharow LLP, as class counsel. Dkt. No. 39.

Defendants then moved to transfer venue of this case to the United States District Court for the District of Utah. Dkt. Nos. 47, 51. The Court denied that motion by Opinion and Order of May 1, 2025. Dkt. No. 56.

On December 19, 2025, Plaintiffs filed the Consolidated Amended Class Action Complaint. Dkt. No. 63. The PACS Defendants moved to dismiss the CCAC on February 17, 2026, filing a memorandum of law and the declaration of Colleen C. Smith in support of that motion. Dkt. Nos. 82–83, 88. That same day, the Underwriter Defendants also filed their motion to dismiss, supported by a memorandum of law in support of the motion and the declaration of Susan L. Saltzstein. Dkt. Nos. 84–85, 87. On April 20, 2026, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss and the declaration of Alfred L.

Fatale III. Dkt. Nos. 89-90. On June 4, 2026, Defendants filed a reply memorandum of law in further support of their respective motions to dismiss. Dkt. No. 91.

## LEGAL STANDARD

### I. Motion to Dismiss

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

In adjudicating a motion to dismiss, the Court is permitted to consider certain documents "that are not contained within the four corners of the complaint" under "[t]wo separate rules": Federal Rule of Evidence 201 and Federal Rule of Civil Procedure 10(c). *Gray v. Wesco*

*Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order). First, the Court may take judicial notice of a fact that is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Consequently, courts can consider "public disclosure documents required by law to be filed, and actually filed, with the SEC." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). The court need not limit itself to "documents attached to the complaint as exhibits or incorporated in the complaint by reference" in taking judicial notice. *Id.* at 773. Second, relying on Federal Rule of Civil Procedure Rule 10(c), the Second Circuit has long held that a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," and that a court may consider documents incorporated in a complaint by reference on a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) without converting it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *Cortec Indus., Inv. v. Sum Holdings*, 949 F.2d 42, 47 (2d Cir. 1991).

To the extent Plaintiffs rely on allegations by confidential witnesses, such as the former PACS employees, the Court "consider[s] and take[s] as true allegations by CWs at the pleadings stage so long as the CWs 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 129 (2d Cir. 2025) (quoting *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)); *see also Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025).

**II. Securities Act**

Section 11 of the Securities Act prohibits materially misleading statements or omissions in offering documents filed with the SEC. *See* 15 U.S.C. § 77k(a). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (internal quotation marks omitted).

Section 12(a)(2) of the Securities Act provides a remedy for a person who purchases a security from another person who offered or sold such security "by means of a prospectus . . . which includes an untrue statement of material fact" or a material omission. 15 U.S.C. § 77*l*(a)(2). It thus "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley,* 592 F.3d at 358–59. "[T]he elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 15 U.S.C. § 77*l*(a)(2)).

"Because Sections 11 and 12(a)(2) are 'Securities Act siblings with roughly parallel elements,' courts typically analyze the two claims together." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 401 (S.D.N.Y. 2020) (Nathan, J.) (quoting

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011)). "Sections 11 and 12(a)(2) together create three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; and (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *In re Wachovia*, 753 F. Supp. 2d at 368 (citing *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011)). "Issuers are subject to 'virtually absolute' [strict] liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *In re Morgan Stanley*, 592 F.3d at 359. Non-issuer defendants include auditors "whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement," 15 U.S.C § 77k(a)(4); and "every underwriter with respect to such security," *id.* § 77k(a)(5). For underwriters and auditors, "section 11 provides several due diligence defenses available to non-issuer defendants, *see* 15 U.S.C. § 77k(b), and section 12(a)(2) contains a 'reasonable care' defense, *id.* § 77*l*(a)(2)." *In re Morgan Stanley*, 592 F.3d at 359 n.7. The relevant non-issuer "defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)." *Id.*

Section 15 of the Securities Act establishes the liability of any individual that "by or though stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l*," *i.e.*, Sections 11 or 12, respectively. 15 U.S.C. § 77*o*. Therefore, "[t]o establish control person liability under . . . the Securities Act . . . Plaintiffs must show . . . a primary violation by

the controlled person; and . . . control of the primary violator by the defendant." *May v. Barclays PLC*, 2025 WL 887300, at *30 (S.D.N.Y. Mar. 21, 2025), *aff'd sub nom. Knapp v. Barclays PLC*, 171 F.4th 166 (2d Cir. 2026); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

## III. Exchange Act

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

For both Section 10(b) of the Exchange Act and Section 11 of the Securities Act, "'[t]he test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis omitted) (quoting *Rombach*, 355 F.3d at 172 n.7 (noting that the "test for whether a statement is materially misleading under Section 10(b) and Section 11" is identical)). This test is objective and looks to the understanding of the "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Moreover, under the federal securities laws, "literal accuracy is not enough. An issuer must also desist from misleading investors by saying one thing and holding back another." *Id.* at 192. Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not

misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

To be actionable under the Exchange Act as well as under the Securities Act, a misrepresentation or omission also must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. "Materiality alone does not demand disclosure, nor does the duty to disclose encompass non-material information." *In re ProShares*, 728 F.3d at 102 (quoting *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)).

When a claim sounds in fraud, such as claims brought under Section 10(b) and Rule 10b-5, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) also applies. The Rule requires that a "party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

*Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. *See* 15 U.S.C. § 78u-4(b)(1). The "complaint [must] specify each statement alleged to have been misleading, the reasons or reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." *Id.* The plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005).

Moreover, under the PSLRA, where the complaint alleges scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively," and "the court must take into account plausible opposing inferences." *Id.* at 323.

Under Section 10(b) and Rule 10b-5(a) and (c), *see* 17 C.F.R. § 240.10b-5(a), (c), "[t]o state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud,

(3) with scienter, and (4) reliance.'" *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) (quoting *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 474 (S.D.N.Y. 2005)). With respect to scienter, "[s]cheme liability claims are subject to the PSLRA pleading standard." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022) (quoting *Menaldi*, 277 F. Supp. 3d at 517).

The Exchange Act provides for control person liability. "Section 20A . . . makes individuals who violate § 10(b) and Rule 10b-5 liable to contemporaneous purchasers when they 'purchas[e] or sell[] a security while in possession of material, nonpublic information.'" *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 429 (quoting 15 U.S.C. § 78t-1(a)). Section 20(a) establishes control person liability for "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act] . . . or of any rule or regulation thereunder" and provides that such person "shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). "It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." *Maher v. Glob. Factors LLC*, 2024 WL 3356985, at *27 (S.D.N.Y. July 8, 2024) (quoting *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014)), *aff'd*, 2025 WL 1554761 (2d Cir. June 2, 2025) (summary order). Therefore, for "control-person liability under sections 20(a) and 20A of the Securities Exchange Act . . . a plaintiff must successfully allege a primary violation." *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019). Moreover, a "§ 20 plaintiff [must] show that [the] 'controlling person was in some meaningful sense a culpable participate in the fraud perpetrated by the controlled person.'" *In re Lehman Bros. Mortg.-*

*Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996)).[16]

**DISCUSSION**

Plaintiffs assert eight claims for relief. Plaintiffs allege that the Securities Act Defendants violated Section 11 and Section 12(a)(2) of the Securities Act and that the IPO Individual Defendants and SPO Individual Defendants violated the control person provision of the Securities Act.[17] CCAC ¶¶ 346–79. They allege that the PACS Defendants (except Sanford) violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, *id.* ¶¶ 683–92; that the PACS Defendants violated Section 10(b) of the Exchange Act and Rules

[16] Although Section 20(a) of the Exchange Act and Section 15 of the Securities Act are "parallel provisions," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007), the Second Circuit has not "decide[d] . . . whether 'culpable participation' is a necessary element for § 15 liability," *In re Lehman Bros.*, 650 F.3d at 186. Courts within this District are divided on the issue. *Compare Nayani v. LifeStance Health Grp., Inc.*, 2023 WL 3260260, at *4 (S.D.N.Y. May 4, 2023) (holding that plaintiff "must not only plead a primary violation—such as a violation of section 11—but also must allege meaningful culpable conduct by that individual beyond mere status as a director or officer" (citation modified)) *with In re Hub Cyber Sec. Ltd.,* 2025 WL 872078, at *18 (S.D.N.Y. Mar. 20, 2025) (holding that textual distinctions between Section 15 and Section 20(a) indicate that there is no "culpable conduct" requirement for Section 15). This Court agrees with Judge Lynch's analysis that, despite overlap in statutory text and purpose, there is a key difference between the two control person liability provisions. *In re Refco*, 53 F. Supp. 2d at 660 n.43. Section 15 of the Securities Act provides that a "controlling person" may not be held liable if they "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist," 15 U.S.C. § 77*o*(a), whereas Section 20(a) of the Exchange Act provides that the "controlling person" may not be held liable if they "acted in good faith and did not directly or indirectly induce the act . . . constituting the violation," *id.* § 78t(a). Congress's decision to introduce this distinction and thereby require that there be a lack of good faith for a Section 20(a) violation factored heavily in the Second Circuit's decision announcing the "culpable participation" requirement. *See Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973) ("The intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.").

[17] The "IPO Individual Defendants" are Murray, Hancock, Apt, Lewis, Millar, and Leavitt; the "SPO Individual Defendants" are Murray, Hancock, Apt, Lewis, Millar, Leavitt, and Dilsaver.

10b-5(a) and (c) promulgated thereunder, *id.* ¶¶ 693–703; and that PACS, Murray, and Hancock violated Section 10(b) and Rules 10b5-(a) and (c) promulgated thereunder, *id.* ¶¶ 704–13. They also allege that PACS, Murray, and Hancock violated Section 20A of the Exchange Act, *id.* ¶¶ 714–24, and that Murray and Hancock violated Section 20(a) of the Exchange Act, *id.* ¶¶ 725–30.

## I. Judicial Notice and Incorporation by Reference

In support of their motion to dismiss, the PACS Defendants attach sixteen exhibits to the declaration of Colleen C. Smith. *See* Dkt. No. 88-12. The enumerated exhibits include: (1) the CCAC; (2) an appendix of the challenged statements from the CCAC; (3) the IPO prospectus; (4) the SPO prospectus; (5) a memorandum regarding the COVID-19 waiver program, published by the CMS and dated May 1, 2023; (6) an article by Zahida Siddiqi, published on the website Skilled Nursing News, titled *Nursing Homes Face 'Sobering Reality' as PHE Ends Amid Operational, Financial Challenges*; (7) PACS's Form 8-K filed on June 16, 2025; (8) ASC Section 606; (9) PACS's Form 10-Q for Q2 2024; (10) the Hindenburg Report; (11) an article by Hindenburg Research titled *A Personal Note from Our Founder*, dated January 15, 2025; (12) the November 2025 Form 10-K filed for fiscal year 2024; (13) PACS's Form 10-Q for Q3 2024; (14) a graph and chart generated by Factset displaying PACS Group, Inc.'s stock prices for the period of April 11, 2024 through February 17, 2026; (15) PACS's Form 10-Q for Q1 2024; and (16) an analyst report by Truist regarding PACS, dated November 5, 2025.

Plaintiffs contend that it would be improper for the Court to consider the Siddiqi article, which is Ex. 6, and that the contents of all other exhibits "must not be accepted as true." Dkt. No. 89 at 18. Defendants do not respond to Plaintiffs' contention in their reply. *See* Dkt. No. 91. Taking together Federal Rule of Evidence 201 and Federal Rule of Civil Procedure 10(c), "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs

relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (citing *Chambers*, 282 F.3d at 153). "[A] court may take judicial notice of 'a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 387 (2d Cir. 2025) (quoting Fed. R. Evid. 201(b)). This principle resolves the issue. The Court does not consider Ex. 6, which is a website, unmentioned in the CCAC, that is run by a private party whose accuracy is not reasonably unquestionable as Rule 201(b) requires. The Court also does not take judicial notice or otherwise consider Ex. 1 and Ex. 2, referring to the CCAC as filed instead. However, the Court may and does consider the exhibits that reference SEC filings (Exs. 3–4, 7, 9, 12–13, 15), which are referenced in—and at times integral to—the CCAC. For the same reasons, the Court considers the CMS's memorandum regarding the COVID-19 waiver program's expiration (Ex. 5) and Hindenburg Report (Ex. 10). As for the January 15, 2025 article by Hindenburg regarding its founder (Ex. 11), the Factset stock chart (Ex. 14), and the Truist analyst report (Ex. 16), the Court may consider such documents since they were, at the very least, knowable by Plaintiffs at the time of the CCAC, but the Court does not rely on any of them in adjudicating the motions.[18]

---

[18] The Underwriter Defendants attached two exhibits to the declaration of Susan L. Saltzstein: (1) the IPO registration statement and (2) the IPO prospectus. *See* Dkt. No. 87. Along with their memorandum of law in opposition, Plaintiffs attached five exhibits to the declaration of Alfred L. Fatale III: (1) an appendix of the challenged statements from the CCAC; (2) a copy of ASC 250; (3) a copy of ASC 606; (4) a reproduction of the *About Skilled Nursing News* webpage from the website Skilled Nursing News; and (5) a production of the *About Us* webpage from WTWH Media. *See* Dkt. No. 90. These exhibits largely overlap with those presented by the PACS Defendants. The Court considers the ASC reproductions and the SEC filings but does not consider the webpages.

Though the Court considers certain exhibits, the Court does not accept the truth of the matters asserted therein. *See, e.g., Donoghue v. Gad*, 2022 WL 3156181, at *5 n.7 (S.D.N.Y. Aug. 8, 2022) ("[W]hether the Court considers the SEC filings attached to Defendant's declaration because they are integral to the Complaint or because it may take judicial notice of such records, its review is limited to determining *what* the records state, not whether what the documents state is *true*."); *SEC v. Fiore*, 416 F. Supp. 3d 306, 328–29 (S.D.N.Y. 2019) ("Although courts may take judicial notice of legally required public disclosure documents filed with the SEC, they may not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted." (citation modified)). Accordingly, the Court disregards characterizations of the noticed documents and only views to "determine what statements the documents contained." *Lewis v. M&T Bank*, 2022 WL 775758, at *1 (2d Cir. Mar. 15, 2022) (summary order) (citation modified).

**A. Short-Seller Report**

The reliability and role of the Hindenburg Report in the Court's analysis warrants further discussion as it is integral to the CCAC in substantiating many of Plaintiffs' factual allegations. Hindenburg Research is "[a] short-seller, 'an entity with an economic interest in driving down the company's stock price,' [that] has the same right to express opinions and analysis as any other market participant." *Grifols, S.A. v. Yu*, 2025 WL 1826611, at *11 (S.D.N.Y. July 2, 2025) (quoting *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023)). But "unlike the issuer, the short seller is not presumed to have special knowledge or material non-public information," *id.* at *12, and the short seller has an incentive to skew its reports in its economic interests. As a result, courts have considered the information reported in short-seller reports "with caution." *DraftKings*, 650 F. Supp. 3d at 155. The cases have tended to fall into two different categories.

First, there is a category of short-seller reports that document firsthand observations by the short seller or provide economic analysis of publicly available information. *See, e.g.*, *In re Zeta Glob. Holdings Corp. Sec. Litig.*, 2026 WL 1971169, at *9 (S.D.N.Y. July 8, 2026) (crediting allegations where plaintiff's expert "provided independent corroboration" of the short-seller report's findings); *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 436 (S.D.N.Y. 2025) (crediting allegations where "well-pled independent and particularized facts corroborate[d] those attributed to" the short-seller report, the report "identifie[d] its source . . . rather than terming the source confidential or anonymous," and the identified source "was in a position . . . to know the facts attributed to him" (citation modified)); *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 382–83 (S.D.N.Y. 2024) (crediting allegations from short-seller report that "did not rely on confidential sources," "explain[ed] the methodology that it used to calculate the number of stores and agents" at the company discussed, "developed a computer program" for its analysis, and "corroborate[d] its analysis of the Company's accessible data" through "in-person visits"); *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) ("[W]here there is a basis to view the short seller's factual allegations as reliable as opposed to fabricated based on self-interest—for example, where facts are cited that tend to substantiate these allegations or reveal the basis for the short seller's factual assertions—those allegations are more apt to be viewed as reliable."); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (crediting short-seller report where other sources, including "interviews with local residents," "a failed safety inspection," and "discrepancies in revenues reported to the SEC and [the Chinese State Administration for Industry & Commerce] for the same operations during part of the class period" substantiated allegations when "[t]aken together"). In these

instances, the author of the report has been willing to stake its name and reputation on the analysis. The analysis itself can be replicated and flaws identified. The author himself or herself presumably is subject to deposition or a subpoena for documents if the information is relevant. In other words, the defendant will have the opportunity to test the veracity of the allegations against it. The courts have been willing to give some weight to the information contained in such reports.

Second, there are short-seller reports that rely on second-hand information relayed to the short seller by confidential witnesses. The short seller has seldom independently confirmed the accuracy of the statements or even the witness's a position to have observed what he or she recounts. The courts have treated such information in a short-seller report with great skepticism. *See, e.g.*, *Smith v. PureCycle Techs., Inc.*, 2024 WL 5186586, at *12 (S.D.N.Y. Dec. 20, 2024) ("[S]peculative statements [from unnamed sources] in the short-seller report, if not corroborated, are fairly discounted or put aside altogether as ill-pled." (internal quotation marks omitted)); *DraftKings*, 650 F. Supp. 3d at 154–55 (not crediting allegations in short-seller report that, "rather than being based on identifiable and/or verifiable sources, [were] based on 'confidential'—that is, unidentified and unspecified—sources"); *see also D'Agostino v. Innodata Inc.*, 2026 WL 1133664, at *15 (D.N.J. Apr. 27, 2026) (not crediting allegations drawn from short-seller report that are "attributed to unidentified former employees" but crediting the short seller's "independent research . . . to the extent that the research does in fact support th[e] claims"); *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *9 (N.D. Cal. Feb. 20, 2024) (not crediting allegations in operative pleadings that "relie[d] on the short-seller's *own* assertions that the characterizations passed on by the [confidential] witnesses were credible" where "no particularized details about the[] former employees' job titles or period of employment" were

disclosed). When a "short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration," the "the risk of motivated reporting . . . is twinned with the reliability concerns presented by anonymous sourcing." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).

There are important differences between a confidential witness upon whom a plaintiff directly relies and the statement of a purported confidential witness as reflected in a short-seller report. Courts routinely have permitted a plaintiff to cite and rely upon information provided to counsel by a confidential witness without requiring the name of that witness to be disclosed in the complaint. *See, e.g.*, *Gimpel*, 156 F.4th at 129–30; *Pension Tr. Fund for Operating Eng'rs v. Clarivate Plc*, 826 F. Supp. 3d 296, 333 (E.D.N.Y. 2026); *Freudenberg v. E*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010). Plaintiffs are not required "to reveal confidential sources at the pleading stage." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). As long as facts are alleged showing that the confidential witness is in a position to have knowledge of the matters to which she addresses herself, the court credits such allegations. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261–63 (S.D.N.Y. 2023) (citing *Novak*, 216 F.3d at 314) (parsing through allegations by confidential witnesses to determine whether each was in a position to have knowledge of the facts alleged); *see also, e.g.*, *Sherman*, 156 F.4th at 164–65; *Blanford*, 794 F.3d at 307. In such a circumstance, counsel for the plaintiff citing confidential witnesses with whom she has spoken puts her professional and personal interests at risk. A lawyer filing a complaint must certify that the pleading is "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). Counsel cannot lie or mislead about what the witness has said. "When citing alleged confidential witnesses in a complaint, the certification means that counsel has spoken

with these confidential witnesses and knows who they are." *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013). If the complaint misrepresents, counsel is subject to sanctions. *See Levine v. FDIC*, 2 F.3d 476, 479 (2d Cir. 1993) (affirming district court's imposition of Rule 11 sanctions on attorney that "could not substantiate the allegations contained" in the complaint); *see also Maiorino v. N.Y.C. Dep't of Sanitation*, 2026 WL 2098145, at *5 (S.D.N.Y. July 21, 2026) (imposing Rule 11 sanctions where attorney had no non-frivolous basis to make a claim given "unrefuted documentary evidence" in attorney's possession at the time of filing the complaint). Moreover, a party confronted with allegations from a confidential witness cited in a complaint has a ready mechanism to test the truth of the allegations against it. While a plaintiff may be able initially to hide the identity of the persons who provide the allegation upon which a complaint rests, once the complaint has survived a motion to dismiss, that information can no longer be concealed. A defendant can demand that the confidential witness's identity be disclosed and the witness deposed. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2023 WL 4362933, at *2 (S.D.N.Y. July 6, 2023) ("The Second Amended Complaint relies upon Mr. Adams as a confidential witness and Defendants are entitled to inquire into his role and knowledge as a confidential witness."); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*, 278 F.R.D. 335, 341 (S.D.N.Y. 2011) ("Where a party has attempted to satisfy the pleading requirements of the PSLRA by showcasing statements from a limited number of confidential witnesses, it may not thereafter refuse to disclose who they are on grounds of work product." (internal quotation marks omitted)); *In re Bear Sterns Co., Inc. Sec., Derivative, & ERISA Litig.*, 2012 WL 259326, at *3 (S.D.N.Y. Jan. 27, 2012) (granting motion to compel identification of confidential witnesses cited in complaint); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010)

(summary order) (discussing that the district court did not err in "order[ing] that the confidential witnesses in the complaint be deposed" at the motion-to-dismiss stage because "anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrated the requirement" of PSLRA and because "Fed. R. Civ. P. 11 requires that there be a good faith basis for the factual and legal contentions in a pleading" that the court may justifiably probe when there are disputes as to the truthfulness of quoted language from confidential witnesses). The statement from the confidential witness thus stands on no different footing than any other allegation of fact made by the plaintiff—by definition, it will have been supported by a reasonable investigation, and it is subject to adversarial testing.

A complaint that rests solely upon a short seller's report as to what a confidential witness has told the reporter stands on entirely different footing. By definition, counsel will not have spoken with the witness. The most that counsel can say is that he or she has viewed the report that contains the information that is reported by the short seller. But that, in and of itself, provides no assurance of reliability. The parties and the court system will have no assurance that the allegation is based on a reasonable investigation, which allegations of fact in federal court require. A short seller's statement that he or she has been told "x" or "y" from a witness who is unwilling to disclose her name does not mean that the witness has said what she was reported to have said, much less whether what is said is accurate or taken out of context. By the same token, the complaint's allegation that the confidential witness has said a certain thing to the short seller does not mean that the witness has said any such thing. Equally important, a lawyer who relies upon a short seller's report of what a confidential witness has told the short seller has deprived the defendant of any real opportunity to confront and to test the evidence against it. It is one thing for a complaint to rely upon a confidential witness with whom counsel has spoken. It is

another thing entirely for a complaint to rely upon a witness whose identity is shrouded from detection both to the plaintiff and to anyone else save the short seller. In the latter instance, the defendant cannot through an interrogatory obtain the identity of the witness. The identity will be in possession of a third party with its own rights and its own interests to protect, including rights of confidentiality potentially protected by state law. *See, e.g.*, *Grifols, S.A. v. Yu*, 2026 WL 2445530, at *5 (S.D.N.Y. Aug. 20, 2026) (holding that financial information reported by a short seller may constitute news protected by New York Shield Law even if the report is subsidized by a short position but rejecting application of the privilege for insufficient showing of editorial judgment).

Along the same line, courts have declined to give weight to allegations in an operative complaint that are drawn from the confidential witnesses' statements in another lawsuit's complaint. A court may rely upon factual allegations or reports incorporated in complaints from other proceedings where they are detailed and independently corroborated. *See Sherman*, 156 F.4th at 166. However, where there is not such corroboration or detail, "[a]llowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support." *In re Lehman Bros.*, 2013 WL 3989066, at *4. In those circumstances, at least, the complaint is drawing from a source that, in turn, is required to be based on reasonable inquiry enforceable by sanctions. The short seller, by contrast, is not required to adhere to any defined standards of reliability. There is thus even less reason to give weight to statements from confidential witnesses contained in such reports and merely repeated in the operative complaint.

The Court therefore gives limited and qualified weight to the statements in the Hindenburg Report. It accepts the allegations regarding the Hindenburg Report for the fact of

what it said, rather than the truth of the allegations. That a report was issued critiquing PACS's accounting is relevant, for example, to issues of loss causation. The Court also takes into account for their truth the financial analysis and independent research contained in the Hindenburg Report. The short-seller reviewed public filings and data to create charts that detailed the growth of PACS's SNFs and the changes in its revenue in 2023 and the first half of 2024. *See, e.g.*, Dkt. No. 88-10 at 18 (chart titled "Medicare Revenue After the Covid Pandemic: Reported (thousands)"). The Report also situated PACS in industry context, assessing the Company's acquisition of Plum Healthcare in November 2021 and comparing PACS's skilled care Medicare revenue and growth to that of Ensign Group. *Id.* at 11, 15–18. Such information is no different from independent economic analysis and investigative work that courts also accept at the pleading stage in other cases. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 n.8 (2d Cir. 2014) (crediting allegations of loss causation for a Section 10(b) claim that relied on "an analysis conducted by an economics expert" (internal quotation marks omitted)); *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 563 (S.D.N.Y. 2016) ("The Court is not, however relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage."). It can be confronted and tested, and other district courts have considered it. *See, e.g.*, *Saskatchewan Healthcare Emp.'s Pension Plan*, 718 F. Supp. 3d at 382–83; *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 459–60 (S.D.N.Y. 2022) (crediting report that included "extensive photographic evidence" and "analyze[d] government records, credit reports, and Mandarin-English translations" of, *inter alia*, revenue contracts and regulatory approvals); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F.

Supp. 2d 547, 564 (S.D.N.Y. 2012) (permitting reliance on a financial analyst's report "to support a securities fraud allegation" at the pleadings stage).

The Court does discount the statements from the former PACS employees who allegedly provided information to Hindenburg Research. As noted above, courts view confidential statements within short-seller reports with skepticism, and the Hindenburg Report's recital of statements from former PACS employees is no exception. Those remarks are attributed to persons who are described only in general terms alternately as "a former regional clinical leader," CCAC ¶ 113 (quoting Dkt. No. 88-10 at 20); *see also id.* ¶ 147 (quoting the same language), "a regional manager," *id.* ¶ 126 (quoting Dkt. No. 88-10 at 12), "one former Administrator," *id.* ¶ 153 (quoting Dkt. No. 88-10 at 19), and a "former employee," *id.* ¶ 231 (quoting Dkt. No. 88-10 at 25). The attributions lack sufficient indicia of reliability. *See DraftKings*, 650 F. Supp. 3d at 155. The Hindenburg Report does not specifically identify each speaker by tenure and time period at PACS, location of work, or specific role and reporting relationships.[19] There is no reason to believe that the witnesses would be in a position to make comments about PACS' practices as a general matter. There is not sufficient information offered that Defendants would be able to confront its accusers and test the veracity of the statements they have made, including whether what they describe was idiosyncratic and localized or general and company-wide. Moreover, none is alleged to have interacted with the Individual Defendants or to have a position in management that would buttress claims of company-wide dysfunction.[20]

---

[19] At times, a speaker is attributed with a broad state location (*e.g.*, "former administrator from Colorado said the respiratory program was pushed onto their facility by PACS management"), but greater particularity—likely even greater than that of firsthand confidential sources—is needed to overcome skepticism of secondhand confidential sources. *See* Dkt No. 88-10 at 19.

[20] Indeed, to the extent the CCAC contends there was top-down coordination of Medicare fraud, the sources of the Hindenburg Report put that allegation into dispute. One former administrator

*Cf. AppHarvest*, 684 F. Supp. 3d 201, 249 (S.D.N.Y. 2023) ("[C]ourts will credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." (quoting *In re Weight Watchers Int'l Inc. Sec. Litig.,* 504 F. Supp. 3d 224, 246 (S.D.N.Y. 2020)).

With these principles in mind, the Court turns to Plaintiffs' claims.

## II. Allegations of Material Falsity Common to Exchange Act and Securities Act Claims

Plaintiffs allege that a series of materially false and misleading statements runs through the IPO Offering Documents, the SPO Offering Documents, and PACS's filings on Form 10-Q, as well as its press releases, earnings calls, and presentations. *See, e.g.*, CCAC ¶¶ 437, 485. The standards for falsity and materiality are identical under the Securities Act and Exchange Act and the two accordingly are ordinarily analyzed together. *See, e.g.*, *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 253 n.7 (S.D.N.Y. 2023) ("[T]he 'legal standard for misstatements or omissions of material fact' is the same under the Securities Act and Exchange Act." (quoting *In re Teva Sec. Litig.*, 671 F.Supp.3d 147, 188 (D. Conn. May 1, 2023))); *Weight Watchers*, 504 F. Supp. 3d at 247; *Rombach*, 355 F.3d at 172 n.7.

The Court thus first addresses those statements that are common to Plaintiffs' Securities Act and Exchange Act claims and then turns to whether Plaintiffs have satisfied the scienter and loss causation elements for an Exchange Act claim. After analyzing the Exchange Act, the Court turns to the additional allegations of falsity that form the basis for Plaintiffs' Securities Act claims. For the reasons that follow, the Court holds that Plaintiffs have stated a claim for a violation of Section 11 of the Securities Act with respect to the SPO Offering Documents. It

---

noted that Medicare Part B billing "started in California and spread across the PACS network, just like the abuse of COVID waivers." Dkt. No. 88-10 at 19 ("I think it started down in Santa Monica with a building that just started blowing this up . . ." (internal quotation marks omitted)).

dismisses for failure to state a claim for relief all other misstatement or material omissions claims alleged in the CCAC.

Plaintiffs allege that PACS's report of its revenue and income for its first and second quarters of 2024, as reported in the SPO Offering Documents and PACS's reports on Form 10-Q for the relevant periods, was false and misleading. They also allege that PACS's narrative statements in both the IPO and SPO Offering Documents, Form 10-Qs, earnings calls, press releases, and presentations were false and misleading. The Court starts with PACS's reports of its financial results and then turns to the narrative statements.

**A. PACS's Report of Financial Results**

Plaintiffs allege that PACS's report of its revenue, earnings, earnings per share, net income, and other revenue-dependent metrics (*e.g.*, Medicare revenue per patient day) were false and misleading. *See* Stmts. 7–8, 12–14, 17–18, 22; *see also, e.g.*, Dkt. No. 88-12 at 78–79, 139–48. During the Class Period, PACS reported that its revenue for the first quarter of 2024 was $934.7 million with a net income of $49.1 million; and for the second quarter, revenue was $981.8 million and net income was a loss of $10.9 million. CCAC ¶¶ 437, 485. But in November 2025, PACS restated its financial reports for these quarters, subtracting $14.9 million from its previously reported Q1 2024 revenue and subtracting $46.1 million from Q2 2024 revenue. While the change in PACS's revenue may not seem consequential at first blush, it had an impact on PACS's bottom line. Net income for the first quarter was restated to be over a fourth lower, and the loss reported for the second quarter nearly tripled. Dkt. No. 88-12 at 143–44. Plaintiffs allege that PACS' report of its revenue and earnings for the first and second quarters were materially false and actionable misstatements of fact that misled reasonable investors. *See* CCAC ¶ 285, 290(d). Because, as the parties agree, the actionability of the financial misstatements turns on one primary legal issue—the legal significance of the

Company's restatement of revenue—the Court considers the accounting statements altogether.[21] *Compare* Dkt. No. 83 at 24–31 *with* Dkt. No. 89 at 33–34.

PACS represented to investors—and there is no dispute between the parties—that the Company adhered to ASC 606 to recognize revenue, and the Company said that it applied this same methodology in both the IPO and SPO Offering Documents and the November 2025 Restatement. ACS 606 requires that when the consideration to be received in exchange for the transfer of goods and services is variable, revenue may be recognized only after appropriately accounting for such variable consideration (*i.e.*, by only attributing the portion for which it is not "probable that a significant reversal" of the reported revenue will occur "when the uncertainty associated with the variable consideration is subsequently resolved"). *See* Dkt. No. 90-3 at 30 (ASC 606-10-32-11).

The parties disagree whether PACS's report of its revenue and earnings was an opinion or a statement of fact. On the one hand, Plaintiffs contend that "[a] company's report of objective, numerical line items as financial results" is a factual statement, and that the Restatement confirmed that the original financials, as mentioned in the accounting statements and the SPO Offering Documents, were "objectively wrong." Dkt. No. 89 at 24. On the other hand, Defendants rely on ASC 606 to argue that PACS's historical reports of its financial results constituted "accounting judgments" related to revenue recognition and are therefore inactionable opinions. Dkt. No. 83 at 24–27. Defendants assert that ASC 606 inherently requires subjective judgment and involves a "non-exhaustive list of factors" expressed in ASC 606-10-32-12, Dkt.

---

[21] The 2024 Annual Report does not explicitly revise the metrics for PACS's average daily Medicare rates and revenue per patient day that Defendants Murray and Apt stated, respectively, on the May 14, 2024 earnings call. *See* CCAC ¶¶ 442, 446. But because those operational metrics require reported revenue as an input, and the relevant revenue numbers were restated, those metrics were necessarily incorrect when told to investors.

No. 83 at 25, such as market volatility, actions of third parties, and the company's "experience" or "practice[s]" with respect to the reimbursement contracts, Dkt. No. 88-8 at 30–31. In their view, PACS's accounting-related opinions were honestly held at the time of the original financial reports, and the November 2025 restatement does not "suggest that [PACS] knew at the time of the 10-Qs that its earlier judgment was wrong." *Id.* at 27. As opinions, Defendants contend the statements are not otherwise actionable for containing an embedded misleading fact or for omitting necessary facts that go to the basis of the Company's belief in its revenue reporting, given that uncertainty and regulatory risk associated with revenue recognition was disclosed to investors. *Id.* at 28–30.

The appropriate characterization and doctrinal treatment of a company's reported results under GAAP has been the subject of some discussion in the Second Circuit. In *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), the plaintiff claimed that the defendants, including the issuing company, violated Sections 11 and 12(a)(2) of the Securities Act by failing to write down the goodwill and sufficiently increase the loan loss reserves in the financial reports that it incorporated into its offering documents. The district court dismissed the complaint on grounds that the financial reports of goodwill and loan loss reserves were inactionable statements of opinion, 712 F. Supp. 2d 117 (S.D.N.Y. 2010), and the Second Circuit affirmed, 655 F.3d 105. Examining first the company's report of goodwill, the Second Circuit explained that it was "subjective" and did not involve "matters of objective fact." 655 F.3d at 110. "GAAP requires that any excess of the purchase price over the fair value of the asset acquired and liabilities assumed be reported as good will." *Id.* at 110; *see id.* at 108 n.1 (discussing the Financial Accounting Standard Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 141). But, while the purchase price might be objectively determinable, the court reasoned

that "fair value" ultimately "depend[s] on management's determination," and that any "estimate of the fair value . . . will vary depending on the particular methodology and assumptions used." *Id.* at 110–11. The court thus concluded that the defendant's "statements regarding goodwill . . . [were] subjective ones." *Id.* at 111. The court's analysis did not end with the conclusion that the reported goodwill was a matter of opinion. It held that such statements would be actionable if the plaintiff alleged that the defendants did not believe the statements regarding goodwill at the time they were made. *Id.* at 111–12 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–96 (1991)); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) ("A statement of reasons, opinion or belief . . . can be actionable under the securities laws if the speaker knows the statement to be false."). Because the plaintiff relied mainly on allegations about adverse market conditions and did not allege that the defendants failed to believe the statements when made, the plaintiff did not state a claim under Sections 11 and 12. The court also concluded that the plaintiff's allegations regarding the loan loss reserves "suffer[ed] from the same deficiencies" as goodwill because "loan loss reserves reflect management's opinion or judgment about what, if any, amounts due on loans ultimately might not be collectible"—and because the plaintiff did not allege "an objective standard for setting loan loss reserves," the plaintiff would have to allege "that defendant's opinions were both false and not honestly believed when they were made." *Id.* at 113. In sum, because neither metric was objectively determinable, they were opinions, and plaintiff was required to plausibly allege that the statements were objectively and subjectively false to state a claim. *Id.* (citing *Virginia Bankshares*, 501 U.S. at 1095).

The Second Circuit's holding in *Fait* thus turned ultimately on the conclusion that in order for the company's report of its financial results to be actionable, the plaintiff would have to

allege that the defendants did not believe the statements at the time they were made. That conclusion had critical implications for Securities Act claims. As the district court explained in *Fait*, an allegation that a defendant did not believe its report of financial results at the time it was made would rest upon an allegation of knowing or reckless conduct, thereby "triggering the enhanced pleading requirements of the PSLRA." 712 F. Supp. 2d at 122. And, as the Second Circuit later observed in *Abramson v. Newlink Genetics Corp.*, under *Fait*, "a district court's characterization of a statement as one of opinion rather than one of fact was all but fatal to the plaintiff's Rule 10b-5 claim . . . [because] it could be difficult for plaintiffs to locate evidence suggesting as plausible that a defendant's subjective beliefs conflicted with that defendant's stated opinion." 965 F.3d 165, 174–75 (2d Cir. 2020) (internal citations omitted).

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* 575 U.S. 175 (2015), however, the Supreme Court "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson*, 965 F.3d at 175. The *Omnicare* Court "established two principal ways of challenging statements of opinion that do not require plaintiffs to show that the speaker subjectively disbelieved the statement." *Id.* "First, plaintiffs can allege that a statement of opinion contained one or more embedded factual statements that can be proven false." *Id.* "Second, . . . plaintiff can allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Id.* "By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion . . . , *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *Id.* at 176.

In the wake of *Omnicare* and *Abramson*, there are three paths for a statement of opinion to be actionable in the Second Circuit: "if (1) the speaker did not hold the belief she professed,

(2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366 (2025); *see also Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

In *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28 (2d Cir. 2024)*, cert. denied sub nom. BDO USA, LLP v. New England Carpenters Guaranteed Annuity & Pension Funds*, 146 S. Ct. 261 (2025), the Second Circuit applied those standards to the defendant company's report of its revenue from extended warranty contracts and its report of compensation-related expenses. The plaintiffs in *DeCarlo* alleged that the defendant, AmTrust Financial Services, Inc., and its officers, directors, auditor, and underwriters, violated Sections 11 and 12 of the Securities Act when they offered and sold securities to the public pursuant to registration statements and prospectuses that materially misstated the company's reported revenue from certain extended warranty contracts and that improperly accounted for certain discretionary bonuses by treating them as expenses in the year they were paid rather than the year they were earned by employees. *Id.* at 36. After AmTrust sold the securities to the public, it reported that it had made errors in its financial reports by misreporting its revenue from extended warranty contracts and its expensing of the employee bonuses. *Id.* at 38. As a result, it restated its financial results. *Id.* The district court dismissed plaintiffs' Securities Act claims on the basis that "AmTrust's financial statements reflected the exercise of subjective judgment and were thus non-actionable statements of opinion," *id.* at 40, but the Circuit reversed. Considering the question whether the reports of the defendant's financial results constituted opinion or fact, the court stated that its prior decision in *Fait* "continue[d] to guide [the court] in distinguishing between a statement of fact and a statement of opinion in the

first place." *Id.* at 40. But the court also recognized the sea change in the law that had been affected by *Omnicare*. It was no longer necessary for a plaintiff to plead that the defendant did not believe its report of its financial results at the time they were issued. "By pointing out that a statement of opinion, even if believed, may nonetheless be actionable if it contains a factual misstatement or is rendered misleading by the omission of material facts, *Omnicare* expanded the scope of issuer liability for statements of opinion." *Id.*

The court accepted the notion that the company's report of its revenue from extended service contracts could be considered a matter of opinion because it rested in part on a subjective judgment whether, under the relevant accounting principle, "sufficient historical evidence" existed to support a particular accounting treatment of that revenue. However, it opined that "the determination that AmTrust's statements are opinion, not fact, is not necessarily the end of the analysis." *Id.* at 44. The company's report that it earned warranty revenue at the time of sale "presuppose[d] the existence of *some* historical evidence" supporting that accounting treatment. *Id.* at 45. And plaintiff alleged that such implicit representation that there existed evidence to support the accounting treatment was rendered false by plaintiffs' allegation that there was no such evidence. *Id.*

Significantly, moreover, the court also reversed the district court's judgment that the company's treatment of the discretionary bonuses was an inactionable matter of opinion. The relevant accounting principle required the company to consider whether it was "'probable' that a liability ha[d] been incurred" and whether "'the amount of the loss could be reasonably estimated' within a range." *Id.* at 46 (alteration adopted) (quoting ASC 450-20-25-2). Though not explicitly observed by the court, the accounting judgment resembled that in *Fait* for loan loss reserves, which also turned upon a judgment whether credit losses were probable and could be

estimated. *See Fait*, 655 F.3d at 112–13 (discussing accounting for loan loss reserves). Notwithstanding that the question of probability could imply the exercise of judgment and the expression of an opinion, as determined by the district court, *see In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2020 WL 2787117, at *3 (S.D.N.Y. Apr. 20, 2020), the Circuit expressed skepticism that the report of expenses could be construed to be a statement of opinion. 122 F.4th at 46. Recognizing that "multiple accounting standards may have been relevant to determining when to expense a bonus," the court concluded that "the fact that these GAAP standards, together or alone, are subject to misreading, misinterpretation, or misapplication . . . does not necessarily mean that they entail an exercise of subjective judgment." *Id.* The court further concluded that even if the report constituted a statement of opinion on the notion that the determination whether it was probable that bonuses would be paid involved subjective judgment, it was still actionable because, based on the information reported in the restatement, it was "quite plausible that the AmTrust Defendants did not base the company's statements or probability on a 'meaningful . . . inquiry,' . . . [and] there was no basis for AmTrust to state that the bonuses should be expensed in the year they were paid rather than earned." *Id.* (quoting *Omnicare*, 575 U.S. at 188–89).

The Circuit Court's latest word on the accounting treatment of reported financial results was in *Gimpel*, wherein the plaintiffs sued under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 after the defendant, Hain Celestial Group, Inc., restated its historical financials, disclosing that it had overstated its net sales and GAAP earnings per share, and reported a material weakness in its internal control over financial reporting, including with respect to revenue recognition. 156 F.4th at 132–33. The court had little difficulty concluding that the company's incorrect report of its sales and earnings were actionable. It stated, without requiring

anything more, that the defendant's "subsequent restatement of its financial results [for revenue from sales] and disclosure of material weaknesses in its internal controls and financial-reporting and accounting practices suffice to establish that these statements were in fact false at the time they were made." *Id.* at 140 (internal citations omitted). The court quoted with approval Judge Koetlt's opinion in *Fresno County Employees' Retirement Association v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017), and Judge Conner's opinion in *In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004), both of which held that "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Id.* at 140. Although Defendants argue that the *Gimpel* court's statement was qualified by footnote 13 to the opinion, *see* Transcript of August 24, 2026 Oral Argument ("Oral Arg. Tr.") at 86:20–87:5, Dkt. No. 95, in which the court observed that plaintiffs alleged that defendants never had an internal auditor or compliance department, 156 F.4th at 140 n.13, that contention is plainly wrong. Footnote 13 addressed a separate alleged misstatement—plaintiff's allegation that defendants' Sarbanes-Oxley ("SOX") certifications were false—and it concluded that those statements were actionable statements of opinion because "Defendants never had an internal audit or compliance department and documented the concessions they personally negotiated in potentially deceptive ways." *Id.* It did not qualify the statement in the text of the opinion that the fact of a restatement alone was sufficient to establish that Hain's report of its originally reported financial results was false and misleading.

As Plaintiffs point out, Dkt. No. 89 at 24, since *Omnicare*, courts in this District and district courts across the Second Circuit have concluded, repeatedly and in a wide range of circumstances, that accounting restatements are sufficient to plead falsity of previously reported financial figures. *See, e.g.*, *Clarivate Plc*, 826 F. Supp. 3d at 319 (finding sufficient for

actionability under Section 11 that "that the registration statements included an untrue statement (the erroneous financial statements)" because of a restatement of reported expenses); *zCap Equity Fund LLC*, 792 F. Supp. 3d at 438–39 ("Although the Restatement [of rental revenue] did not admit *wrongdoing*, it operated as an admission that earlier statements were false when made." (citation modified)); *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 305 (E.D.N.Y. 2025) (holding that there "can be no dispute that the Amended Complaint pleads numerous false and misleading misstatements with respect to [the company's]" SEC filings given its restatement of financial results including allowance for sales returns, recognition of revenue and increase in bad debt expense); *Africa v. Jianpu Tech., Inc.*, 2022 WL 4537973, at *9 (S.D.N.Y. Sept. 28, 2022) ("misreported financial data are false statements of fact," including restated revenue from company's credit card segment (citation modified)); *comScore*, 268 F. Supp. 3d at 544 ("In light of comScore's admission that it must restate its financial statements [with respect to the accounting for nonmonetary transactions], there can be no dispute that the SAC pleads numerous false and misleading misstatements with respect to revenue, revenue related metrics, and comScore's compliance with GAAP.").

Plaintiffs have adequately stated a claim based on PACS's report of its originally reported financial results for the first and second quarters of 2024 communicated to investors through various press releases, earnings calls, and quarterly reports, *see* Stmts. 7–8, 12–14, 17–18, 22, as well as in the SPO Offering Documents. In those communications, PACS reported revenues of approximately $934.7 million for its first quarter of 2024 and $981.8 million for its second quarter of 2024. CCAC ¶ 317; Dkt. No. 88-4 at 223. The Company also reported for the first quarter of 2024, net income of $49.1 million, net income per common share of $0.38, and accounts receivable of $622.7 million; for the second quarter, a net loss of negative $10.9

million, net loss per common share of negative $0.07, and accounts receivable of $610.6 million; and for both quarters, no refund liability. CCAC ¶ 317; Dkt. No. 88-4 at 222–23. But as PACS later acknowledged in the Restatement, those figures were wrong. They were reported as a result of "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." CCAC ¶ 259 (quoting ASC 250); Dkt. No. 88-12 at 78. PACS should have reported the restated figures. Information that apparently was available, but that PACS apparently ignored due to oversight, "indicated [that] certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, m[ight] not be eligible for reimbursement under Medicare Part B" and thus revenue for those ancillary services were "subject to significant reversal in the future." Dkt. No. 88-12 at 78. The company also admitted that it had an internal weakness in its controls over financial reporting. It "did not design and maintain adequate controls within the revenue process to appropriately recognize revenue for new services in accordance with Financial Accounting Standards Board Accounting Standards." *Id*. at 79. The results that should have been reported for the first and second quarters of 2024 were dramatically different from the results PACS reported and provided to investors. For the first quarter of 2024, revenue was adjusted down by $14.9 million (1.6%) to $934.3 million; net income decreased by $14.3 million (29.1%) to $34.8 million; net income per share decreased by $0.11 (29%) to $0.27; accounts receivable decreased by $10.9 million (1.8%) to $611.8 million; and a new refund liability was listed for $3.9 million. *See* Dkt. No. 88-12 at 141, 143. The changes were even more dramatic for the second quarter, for which revenue was adjusted down by $46.1 million (4.7%) to $935.3 million; net loss increased by $21 million

(192.1%) to negative $31.9 million; net loss per share increased by $0.14 (200%) to negative $0.21; accounts receivable decreased by $30.4 million (5%) to $580.1 million; and a new refund liability was listed for $30.6 million.[22] *See id.* at 142, 144.

The Court need not decide whether Defendants' accounting statements constitute fact or opinion. *See Shanda Games*, 128 F.4th at 44 (assuming, without deciding, that a certain statement "reflects an opinion"); *Abramson*, 965 F.3d at 176 (same). PACS's "subsequent restatement of its financial results and disclosure of material weaknesses in its internal controls and financial-reporting and accounting practices, suffice to establish that these statements were in fact false at the time they were made." *Gimpel*, 156 F.4th at 140; *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 544 (S.D.N.Y. 2024) ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." (quoting *SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 n.5 (S.D.N.Y. 2012)); *comScore*, 268 F. Supp. 3d at 544; *Atlas Air Worldwide*, 324 F. Supp. 2d at 486. Even if the statements could be considered to be opinion, Plaintiffs have plausibly alleged that PACS "sa[id] one thing and [held] back another," *DeCarlo*, 122 F.4th at 45 (quoting *Omnicare*, 575 U.S. at 192). PACS originally stated that it earned revenue from respiratory treatment and other ancillary services, but it later admitted that information existed that such services were not eligible for reimbursement under Medicare Part B. In addition, even if the question of whether it was "probable" that a claim would be subject to significant reversal in the future involved the exercise of subjective judgment, the fact that the GAAP standard was "subject to misreading, misinterpretation, or misapplication, as happened here, does not necessarily mean that [it] entail[ed] an exercise of subjective judgment." *DeCarlo*, 122 F.4th at 46 (addressing accounting standard that involved

[22] Put simply, for the second quarter of 2024, the net loss was triple the size previously reported.

considering whether it was "probable" that bonuses would not be paid). At a minimum, PACS's statements that it was reporting revenue in compliance with GAAP would have been understood that such judgment was based on a meaningful inquiry. *See, e.g.*, Dkt. No. 88-9 at 8, 13 (Form 10-Q for the quarter ended June 30, 2024); Dkt. No. 88-15 at 8, 13 (Form 10-Q for the quarter ended March 31, 2024). And, as in *DeCarlo*, that PACS seemingly ignored the evidence that the ancillary services would not be eligible for reimbursement under Medicare Part B, "makes it quite plausible" that "the company's statements of probability [were not based] on a meaningful inquiry." *Id.* at 46. Therefore, PACS's financial statements for the first and second quarters of 2024 were necessarily actionable either as false statements of material fact or actionable omissions,[23] and each mention of those figures in the quarterly reports, press releases, and earnings calls—as well as the SPO Offering Documents—satisfies Plaintiffs' pleading obligation as to falsity.[24] *See* Stmts. 7–8, 12–14, 17–18, 22.

Defendants protest that Plaintiffs have not adequately alleged that Defendants had anything other than an "honest belief" in their initial reporting of Medicare Part B billings nor that PACS "knew . . . its earlier judgment was wrong." Dkt. No. 83 at 27. Defendants also contend that, beyond the Restatement itself, Plaintiffs have not identified any specific evidence or bases that would undermine PACS's original judgment. *See* Dkt. No. 83 at 27–31; Oral Arg. Tr. at 17:2–7 ("And they don't actually identify anything, again other than the [R]estatement,

---

[23] Defendants do not dispute materiality, nor could they at this stage. Materiality is established at the pleading stage by the Restatement itself. *SEC v. Kelly,* 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (restatement sufficient to establish materiality of misrepresentations, because "a restatement issues only when errors are material").

[24] To escape this conclusion, Defendants also rely on the discussion of restatements and opinions in *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171 (N.D. Cal. Sept. 29, 2021), *aff'd sub nom. Hunt v. PricewaterhouseCoopers LLP (PwC)*, 159 F.4th 603 (9th Cir. 2025). It suffices to say that *Hunt* does not state the law of the Second Circuit.

that shows that the [C]ompany did not have a basis for making the accounting judgments that it did."). Defendants forewarn that under the standard Plaintiffs advocate and the Court applies, any restatement would inevitably give rise to a Section 11 claim. *See* Oral Arg. Tr. at 13:7–14:12. But, the question of "honest belief" and knowledge goes to scienter and not to material falsity—a defendant can innocently make a false statement upon which a reasonable investor would rely. By the same token, there is no apparent reason why a defendant, if she had a motive and an opportunity to defraud in connection with the company's financial statements, should be protected from liability on the theory that the numbers that were reported as results constituted an opinion. Furthermore, if Plaintiffs have not identified any basis for alleging that PACS's originally reported financials were materially false other than the Restatement and the report of a material weakness, *Gimpel*, in particular, does not seem to require more. *See* 156 F.4th at 140.

It is not obvious, moreover, why a plaintiff should be required to plead more than a restatement. The question at the motion to dismiss stage is whether the plaintiff has pleaded sufficient facts to create "a reasonable expectation that discovery will reveal evidence" that PACS's report of its financial results was materially false. *See Matrixx*, 563 U.S. at 46 (quoting *Twombly*, 550 U.S. at 556). While it may be that "[g]enerally accepted accounting principles . . . tolerate a range of reasonable treatments, leaving the choice among alternatives to management," *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979), it also is correct that management's discretion is "limited to *accepted* methods," *Shanda Games*, 128 F.4th at 45. And from the fact of a restatement, whereby the company admits that, in reporting its results, it made a mathematical mistake, erred in the application of GAAP, or ignored or misused facts that existed at the time, *see* Dkt. No. 90-2 (ASC 250), it is "quite plausible," *DeCarlo*, 122 F.4th at 46, that

discovery will yield such evidence of material falsity, regardless of whether the report of historical results is characterized as fact or opinion.[25]

The Securities Act "requires that companies issuing securities make a 'full and fair disclosure of information' in connection with a public offering." *Id.* at 39 (quoting *Pinter v. Dahl*, 486 U.S. 622, 646 (1988)). It "aims to protect investors and to 'achieve a high standard of business ethics in the securities industry.'" *Id.* (quoting *Lorenzo v. SEC*, 587 U.S. 71, 81 (2019)). The standards for material falsity under the Exchange Act are identical. *Vivendi S.A.*, 838 F.3d at 250; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("We have held that the definition of 'materiality' under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act."); *Rombach*, 355 F.3d at 172 n.7. And a company's report of its financial results is among the most important pieces of information it provides to investors. *United States v. Arthur Young & Co.*, 465 U.S. 805, 810 (1984) ("Corporate financial statements are one of the primary sources of information available to guide the decisions of the investing public."); *Lottery.com, Inc.*, 715 F. Supp. 3d at 547 ("Indeed, 'earnings reports are among the pieces of data that investors find *most* relevant to their investment decisions.'" (quoting *Ganino*, 228 F.3d at 164)). A director or signer of the registration statement concerned about potential liability can protect herself by conducting due diligence or, in the case of an expertised statement, if she had "no reasonable ground to believe and did not believe" that the report contained false statements. 15 U.S.C. § 77k(b)(3). An

[25] Courts have held that failure to take an impairment charge may constitute a false and misleading statement when the plaintiff is able to allege the amount by which certain assets should have been written down and when the write-down should have occurred. *Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 233 (citing *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2009)). In the case of a restatement, however, the defendant has admitted the amount by which the financials have been misstated and when they were misstated.

underwriter concerned about its potential liability for misstated financials likewise can protect itself by conducting sufficient diligence (or relying upon an expertised statement), *id.*, and, as appropriate, obtaining a comfort letter from the auditor. *See* Frank Ciatto, Randi Rubinstein & Vikram Suryavanshi, *Due Diligence in Corporate Transactions* § 12.01[4][d] (2026) (discussing that "comfort letters do not replace independent diligence by underwriters, [but] provide a crucial evidentiary component in establishing the due diligence defense with respect to financial disclosures"). If management has failed to discharge its obligations or the underwriter has neglected its responsibilities, it would not seem a sufficient answer for either to later claim that the reported result was always an opinion and that no care or diligence was required in the first place. And, if the registrant has raised money with a report that contained financials that turned out to be wrong at the time they were stated, it would seem odd that it would bear no responsibility to the person who purchased based on those financials. It would seem stranger still that the court would have to delve into the complex question of whether a particular accounting principle turned on judgment before turning to the question of diligence. Instead, the risk of loss might appropriately and straightforwardly be placed on the party responsible for the fact that financials were reported that later had to be restated rather than on the investor who purchased in reliance on the fact that the financials were compliant with GAAP.

**B. Narrative Statements**

Plaintiffs also challenge narrative statements made by the Company in the IPO and SPO Offering Documents, which were repeated in quarterly filings with the SEC on Form 10-Q and earnings presentations. These statements concern (1) the Company's risk disclosure regarding potential changes to coverage or reimbursements under, *inter alia*, Medicare; (2) the Company's risk disclosures regarding its internal audits and controls for legal compliance; (3) a general disclaimer regarding forward-looking statements from earnings presentations; and (4) the

Company's characterizations of its business model. *See* Dkt. No. 89 at 35. Defendants move to dismiss each set of challenged non-accounting statements because they are either true, opinions, or inactionable as a matter of law and would not mislead a reasonable investor. Dkt. No. 83 at 10–24. To the extent Plaintiffs rely on CWs to bolster the falsity contentions, Defendants ask the Court to scrutinize the allegations and ignore those that are either unjustified or do not relate to the challenged statements. *See id.* at 17–19.

### 1. Medicare Coverage Change Risk Disclosure

Plaintiffs challenge the italicized language in the following risk disclosure made in the IPO and SPO Offering Documents, and repeated verbatim in the Company's Form 10-Q filings:

> We rely on payments from third-party payors, including Medicare, Medicaid, and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.*

CCAC ¶¶ 385, 422, 470, 504 (Stmts. 1, 9, 19, 26); Dkt. No. 89 at 35.

Plaintiffs argue that the conditional statement was false and misleading when made because the PACS Defendants "knew, or at a minimum were deliberately reckless, in claiming that a change in reimbursement was a mere potentiality ('if')" given that the COVID-19 waiver had ended 11 months before the IPO, its expiration had an "outsized impact on PACS due to the inappropriate and concealed extent to which PACS had been over-using and taking advantage of the COVID-19 Waiver," and the change "was already materially and adversely affecting PACS's 'revenue and profitability.'" *Id.* ¶ 386(a), (b). Plaintiffs also allege that the statement was false and misleading because the PACS Defendants knew that PACS's financial results were "being inflated by reimbursement for Medicare Part B," considering "PACS's own acknowledgment of then-existing 'billing uncertainties' . . . rather than changes Medicare might make" and the

foreseeable material impact of the Medicare overbilling schemes on PACS's financial results. *Id.* ¶ 386(c), (d); *see also id.* ¶ 387.

"[A] risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405–06 (S.D.N.Y. 2020) (citing cases). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017); *In re Mobileye Glob. Sec. Litig.*, 2025 WL 3640904, at *2 (2d Cir. Dec. 16, 2025) (summary order) ("Once a company speaks on a topic, it must 'tell the whole truth,' meaning that it may not 'omit material facts' necessary to make its statement not misleading, not that it must 'disclose all the facts that pertain to a subject.'" (quoting *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020))). Thus, "a company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition." *Williams*, 869 F.3d at 242; *see also Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 230 ("[A] risk disclosure can itself be a material misrepresentation . . . where the company warns only that a risk may impact its business when that risk has already materialized." (internal quotation marks omitted)). "The classic statement is that it is not sufficient for 'someone to warn his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *Chapman*, 466 F. Supp. 3d at 405 (alterations adopted) (quoting *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). If the risk that the company warns might be coming down the road is already impacting the company, its risk disclosure may be misleading. *See City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 301 (2d Cir. 2025)

(explaining that "when the [risk] warnings [about potential impacts] remained unchanged after 'market volatility put to rest any uncertainty as to the price-impact,' those warnings became actionable misstatements" (alteration adopted) (quoting *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 86 (2d Cir. 2021))).

The analysis's touchstone is whether the "failure to disclose that the risks warned against had actually materialized rendered the seemingly hypothetical disclosures misleading" to a reasonable investor at the moment of the disclosure, in view of "the totality of the circumstances" in each specific case. *Smith v. Gap, Inc.*, 177 F.4th 405, 410–11 (2d Cir. 2026). "[T]he inquiry must focus not on whether 'particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 658 (S.D.N.Y. 2004) (quoting *DeMaria v. Anderson,* 318 F.3d 170, 180 (2d Cir. 2003)). The Second Circuit has rejected the rule "that a risk disclosure is actionable whenever a company fails to disclose that the risk already materialized in some way." *Smith*, 177 F.4th at 410. In considering the views of an objective reasonable investor, the Supreme Court has explained that such an investor "reads each statement . . . whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare*, 575 U.S. at 190.

PACS's risk disclosure regarding changes in coverage or reimbursement is not actionable for misrepresenting an actualized risk as an unrealized hypothetical. Plaintiffs do not dispute Defendants cannot be held liable for the failure to disclose that the COVID-19 waiver had lapsed, which constitutes at the very least a change in "coverage or reimbursement for services" under Medicare. Defendants disclosed that fact in the offering documents and the Form 10-Q

filings. *See* Dkt. No. 88-3 at 14, 29; Dkt. No. 88-4 at 15, 28; Dkt. No. 88-9 at 56; Dkt. No. 88-15 at 49. All SEC filings included identical language that that the COVID-19 waiver program had expired as of May 11, 2023, which "required, and may continue to require, operational changes," and that the Company faced "numerous risks" related to its expiration. *Id.* PACS disclosed the waiver's expiration and that the expiration required operational changes. *See Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *18 (S.D.N.Y. Mar. 21, 2022) ("The defendants cannot be held liable for failing to disclose something that they disclosed." (quoting *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017)); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 760 (S.D.N.Y. 2018) ("[D]efendants cannot be said to have concealed a risk that had already metastasized into reality."). Plaintiffs' claim with respect to the waiver, instead, rests on the contention that its expiration had materially and adversely affected the Company's revenue and profitability—a purported fact that the Defendants did not disclose.

That contention fails because the risk disclosure's language does not assure reasonable investors that there were no revenue impacts from historical changes to Medicare services or reimbursements prior to when the first statement was made in in the IPO Offering Documents. With respect to risk disclosures and cautionary language, the Second Circuit has explained that "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk *when he invested*." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (second emphasis added). By the time of the IPO on April 11, 2024—the start of the Class Period—the waiver and its effect were in the past. The waiver had already been discontinued for nearly eleven months. The IPO was also approximately eight months after the end of "100-day benefit period," which started after Medicare Part A coverage

was "triggered." CCAC ¶ 124. Not only was all of that information explicitly disclosed in the IPO Offering Documents, but it was also available publicly through CMS. As this Court has previously explained:

> [N]ot every . . . risk disclosure[] necessarily implies that the event which could create a risk has not occurred to any extent. A risk disclosure may just be what it purports to be—an identification by the issuer of the type of facts and events that could make the investment risky and not necessarily a representation one way or the other regarding whether the event has occurred to the extent that it presents a risk. Instead, the potential for the disclosure to mislead often turns on the specificity of the disclosure. The more specific the caution, the closer it comes to an implied representation of fact and the more likely it is to mislead.

*AppHarvest*, 684 F. Supp. 3d at 267–68; *see also Smith*, 177 F.4th at 410–411. PACS's risk disclosure regarding policy changes operated to warn an investor of risks to their investment on a going-forward basis. As a historical matter, Medicare and Medicaid may have made any number of changes to their coverage requirements in the past. The risk disclosure, in order not to be misleading, would not have imposed on PACS a duty to survey all of those past changes and to indicate the magnitude of their impact. For the same reason, by disclosing the fact that Medicare and Medicaid might change their requirements in the future and that such changes could impact PACS' operations, PACS did not impose on itself a duty to reveal the precise impact that the end of the COVID-19 waiver had had on its business. At the time of IPO in April 2024, the end of the COVID-19 waiver was in the past. It had ended 11 months earlier and its impact on revenue had ended eight months earlier. It was sufficient for PACS to disclose that it had ended and that its end created numerous risks, and to disclose the financial results that included the impact of that end.[26]

[26] The financial statements showed that, by year end 2023, which would incorporate the impact of COVID-19 waiver's expiration in May 2023 (and the 100-day rollover period), PACS's Medicare-associated revenue had increased from $1.1 billion in 2022 to $1.2 billion—a smaller percentage change than for total patient service revenue, which increased from $2.4 billion to

Plaintiffs' contentions also independently fail because there are no well-pleaded allegations that plausibly link the waiver's expiration to the Company's performance. Where plaintiffs do not allege that "conditional statements are false" but rather that "they present risk as conditional, when in fact the risk had already materialized," courts evaluate whether there are "sufficient [allegations] to demonstrate" that the risk had come to pass "at the time that the Company's risk disclosures were presented." *In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at *21 (S.D.N.Y. Mar. 18, 2025). In *Vroom*, the court considered risk disclosures by a company that offered a platform to buy and sell used cars, which read that "if Vroom fails to correct or mitigate misinformation or negative information . . . it could materially and adversely affect [its] business." *Id.* (alterations adopted) (internal quotation marks omitted). The court held that even though events had transpired that might constitute some materialization of risk covered by a conditional risk disclosure—there, that consumer complaints to the Better Business Bureau had diminished consumer confidence in the company's platform for the sale and purchase of used cars—the pleadings failed to "adequately allege" that the complaints had diminished consumer confidence and adversely impacted the company "at the time of the Company's disclosures" because "Plaintiffs' core factual allegation—that the BBB complaints are evidence of an undisclosed 'logistical bottleneck' within Vroom—is speculative." *Id.* at *16.

Likewise here, Plaintiffs do not offer enough factual allegations to shore up their speculation. Their theory is that PACS's growth up to mid-2023 was fueled by abusing the COVID-19 waiver to overcharge Medicare, and once the waiver expired in May 2023, PACS faced significantly lower quarterly revenue in the third and fourth quarters of 2023. Plaintiffs

---

$3.1 billion in the same span. *See* Dkt. No. 88-3 at 183 (reporting a decline in net income from $150.5 million in 2022 to $112.9 million in 2023).

contend the IPO Offering Documents and subsequent communications were materially misleading because the COVID waiver's expiration was omitted as the cause of the Company's $90 million quarterly revenue declines in the third and fourth quarters of 2023. *See* CCAC ¶ 387(e); Dkt. No. 88-10 at 18. Echoing the Hindenburg Report, Plaintiffs also hypothesize that because PACS's revenue declined precipitously through the end of 2023, PACS was driven to abuse Medicare Part B in 2024 to plug the gap in its story of continued growth prior to its IPO. *See* CCAC ¶ 12 ("PACS's revenue from Medicare for skilled care declined at least $90 million in each of the two quarters after expiration of the waiver"); Dkt. No. 88-10 at 17–18 (asserting that after "accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimate ~$90 million per quarter" in 2023 for PACS). But the sources Plaintiffs cite for corroboration—the Hindenburg Report, the Restatement, and firsthand CWs (whether considered together or alone)—are unable to carry Plaintiffs' burden on a motion to dismiss. The Hindenburg Report does verify the fall in revenues through a replicable analysis but its second step is less persuasive: the short seller posits that "this decline indicates PACS was generating hundreds of millions of dollars a year in Medicare revenue from the COVID waiver scheme," and to buttress this conjecture, it cites the performance of another company and unidentified former employees, including a "former PACS administrator that agreed with [their] theory." Dkt. No. 88-10 at 18–19. But PACS's performance with respect to Part A might have been better than a peer company for any number of reasons, including the reason that it offered, which was that its business model was different from and better than that of others. Plaintiffs acknowledge that, at most, the Report provides an "implication"—one that is cabined to one

competitor for a fraction of PACS's facilities and is not alleged to be across the Company.[27] And, for the reasons stated above as well as others, the Court does not give any weight with respect to this issue to the allegations of embedded CWs in the Hindenburg Report. Among other things, Plaintiffs cite the Hindenburg Report's representation that it spoke with "more than a dozen former PACS employees," but neither Plaintiffs nor Hindenburg Report provide particularized facts that would support that the Report's unidentified employees were in possession of the relevant information about the company as a whole or the magnitude of the benefit from the waiver. CCAC ¶ 125; Dkt. No. 88-10 at 2. The Report's CWs are not listed with time period of work at PACS or identified by facility; at most, the Report notes the state identification of a few former employees, and the Report's quoted language from these employees often reflects a focus on paradigmatic corporate concerns. *See* Dkt. No. 88-10 at 9 ("A former PACS administrator from California estimated that a Medicare beneficiary drives 3–3.5x more revenue per day than a Medi-Cal beneficiary" (internal citation omitted)). The Report attempted to establish a company-wide inference and noted that the short seller "shared [its findings of COVID waiver] conduct with another former PACS administrator of a facility and asked if it was isolated conduct of certain facilities," and that nondescript confidential witness simply responded: "I don't think that this is an isolated thing," along with an anecdote of his personal experience. *Id.* at 13. Similar statements are cobbled together to claim that "a dozen former employees [Hindenburg Research] interviewed corroborated the existence of the COVID waiver scheme." Even if the Court were to credit these amorphous CWs—not attested to by

---

[27] The Hindenburg Report provides the following uncontroversial conclusion from its number-crunching: "This analysis indicates that PACS' triple-digit growth in skilled care Medicare revenue while the COVID waiver was in place wasn't an industry trend experienced by its largest key competitor"—not that there was no industry trend or that PACS had allegedly engaged in nefarious conduct. Dkt. No. 88-10 at 15.

Plaintiffs or their counsel—their allegations only prove that the COVID waiver incentivized Part A billing because of the unit economics. The Report bolsters Plaintiffs' allegations about the existence of a downward quarterly trend in 2023 and PACS's growth in the era of the COVID waiver, but not the speculation as to its cause or unlawful abuse of Medicare Part A. The Restatement, alone, provides no insight on what occurred in 2023 or the reasons for quarterly declines in that year. Only financial figures for the first two quarters of 2024 were restated.

The CWs who actually provided information to Plaintiff provide no independent support for the proposition that the extent of the decline in revenue was caused by the waiver's expiration. "[T]o credit the allegations of confidential witnesses, the witnesses must be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (quoting *Novak*, 216 F.3d at 314). Plaintiff relies on only two CWs for the allegation regarding COVID-19 and the relevant CWs, FE-1 and FE-10, are mentioned across three paragraphs in the section titled, "COVID-19 Waiver Scheme," *see* CCAC ¶¶ 119–129. FE-1 speaks only to PACS's practice of "'flipping' patients to Medicare" without any reference to the COVID waiver, and FE-10 only notes that "patients admitted under Medicare Part A would be switched to Part B when their Part A coverage expired." *Id.* ¶¶ 122–23. Those allegations say nothing as to the waiver expiration's effect on PACS's revenues and do not provide any corroboration for the Hindenburg Report's implication—or that of the Report's CWs—that PACS may have been taking advantage of the waiver when viewed against other industry participants. *Contra* Dkt. No. 88-10 at 11–12 (discussing allegations from former PACS employees that PACS was engaged in conduct that mirrored that of competitor ReNew Healthcare, which had purportedly settled with federal and

state authorities for misuse of the COVID waiver). Moreover, neither FE is alleged to have been in a position to understand how the waiver would have impacted company-wide revenues in 2023. Both began their roles not only after the expiration of the waiver in May 2023, but also any 100-day grace period that would have expired at the end of August, seeing as FE-1 is alleged to have been employed from November 2023 through August 2024 and FE-10 was employed from September 2023 through July 2024. CCAC ¶¶ 98, 107. FE-1 worked at an unspecified SNF as Director of Admissions, whereas FE-10 worked in an Arizona facility as an Administrator. *Id.* Ultimately, Plaintiffs' assertion is "precisely the sort of speculative leaps of logic [from CWs] that courts have rejected." *Schiro*, 396 F. Supp. 3d at 305 (citation modified).

Plaintiffs' alternative theory is that the risk disclosure was rendered materially misleading by virtue of PACS's policy of recording revenue for respiratory therapies when such treatments were not eligible for reimbursement under Medicare Part B. CCAC ¶ 386(c). Plaintiffs allege, in effect, that the determination that respiratory, sensory integration and wound care ultrasound mist therapy may not be eligible for reimbursement under Medicare Part B qualifies as a "change, reduction or elimination of coverage for services," and that such change had already materially and adversely affected PACS's operations, revenue, and profitability by April 2024.

Plaintiffs' argument runs up against the primary basis of their claims. Plaintiffs do not allege that Medicare changed its rules or regulations for coverage of ancillary services. They allege, to the contrary, that Medicare Part B revenues should never have been reported because of then-existing facts. A risk disclosure is not misleading on its own terms when the risk it discusses is not alleged to have materialized, resulting in "a mismatch in terms of both subject matter and specificity." *Lian v. Tuya Inc.*, 2025 WL 733253, at *9 (S.D.N.Y. Mar. 7, 2025); *see also Rein v. Dutch Bros, Inc.*, 2024 WL 3105004, at *15 (S.D.N.Y. June 24, 2024) (noting "a

mismatch between the fact the [complaint] faults [the company] for omitting . . . and the statements it challenges”). The policy change risk disclosure concerns the risk from an external event—a change by Medicare or Medicaid or another governmental program to their rules regarding coverage and that such change, were it to occur, could result in hits to profitability (*i.e.*, changes to “coverage or reimbursement”). It does not provide assurance that PACS, in all instances, was correctly interpreting and applying Medicare’s current rules regarding reimbursements. Moreover, Plaintiffs do not allege that Medicare or Medicaid implemented any changes that were kept hidden from investors. Instead, the core allegations are that PACS violated the policies as they existed before and throughout the Class Period by accounting for revenues that should not have been recognized under static policies. The risk disclosure might have been false if Plaintiffs adequately pled that Medicare Part B once allowed reimbursements for respiratory, sensory, and wound care ultrasound therapies but that policy had changed and PACS overbilled for those treatments anyways. But Plaintiffs make no such allegation; they explicitly contend that “revenue levels [were] being inflated by reimbursements for Medicare Part B that PACS now admits were improper—due to PACS’s own acknowledgment of then-existing ‘billing uncertainties,’ as admitted in the Restatement, *rather than changes to Medicare*.” CCAC ¶ 386(c) (emphasis added). The risk factor does not cover misinterpretations of coverage and reimbursement policies or related accounting standards or impose on PACS an obligation to disclose on a continuing basis outside its quarterly reporting the impact of such misinterpretations on its financial results, only objective changes to said policies.

**2. Compliance & Review Risk Disclosures**

Plaintiffs also challenge two other risk disclosures from the IPO and SPO Offering Documents and the Form 10-Q filings for the first two quarters of 2024. These risk disclosures share a common theme. The first addresses the risk of non-compliance with health care rules

and regulations or a change in those rules and regulations and the possibility that it could cause significant expenditures or a change in operations. The second warns that while PACS has an internal review system, if PACS does not detect all instances of noncompliance, it might be required to repay billed amounts. As elaborated on below, Plaintiffs plead no facts that either disclosure is false or misleading.

**a. Legal Compliance**

The risk disclosure concerning legal compliance reads:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*

*Id.* ¶ 393, 430, 478, 512 (Stmts. 3, 11, 21, 28).

Plaintiffs allege that this disclosure was false and misleading because the Company was not operating in compliance with regulations, starting from the time of the IPO and through the Class Period, and because changes in law or regulations were not a mere "potentiality" but had occurred with the end of the COVID-19 waiver—and the end of that waiver already had an "outsized impact on PACS's operations, revenue and profitability." *Id.* ¶ 394(a), (b). Defendants allegedly knew or were reckless in not knowing that PACS's revenue levels were inflated by overbilling for Medicare Part B services and so would foreseeably result in a material impact to PACS's financial results. *Id.* ¶ 394(c). To plead sufficient facts, in addition to the allegations from CWs and the Hindenburg Report, Plaintiffs point to the Restatement, in particular its disclosure of a material weakness regarding the Company's whistleblower hotline and its report of governmental investigative action, including an April 8, 2024 CID requesting

information regarding PACS Services and Paradise Valley days before the IPO. *See, e.g.*, *id.* ¶¶ 395, 397, 480, 482.

Plaintiffs have failed to plead facts that this disclosure was false when made. PACS warned that if it did not act in compliance with the "extensive and complex laws and government regulations" that governed its business, or if those laws and regulations changed, it could be required to make significant expenditures or to change its operations to become compliant. *Id.* ¶ 393, 430, 478, 512. The risk that PACS thus warned against was that it "could be required to make significant expenditures or change [its] operations in order to bring [its] facilities and operations into compliance." It did not warrant that there would be no instances in which an employee violated one of more of the laws and regulations that governed PACS's business. PACS had 212 to 314 facilities during the Class Period. It did not guarantee that every employee in each one of those facilities was always in compliance with the law.

Plaintiffs do allege instances of non-compliance by PACS employees. The CWs allege a hodge-podge of unlawful behaviors: FE-9 alleges the Company incentivized lavish gifts and parties, and FE-4 alleges patient neglect and forging medical records. Additionally, FE-2, FE-5, FE-6, FE-9, and FE-10 also alleged various PACS facilities skirted licensing requirements in California, Arizona, and Colorado by misusing an administrator's license across more facilities than permitted or falsely representing a facility had a specifically named licensed administrator on site. CCAC ¶¶ 176–191. But PACS was not required to disclose scattershot instances of wrongdoing that these CWs identify in order to render its disclosure not misleading. It was required to identify instances of wrongdoing that would or did have an operational impact. It is there that Plaintiffs' allegations fall short. The CCAC does not plead facts to establish that the instances of non-compliance were systematic or that they would cause any undisclosed

significant expenditures or operational changes. *Cf. Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (holding that risk disclosures were misleading where "the company was already experiencing significant setbacks [from the disclosed risk] . . . at the time the 10-K was issued" without also disclosing that the setback had occurred). Likewise, the Restatement's acknowledgement that a material weakness existed with respect to PACS's hotline does not suffice to make the risk disclosure false. PACS noted that the Company "did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including potential compliance issues received through the hotline process." Dkt. No. 88-12 at 5. But Plaintiffs do not identify what those compliance issues were or that they had any impact on operations or results.

The Restatement's changes to 2024 financial statements do not bear on the legal compliance risk disclosure. The risk disclosure speaks to compliance with the laws and regulations of the healthcare industry, not the accuracy of PACS' reported financial results. The Restatement speaks to the latter and not to the former. It may have been (as Plaintiffs allege) that there were episodic instances of billing for services that were not necessary, but Plaintiffs do not allege that those caused significant expenditures or operational changes and those were not the basis for the Restatement. The Restatement was based on a conclusion that the Company had "received information that indicated certain ancillary services, including respiratory [therapy] . . . *may* not be eligible for reimbursement" and that such revenue should not be recognized "until *definitive conclusions* regarding eligibility for billing." Dkt. No. 88-12 at 78 (emphasis added). In other words, the level of uncertainty had reached the point that revenue recognition was not permitted. The Restatement did not admit, and Plaintiffs have not alleged facts to support, that

Defendants were acting unlawfully in the submission of claims. Plaintiffs do not allege that Defendants violated the False Claims Act or any other law or regulation.

Instead of well-pled allegations of company-wide illegality, Plaintiffs reason that because "the Company would need to return to Medicare . . . millions of dollars from the Company's widespread overbilling," PACS's billing was illegal. CCAC ¶¶ 396(c), 397. But the best Plaintiffs allege to draw the bridge from "overbilling" (*i.e.*, charging for respiratory therapies to maximize revenue that PACS thought was recognizable) to unlawful is that PACS received CIDs and a subpoena in the period from April 2024 to February 2025. *Id.* ¶¶ 264(a)–(d). The first CID from April 8, 2024, is alleged to have concerned PACS Services and one facility (Paradise Valley) and to have concerned allegations of a violation of the False Claims Act. *Id.* ¶ 264(a). Plaintiffs make no allegation that the CID inquired about anything other than conduct at that single facility or that PACS in fact committed violations of the False Claims Act. PACS received two CIDs in September 2024, and a subpoena in February 2025. Dkt. No. 88-12 at 73–74. Those demands obviously could not have rendered false and misleading statements by PACS that preceded them, including the September 6, 2024 SPO. They also do not call the risk disclosure into question. One of the September CIDs concerned "California-based" SNFs and an allegation that PACS violated the False Claims Act by submitting false claims to Medicare for reimbursement under the patient-driven payment model for skilled services and rehabilitation services, and the other concerned a single facility (Bishop) and sought information regarding claims submitted to Medicare for reimbursement under the COVID-19 waiver—in other words, they were localized and did not seek information about the same practices. CCAC ¶¶ 264(b)–(c); Dkt. No. 88-12 at 73. There is no allegation that either CID progressed beyond the Government asking for information. The subpoena was issued after publication of the short-

seller report; it inquired into the alleged practices mentioned in that report. CCAC ¶ 264(d). But what is telling is the absence of any allegation that, after the subpoena was issued, the Government felt the need—or the basis—to take any action against PACS. The Government may issue a civil investigative demand so long as it has "reason to believe" that there might be "information relevant to a false claims law investigation." *See* 31 U.S.C. § 3733(a)(1). It may serve a subpoena on a showing of relevance and "reasonableness related to a defined investigative scope," without any conclusion of probable cause. *See ACLU v. Clapper*, 785 F.3d 787, 811–15 (2d Cir. 2015) (discussing the "accepted standard of relevance" for grand jury and administrative subpoenas); *see also* 31 U.S.C. § 3733(b)(1)(A). That the Government asked whether PACS was complying with the law absent any allegation that it concluded that PACS was failing to comply with the law thus tends to undermine rather than support Plaintiffs' allegation that the risk disclosure was false.

The allegations here may be helpfully contrasted with those in *In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015) (Nathan, J.). There, Judge Nathan considered risk disclosures that expressly said that the issuer, BioScrip, "periodically respond[s] to subpoenas and requests for information [and] . . . cannot predict with certainty . . . whether we may in the future become a target or potential target of an investigation." *Id.* at 726 (internal quotation marks omitted). However, BioScrip had been served with a CID—as PACS had—prior to when the statement was made, rendering the risk disclosure misleading for a material omission. *Id.* at 727. But the risk disclosure here does not suggest to a reasonable investor that PACS is not subject to a government investigation because it does not speak to the risk of a civil investigation at all, unlike the risk disclosure in *BioScrip*. The nexus between the language of

the risk disclosure and Plaintiffs' allegations for why it is rendered misleading or materially false is too attenuated.

**b. Compliance Review**

The risk disclosure concerning PACS's instances of noncompliance warns that there are instances of non-compliance that sometimes affect PACS's billing. It reads:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.*

CCAC ¶¶ 389, 426, 474, 508 (Stmts. 2, 10, 20, 27).

Plaintiffs allege that this statement was false and misleading because "instances of noncompliance" did not occur "time to time" but were instead pervasive, pushed by PACS leadership "across the Company" who were urging facilities "to perform unnecessary respiratory therapies on thousands of patients, to drive up revenue at each facility from $150,000 to $1 million per month" and yet the statement did not disclose that PACS leadership "had been orchestrating the use of sensory rooms, devoid of actual therapeutic tools, to overbill Medicare Part B for their treatments," thus rendering this disclosure misleading. *Id.* ¶ 390(a), (b). Plaintiffs also allege that PACS did not audit and correct these practices even though the "internal investigation found at least $61 million in noncompliance, requiring Restatement." *Id.* ¶ 390(e). Plaintiffs assert that "PACS was directing—through quotas, training sessions on how to maximize overbilling while evading detection, and terminating employees who objected—the very noncompliance such procedures were meant to prevent." Dkt. No. 89 at 37.

Plaintiffs' allegations fail for reasons similar to the reasons that undermine Plaintiffs' claims with respect to legal compliance. The allegations fail to establish a widespread practice of billing for unnecessary respiratory therapies or other ancillary services. Plaintiffs rely on the

Hindenburg Report, firsthand CWs, and the Restatement. *See, e.g.*, CCAC ¶¶ 7, 13, 154, 391, 404.

The Hindenburg Report fails to provide evidence of widespread and improper overbilling. Even if the confidential sources quoted in the report could be credited, they do not support the contention that instances of noncompliance leading to reduced billing was anything other than episodic. One source says that "[overbilling Medicare Part B] started down in Santa Monica" and then spread organically across PACS's network once others caught on that that facility was experiencing strong performance after overcharging Part B, but provides no specifics with respect to such supposed organic growth, while another "from Colorado said that the respiratory program was pushed onto their facility by PACS management," without indicating that the billing was non-compliant. There is no suggestion from either of a top-down effort to overbill. Dkt. No. 88-10 at 19. Some CWs in the Report simply attest to PACS's focus on "profitability," without suggesting that such focus resulted in non-compliance. *Id.* (former administrator explaining that PACS is "maximizing" Medicare Part B, and another relaying that the "program equals dollars"). Others provide allegations of wrongful document practices such as falsifying documents, but the Hindenburg Report does not clarify which facility the CW is speaking to, in what capacity, or for which time period. As for economic analysis conducted by Hindenburg Research, the Report does not posit a cause for PACS's V-shaped revenue from the first quarter of 2023 to the second quarter of 2024, and instead only relies on unspecified former employees to suppose the cause was overbilling. *Id.* at 18–19.

Plaintiffs' firsthand CWs do not provide corroboration of a coordinated, management-driven scheme of non-compliance and to abuse Medicare. "[C]ourts have found at the pleading stage that the accounts of confidential witnesses support a company-wide inference where, for

example, they emanate from several geographic areas; (2) span different levels of the Company hierarchy; and (3) remain consistent across different time period[s]." *AppHarvest*, 684 F. Supp. 3d at 262–63 (S.D.N.Y. 2023) (citation modified). Here, none of the CWs are purported to have worked at headquarters and altogether they provide a vantage into only a small fraction of PACS's SNFs—28 of 212 to 314 facilities during the Class Period—at positions below the RVP level. CCAC ¶ 116. Three of the CWs worked in California (FE-2, FE-3, FE-9), three in Arizona (FE-4, FE-6, FE-10), and two in Colorado (FE-5, FE-8). *Id.* ¶¶ 98–108. Two of the FEs, FE-1 and FE-7, do not have fully disclosed locations, though FE-7 is attributed as a Regional Marketing Director in 2024 for the Southwest region. *Id.* ¶ 104. PACS had fourteen RVPs at the time of the IPO, but only three are mentioned in the CCAC (Nielsen, Smitty, and McLane) as interacting with the FEs. CCAC ¶ 139 n.11. To be sure, "[a] comprehensive survey of employees is not needed at the pleading stage," *Freudenberg*, 712 F. Supp. 2d at 197, but the lack of a more comprehensive geographic span and the unrepresentative reflection of the corporate hierarchy is coupled with insufficiency of the FEs' allegations themselves.

More significantly, the CWs do not support the claim that leadership of PACS was driving an effort to conduct and bill for unnecessary procedures. With respect to Medicare Part B overbilling specifically, only six are even *alleged* to corroborate the scheme: FE-1, FE-3, FE-5, FE-6, FE-9, and FE-10. But many of these FEs' allegations, taken as true, do not plausibly plead routine noncompliance to which the Company turned a blind eye: FE-1 and FE-10 noted that the Company sought to "maximize billing," CCAC ¶¶ 121–23; FE-5 discussed a meeting where an administrator "gave a four-hour lecture on how to bill more for respiratory therapy," *id.* ¶ 139; and FE-9 recalled how respiratory therapists were given bonuses based on revenue and "how Chad Nielsen and other Administrators encouraged facilities to enroll as many patients as

possible" in respiratory therapy, *id.* ¶¶ 131, 141. But these allegations do not indicate a systematic plan to overbill Medicare Part B or to perform unnecessary services. So long as the patients needed the services, there is nothing non-compliant about an effort to maximize billing or to incent employees to perform. While the CWs are "certainly able to muster a litany of criticisms, [the CWs'] allegations at most only support an inference of an oversight failure of management." *Burns v. UP Fintech Holding Ltd.*, 2026 WL 834387, at *8 (S.D.N.Y. Mar. 26, 2026) (citation modified); *see also Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *13 (S.D.N.Y. Dec. 12, 2024) ("[M]any of the confidential witness allegations actually do not suggest what Lead Plaintiffs contend they suggest."); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("However, plaintiffs' use of confidential witnesses does not rectify the fact that they do not adequately plead falsity."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (summary order). Of the more direct allegations linking Part B abuses to Part A, FE-3 indicated that "quotas were discussed on a video call in or shortly before May 2023"—the time that the COVID waiver expired—and suggested that a RVP named Eric Felton "instructed how to perform respiratory therapy and how to bill for it," and that this "Zoom meeting was for his whole region." CCAC ¶ 135 (FE-3 stating that video conference meetings during this time were led by "Corporate Level Management"). Plaintiffs do not explain how an instruction to perform respiratory therapy and to bill for it would be non-compliant or provide evidence that unnecessary services were performed. This allegation is innocuous on its face. As critically, FE-3 is alleged to have started working at PACS in October 2023 and so could not possibly have been in the position to possess knowledge about a transition of services occurring in May 2023. *Id.* ¶ 100 ("FE-3 was a Business Officer Manager for a California SNF from October 2023 to August 2024."). A few allegations, read most

generously, might provide support of episodic noncompliance. For instance, FE-1 indicated that a "therapist was pushed to perform treatments on 12 to 15 patients a day" even when not needed, *id.* ¶ 143. But those stray assertions do not disprove the risk disclosure and only prove that there might "time to time" be noncompliance. *See, e.g.*, *id.* ¶¶ 389, 426. FE-1 also claimed that there was leadership pressure to keep SNFs filled, and that such initiative was indicative of a company-wide overbilling scheme. However, such "rumors cannot reasonably satisfy the requirement that the facts alleged 'provide an adequate basis for believing that the defendants' statements were false.'" *In re Vertex Pharms., Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 354 (D. Mass. 2005) (quoting *Novak*, 216 F.3d at 314). As to the assertion that PACS was not conducting audits, Plaintiffs fail to allege facts that such statement was false and rely in conclusory fashion on the Restatement itself, which did not speak to audits and care delivery but that a whole category of services were mistaken to be reimbursable, resulting in a mismatch between the Restatement and the risk factor. *See Lian*, 2025 WL 733253, at *9.

Plaintiffs do not push the assertion that the Restatement could indicate non-compliance, and for good reason. The Restatement acknowledged that certain revenues should not have been recognized because it was "probable that a significant reversal in the amount of cumulative revenue recognized" would occur, *see* CCAC ¶ 258 n.15 (quoting Dkt. No. 88-3 at 194). Plaintiffs extrapolate, in conclusory fashion, that because there was a Restatement, PACS leadership must have "already known that the Company would need to refund Medicare" for all of respiratory, sensory, and other therapy services during the Class Period. *Id.* ¶ 391(a)–(b). But that is not what ASC 250 requires nor what the Restatement signaled and it is not evidence of non-compliance. The Restatement signaled that PACS had submitted bills (and been paid on some) and recorded revenue when there was a risk that such revenue would not be reimbursable

or would be subject to refund or recoupment.[28] It did not reflect that PACS was non-compliant with the rules and regulations of the healthcare industry.

### 3. Disclaimer in Earnings Presentations

Plaintiffs challenge a disclaimer from PACS's earnings presentations for the first two quarters of 2024 that speaks to the same subject matter as the risk factor statements from the SEC filings and represents that there "could" be adverse effects from "risks associated" with PACS's internal review process:

> Forward-looking statements are not guarantees of future results and are subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control, and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statements, including . . . risks associated with our review and audit of the care delivery, record keeping and billing processes of our operating subsidiaries . . . .

*Id.* ¶¶ 451, 495.

Plaintiffs allege that this statement was false and misleading because at the time the statement was made, the "PACS Defendants knew, or at minimum were deliberately reckless, that it was committing widespread misconduct in record keeping and billing processes," including by reporting revenue that would have to be restated. *Id.* ¶ 452(a)–(c). The Court has concluded that Plaintiffs have alleged a false and material misstatement in connection with Defendants' report of revenue and earnings for the first and second quarters of 2024. The allegation regarding PACS's forward-looking statement adds nothing and does not state a claim for relief. PACS's statement related to its forward-looking statements told investors that such

[28] At oral argument, Plaintiffs mistakenly suggested that the information was learned prior to the SPO, *see* Oral Arg. Tr. 60:24–61:8, reasoning that the Restatement states that information received "[s]ubsequent to the issuance of the Company's Quarter Report on Form 10-Q filed on August 12, 2024" revealed that certain services "may not be eligible" for Medicare Part B reimbursement. Dkt. No. 88-12 at 78. That contention rests on conjecture: "subsequent" could refer to any time between August 12, 2024, and the Restatement's issuance in November 2025.

statements were subject to uncertainties and that future results could differ from those expressed in any forward-looking statement. In order for such statements to be ensured safe-harbor protection under the PSLRA, 15 U.S.C. § 78u-5, PACS was required to include such cautionary language. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Plaintiffs have not challenged any forward-looking statement by Defendants.[29] It follows that the language caveating forward-looking statements generally cannot itself be false or misleading.

**4. Business Model Representations**

Plaintiffs further allege that Defendants made materially false and misleading statements that optimistically described PACS's business model and its positive attributes throughout the Class Period, including in SEC filings and communications with investors, including:

> Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.

CCAC ¶¶ 407, 526 (Stmts. 6, 31) (emphasis omitted).

> Our significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.

*Id.* ¶¶ 399, 518 (Stmts. 4, 29) (emphasis omitted).

> We believe our success is driven in significant part by our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously and deliver excellence in clinical quality and a superior experience for our patients.

*Id.* ¶¶ 403, 522 (Stmts. 5, 30) (emphasis omitted).

---

[29] Defendants clarified at oral argument that they are not relying upon the safe harbor for forward-looking statements. *See* Oral Arg. Tr. at 26:15–27:18

> Model prioritizes local operational autonomy, leveraging robust technology and services for responsive decision-making based on community needs, enhancing patient care and facility operations.

*Id.* ¶¶ 455, 499 (Stmts. 16, 25) (emphasis omitted).

> In addition to training new leaders, the PACS leadership model allows our local leaders to make operational decisions as close to our patients and employees as possible, which is ultimately better for the residents and community in which they live.

*Id.* ¶ 490 (Stmt. 23) (emphasis omitted).

PACS' statements regarding "billing integrity", "robust controls" and "[r]obust culture of compliance" are inactionable puffery.[30] "[A]lleged statements [that] are nothing more than 'milquetoast corporate-speak' . . . fail to provide any description of specific initiatives or assurances of efficacy upon which a reasonable investor could have relied," particularly those that address "non-specific internal controls." *Puchtler v. Barclays PLC*, 2025 WL 887502, at *11–12 (S.D.N.Y. Mar. 21, 2025) (quoting *Menaldi*, 277 F. Supp. 3d at 513), *aff'd*, 2025 WL 3495490 (2d Cir. Dec. 5, 2025) (summary order). "Statements that a company has implemented internal controls do not . . . 'constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that the descriptive statements about the implementation of such controls were false.'" *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at *9 (S.D.N.Y. Sept. 9, 2025) (quoting *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019)). Plaintiffs allege that PACS' statements mislead because PACS "touted" the effectiveness of its audits even though noncompliant practices (e.g., overbilling) were running rampant in the Company. *See* CCAC ¶¶ 17, 312, 407; Dkt. No. 89 at 36. However, PACS's statements provided "no assurance to investors" that its procedures would

[30] For the same reasons that follow, allegations concerning PACS's statements regarding "robust controls" and "[r]obust culture of compliance" in the IPO Offering Documents are also inactionable. CCAC ¶¶ 307(e), 331.

be sufficient to prevent overbilling. *Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020). And, for the reasons already discussed, Plaintiffs do not allege facts supporting widespread overbilling. Unlike the disclosures found actionable in *Jinkosolar*, PACS did not describe its "compliance measures in confident detail," *Luo*, 465 F. Supp. 3d at 409 (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)). Its disclosures were more "tentative and generic." *Id.*

Thus, these statements constitute inactionable puffery. "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174; *see also Novak*, 216 F.3d at 309. With regard to PACS's billing integrity, statements concerning "commitments or values . . . [are] 'simple and generic assertions' regarding Defendants' commitment to compliance [and] are 'not materially misleading absent significantly more detailed assurances of compliance.'" *Puchtler*, 2025 WL 887502, at *10 (quoting *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023)); *Singh*, 918 F.3d at 63 ("general declarations about the importance of acting . . . with integrity" are puffery). As to generic descriptions of PACS's business model, they also are inactionable opinions as they do not rest on any objective elements, despite Plaintiffs' arguments to the contrary, *see* Dkt. No. 89 at 38. The "challenged statements regarding the Company's focus and strategy are a set of aspirational generalizations, which are precisely the type of puffery that the Second Circuit has consistently held to be inactionable." *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *102 (S.D.N.Y. Sept. 19, 2024).

Two of the statements explain PACS's success—that "significant historical growth has been primarily driven by . . . expertise in acquiring underperforming [SNFs] . . . and transforming them," as well as that the Company's success is "driven in significant part by [its]

decentralized" operating model—but are, Plaintiffs allege, misleading because they leave out that the real reason for success was overbilling Medicare pursuant to a top-down directive, as confirmed by the Restatement. CCAC ¶¶ 400, 404. These statements describe PACS's "success in general terms" and are "not specific enough to put the reason for [its] success at issue, triggering a duty to disclose." *Africa*, 2022 WL 4537973, at *9. Moreover, there are no well-pled allegations that PACS's success was not driven by the acquisition of underperforming SNFs or by its decentralized business model. Indeed, certain of Plaintiffs' allegations suggest precisely that PACS success was driven by its ability—through the focus on profit and billing—to acquire and turn around underperforming SNFs. The disclosure does not speak in specific terms as to how PACS was able to turn around the underperforming SNFs. As for Medicare Part B services, the statements are not incompatible with the delivery of those services as an engine for PACS's growth: the first speaks to "historical growth" and ascribes it to the acquisition of underperforming SNFs; Plaintiffs' allegation relates to how the SNFs were able to perform in 2024, months before the IPO. The second does not speak to which services are offered but PACS's choice of operating model. On the latter, Plaintiffs quote the Company's language of describing the operating model as "locally led, centrally supported" on "the latest earnings call on November 19, 2025" versus the language of "decentralized, local operating model" during the Class Period, but even if those two statements were incompatible, how PACS described its operating model in November 2025 does not bear on the truth of its statements during the Class Period. CCAC ¶ 404.

To support their arguments that the business model statements are false, Plaintiffs rely on *In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009), but that case undermines their claim. In *Moody*, the court focused on "verifiable actions" that Moody's was

"taking to ensure its independence," which it claimed were "the 'raw materials' of its business." *Id.* at 509. Moody's statements included detailing "specific steps." *Id.* Instead, PACS's statements are readily analogous to broad corporate-speak statements district courts have regularly found inactionable when describing a company's value proposition and operations, in part because they are near impossible to empirically disprove. *See, e.g.*, *Applied Minds, LLC v. Guild Hall of E. Hampton, Inc.*, 2025 WL 4072652, at *6 (S.D.N.Y. Sept. 22, 2025) ("[S]tatements about a company's experience or expertise constitute mere opinion or puffery and are not actionable as fraud.") (collecting cases), *report and recommendation adopted*, 2026 WL 775622 (S.D.N.Y. Mar. 19, 2026).

## III. Allegations of Scienter under the Exchange Act Claims

Even if Plaintiffs had alleged a false and misleading narrative statement under the Exchange Act (and notwithstanding that they have alleged that PACS's reports of its financial results were false and misleading), Plaintiffs have not adequately alleged scienter for purposes of their Section 10(b) claims under the Exchange Act.

### A. Scienter

To plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b-5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168). Recklessness may also suffice to plead scienter for securities fraud in the Second Circuit. *See JP Morgan Chase Co.*, 553 F.3d at 198.

To survive a motion to dismiss, "the inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent." *Id.* (internal quotation marks omitted). In assessing whether such an inference exists, courts consider both the inferences urged by plaintiffs as well as any reasonable competing inferences "rationally drawn from all the facts alleged, taken collectively." *Id.* The inference of scienter, however, "need not be "irrefutable,' of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Gimpel*, 156 F.4th at 143–44 (quoting *Tellabs*, 551 U.S. at 324). The court takes "into account inferences favoring both the plaintiff and the defendant." *Id.*

"A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553 F.3d at 198). To raise a strong inference of scienter through "motive and opportunity" to defraud, plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307–08). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* (quoting *Novak*, 216 F.3d at 307). If plaintiffs do not make this showing of "motive and opportunity," they may adequately allege scienter through the circumstantial evidence prong "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *Id.* (quoting *Kalnit*, 264 F.3d at 142). The court may also consider whether the combination of motive and opportunity and circumstantial evidence of knowledge together create an inference of scienter. *Gimpel*, 155 F.4th at 145–46 ("Because we conclude that the Plaintiffs' motive allegations weigh

in favor of scienter, the circumstantial evidence need not be as great, although it must still be strong").[31]

It is not sufficient under the PSLRA that any company employee knew that its statements were false or intended to commit fraud. "[T]he pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* In "exceedingly rare instances," *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), a plaintiff may be able to allege a strong inference of corporate scienter "without being able to name the individuals who concocted and disseminated the fraud" such as when a statement is "so dramatic [that it] . . . would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195–96 (internal quotation marks omitted).

**1. Motive and Opportunity**

Plaintiffs argue that they have alleged scienter through the motive and opportunity of PACS's senior executives. For Murray and Hancock, Plaintiffs contend their stock sales in the IPO and SPO led to extraordinary profits, totaling nearly $657 million between the two of them across both offerings, and should be viewed with suspicion. CCAC ¶ 536. Plaintiffs do not contend that Apt, Sanford, and Jergensen made any suspicious stock sales, but rather contend that each had motive and opportunity to defraud investors because of their compensation

[31] *Gimpel* did not purport to change the law of the Circuit that motive and opportunity alone can give rise to a strong inference of scienter. As the *Smith* court noted after *Gimpel*, "Plaintiffs may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." 177 F.4th at 413 (internal quotation marks omitted).

schemes. *Id.* ¶ 546. Defendants do not dispute that the Individual Defendants would have had the opportunity to commit fraud, but they vigorously dispute motive. They contend that Plaintiffs fail to state, with particularity, how stock sales by Defendant Murray and Hancock during the offerings are unusual or suspicious, nor how Defendants Apt, Sanford, and Jergensen benefited in a concrete and personal way. Dkt. No. 83 at 35–37.

Plaintiffs' allegations regarding Murray's and Hancock's stock sales do not establish a strong inference of scienter. Murray and Hancock sold stock in the IPO and the SPO, but not in the open market. The sales happened within PACS's first half-year as a public company and less than two months after the release of the Hindenburg Report. *See* Dkt. No. 89 at 40. They netted nearly $34 million each from the IPO and $295 million each from the SPO, a change in ownership from 50% of the company to just over 35% for Murray and Hancock each. *See* CCAC ¶¶ 536–37, 649. Plaintiffs thus contend that collectively and individually, Murray and Hancock "unloaded approximately 30% of the Company's entire supply of stock." *Id.* ¶ 538. In calculating this change in ownership, Plaintiffs include shares that Murray and Hancock had "gifted" PACS to sell in the SPO and calculate their change in ownership based on their holdings relative to the stock's total float. *Id.* ¶ 41; Dkt. No. 89 at 40; Dkt. No. 91 at 15. In terms of absolute number of shares, Murray and Hancock each started with 64,361,693 shares before the IPO and ended with 54,626,199 shares after the SPO, indicating a reduction of approximately 15.1% for each. *See* Dkt. No. 88-3 at 153; Dkt. No. 88-4 at 160.

Unusual insider sales immediately before and during the class period may permit an inference of scienter. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). Courts consider a number of factors to determine if a sale was "unusual or suspicious": "(1) the amount of net profits realized

from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants[] selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

In this instance, however, the Individual Defendants' stock sales fail to support an inference of scienter. Murray and Hancock's sales generated large proceeds, but that is a function of the size of their holdings. Murray and Hancock only sold 15% of their respective stakes in the Company through the offerings—significantly less than the reduction of ownership courts have found probative of scienter. *See Zornberg v. NAPCO Sec. Techs., Inc.,* 778 F. Supp. 3d 516, 526 (E.D.N.Y. 2025) ("The Second Circuit has held that stock sales of more than 40% of holdings are sufficient to establish a motive."). Plaintiffs insist that the Court consider a 28.8% reduction in ownership for Murray and Hancock but cite no authority for the proposition that founders' shares gifted to the issuer for an offering are to be included in calculations of holdings changes. *See* Dkt. No. 89 at 40. That gift is most naturally considered a further investment in kind by the two in the company or contribution to the company; through it, the company would be able to raise additional proceeds on behalf of all investors, with Murray and Hancock able to share in the benefit (and take the risk) of that corporate activity through their (now reduced) share ownership. It thus bespeaks a motive, common to most corporate officers, to benefit the corporation, and not to benefit themselves individually. *See JP Morgan Chase Co.*, 553 F.3d at 198; *cf. In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 n.8 (S.D.N.Y. 2001)

(noting that individual "disposed of her CMI shares by gift, and thus we do not consider that activity to be improper insider trading").

Even if the Court credited Plaintiffs' assertion that the correct figure is 28.8%, that would not make Murray and Hancock's transactions suspicious. Plaintiffs cite to *In re Weight Watchers Securities Litigation* to indicate that the magnitude of the change in holdings is actionable, but that case reveals that Plaintiffs' arguments are weak on their own terms because there, the court considered a change in ownership of 44% to 22%. *See* 504 F. Supp. 3d. at 256–57. That 50% "reduction in ownership" is patently more suspicious than the sub-30% change that Plaintiffs point to for Murray and Hancock. *Cf. In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (discussing that the inquiry turns on whether a "sale amount[s] to a large percentage of an individual's holdings," and finding that defendant's "liquidation of 97% of his Sallie Mae holdings" is probative of scienter).

The magnitude of Murray and Hancock's proceeds does not make their stock transactions suspicious. It is a function solely of the valuation of PACS. The two generated substantial proceeds, measured in absolute dollars. But they started with stock, that if valued at the IPO offering price, had far greater worth. And they held onto most of that stock. If the two had sold even a smaller percentage of their holdings, the sale would have generated substantial proceeds but that does not make the transactions suspicious. Plaintiffs cite to various cases to draw a distinction on the basis of dollar amount of proceeds, *see* Dkt. No. 89 at 39, but those comparisons are unpersuasive in context. In *Gimpel* and *comScore*, the individual defendants sold over half of their holdings and generated more from their sales than they continued to hold in the company. *See Gimpel*, 156 F.4th at 144 (individual defendants each sold two-thirds or more of their shares); *comScore*, 268 F. Supp. 3d at 554–55 (three individual defendants each

sold between 57% to 83% of their holdings). And, while Plaintiffs contend that in *Blanford*, the "two defendants profiting $49 million [was deemed] suspicious," Dkt. No. 89 at 49 (citing 794 F.3d at 308–09), the Second Circuit has since made clear that to allege unusual stock trades it is not enough that the trades "generated significant net profits," but plaintiffs must also allege other circumstances making the transactions suspect including "the proportion of individual defendants' stockholdings involved in the sales compared to their overall holdings" and whether the transactions were "timed suspiciously." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022); *see also N.Y.C. Pub. Pension Funds v. Coupang, Inc.*, 2025 WL 2613650, at *25 (S.D.N.Y. Sept. 10, 2025) ("Though the proceeds of the alleged stock sales are, by any measure, considerable, more is required in order for these trades to give rise to a strong inference [of scienter]." (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (summary order))). It is not unusual for a founder who has devoted time and capital in a start-up to wish to monetize some of the value of her investment when the company is able to go public. Nor is it unusual for the privately held shares to have increased in value. The proceeds received by Murray and Hancock in the IPO and SPO cannot alone establish scienter without establishing a virtual *per se* rule—a founder who sells stock in the IPO of a previously privately held company will strictly be liable for any mistakes in the offering documents, regardless of whether he or she knew or was reckless as to the mistakes.

When the remainder of the factors are considered, they tend to refute scienter. As noted, the two sold only a small percentage of their holdings in PACS. That means that they continued to hold a substantial stake in the company and were themselves among the largest losers (if not the largest losers) when the misstatements were disclosed. *See Menora Mivtachim Ins. Ltd. v.*

*Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *27 (S.D.N.Y. Mar. 30, 2021) (rejecting theory of scienter where defendants allegedly "suddenly decided ten months later that it would be prudent to disclose for the first time the previously secret scheme to both investors and the Department of Justice, knowing full well that it would almost certainly lead to this very lawsuit and possibly other legal ramifications"); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *17 (S.D.N.Y. Sept. 19, 2011) (rejecting a theory of scienter that defendants knew of a fraudulent scheme and made several misrepresentations about the scheme "only to reveal [the scheme] to the world a few months later" as "illogical" and "bizarre").

Murray and Hancock sold their shares in the IPO and SPO respectively, and not on the open market. While Plaintiffs allege a class period from April 11, 2024, to December 16, 2024, and alleged misstatements throughout that period, they do not allege any sales by either Murray or Hancock after the early September 2024 SPO. "[T]he fact that the Individual Defendants sold only in public offerings cuts against an inference of scienter, because it suggests a motive that is 'generally possessed by most corporate directors and officers.'" *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 420 (S.D.N.Y. 2020) (quoting *Kalnit,* 264 F.3d at 139); *id.* at 419 (noting that stock sales were not unusual given that there were "no allegations that any Executive Defendant sold shares at any time other than in connection with the IPO and SPO"); *see also DraftKings*, 650 F. Supp. 3d at 177. Additionally, "district courts in our Circuit are 'frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure.'" *Gimpel*, 156 F.4th at 145 (quoting *Chapman*, 466 F. Supp. 3d at 412). Lastly, CFO Apt and Chief Accounting Officer Lewis—the persons who allegedly would have been responsible for PACS's financial statements—are not alleged to have sold any shares

during the Class Period and thus to have profited at all from the supposed fraud. To accept Plaintiffs' theory then the Court would have to accept either one of two implausible conclusions (i) Apt and Lewis were complicit in PACS's improper accounting and other alleged false statements and took the risk while allowing Murray and Hancock to enjoy all the benefit of stock sales; or (ii) Apt and Lewis did not believe that the accounting for which they were responsible was improper but Murray and Hancock (who are not alleged to have any unique accounting knowledge) somehow did believe that the financials were false.

Taken altogether, Plaintiffs have failed to raise a strong inference of scienter based on Murray's and Hancock's stock sales.

As for the motive and opportunity of Defendants Apt, Sanford, and Jergensen, the pleadings are weaker still.[32] Plaintiffs point out these Defendants benefited from the 2024 Management Bonus Program, because "an aggregate bonus pool equal to 8% of the Company's Adjusted EBITDA" would be doled out amongst them depending on quarterly performance in fiscal year 2024, as well as grants of restricted stock units ("RSUs") in the IPO that vested over five years. CCAC ¶¶ 546, 612–14. In other words, the value of their bonuses and RSUs were tied to PACS's reported EBITDA. But the allegation that Apt, Sanford, and Jergensen had a motive to defraud because the effect of the alleged fraud was to increase the value of their RSUs positions them no differently (and maybe worse) than the ordinary shareholder. If the fraud raised the price of PACS' stock price, they would benefit—save that, in the case of Apt, Sanford, and Jergensen, they would be able to realize that benefit only ratably over a period of five years and not immediately. The RSUs with an elongated vesting schedule could only align these Defendants with ordinary corporate motives, not incentivize fraudulent activity given that their

[32] Plaintiffs allege no motive for Lewis.

assets would be equally hurt if the fraud were exposed. *In re Adobe Inc. Sec. Litig.*, 2025 WL 3124312, at *14 (S.D.N.Y. Nov. 7, 2025) (discussing, with respect to RSUs, that the "allegations fail to allege motive because the Individual Defendants would not benefit from an inflated stock price unless they sold their shares before the alleged corrective disclosure decreased the value of the stock and there is no allegation that they did"). And the bonus allegation is generic to every corporate officer whose performance is judged on the basis of the performance of the company. Neither of these incentives are dissimilar from generic incentives that every corporate officer has, which are insufficient to create a strong inference of scienter. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) ("These allegations alone are not sufficient to give rise to a strong inference of scienter, because motives that are common to most corporate officers, such as the desire . . . to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." (citation modified)). Accordingly, Plaintiffs have failed to adequately suggest a strong inference of scienter through these Defendants' motive and opportunity.

Although Plaintiffs cite to *Gimpel*, that case cuts against the allegations here. There, one of the individual defendants met their bonus target by "only 0.1%—and would not have hit that metric" but for the fraudulently accounted revenue. 156 F.4th at 145. Here, Plaintiffs do not allege the purportedly inflated revenue was consequential for a tiered incentive plan and that the misstatement indicated a particular incentive to meet a certain threshold. Instead, the bonus program here was standard fare: the better the company performs, the more of a bonus each relevant Defendant receives. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 526 (S.D.N.Y. 2020) ("Wholly apart from the flawed logic of plaintiffs' argument, it must be evaluated in the context of the Second Circuit's case law, which clearly provides that an

incentive-based compensation system is generally insufficient to support a strong inference of scienter.”).

**2. Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Because Plaintiffs have failed to plead motive and opportunity, they “bear[] a ‘correspondingly greater’ burden in alleging conscious misbehavior or recklessness.” *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *23 (S.D.N.Y. May 19, 2025) (quoting *JP Morgan Chase Co.*, 553 F.3d at 198–99). Plaintiffs offer an amalgamation of circumstantial evidence to meet this burden: (1) top-down directives implemented through RVPs, (2) unusual executive departures, (3) delayed financial reporting, and (4) SOX certifications by Defendants Murray and Apt. Individually and taken together, these allegations do not suffice for Plaintiffs to clear the hurdle.

“Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that ‘someone whose intent could be imputed to the corporation acted with the requisite scienter’ or (2) that the statements ‘would have been approved by corporate officials sufficiently knowledgeable about the company to know’ that those statements were misleading.” *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex*, 531 F.3d at 195–96). To establish conscious misbehavior or recklessness, Plaintiffs must allege that a corporate defendant or other person who approved or was responsible for the statements “had access to non-public information contradicting their public statements.” *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp.*, 252 F.3d at 76). “[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.” *Dynex*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309); *see In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020)

(concluding that scienter was insufficiently pled where plaintiffs "fail to show what specific contradictory information was available to any Defendant at the time they made any alleged false or misleading statement" (internal quotation marks omitted)). "[C]ontrary facts may also be learned in other ways, including through observation." *Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 237.

Plaintiffs argue initially that the Restatement pursuant to solely ASC 250 constitutes "powerful, direct evidence of scienter" that, independently, can satisfy the PSLRA's scienter requirement.[33] But that is plainly wrong. While a restatement can constitute evidence supporting an inference of scienter, it "cannot alone establish scienter." *Glantz*, 2025 WL 278440, at *7 (collecting cases); *see also zCap*, 792 F. Supp. 3d at 438 (regardless of "magnitude," a restatement "does not by itself prove" scienter).

Resting on allegations from FEs, Plaintiffs next contend that Defendants Murray and Hancock gave a top-down directive to overbill Medicare Part B by performing unnecessary therapies. CCAC ¶¶ 133–150; Dkt. No. 89 at 43. Plaintiffs do not do any better with this theory. Plaintiffs rely on supposition from the fact that Defendant Sanford oversaw the RVPs and sat in between the RVPs and Murray and Hancock, that the cofounders must have known of the improper accounting. CCAC ¶ 140. Scienter cannot be established by "bare assertions that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any

[33] Despite Defendants' protestations that this theory of scienter was not pleaded, the CCAC fairly encompasses the argument that the Restatement is sufficient evidence of "PACS Defendants' knowledge of . . . wrongdoing." CACC ¶ 533 (asserting that knowledge was "confirmed when the more-than-year-long investigation concluded that the Company would need to materially restate at least $61 million revenue due to improper recognition"). The theory is discussed first, before turning to motive and opportunity, which is claimed to "[i]ndependently establish[] a strong inference of scienter," and then circumstantial evidence. *Id.* ¶ 535.

further facts or details." *AppHarvest*, 684 F. Supp. 3d at 247 (citation modified). Plaintiffs cite the statement from FE-10 that he attended annual and monthly meetings at which financial disclosure was discussed and that PACS RVPs and "C-suite executives, including Senior Vice President of Operations for the Western States Clark Nelson," attended these meetings, and, separately, that after "PACS went public, the pressure from the C suite increased" and Apt sent emails highlighting which facilities needed to improve their revenue. CCAC ¶¶ 209–10. It may be that the CFO pushed the facilities to increase their revenue, but that is a far cry from alleging that he (or anyone else in a position to approve the financial statements) knew or were reckless in not knowing that the billings for respiratory and other ancillary services should not have been recorded. As to Defendant Sanford and any relationship he may have had with Defendants Murray and Hancock, the conclusory allegations that information traveled "through the corporate hierarchy" does not suffice. *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (summary order).

Plaintiffs further rely on a purported "company-wide policy of firing employees who objected to its improper directives." CCAC ¶¶ 224–30. Plaintiffs' factual allegations do not live up to the heading in their complaint. FE-1 told Plaintiffs' counsel simply that "'pressure' from the top made other employees scared to refuse questionable instructions," *id.* ¶ 225, without identifying what the instructions were, whether they had any relation to the alleged fraud, and even whether the instructions were improper rather than just "questionable." FE-8 stated that "PACS employees were treated as 'disposable" if they were not part of the 'clique' . . . consist[ing] of those employees who were close to the Administrator" and that "since the Administrator started in his role," "there had been 'a lot' of terminations" including terminations

of some who later filed complaints for wrongful termination. *Id.* ¶ 226. But it is not unusual and certainly not indicative of fraud that an employee whose employment was terminated might challenge that termination. Plaintiffs do not allege anything from FE-8 that would suggest that PACS gave improper directive or that those who failed to follow them were terminated. FE-6 told counsel he was fired after he told a RVP that he would provide therapy for patients who needed it but not for all patients, but Plaintiffs do not allege that the RVP asked FE-6 to provide therapy for patients who did not need it or that his firing had anything to do with his statement. Plaintiffs provide the most detailed allegations with respect to FE-7. FE-7 knew of an administrator who was fired and replaced by persons who were personal friends of the RVP and not licensed, *id.* ¶ 230, that another employee was fired after the employee complained about the length to which an administrator was going to get patients and generate revenue, *id.* ¶ 228, and that the RVP pressured an administrator to fire a respiratory director because he was not billing enough respiratory therapies, *id.* ¶ 229. FE-7 supposes that the RVP was pressuring the administrator and his respiratory director "to provide unnecessary respiratory therapies solely to generate revenue," *id.* ¶ 229, but Plaintiffs offer no facts to support such supposition. Taken together, as in *Jackson*, even if some employees knew of scattered operational "problems" at PACS, a complaint does not sufficiently raise a strong inference of scienter if there "is no connective tissue between those employees and the alleged misstatements," which Plaintiffs contend relate to financial accounting, billing reviews, and legal compliance—not personnel policies. 960 F.3d at 99.

The remaining three indicia of scienter—executive departures, delayed financial reporting, and SOX certifications—do not move the needle.

"[K]ey personnel changes—while not sufficient to establish scienter—may add to the total mix of circumstantial evidence of fraud when those changes are 'highly unusual and suspicious,' especially 'when independent facts indicate that the resignation was somehow tied to the fraud alleged.'" *Gimpel*, 156 F.4th at 149 (quoting *AppHarvest*, 684 F. Supp. 3d at 245); *accord In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–47 (S.D.N.Y. 2005) (resignations shortly before or coterminous with defendant's disclosures of improper accounting and financial restatements did not support inference of scienter where plaintiffs alleged no facts linking the resignations to the accounting improprieties). Here, Sanford was kept on as a consultant, CCAC ¶ 252, which is inconsistent with an inference of scienter. And Apt was fired not for improper accounting or for anything else related to the alleged fraud but for accepting improper gifts, *id.* ¶ 550. Plaintiffs rely on *In re Salix Pharmaceuticals, Ltd*, but that case is readily distinguishable because the court reasoned that the "resignations of the Individual Defendants were highly unusual or suspicious because the Board exercised the clawback provisions in their resignation agreements." 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016). There are no such allegations here.

Second, Plaintiffs argue that an inference of fraud should be drawn because Defendants did not immediately denounce the Hindenburg report and instead PACS announced that it was postponing the release of its third quarter financial statements and launching an audit committee investigation. Dkt. No. 63 ¶ 247. But Defendants did immediately assert that "recent third-party allegations are misleading." *Id.* Public companies faced with allegations of internal wrongdoing are advised to conduct an investigation before a regulator begins investigating rather than issue a precipitous blanket denial, lest the allegations—no matter how ill-supported at the outset —ripen into a chargeable violation. *See* Rep. of Investigation Pursuant to Section 21(a) of the Sec. Exch.

Act of 1934 & Comm'n Statement on the Relationship of Coop. to Agency Enf't Decisions ("Seaboard Report"), Exch. Act Release No. 44,969, 76 SEC Docket 220 (Oct. 23, 2001) (describing the SEC's willingness to consider a company's internal attempts to rectify misconduct as a mitigating factor); SEC, Benefits of Coop. with the Div. of Enf't (Sept, 15, 2025) (SEC takes into account "[s]elf-reporting of misconduct when it is discovered, including conducting a thorough review of the nature, extent, origins, and consequences of the misconduct"); U.S. Dep't of Just., Principles of Fed. Prosecution of Bus. Orgs., Just. Manual § 9-28.300 (listing a "cooperation's willingness to cooperate," "compliance program," and "timely and voluntary self-disclosure of wrongdoing" as factors to be considered in a charging decision); *id.* § 9-28.700 (discussing internal investigations). Plaintiffs cite no authority for the proposition that a public company that follows that advice and prudently investigates before speaking should somehow be charged with acting with scienter or deemed to have adopted the allegations made against it. A company's decision to investigate does not mean that it credits the allegations that are being investigated. Silence may safely be considered an adoptive admission "only when no other explanation is equally consistent with silence." *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976) (Friendly, J.) (quoting 4 Wigmore, *Evidence* § 1071, at 102 (Chadbourn rev. 1971)).

Third, the SOX certifications "add nothing substantial to the scienter calculus." *Puchtler*, 2025 WL 887502, at *16 (quoting *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018)). Corporate officers are required to make SOX certifications. "[P]ermitting those certifications to create an inference of scienter in every case where there was an accounting error would eviscerate the pleading requirements for scienter set forth in the PSLRA." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30,

2021) (citation modified). Because Plaintiffs "cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statement," and Plaintiffs have failed to do so, the SOX certifications are of little to no value in the Court's analysis. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015)

**3. Non-Fraudulent Inference**

Not only have Plaintiffs failed to make any positive allegations supporting scienter but the "opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324, is inconsistent with scienter. Plaintiffs would have the Court infer that Defendants who helped establish the Audit Committee to investigate the Hindenburg Report allegations and then engaged in no trades thereafter, all the while knowing that the company had engaged in wrongdoing and might be required to restate nonetheless were the masterminds of the fraud that the Hindenburg Report exposed. *See* CCAC ¶ 24 (Audit Committee announced on November 6, 2024). Such an inference is wholly implausible and undermines Plaintiffs' allegation of scienter. *See Saskatchewan Healthcare Emp.'s Pension Plan*, 718 F. Supp. at 389–90 ("the undertaking of an internal investigation shortly after the short-seller report was issued to the public undermines the . . . allegations" of scienter.); *see Slayton*, 604 F.3d at 777 (finding that scienter not sufficiently pled where the "facts [did] not support an inference that [the defendant] was trying to hide anything from its investors. Rather, they suggest[ed] that [the defendant] . . . was endeavoring in good faith to ascertain and disclose future losses."); *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (holding that "the fact that [the defendant] commenced an internal investigation tends to undermine any inference of scienter"). The more plausible inference is that, as PACS disclosed, the Hindenburg Report

precipitated a deeper review of PACS's accounting treatments and information discovered later called into question financial statements for the first two quarters of 2024, only after those statements had already been reported and repeated in the Form 10-Qs and the SPO Offering Documents. *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426–27 (S.D.N.Y. 2013) ("Ordinarily, [a company's] formation of an independent committee to investigate potential defects . . . would provide some evidence of non-fraudulent intent.").

**B. Loss Causation**

Defendants further challenge Plaintiffs' allegations of loss causation. Defendants do not contend that Plaintiffs have failed to allege any loss caused by the disclosure of previously undisclosed negative information regarding PACS. Plaintiffs allege four loss causation dates: (1) November 4, 2024, when the Hindenburg report was released; (2) November 5, 2024, the day following the report when analysts discussed the report and PACS remained silent; (3) November 6, 2024, when PACS announced that it will be postponing its Q3 2024 earnings release and launching the Audit Committee; and (4) December 17, 2024, when J.P. Morgan downgraded the Company's stock rating. CCAC ¶¶ 563–76. Defendants challenge only the November 5 and December 17 dates. They do not challenge that November 4 and November 6 corrective disclosures are pled sufficiently. The Court declines to decide in this case and at the motion to dismiss stage whether Plaintiffs' allegations regarding November 5 and December 17 alone and without any further factual development would establish loss causation.

To sufficiently plead the loss causation element of Section 10(b) claim, a plaintiff must show that a "share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson*, 965 F.3d at 179 (citation modified); *see also*

*Puchtler*, 2025 WL 887502, at *20. "[L]oss-causation pleadings are not subject to th[e] heightened pleading requirements" and "allegations [are to be viewed] under the default pleading standard of Rule 8(a)(2)." *Huey v. Anavex Life Scis. Corp.*, 180 F.4th 56, 71–72 (2d Cir. 2026); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005) ("[N]either the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."). The burden of pleading loss causation is "not a heavy one," and the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187 (quoting *Dura Pharms.*, 544 U.S. at 347). It is undisputed here that Plaintiffs have satisfied Rule 8. They have pleaded that PACS's share price fell significantly after a corrective disclosure.

The question of whether each of the alleged corrective disclosures establishes loss causation may go to the measure of damages and may be appropriately addressed either at summary judgment or in a *Daubert* motion or motion in limine. *Cf. Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512–14 (2d Cir. 2010) (affirming the district court's decision on summary judgment that "appellant failed to raise a material issue of fact that would support a finding of loss causation" after considering expert testimony); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013) (summary order) (affirming dismissal of a securities fraud action because plaintiffs had "fail[ed] to allege the existence of *any* corrective disclosures during the class period" that would satisfy their burden on loss causation (emphasis added)); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16–17 (S.D.N.Y. Mar. 30, 2012) (dismissing complaint for, *inter alia*, failure to plead any "partial disclosures" that would satisfy the element). The Court need not address it at this stage in order

to resolve the pending motions. "Given the light burden for pleading loss causation, and the potential factual disputes inherent in [the loss causation] analysis," Defendants' "arguments [would be] better suited for summary judgment or trial." *Mullen Auto., Inc. v. IMC Fin. Markets*, 2025 WL 951501, at *6 (S.D.N.Y. Mar. 28, 2025).

## IV. Plaintiffs' Securities Act Claims

Plaintiffs allege that the Offering Documents Defendants used in connection with the IPO and SPO violated the Securities Act. Plaintiffs' IPO Securities Act claims are based on PACS' financial reports, the risk factor statements, the business model statements and an alleged violation of Item 303. Plaintiffs' SPO Securities Act claims are based on Defendants' financial reports for the first and second quarters of 2024, the risk factor statements, the business model statements, and Item 303. The Court already has discussed the reports of PACS's results for the first and second quarters of 2024, the risk factor statements, and business model statements. That analysis applies here. *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017) ("The test for whether a statement is materially misleading under Section 11 [of the Securities Act] is the same as the test under Section 10(b) [of the Exchange Act]." (citing *Rombach*, 355 F.3d at 178 n.11)), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (summary order). Accordingly, the Court confines its analysis to Plaintiffs' allegations regarding the financial results reported in the IPO and their allegations regarding Item 303.

### A. Pleading Standard

As a threshold matter, the parties dispute which pleading standard applies to Plaintiffs' Securities Act claims. Defendants ask the Court to analyze the Securities Act allegations under Rule 9(b) of the Federal Rules of Civil Procedure, which requires particularity for fraud claims, rather than Rule 8. Dkt. No. 83 at 47–48. The Court declines to do so.

To determine which pleading standard to apply—Rule 8 or Rule 9(b)—the Court must undertake a "preliminary inquiry into the nature of the plaintiff's allegations." *In re Morgan Stanley*, 592 F.3d at 358.[34] Although "a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Rombach*, 355 F.3d at 171. "At the same time, however, the Rule 8 notice pleading standard applies where the 'plaintiff alleges negligent preparation of the registration statement and prospectus, rather than fraudulent preparation,' . . . or where the complaint 'explicitly does not allege fraud.'" *Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *1 (2d Cir. Oct. 28, 2024) (summary order) (first quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620–21 (2d Cir. 2009) (summary order); and then quoting *Litwin*, 634 F.3d at 715). The inquiry does not require that a plaintiff plead only Securities Act or Exchange Act claims lest a court collapse all claims because of dispersed references to fraud. Instead, "[n]othing in Rule 9 or in this Court's prior decision[s] . . . forecloses pleading Section 10(b) fraud and Section 11 negligence as alternatives with the former claim to be governed by Rule 9(b) and the latter by Rule 8." *Id.*; *see also Van v. Bright Health Grp., Inc.*, 2025 WL 3171688, at *2 (2d Cir. Nov. 13, 2025) (summary order). "A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 and Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Pappas*, 2024 WL 4588491, at *2.

---

[34] Unlike the bright-line rule adopted in the Eighth Circuit, the Second Circuit has rejected the argument that Section 11 and Section 12(a) are exempt from "the particularity requirement of Rule 9(b) . . . because proof of fraud or mistake is not a prerequisite to establishing liability." *Rombach*, 355 F.3d at 170–71 (quoting *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997)).

In *Pappas*, the Second Circuit reversed the district court for improperly applying Rule 9(b) to the plaintiff's Securities Act claims. The plaintiff framed his Securities Act claims "in the class language of negligence and strict liability" and "made more than nominal efforts to distinguish the negligence-based claims from the fraud-based claims" in the complaint. *Id.* Because the plaintiff's "allegations would be evaluated under Rule 8 if contained in a stand-alone complaint alleging violations only of the Securities Act," the court concluded that they should not "be held to a higher standard because Plaintiff also exercised his right to sue Defendants for securities fraud under the Exchange Act." *Id.* In *Van*, the Second Circuit concluded that the district court "correctly determined that the plausibility standard under Rule 8, rather than the heightened pleading standard under Rule 9(b), applie[d] to [plaintiff's]Securities Act claims," because, in advancing the Securities Act claims, the complaint explicitly disclaimed fraud and alleged negligence and described separately the Securities Act and Exchange Act claims."[35] *See Van*, 2025 WL 3171688, at *2.

Here, Plaintiffs have fastidiously distinguished their strict-liability and negligence-based Securities Act claims from their fraud-based Exchange Act allegations. CCAC ¶¶ 348, 361 (expressly disclaiming "any allegations of scienter or fraudulent intent in this non-fraud claim

[35] The court also noted that the "Exchange Act claims contain[ed] additional alleged misrepresentations." *Van*, 2025 WL 3171688, at *2. But such statement appears to be one of fact and not an independent requirement for a plaintiff to be able simultaneously to plead Securities Act and Exchange Act claims without foregoing the more relaxed pleading standard under Rule 8. The court in *Pappas* did not impose any such requirement which would be perverse in any event. If a Securities Act claim relies upon allegations of fraud, it is subject to Rule 9(b) even if it is joined by Exchange Act claims that asserted additional misrepresentations. And if the Securities Act claim does not rest upon allegations of fraud but instead on allegations of negligence and is clearly distinguished from the Exchange Act claims then it is judged under the standards of Rule 8 even if the Exchange Act claims rely on the identical misstatements. The fact that plaintiff alleges additional statements in violation of the Exchange Act is neither necessary nor sufficient for the Securities Act claim to be evaluated on its own under Rule 8.

except that any challenge statement of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinions or belief when made"); *id.* ¶ 350 ("None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for belief that the statements in the IPO Registration Statement or SPO Registration Statement were true and without omissions of material fact required to be stated therein or necessary to make the statement therein not false and misleading."); *id.* ¶ 351 ("Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement and SPO Registration Statement, respectively."). Plaintiffs have expressly pled negligence and strict liability, disclaimed fraud, eschewed language in its Section 11 and Section 12(a)(2) claims implying fraud or the elements thereof, and separated allegations supporting the fraud claims from allegations supporting the negligence claims. As in *Pappas*, "[e]ach claim is set forth under its own heading and incorporates only certain factual allegations such that, although all claims follow a general recitation of the factual background, the Securities Act claims expressly do not incorporate the allegations supposedly supporting a finding of scienter and reliance." 2024 WL 4588491, at *2 (reversing dismissal of Section 11 claims because the district court applied the heightened pleading standards of Rule 9(b) and not Rule 8).

There is admittedly some overlap between the Securities Act and Exchange Act claims. Though the averments selectively incorporate references from the general background, some substantive allegations do run across both claims. *See, e.g.*, CCAC ¶ 346 (incorporating, under Count I for a violation of Section 11, CCAC ¶¶ 5, 8–10, and 27–345 and separately cataloging allegations regarding scienter and fraud in Section X (Exchange Act Allegations) of the CCAC); *see also id.* ¶ 359 (doing similar under Count II for a violation of Section 12(a)(2)). But

"complete isolation of Securities Act claims is not necessary to allow plaintiffs to plead a theory of negligence," seeing as "plaintiffs must be allowed leeway to draft their complaint in a comprehensible narrative form." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424 n.12 (S.D.N.Y. 2011). Accordingly, Rule 8 applies to Plaintiffs' Securities Act claims. Fed. R. Civ. P. 8(a); *see also Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 338–42 (S.D.N.Y. 2025) (determining that Rule 8 applied to Securities Act claims).

Plaintiffs' claim pursuant to Item 303 "does not require a different conclusion" as to the operative pleading standard. *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *14 (S.D.N.Y. Mar. 12, 2024). To plead an Item 303 violation, as discussed below, Plaintiffs must plead facts establishing actual knowledge of an unreported trend or uncertainty with some specificity. *See Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *33 (S.D.N.Y. Sept. 29, 2023). Thus, Item 303 does require "'the registrant's actual knowledge of the relevant trend or uncertainty,' [b]ut just because 'a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud'" such that Rule 9(b) is triggered. *In re Grab Holdings Ltd.*, 2024 WL 1076277, at *14 (first quoting *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016); and then quoting *Wallace v. IntraLinks*, 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013)).

**B. Financial Statements in IPO Offering Documents**

Plaintiffs contend that the IPO Offering Documents were "false and misleading" because at the time of the IPO in April 2024, revenues were being recognized in quarterly reporting for FY 2024 that would then need to be restated, and improper Medicare Part B billing allegedly happening during the time of the IPO rendered risk disclosures false. *See* CCAC ¶¶ 309, 312. In essence, Plaintiffs reason backwards and assert that because Plaintiffs incorrectly reported

revenue for the first and second quarters of 2024 it must also have incorrectly reported the revenue for FY 2023 that was reported in the IPO Offering Documents.

Plaintiffs' argument is fallacious. Plaintiffs alleged and the Court has held that PACS incorrectly reported its revenue and earnings for the first two quarters of 2024 because the company admitted in the Restatement that it reported its revenue and earnings incorrectly for those quarters. But that PACS reported its revenue incorrectly in the first two quarters of 2024 does not mean that it reported its revenue incorrectly before those time periods. Plaintiffs' theory is that PACS began emphasizing respiratory treatment and other ancillary services only after the COVID-19 waiver and its effect had expired. Its allegations center on 2024. There is thus no reason to presume that the errors in the first two quarters of 2024 also infected the prior periods in 2023. *See Eden Alpha CI LLP*, 763 F. Supp. 3d at 301 (holding that plaintiff had not met "its burden of showing" that "financial metrics" for non-restated time periods were "false" because "[w]hile the . . . Restatement did restate [the company's] financials for fiscal year 2021 and Q1 of 2022, it did not restate the company's financials for Q2 or Q3 of 2021," and so the restatement "does not prove or indicate" falsity as to those periods).

**C. Item 303**

Plaintiffs next allege that the IPO and SPO Offering Documents violate Regulation S-K, Item 303 because Defendants failed to disclose: (1) the significant change in PACS's Medicare reimbursement conditions with the termination of the COVID-19 waiver program, CCAC ¶ 290(a); (2) the elevated risk of reversal for respiratory and sensory therapies and other ancillary services under Medicare Part B, *id.* ¶ 290(b); and (3) that PACS' internal controls and compliance processes were inadequate, which was a "known certainty," *id.* ¶ 290(c). Plaintiffs also allege that Defendants violated Item 303 in the SPO Offering Documents by failing to

disclose the "known trend in declining revenue quality and increasing exposure to refund liabilities" as reflected by the Restatement, *id.* ¶ 290(d).

"Item 303 . . . requires companies to '[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a materially favorable or unfavorable impact on net sales or revenues or incomes from continuing operations.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024) (quoting 17 C.F.R. § 229.303(b)(2)(ii)).[36] Item 303 requires that a registrant must make disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting Mgmt's Discussion & Analysis of Fin. Condition & Results of Operations, Exch. Act Release No. 6,835, 43 SEC Docket 1330 (May 18, 1989)). For a trend to be disclosable, it must be "both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Litwin*, 634 F.3d at 716 (internal quotation marks omitted) (Item 303 disclosure required when, at time of IPO, management knew of downward trend in real estate market and that the trend was reasonably likely to have a material impact on registrant's financial condition); *see Panther Partners Inc. v. Ikanos Commc'ns Inc.*, 681 F.3d

---

[36] In *Macquarie*, the Supreme Court held that a free-standing claim of failure to disclose information required by Item 303 does not give rise to a claim under Section 10(b) of the Exchange Act or Rule 10b-5(b) promulgated thereunder. But the Court specifically distinguished Section 11(a) of the Securities Act from Section 10(b) of the Exchange Act. "Congress imposed liability for pure omissions in § 11(a) of the Securities Act of 1933. . . . By its terms, in addition to proscribing lies and half-truths, this section also creates liability for failure to speak on a subject at all." *Macquarie*, 601 U.S. at 891. Thus, the failure to disclose information required by Item 303 can give rise to liability under the Securities Act. *See Orient Plus*, 799 F. Supp. 3d at 344 (denying motion to dismiss certain Securities Act claims because the complaint "plausibly alleges that disclosure was required under Item 303").

114, 121–22 (2d Cir. 2012) (Item 303 disclosure required where chip defect issue and its potential impact on registrant's business was known and registrant reasonably expected it would have a material unfavorable impact on revenues or income from continuing operations); *Stratte-McClure*, 776 F.3d at 104–05 (Item 303 disclosure required where soaring default rate on subprime mortgage lending was known and reasonably expected to have material effects on the company's financial position). Actual knowledge is required. For purposes of Item 303, "knowledge" refers to what the "registrant . . . actually knows of when it files the relevant report with the SEC," and it is "not enough that it should have known of the existing trend, event, or uncertainty." *SAIC, Inc.*, 818 F.3d at 95 (noting that "the trends or uncertainties must be presently known to management" (emphasis omitted)). "Although 'Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend.'" *In re Hut 8 Corp. Sec. Litig.*, 2025 WL 2636150, at *17 (S.D.N.Y. Sept. 12, 2025) (quoting *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010); *see Medina v. Tremor Video, Inc.,* 640 F. App'x 45, 48 (2d Cir. 2016) (summary order) ("Our precedents require allegations of specific facts from which we could draw the 'plausible inference' that defendants had actual knowledge of the trends or uncertainties at the time the registration statement was issued"); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) ("A plaintiff relying on Item 303 to establish a § 11 claim must plead, with some specificity, facts establishing that defendant had actual knowledge of the purported trend." (internal quotation marks omitted)).[37]

---

[37] Plaintiffs do not elaborate on their allegations of a violation of Rule 408 or Item 105, which are not incorporated explicitly in the causes of action. In their motion to dismiss, Defendants call

Plaintiffs' claim founders on the obligation to plead the omission of a trend of which management had knowledge.

PACS cannot be faulted for failing to disclose the expiration of the COVID waiver and that it would have an impact on PACS's business because PACS disclosed in both the IPO and the SPO Offering Documents that the COVID waiver had expired and that it would require operational changes. *See, e.g.*, Dkt. No. 88-3 at 14 ("We face numerous risks related to the expiration of the COVID-19 public health emergency (PHE) expiration and surrounding wind down and uncertainty, which could . . . have a materially adverse effect on our business, financial condition, liquidity, results of operations and prospects."); *id.* at 93 (acknowledging that "Emergency Waivers under the COVID-19 PHE" had led to skilled nursing services revenue); *id.* at 29 (noting that the "expiration of Emergency Waivers . . . have required and may continue to require, operational changes"); *see also* Dkt. No. 88-4 at 15, 93 (identical statements in the SPO prospectus). To the extent that Plaintiffs criticize Defendants for failing to disclose the magnitude of the impact from the end of the COVID-19 waiver, that claim is not cognizable both because Plaintiffs fail to make any well-pleaded allegations regarding the magnitude of that impact and fail to allege knowledge by management of the impact at the time of the IPO and SPO. Thus, to the extent that the end of the COVID-19 waiver and its impact could even be considered to be a trend at the time of the IPO and SPO (when the waiver and its impact ended long before both events),[38] Plaintiffs still have not stated a claim under Item 303.

---

these allegations "derivative" and not "elaborate[d]" on in the CCAC. Dkt. No. 83 at 54 n.10. Plaintiffs offered no response. Accordingly, the claims are deemed abandoned. *See* Dkt. No. 89 at 26–28; Dkt. No. 91 at 23; *see also Ross v. Port Chester Hous. Auth.*, 2019 WL 4738941, at *7 (S.D.N.Y. Sept. 27, 2019) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims.").

[38] Defendants assume and therefore so does the Court (without affirmatively holding) that the end of the COVID-19 program could constitute a trend when that end was in the past.

Plaintiffs also allege that PACS should have disclosed the elevated risk of reversal for respiratory and sensory therapies and other ancillary services under Medicare Part B. CCAC ¶ 290(b). That allegation is based on the Restatement. Plaintiffs assert that since the Restatement acknowledged that PACS applied ASC 606, which directs how revenue is to be recorded in instances where there is any uncertainty regarding collection, there was a known trend of a risk of reversal for ancillary services that PACS failed to disclose. In essence, Plaintiffs attempt to read into Item 303 a requirement that PACS disclose the facts it later disclosed in the Restatement. Plaintiffs, however, plead no specific facts to assert that PACS was aware at the time of the IPO and SPO that it was "probable that a significant reversal" of the billings that PACS had made for ancillary services would occur. Dkt. No. 88-8 at 30 (ASC 606-10-32-11). PACS later disclosed that it learned of the information giving rise to the Restatement only after the IPO and SPO. *See* Dkt. No. 88-7 (June 12, 2025 Form 8-K announcing that PACS had "learned" "additional facts" through "Audit Committee's internal investigation" and that the Company is "diligently working to restate" the financial statements for the first half of fiscal year 2024). PACS had no obligation to disclose something that it did not then know. Plaintiffs' argument to the contrary rests on a mistaken conflation of the "uncertainty" that gives rise to an obligation to apply ASC 606 and the uncertainty that precludes a registrant from reporting revenue where a reversal is possible. PACS disclosed the "uncertainty" from Medicare Part B in the Offering Documents and explained why PACS had chosen the revenue recognition standard it did. *See, e.g.*, Dkt. No. 88-3 at 83, 194–95; Dkt. No. 88-4 at 79–80, 196–97. PACS also disclosed that it may be subject to "an obligation to refund amounts previously paid to [the Company] pursuant to the Medicare or Medicare programs." *Id.* at 49. PACS did not disclose that there would be a $61 million adjustment in revenue for the first half of 2024 and a new line

item for refund liability during the Class Period—and, as discussed throughout, there are no well-pleaded allegations that PACS knew of its accounting issues before the moment it disclosed them.[39]

The third pleaded "known uncertainty" is regarding internal controls and the fourth "known trend" is regarding declining revenue quality. The two are interrelated and stem from the Restatement, including its acknowledgment of material weaknesses to PACS's compliance and audit regime. They fail for similar reasons and similar reasons to why Plaintiffs' other Item 303 claims fail. There are no allegations that connect management-level employees such as Individual Defendants to on-the-ground allegations of compliance infractions at select facilities referenced by the firsthand CWs.

### D. Statutory Sellers

Individual Defendants Millard, Leavitt, Dilsaver, Lewis, and Apt argue that even if there is an actionable Securities Act claim, they do not fall within Section 12(a)(2)'s definition of a liable "statutory seller" as defined in 15 U.S.C § 77*l*(a)(2) and elaborated in *Pinter v. Dahl*, 486 U.S. 622 (1988).

"An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he (1) 'passed title, or other interest in the security, to the buyer for value' or (2) 'successfully solicited the purchase [of a security], motivated at least in part by a desire to serve

[39] The November 2025 Restatement listed the refund liability as $3.9 million for Q1 2024, $30.6 million for Q2 2024, $84.0 million for Q3 2024, and $145.8 million for Q4 2024. CCAC ¶ 265. Refund liabilities were not listed prior to the Restatement. *See* Dkt. No. 88-3; Dkt. No. 88-4. Though Plaintiffs argue that, by "the month of the SPO," the refund liabilities were at $84 million, Dkt. No. 89 at 28, that was unknown at the time. There are no allegations regarding PACS's internal financial planning and analysis, let alone any that PACS had completed its internal reporting to know what its third quarter refund liability would be during the middle of the period and prior to its Restatement. *Cf. Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) ("Item 303, however, does not require such real-time disclosures.").

his own financial interests or those of the securities' owner.'" *In re Morgan Stanley*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting *Pinter*, 486 U.S. at 642, 647). "The Second Circuit has yet to define the activities that constitute successful solicitation, but it has advised that an individual must have done more than engage in activities that were preliminary to the offering." *Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020). It does not include lawyers or other professionals "who have performed their usual professional functions in preparing documents for an offering," *Wilson v. Santine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989), or someone who is a mere director, *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017 (2d Cir. 1989). "Rather, to satisfy *Pinter*'s solicitation prong, a plaintiff must show that a defendant had 'direct and active participation in the solicitation of the immediate sale.'" *Underwood v. Coinbase Glob., Inc.*, 2026 WL 2198774, at *24 (S.D.N.Y. July 30, 2026) (quoting *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 238 (S.D.N.Y. 2023), *aff'd in part*, *rev'd in part and remanded sub nom. Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773 (2d Cir. Apr. 5, 2024) (summary order)); *cf. Weight Watchers*, 504 F. Supp. 3d at 259–61 (finding that individual was not a statutory seller because the allegations only corroborated assistance with another's solicitation efforts and did not plead active participation in direct or indirect marketing or promotional activities). However, courts have held that "an allegation that an individual participated in a 'road show' to sell the securities is sufficient to plead that a defendant is a statutory seller." *Alpha Cap.*, 2020 WL 3318029, at *4 (citing *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003)); *accord Lozada*, 710 F. Supp. at 316 n.25 (S.D.N.Y. 2024) ("[A] defendant may be alleged to have engaged in sufficient active solicitation by participating in a 'road show' to market the securities to potential investors."); *Hardin v. TRON Found.*, 2024 WL

4555629, at *13 (S.D.N.Y. Oct. 23, 2024); *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 119 (E.D.N.Y. 2024).

Defendants Millard, Leavitt, and Dilsaver were members of PACS's Board of Directors and the Audit Committee. CCAC ¶ 48–50. Defendant Apt was PACS's CFO and received 1,313,830 restricted stock units ("RSUs") worth over $27.5 million at the time of the IPO, *id.* ¶ 43, and Defendant Lewis was PACS's Chief Accounting Officer and received an award of 374,380 RSUs worth over $7.8 million at the time of the IPO, *id.* ¶ 47. None of these five defendants is alleged to have sold stock in any offering or directly participated in solicitation activities. However, Plaintiffs affirmative allege that "[e]ach of the IPO Individual Defendants" and "[e]ach of the SPO Individual Defendants reviewed, edited and approved the … roadshow presentation, talking points, and script for presentation to investors: and "conducted the roadshow along with the . . . Underwriter Defendants." *Id.* ¶¶ 55, 57. Those allegations pass muster at this stage.

**E. Control Person Liability**

Plaintiffs bring claims of control person liability under Section 15 of the Securities Act, 15 U.S.C. § 77*o*, against the IPO Individual Defendants and SPO Individual Defendants. CCAC ¶¶ 371–79. Defendants argue that any control person liability claim be dismissed because there is no primary violation. *See* Dkt. No. 83 at 56; *see Wong v. Hesai Grp.*, 821 F. Supp. 3d 445, 460 (S.D.N.Y. 2026) ("Section 15 liability is derivative; absent a primary violation, there can be no control-person liability."). As Plaintiffs point out, "[t]hey do not dispute the relevant actual control." Dkt. No. 89 at 32. Because the Plaintiffs have sufficiently alleged primary liability with respect to the accounting statements in connection with the SPO, the Section 15 claims may

proceed against the SPO Individual Defendants (Murray, Hancock, Apt, Lewis, Millar, Leavitt, and Dilsaver).[40]

## V. Plaintiffs' Remaining Exchange Act Claims

Under the Exchange Act, Plaintiffs also bring a scheme liability claim under Section 10(b) against the PACS Defendants; insider selling claims against PACS, Murray, and Hancock under both Section 10(b) and Section 20A, and a claim for control person liability against Murray and Hancock under Section 20(a). In their motion to dismiss, Defendants argue that Plaintiffs have failed to state a claim for scheme liability, failed to plead that Defendants engaged in insider trading, with scienter, on material, nonpublic information, and that without a primary violation, Plaintiffs have no viable claim for control person liability.

### A. Scheme Liability

Plaintiffs allege three sets of purportedly deceptive acts by the PACS Defendants: (1) dissemination of the challenged statements, (2) Medicare overbilling, and (3) PACS's "deceitful" business model. *See* Dkt. No. 89 at 53–55. To sufficiently plead a claim for scheme liability, in addition to a deceptive or manipulative act, a plaintiff must present facts showing furtherance of the alleged scheme to defraud, scienter, and reliance. *Menaldi*, 277 F. Supp. 3d at 517. The element of scienter must be evaluated under the PSLRA. *Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 247. For the reasons that follow, Plaintiffs have failed to state a plausible claim for scheme liability under any of their three theories.

Plaintiffs' first deceptive act—that "PACS Defendants disseminated" the "thirty-one false and misleading statements," CCAC ¶¶ 588–90—cannot form the basis of a successful

[40] The Underwriter Defendants raise no independent arguments. *See* Dkt. No. 85. Because the Court rules that the Securities Act claim survives with respect to the SPO, the SPO Underwriter Defendants remain in the case with respect to Counts I and II. CCAC ¶¶ 346–70.

scheme liability claim. "Misstatements alone are insufficient for scheme liability" under a theory of dissemination. *Milne v. Project Primus, Inc.*, 2026 WL 670322, at *7 (S.D.N.Y. Mar. 10, 2026). "Plaintiffs must allege 'something extra' in order to bring a scheme liability claim" against the PACS Defendants but have failed to do so. *Turquoise Hill Res. Ltd.,* 625 F. Supp. 3d at 251. The three paragraphs devoted to this deceptive act in the pleadings are conclusory and do not provide any details on what, beyond making the statements themselves, would qualify as "dissemination." CCAC ¶¶ 588–90; *see also* Dkt. No. 89 at 53–54 (providing no examples of disseminating activity in opposition to the motion to dismiss).

Similarly, as to deceptive acts that stem from Medicare overbilling itself or PACS's business model, Plaintiffs "do not adequately allege that [the named Defendants] actively participated in" the underlying schemes. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 471 (S.D.N.Y. 2017). At most, Plaintiffs rely on conclusory allegations that are not plausibly corroborated by CWs or other well-pleaded. facts. *See, e.g.*, CCAC ¶ 112 ("PACS employees company-wide began to receive top-down directives from the PACS Defendants to perform unnecessary respiratory therapies on thousands of patients, regardless of clinical need or outcome" and that "PACS Defendants coordinated this effort all Class Period."). To the extent that Defendants encouraged SNFs to prioritize certain therapies and provide additional care to increase revenues, there are no particular allegations that specific Defendants "knew or had reason to believe (or willfully disregarded the risk) that high [targets] were causing . . . associates to engage in . . . fraudulent practices." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 534–35 (S.D.N.Y. 2020) ("Although Plaintiffs argue in their brief that Rule 10b–5(c) is expansive, they have failed to identify any case holding that setting aggressive sales targets is a deceptive act." (internal citation and quotation markets omitted)), *aff'd sub nom. Steamfitters*

*Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order).

Plaintiffs' claims also fail for the independent reason that Plaintiffs fail to adequately plead scienter. As discussed *infra*, the CCAC contains insufficient allegations, under the PSLRA and Rule 9(b), that create a strong inference of scienter under either motive and opportunity or circumstantial evidence of conscious misbehavior or recklessness. The PACS Defendants were motivated by generic corporate incentives—either cashing out stock in a public offering or ensuring the company performs better because of a standard performance-based incentive program—and such alignments of interest are not indicia of fraudulent intent.

### B. Control Person & Insider Selling Liability

Claims under Section 20A and 20(a) require a primary violation of the Exchange Act. *See Feiner Fam. Tr. v. VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009) (summary order) (holding that because "derivative control person and insider trading liability under sections 20(a) and 20A(a) of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78t–1(a) . . . require [plaintiff] to establish a primary violation of the Exchange Act, [the] conclusion that [plaintiff] has not stated a claim under section 10(b) precludes relief under these sections"). Accordingly, Plaintiffs have failed to state a claim under either Section 20(a) or Section 20A.[41]

## CONCLUSION

In sum, Plaintiffs have plausibly stated a claim for violations of the Securities Act under Sections 11 and 12 against the PACS, Individual Defendants, and SPO Underwriter Defendants

[41] Because the Court determines that there is no predicate violation of the Exchange Act—including for lack of scienter—to sustain a claim under Section 20A, it does not reach the parties' arguments concerning whether Plaintiffs sufficiently pled that the relevant Defendants had material, nonpublic information at the time of trades. *See* Dkt. No. 83 at 46–47; Dkt. No. 89 at 59–60.

and under Section 15 as to the SPO Individual Defendants based on PACS' financial reporting. Plaintiffs have failed to state a claim for relief under the Exchange Act, and such claims are dismissed without prejudice. The motions to dismiss are accordingly GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 82, 84.

SO ORDERED.

Dated: September 4, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge